# EXHIBIT M

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
IN AND FOR THE COUNTY OF COCHISE

STATE OF ARIZONA,              )
                               )      Cochise County
            Plaintiff,         )      No. CR94000471
                               )
       vs.                     )      Division 1
                               )
EARL FELTON CRAGO, JR.,        )              .
                               )
            Defendant.         )

---

COURT REPORTER'S COMPLETE TRANSCRIPT OF PROCEEDINGS

HEARING ON PETITION FOR POST-CONVICTION RELIEF

Before:  The Honorable Laura Cardinal

October 20, 2020
Bisbee, Arizona
8:57 A.M.

REVOLUTIONARYTEXT
ARIZONA FIRM NO. R1110
LEE ANN EATON
CERTIFIED COURT REPORTER
CERTIFICATE NO. 50963

```
 1                    A P P E A R A N C E S

 2

 3     Mr. Doyle Johnstun, Esq.
       Attorney for Plaintiff
 4     150 Quality Hill Road
       Bisbee, AZ 85603
 5

 6     Ms. Xochitl Orozo, Esq.
       Attorney for Defendant
 7     P.O. Box 106
       Bisbee, AZ 85603
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                        I N D E X

2    Witnesses for the Defendant:

3    BRITTANY CASSIANO

4    Direct Examination by Ms. Orozco........  16
     Cross-Examination by Mr. Johnstun.......  36
5    Redirect Examination by Ms. Orozco......  41

6

7

8    EARL FELTON CRAGO, JR.

9    Direct Examination by Ms. Orozco........  43
     Cross-Examination by Mr. Johnstun.......  51
10

11   EXHIBITS                  Offered/Received

12   Defendant's A                   23

13   Defendant's B                   28

14

15

16

17

18

19

20

21

22                           `

23

24

25
```

<pre>
 1              P R O C E E D I N G S

 2            (On the record at 8:57 A.M.)

 3            THE COURT:  This is State of Arizona versus

 4   Earl F. Crago, CR94000471.  This is the time set for a

 5   hearing on the -- on a Petition for Post-Conviction

 6   Relief.

 7            The record should reflect the defendant,

 8   Earl F. Crago, is present by video conference from the

 9   Arizona Department of Corrections.  His attorney,

10   Xochitl Orozco, is present in the courtroom.  The

11   state's attorney, Doyle Johnstun, is present as well.

12            Ms. Orozco, if you would give us an overview

13   of what we're going to do today.

14            MS. OROZCO:  Yes, Your Honor, Mr. Crago has

15   filed a Petition for Post-Conviction Relief alleging

16   that he is being held past his date of sentence.

17   There has been, admittedly, a very confusing time

18   computation history in his case, and Mr. Crago asserts

19   that he was given 25 calendar years with release,

20   which was community supervision after the 25 years.

21            That is the only way to read the sentencing

22   minute entry and give it any weight.  You have to look

23   at each element of the sentencing minute entry.  That

24   includes the 25-year without -- and then eligible for

25   any type of release, and then the next sentence is the
</pre>

1    release type, and that is community supervision for

2    three years and seven months, which is the calculation

3    of 85 percent of 25 years.

4         So the intent is clear.  The State has

5    asserted issue preclusion.  We claim that there is not

6    issue preclusion for two reasons:  First, the courts

7    noted that this wasn't ripe because he had not been

8    held past his 25-year sentence until now, and Chaparro

9    is in direct contradiction to the 2011 memorandum

10   decision regarding Mr. Crago.  The language in the

11   2011 memorandum decision states things like the

12   community supervision is an illegal portion of the

13   sentence that is not enforceable.

14        Well, that's exactly what happened in

15   Chaparro with parole.  Parole was not a legal sentence

16   for Mr. Chapparo, and they said it's an illegally

17   lenient sentence that you have to abide by because the

18   State did not appeal.  The State has not appealed.

19   The State has alleged that this is an illegal

20   sentence, and we are asking that every element of the

21   sentencing minute entry be abided by and that the

22   intent of Judge Borowiec's sentence be clear and

23   followed, which would mean that Mr. Crago has now

24   served his 25 years and that he is now serving his

25   one-and-a-half-year consecutive sentence; and that he

1  be -- he receive community supervision after both of

2  those sentences.  Thank you.

3            THE COURT:  Thank you.  And let me ask you

4  this, Ms. Orozco --

5            MR. JOHNSTUN:  Your Honor, was that an

6  overview of what we're going to be doing?

7            THE COURT:  I'm going to give you an

8  opportunity in a moment as well, but you did not

9  address the portion of the sentence that Judge

10  Borowiec imposed on Page 3 of the sentencing

11  memorandum that he's committed to a life, all caps,

12  term in the department of corrections.  How do you

13  harmonize that with the remainder of the sentence

14  imposed there?

15            MS. OROZCO:  In 1994 the statute

16  distinguished between natural life and life, and life

17  was 25 years with -- before he is eligible for any

18  type of release.  That was the definition of a life

19  sentence at that time, because it had to be

20  distinguished between a natural life sentence and a

21  life sentence.  In the sentencing transcript, I

22  believe it's Mr. Malanga, maybe the State, addresses

23  the fact that Judge Borowiec has that choice, and

24  Judge Borowiec clearly chose life as opposed to

25  natural life.

```
 1            In 1994 this statute got changed, and so

 2    judges were dealing with uncertainty as to what these

 3    sentences actually meant, which is why there is --

 4    there are so many cases coming up right now because

 5    there is all of this confusion.

 6            What we assert is that Judge Borowiec had

 7    two choices:  Natural life or life.  He chose life.

 8    Then he said 25 years of the sentence imposed before

 9    he is eligible for any type of release, and then the

10    next sentence says what type of release he believes is

11    appropriate, which is 13-603(I), which is still the

12    community supervision statute, and he calculated three

13    years and seven months.

14            This intent can also be derived from the

15    sentencing transcript, where Judge Borowiec says

16    nobody knows what Mr. Crago is going to be like after

17    25 years, so although we cannot question Judge

18    Borowiec as to his intent, we cannot ignore an entire

19    portion of his sentencing minute entry or the

20    statements he makes in court, and Mr. Crago was

21    operating on the assumption that he had a 25-year

22    sentence with the community supervision.

23            That is a life term as compared to a natural

24    life term, so the statute to look at was that.

25            THE COURT:  Okay.  Great.  Mr. Johnstun,
```

1    what do you think we're talking about here today?

2            MR. JOHNSTUN:  Your Honor, the applicable

3    law regarding illegally lenient sentences was already

4    the law in 2011 when the Court of Appeals said the

5    defendant has a life sentence, and it's always been a

6    life sentence, and it remains a life sentence; and he

7    is eligible after 25 years to have the sentence

8    commuted.

9            You can go in front of the Board of

10   Executive Clemency, and there is a procedure for that,

11   and that was already the law under Dawson.

12           THE COURT:  Isn't commutation a different

13   animal from parole or community supervision?

14           MR. JOHNSTUN:  No.  It's the same because

15   both eligibility for parole in Chaparro and

16   eligibility for community supervision in this

17   sentencing document were both illegally lenient.

18           THE COURT:  But you said, "Commutation."

19           MR. JOHNSTUN:  Okay.  But that's what the

20   Court of Appeals said in 2011, that after 25 years,

21   the defendant -- and the defense is correct, the

22   defendant did not receive a natural life sentence,

23   which means you leave prison when you're dead.  He

24   received a life sentence with eligibility for release

25   after 25 years.

1          THE COURT:  Isn't that a different sentence,

2     though, than what Judge Borowiec imposed?

3          MR. JOHNSTUN:  Well, it kind of is and it

4     kind of isn't.  And the problem with Judge Borowiec's

5     intent is on the one hand, we have the

6     three-year-and-seven-month community supervision,

7     okay, which indicates Judge Borowiec intended the

8     defendant to be released after 25 years.  But then we

9     have three different things, either from the

10     sentencing document or from Judge Borowiec's oral

11     statements during sentencing, that cut in the opposite

12     direction.

13          First of all, it's before he's eligible for

14     release, must do at least 25 years.  Not before he's

15     released, before he's eligible for release.  Okay?

16     And the other thing Judge Borowiec said, he has to

17     serve at least 25 years.  Okay?  And, finally, Judge

18     Borowiec's statement that "Nobody knows what the

19     defendant will be like in 25 years," indicates that

20     Judge Borowiec did not pretend to have a crystal ball

21     and be able to say that the defendant should be

22     released after 25 years, but that nobody knows if he's

23     going to be rehabilitated or if he's going to be some

24     terrible thing, and since nobody knows, the fairest

25     reading of that statement by Judge Borowiec goes back

1  to he's eligible for release after 25 years, not that

2  he should be released after 25 years.

3          Your Honor, since there are three -- three

4  instances between the sentencing document and Judge

5  Borowiec's oral pronouncement that indicate the

6  defendant doesn't automatically get released versus

7  one -- the community supervision that indicates that

8  he does, you can't say that it was clearly his intent

9  that he does get released.  It's three to one against

10  the defendant.  And so, if anything, Judge Borowiec's

11  intention was that he not be released after 25 years,

12  and, Your Honor, and, again, all of this was already

13  the law in 2011 under Dawson, when the Court of

14  Appeals said the defendant -- the community

15  supervision portion of the defendant's sentence has no

16  effect.

17          The same law in Chaparro was already the

18  law, and the Court of Appeals said this has no effect.

19  The defendant's claim regarding community supervision

20  is precluded, Your Honor, under Rule 32 petitions.

21  The more that get filed on the same issue, they get

22  more precluded after you have raised those issues.

23  They don't get less precluded.  And so I -- if the

24  Court of Appeals was ignorant of Dawson and

25  erroneously ruled against the defendant in 2011, I

1    think the Court of Appeals or the Supreme Court in

2    Phoenix has to say so.  I'm not sure that this Court

3    can say that the Court of Appeals didn't know the law.

4            THE COURT:  And so I'm not sure what

5    argument you're making here exactly.  Are you saying

6    that the Court of Appeals in 2011 abrogated that part

7    of the sentencing from Judge Borowiec that ordered

8    community supervision?

9            MR. JOHNSTUN:  Yes.  That's exactly what

10   they did.  That's in the opinion.

11           THE COURT:  Do you think that the language

12   of the sentence, "Life without possibility of release

13   until 25 years has been" -- at least has been served

14   before there's any eligibility for any type of release

15   is a similar sentence to what might have been imposed

16   prior to January of 1994?

17           MR. JOHNSTUN:  No.

18           THE COURT:  Which was life without

19   possibility of parole, possibility of parole until you

20   have served 25 years?

21           MR. JOHNSTUN:  No.  Prior to January 1994, I

22   believe the law was parole, which is why the judge in

23   Chaparro made Mr. Chaparro erroneously eligible for

24   parole, and as to -- community supervision got

25   substituted for parole in 1994, and that was part of

1    the Truth in Sentencing amendments that required

2    85 percent, and that's where the 1/7th comes from,

3    because that's what's left over after 85 percent.

4              THE COURT:  Uh-huh.  And so what is this

5    community supervision order then?

6              MR. JOHNSTUN:  What is it?

7              THE COURT:  Judge Borowiec's order, what is

8    it?  Is it consistent with the post-January 1, 1994,

9    law?

10             MR. JOHNSTUN:  No.  We know that it's not.

11             THE COURT:  Why would he do that?

12             MR. JOHNSTUN:  He made a mistake because it

13   was a new law, and everybody was trying to figure it

14   out.  Just like counsel has pointed out, a lot of

15   these cases are coming up now on erroneous or illegal

16   sentences because under the new law and no --

17             THE COURT:  Under the Truth in Sentencing

18   Law?

19             MR. JOHNSTUN:  Yes.

20             THE COURT:  How ironic is this?  All right.

21   Let's hear from -- what kind of evidence have we got?

22             MS. OROZCO:  We have Brittany Cassiano

23   calling from DOC.  May I respond just briefly before I

24   forget my --

25             THE COURT:  Sure.

1          MS. OROZCO:   The Court of Appeals affirmed

2     Judge Hoggatt's order, and Judge Hoggatt did not

3     remove the community supervision.  He said the State

4     didn't appeal, and the State just said it was a

5     mistake.  Well, it was a mistake in favor of

6     Mr. Crago, and it was not timely appealed.  That is on

7     all fours with Chaparro.  There is a portion of the

8     sentence that was not being abided by, and if you look

9     at the 2011 decision, the State's argument was,

10    Paragraph 4, the community supervision clause in

11    Mr. Crago's sentence be stricken as contrary to law.

12    That's exactly what Chaparro says you cannot do, and

13    so it's -- that's where we are.

14          There is a portion of the sentence that

15    Judge Borowiec took the time to insert, and if you

16    refer to Page 28 of the sentencing transcript -- I'm

17    pulling it up right now.  It says, "And I am going to

18    impose the sentence of life, with the condition that

19    he serve at least 25 years, every day of 25 years."

20    Then he imposes community supervision thereafter on --

21    after providing the presentence incarceration credit

22    on Page 29, it is further ordered that you will serve

23    three years and seven months community supervision

24    once you are released from prison.  He uses the word

25    "Release."  He says, "Serve 25 years," and then he

1    puts in community supervision as release.

2            Even if that was a mistake, it was an

3    intentional act to put in an entirely separate

4    paragraph in the sentencing minute entry that cannot

5    just be ignored.  So I wanted to make sure that I

6    addressed that argument before we moved on.

7            I can e-mail Ms. Cassiano and ask her to

8    call in now.  I didn't tell her to call in until 9:30.

9    I thought the openings were going to take a little

10   longer.

11           MR. JOHNSTUN:  Your Honor.

12           THE COURT:  Yes.

13           MR. JOHNSTUN:  A final point.  Pages 7 and 8

14   of the Court of Appeals opinion, it says that the

15   community service requirement has no bearing on

16   defendant's life sentence or his eligibility to have

17   his sentence commuted, so the Court of Appeals said

18   that the community supervision portion of the sentence

19   was meaningless.  I mean, that's what the Court of

20   Appeals said at Pages 7 and 8.

21           MS. OROZCO:  Which makes the argument that

22   Chaparro says, you cannot ignore parts of the sentence

23   just because they don't fit with the issues.  Which I

24   think that that makes our argument stronger.

25           THE COURT:  And the witness that you have

1   got coming in is who?

2          MS. OROZCO:  Brittany Cassiano from DOC.

3          THE COURT:  And she is with time

4   computation?

5          MS. OROZCO:  Correct.

6          THE COURT:  She is going to call in on the

7   Meet Me line?

8          MS. OROZCO:  At 8549?  Is that the Meet Me

9   line?

10          THE COURT:  8549.  It is open, and has that

11   been set up up here?  We're connected.  If she is

12   available, see if she can call in.

13          MS. OROZCO:  I also plan on questioning

14   Mr. Crago, but it makes more sense to do that after

15   speaking with time comp.

16          THE COURT:  Is the State going to call any

17   witnesses at all?

18          MR. JOHNSTUN:  No, Your Honor.

19          THE COURT:  Are you emailing her?

20          MS. OROZCO:  I just did.  Thank you. I have

21   marked an exhibit for this witness, Defense A.

22          THE COURT:  So legible.

23          MR. JOHNSTUN:  The next page.

24          THE COURT:  The next page is better?

25          MS. OROZCO:  Mr. Crago, have you been able

1   to hear us thus far?

2            THE DEFENDANT:  Yes, ma'am.  Thank you.

3            THE COURT:  We'll take a brief recess.

4            (Brief recess.)

5            THE COURT:  Good morning, Ms. Cassiano.

6   This is Judge Cardinal in the Superior Court.  You're

7   here to testify in the Crago matter?

8            THE WITNESS:  Yes.

9            THE COURT:  Would you please raise your

10  right hand and be sworn by the clerk of court.

11           (Witness sworn.)

12           THE COURT:  Very good.  We have Ms. Orozco

13  here on behalf of Mr. Crago.  I believe that you are

14  her witness, so I'm going to ask her to proceed.

15                   BRITTANY CASSIANO,

16  having been duly sworn, testified as follows:

17                   DIRECT EXAMINATION

18  BY MS. OROZCO:

19       Q.   Good morning, Ms. Cassiano.

20       A.   Good morning.

21       Q.   Could you please state and spell your name

22  for the record.

23       A.   My name is Brittany Cassiano,

24  B-R-I-T-T-A-N-Y, Cassiano, C-A-S-S-I-A-N-O.

25       Q.   And where are you employed?

1       A.   With the Arizona Department of Corrections

2  Time Computation Unit.

3       Q.   And how long have you been there?

4       A.   For 11 and a half years.

5       Q.   And what do you do at time comp?

6       A.   I calculate release dates.  I interpret

7  statutes and how they relate to the inmate's sentence

8  at the time of their offense, and I correlate with

9  courts and the institutions on getting the inmates

10  released.

11       Q.   Do you have any educational background

12  associated with this profession?

13       A.   I do not.

14       Q.   But you have been there for 11 and a half

15  years?

16       A.   Yes.

17       Q.   Have you come across issues with sentences

18  for first-degree murder imposed on or around 1994?

19       A.   Yes.  There have been a few.  We just came

20  out of a -- oh, my gosh, a Supreme Court hearing

21  because of it.

22       Q.   In another case?

23       A.   Yes.

24       Q.   And that was recently, as in how long ago?

25       A.   Oh, gosh.  It was Chaparro versus Shinn, and

1    it was earlier this year; and the issue was how to

2    release an inmate at 25 -- when they have a 25- or

3    35-year-to-life sentence, so the issue is -- go ahead.

4         Q.   In Chaparro the issue was parole being part

5    of the sentence, correct?

6         A.   Correct.

7         Q.   And what was the outcome in that case?

8         A.   The outcome was that if the sentencing order

9    states specifically that the inmate is sentenced to 25

10   or 35 years until parole, then they can have a parole

11   hearing; however, if it says, "25 or 35 years until

12   release," then they are not eligible for parole and

13   would have to apply for commutation.

14        Q.   And has the -- I'm sorry.

15             THE COURT:  Ms. Cassiano, could you repeat

16   what you just said?

17             THE WITNESS:  Sure.

18             THE COURT:  Skip the 35 years.  Just tell me

19   about the 25 -- tell me about 25-year sentences.

20             THE WITNESS:  Okay.  So the outcome of

21   Chaparro versus Shinn was the sentencing order

22   documents must state "Parole" somewhere in the

23   document in order for the inmate to be eligible for a

24   parole hearing after 25 years.  If the sentencing

25   order documents do not state "Parole," then they would

1    have to apply for commutation at the 25-year mark.

2           THE COURT:  What if it says, "Community

3    Supervision"?

4           THE WITNESS:  Community supervision, I don't

5    believe that was covered, so -- let's see here.

6           THE COURT:  Actually, I believe Chaparro

7    does talk about community supervision.

8           THE WITNESS:  Let me pull up the order.

9    Sorry about that.

10           THE COURT:  Are you looking at Chaparro v.

11    Shinn?

12           THE WITNESS:  Yes.

13           THE COURT:  Are you an attorney?

14           THE WITNESS:  No, I am not.

15           THE COURT:  Who advises you legally with

16    respect to interpreting a Supreme Court decision such

17    as this, or are you kind of left to read it and make

18    your own determinations?

19           THE WITNESS:  No.  We get help from Jon

20    Schwartz, Jonathan Schwartz.

21           THE COURT:  Who is Mr. Schwartz?

22           THE WITNESS:  Jonathan Schwartz is a -- hold

23    on one second.  Let me see his exact title.

24           THE COURT:  Okay.

25           THE WITNESS:  It is -- I'm sorry.  I just

```
 1   had it.  He's the Assistant Attorney General.
 2          THE COURT:  For the department of
 3   corrections or for time computation?
 4          THE WITNESS:  For Maricopa County, and yes,
 5   he helps the department of corrections time
 6   computation.
 7          THE COURT:  He works for the Attorney
 8   General?
 9          THE WITNESS:  Yes.
10          THE COURT:  You said he's in Maricopa
11   County?  Is that what you're --
12          THE WITNESS:  Yeah, he works for the
13   Attorney General.  He works in Maricopa County, mostly
14   deals with Maricopa court cases.
15          THE COURT:  Oh, I see, but if the department
16   of corrections time computation has issues, he's the
17   guy you call?
18          THE WITNESS:  Yes.  Him and then also
19   sometimes -- what's his name?  I'm having a blank.
20   Paul Carter.
21          THE COURT:  Paul Carter?
22          THE WITNESS:  Yes, and he's the Assistant
23   Attorney General for Pima County.
24          THE COURT:  I see.  Okay.  And did you
25   consult with either of those two gentlemen prior to
```

1    your testimony here today?

2            THE WITNESS:  No.  Actually I have not

3    spoken to them.

4            THE COURT:  Are they present with you during

5    your testimony here today?

6            THE WITNESS:  They are not.

7            THE COURT:  Okay.  All right.  Ms. Orozco,

8    you can continue.

9    BY MS. OROZCO:

10       Q.   In 1994 how were life sentences, not natural

11   life, but life sentences being treated by time

12   computation?

13       A.   Right when we switched over to Truth in

14   Sentencing in 1994, we calculated them as life, and

15   then we gave them what we call a mandatory minimum

16   date because there were no statutes outlining how to

17   calculate the 25-to-life Truth in Sentencing.

18       Q.   And so with the mandatory minimum, did that

19   include a community supervision term?

20       A.   Yes.  Yeah, the 25 years would -- I mean,

21   upon release the inmate would have to go to some sort

22   of supervision; however, we were not 100 percent

23   positive, because, like I said, there were no statutes

24   or clarification on how to calculate the parole

25   25-to-life sentences at that time.

1      Q.   And these calculations were -- the

2  calculations provided to these inmates has changed

3  over the years, correct?

4      A.   Yes.

5      Q.   Why?

6      A.   Because of different legal opinions from the

7  Attorney General's Office and our own legal

8  department, so when we first went into Truth in

9  Sentencing, we would calculate 25 years to life, but

10  we would still reflect life in our system, in our

11  Arizona Inmate Management System, and then sometime in

12  the late '90s we got a different AG opinion to

13  calculate an actual release date for 25 to life; and

14  then sometime after that, I'm not sure exactly when,

15  it went back to it needs to be 25 years to life, still

16  unknown exactly what that 25-year release date would

17  be.

18      Q.   So at the second time, time computation sent

19  out a release date calculation that included a

20  community supervision date, correct?

21      A.   We did, yes.

22      Q.   And when we first started talking, I sent

23  you an appendix that included a calculation for

24  Mr. Crago.  Do you recall seeing that?

25      A.   I do, yes.

1        Q.    Okay.  And that included a release to

2   community service date of September 17th, 2019; is

3   that correct?

4        A.    Yes.

5        Q.    Okay.  And you also sent me some annotations

6   of ADOCRR audits; is that correct?

7        A.    Yes, I did.

8        Q.    Do you have that in front of you?

9        A.    I'm pulling it up right now.  Yes, I have

10  it.

11       Q.    Is it a three-page document?

12       A.    One, two, three.  Yes, it is.

13             MS. OROZCO:  Your Honor, I move for

14  admission of this document.

15             THE COURT:  Any objection, Mr. Johnstun?

16             MR. JOHNSTUN:  No objection.

17             THE COURT:  Defendant's Exhibit A will be

18  admitted into evidence.

19  BY MS. OROZCO:

20       Q.    If you can turn to Page 3 and tell us what

21  ADOCRR is to start.

22       A.    Is Arizona Department of Corrections

23  Rehabilitation and -- oh, what is it?  I'm sorry.  We

24  just changed the names on --

25       Q.    Some other "R" word, right?

1          A.    Yeah, Reentry and Rehabilitation.

2          Q.    And how do you read this document?

3          A.    So the O-5 time computate means that those

4    are annotations from time computation employees

5    through the years.  So it started in 1995.  That was

6    when our first audit was complete, and so back then,

7    though, we didn't put the actual release date in our

8    annotation, which is why I included the screenshot

9    above.

10         Q.    So for this document, Mr. Crago's sentence

11   has been evaluated by time computation 29 times; is

12   that correct?

13         A.    No.  You have to look at each date.  So

14   9-9-1995 was the first comment, and then you go to

15   3-7-1996 and then that comment lasts until Line 5, and

16   then the next comment was started at Line 6, on

17   June 9th, 1999; and that comment ended on Line 14.

18   You can tell because we end our annotations with what

19   we call our SID, which was basically like our names,

20   so if you see BMS1, that is an employee -- on Line 14,

21   that is one of our supervisors at the time; and

22   then -- let's see here.  How many comments in total?

23              So he was audited one, two, three.  The one

24   on Line 13 is not an audit.  That's just us saying

25   that we received the minute entry.  And then Line 15,

1    we audited again.  So one, two, three -- that's four

2    audits.  And then Line 19 is a fifth audit, and then

3    Line 23 is a sixth audit.

4              Then Line 26 is not an audit; however, he

5    received discipline, so that's just us saying that we

6    approved the discipline ticket.

7              And then Line 28 is also not an audit.  It's

8    just simply stating that we manually logged the dates

9    in the system to reflect the above audit.  So in all,

10   he has had six audits over the years.

11        Q.   And in those six audits, are they all

12   consistent?

13        A.   No, because he has -- let's see here.  He

14   has received additional sentences, so that was an

15   audit.  So the first audit was the initial one where

16   we gave him a life, a release date of 25 years to

17   life.  The second audit --

18        Q.   Let me stop you there, and we'll go through

19   each one.

20        A.   Okay.

21        Q.   So the first one it says sentence is a

22   25-year life sentence?

23              THE COURT:  Community audit beginning at

24   Line 3?

25              MS. OROZCO:  Yes.

```
 1              THE COURT:  Okay.  Go ahead.
 2       Q.   "Community supervision time reflected
 3  subject to GHNG based on AG opinion."  Can you tell me
 4  what that means?
 5       A.   That's a typo.  Excuse me.  That's a typo.
 6  That's actually a CHNG, so that says sentence is a
 7  25-year life sentence, community supervision time
 8  reflected.  Subject due to change based on AG opinion.
 9       Q.   So he did -- Mr. Crago did have a community
10  supervision time calculation in that initial audit,
11  correct?
12       A.   Yeah.  That would be the second audit, and
13  that was because AG opinion changed, yes.
14       Q.   Okay.  I'm sorry.  Maybe I missed -- so the
15  first -- the first audit, what was that one?
16       A.   It was the first line, 9-5-1995, it says
17  audit CR9400471; however, back then in 1995, we did
18  not annotate the exact release dates.  That's why I
19  copied -- and I'm sorry.  They are very poor pictures
20  because it was done on carbon paper in 1995, so it has
21  faded through the years, but above is actually a
22  picture of what his sentence looked like in 1995 when
23  we did that first audit, and it shows "Life"; and then
24  it shows a mandatory minimum date of August 27th --
25  what is that?  I can't read that.
```

```
 1              THE COURT:  It says August 27th, 7-3-7-8?
 2         A.    Yeah, so it was miscalculating back then.
 3    But like I said, we didn't know what that minimum date
 4    was going to be, like what kind of a release type that
 5    was going to be, so the only thing we worried about in
 6    1995 was that it was a life sentence; and then we were
 7    waiting for some kind of opinion on how to calculate
 8    the 25 years.
 9         Q.    And so the audit, the second audit that we
10    just discussed, had an AG opinion saying, "Put in
11    community supervision"; is that correct?
12         A.    Yes.
13         Q.    And you did that for Mr. Crago, correct?
14         A.    Yes.
15         Q.    And that was a community supervision release
16    date of September 17th, 2019, correct?
17         A.    Yes.
18         Q.    And a community supervision end date of
19    April 13th, 2023; is that correct?
20         A.    Yes.
21              THE COURT:  Is that reflected in one of
22    these documents, Ms. Orozco?
23              MS. OROZCO:  Your Honor, that is Appendix 3
24    to memorandum in support.
25              THE COURT:  I'm sorry, the memorandum --
```

1          MS. OROZCO:  That I filed, the original PCR.

2          THE COURT:  And Appendix 3?

3          MS. OROZCO:  Yes.  It is another one that's

4  not great at legibility.

5          THE COURT:  Are you going to have this

6  marked as an exhibit to this hearing?

7          MS. OROZCO:  Your Honor, I had not thought

8  of that because the appendix was submitted as part of

9  the PCR.  I can.  It's up to the Court.

10          THE COURT:  Do you have any objection to us

11  marking the Appendix 3 to the filed memorandum in

12  support of the Petition for Post-Conviction Relief to

13  consider it as evidence?

14          MR. JOHNSTUN:  No, Your Honor.

15          THE COURT:  All right.  Exhibit 3 -- Exhibit

16  3 to the defense Memorandum in Support of Petition for

17  Post-Conviction Relief and Request for Informal

18  Conference filed August 13, 2020, will be admitted.

19  I'm going to disassemble my copy and admit the

20  Department of Corrections Release Date Calculation

21  dated, I believe, March 7th of 1996, as Defense

22  Exhibit B.  It's got two pages.

23          MS. OROZCO:  Yes, because one is cut off,

24  and one is illegible, so I thought two together was

25  better than one.

1          THE COURT:  Both pages of Appendix 3 will be

2    marked as Defense Exhibit B for this hearing.  Go

3    ahead.

4    BY MS. OROZCO:

5          Q.   Now, Ms. Cassiano, the third audit says

6    offense and conviction are affirmed.  So did that keep

7    the second audit's determination?

8          A.   No.  All that is saying is that the -- his

9    sentence by the Court is confirmed, so it was

10   confirming that he was sentenced to 25 years to life.

11         Q.   And what was the calculation on that third

12   audit?

13         A.   Let me see here.  Sorry.  Yeah, it stayed

14   consistent, and that didn't change anything.

15         Q.   So there was still a community supervision

16   release date for the third audit?

17         A.   At that time, yes.

18         Q.   Now, we go down to Line 15 for the next

19   audit; is that correct?

20         THE COURT:  If I can interrupt you,

21   Ms. Orozco, Ms. Cassiano, the time computation listed

22   now in what's been marked as Defendant's Exhibit B,

23   which has been moved into evidence, this is a time

24   comp calculation from 1996 indicating a release date

25   to community supervision in 2019, end date of

1    community supervision in 2023.   The calculation that

2    was performed then in 1996 was based on the Attorney

3    General opinion issued in -- sometime in 19- -- well,

4    I guess, 1996.

5              THE WITNESS:  Yes.

6              THE COURT:  Okay.  But that continued to be

7    in effect through 1998?

8              THE WITNESS:  Yeah.  You know, actually I'm

9    not sure when it stopped going into effect, but it was

10   definitely before we caught it, so we just -- we just

11   didn't change it until it was brought to our

12   attention.

13             THE COURT:  By whom?

14             THE WITNESS:  It doesn't say exactly who

15   brought it to our attention.

16             THE COURT:  All right.  It looks like,

17   though, in the '90s the Attorney General's opinion

18   then was that a court's imposition of a community

19   supervision term on a 25-to-life sentence was not

20   inappropriate?

21             THE WITNESS:  Correct.

22             THE COURT:  Okay.  Go ahead.  Ms. Orozco.

23   BY MS. OROZCO:

24       Q.   Do you know what year the community

25   supervision was taken off of Mr. Crago's sentence in

```
1    time computation?
2         A.   So it was in 2005; however, he received an
3    additional sentence in 2005, so you're still going to
4    see that we calculated his release dates off of the
5    25-year and gave him the community -- oh, no, wait.
6    Let me see here.
7              No, it was 2006.  I read that wrong.  2005
8    he got that additional sentence, and we still
9    calculated it with an actual release date to
10   consecutive sentence; and on July 26, 2006, on
11   Line 19, it says, "Disregard lines 15 through 18."
12   Inmate dates are S-E-D life to start a
13   one-and-a-half-year sentence consecutive to that life
14   sentence.
15        Q.   So from 1994, when Mr. Crago was sentenced,
16   to 2006, from time computation Mr. Crago had a
17   community supervision release date; is that correct?
18        A.   Yes.
19        Q.   And then he received an additional sentence.
20   Let's switch to that just so that we have got that on
21   the record.  If he were to receive a 25-year calendar
22   sentence on this case and then serve his 1.5 year
23   consecutive sentence in the other county's case, when
24   would he be released to community supervision from
25   DOC?
```

 1          A.    That would be on December 21st, 2020, if he

 2     were eligible for his 90-day early release.  Let me

 3     see here.  Sorry, I want to bring him up in the system

 4     to make sure he meets all that criteria really quick.

 5     I don't remember off the top of my head.  Sorry about

 6     that.

 7          Q.    Let's just go with both and put them both on

 8     the record.  So if he got the TR, it would be

 9     12-21-20?

10              THE COURT:  Abbreviations -- If he got TR,

11     if he got what?

12              THE WITNESS:  That would be a temporary

13     release.

14              THE COURT:  Thank you.

15          Q.    And that's 90 days; is that correct?

16          A.    90 days early, yes.

17              THE COURT:  What does temporary release

18     mean?

19              THE WITNESS:  That means that they get

20     released 90 days earlier than their mandated

21     85 percent date, and they have to serve that under

22     community supervision, so -- go ahead.

23              THE COURT:  And that would be as to the year

24     and a half, correct?

25              THE WITNESS:  Yes.

1       A.   So, yeah, it looks like right now he would

2   be eligible for the early temporary release, but if

3   for any reason he were to go into a higher custody

4   class or have a detainer somewhere, that pops up on

5   a -- if we run an ACJIS, then he wouldn't be released

6   until -- let me get back to that.  Sorry -- until

7   January 10th, 2021.  That's because it's a violent

8   offense, so he would have to do 85 percent, and then

9   the mandated date is actually 85.7 percent, so that's

10  the difference between those two.  As long as he stays

11  eligible for the early temporary release, it will be

12  December 21st.  If he becomes ineligible to that per

13  our department order 1002, it would be January 10th,

14  2021.

15      Q.   What would the community supervision end

16  date be?

17      A.   So if he were to be released at the early

18  temporary release, it would be November 27th, 2024.

19      Q.   And if it was the non-early?

20      A.   It would be November 4th, 2024.  Keep in

21  mind that these are projected.  It can change at any

22  time if he were to receive any discipline tickets,

23  like that.

24      Q.   Okay.  Now, when the Attorney General issues

25  an opinion regarding these time computations, does

1    somebody go back and look at the original sentencing

2    minute entry in a case to see what the intent of the

3    judge was?

4        A.    Yes.   So when we get an AG opinion changing

5    something like that -- so like earlier this year when

6    Chaparro happened, we had to pull a report of all the

7    inmates we could find that were serving 25 to life and

8    check those court documents and make sure that those

9    inmates are eligible for parole or if they are going

10   to have to apply for commutation.

11           The only reason he was probably missed back

12   then is because we were using a different system.   We

13   changed to a different system which is more accurate.

14   Back then, The Arizona Management System, the ADOA

15   mainframe system was not exactly perfect all the time,

16   so it didn't always bring up all of the inmates on the

17   list.

18       Q.    We may just be pronouncing it differently,

19   but I want to make sure, are you talking about Shapiro

20   like the OJ Simpson former lawyer, or Chaparro, like

21   chaps, with an R-O at the end?

22       A.    I think it's Chaparro.   It's spelled

23   C-H-A-P-A-R-R-O.

24       Q.    Okay.   I just wanted to make sure we were

25   talking about the same case.   So in Chaparro, time

 1    computation was not providing parole eligibility to

 2    Mr. Chaparro; is that correct?

 3        A.    I believe so.

 4              MR. JOHNSTUN:  Your Honor, I'm going to

 5    object to that question.  That calls for a legal

 6    conclusion, and I think the Chaparro decision speaks

 7    for itself probably better than this witness.

 8              THE COURT:  I'm going to overrule it because

 9    I don't know exactly what -- repeat the question

10    again.

11              MS. OROZCO:  And I can move on.

12        Q.    All I'm saying is that the DOC time

13    computation calculations vary depending on the AG

14    decisions, correct?

15        A.    Yeah, until the legislature approves the

16    statute or we get like a court case like Chaparro.

17        Q.    So the AG opinion was overruled by the

18    Arizona Supreme Court in Chaparro for Mr. Chaparro; is

19    that correct?

20        A.    Yes, and also Arizona Revised Statute

21    13-718, that also outlines how to release 25-to-life

22    inmates, and that wasn't passed until, I believe,

23    2019.

24        Q.    And Arizona Revised Statute 13-718 has to do

25    with parole eligibility; is that correct?

1    A.   Yes, and what that does is say that the

2  inmate had to have pled guilty to a 25-to-life

3  sentence, and the plea must state that the inmate

4  would be eligible for parole at 25; and then Chaparro

5  came about because he said it's not fair because he

6  was a trial, but his court document actually said that

7  he would be eligible for parole, specifically at 25

8  years.  So 718 catches if they pled guilty to 25 to

9  life, and then if it's not specific to parole, that's

10  where Chaparro clears it up completely.

11    Q.   And I just want to make sure, since 1994,

12  there have been varying Attorney General opinions

13  about how to treat sentences to life imposed after

14  1994; is that correct?

15    A.   Yes.

16    Q.   That includes treating the sentence as

17  though it were a 25-year sentence with community

18  supervision thereafter, correct?

19    A.   Yes.

20         MS. OROZCO:   I have no further questions.

21  Thank you.

22         THE COURT:  Mr. Johnstun.

23         MR. JOHNSTUN:   Thank you, Your Honor.

24                  CROSS-EXAMINATION

25

1  BY MR. JOHNSTUN:

2      Q.   Mr. Chaparro, he wasn't granted parole.   He

3  was granted eligibility for parole consideration; is

4  that correct?

5      A.   Correct.

6      Q.   Okay.  Let me ask you this:  Did I

7  understand you to say that this defendant's

8  25-to-year -- 25-to-life sentence should have been

9  reevaluated following Chaparro, but for some reason it

10 fell through the cracks?

11     A.   No.  Chaparro, we did catch it.  I said it

12 fell through the cracks in the early 2000s when the

13 AG opinion changed from giving the inmate a release

14 date with community supervision time to showing it

15 back to 25 years to life.

16     Q.   Well, let me ask you, in light of Chaparro,

17 would there be a mechanism in place to have the

18 Attorney General, who advises time computation, to

19 take another look at the defendant's sentence?

20     A.   I'm sorry.  Can you repeat the first part of

21 that question?

22     Q.   Yeah.  You testified that after Chaparro,

23 you pulled up all of the 25-to-life sentences, and

24 they were -- they were looked at again?

25     A.   Yes.

1    Q.   And, now, this defendant's sentence says --

2    instead of parole, it says community supervision.  Is

3    there an administrative procedure for the Attorney

4    General to -- or an audit coming up to get an opinion

5    from the Attorney General regarding this defendant's

6    sentence in light of Chaparro?

7    A.   No.  Actually, we -- since it says it is

8    ordered that the defendant must serve every day of 25

9    years of the sentence imposed before he is eligible

10   for any type of release, it doesn't specify parole,

11   so --

12   Q.   Okay.

13   A.   Yeah, right now, as of right now he would

14   have to apply for commutation, but I do see right

15   there in a court document that it's he should have

16   three years seven months of community supervision, so

17   I believe that is probably something that we should

18   get with the AG's office on.

19   Q.   And but for this morning's hearing, are you

20   saying that probably would not have happened?

21   A.   That has not happened, and it's currently

22   not planned to happen, no.

23   Q.   But you're saying that maybe that should

24   happen now that that's brought to your attention?

25            THE COURT:  What should happen?

1          MR. JOHNSTUN:  That the defendant's sentence

2     should be submitted to the Attorney General's Office

3     for an opinion regarding how time computation should

4     treat the community supervision language in the

5     defendant's --

6          THE COURT:  I think that's why we're here in

7     a court of law.  The Attorney General is not a court

8     of law.

9          MR. JOHNSTUN:  I agree, and I did not -- I

10     was not trying to be offensive.

11          THE COURT:  Are you saying, Ms. Cassiano,

12     that you have never encountered a 25-to-life

13     sentencing document in which there was an order for

14     mandatory community supervision?

15          THE WITNESS:  Well, we haven't encountered

16     one that specifically says what the community

17     supervision time should be.  Most of the time the

18     courts just use a template and leave that 13-603

19     statute in there, so we usually just don't pay

20     attention to it; but since it's so specific to three

21     years seven months, that is strange.

22          THE COURT:  Okay.  So even though Chaparro

23     absolutely recites that the defendant Chaparro would

24     be in prison for the rest of his natural life without

25     possibility of parole for 25 years followed by a

1    consecutive term of community supervision, Chaparro

2    does not guide you on this case?

3              THE WITNESS:  Correct.  Yeah, he does not

4    fall under the Chaparro ruling.

5              THE COURT:  And how is that?

6              THE WITNESS:  Because his court document

7    does not say, "Parole," anywhere, it only says,

8    "Release."

9              THE COURT:  Okay.  So the word "Release" is

10   to be distinguished from -- so any type of release

11   would not include parole?

12             THE WITNESS:  No.

13             THE COURT:  What does "any type of release"

14   suggest?

15             THE WITNESS:  That just suggests that he

16   needs to apply for commutation or pardon at 25 years.

17             THE COURT:  The phrase "any type of release"

18   is limited in the department of corrections's parlance

19   to commutation or what?

20             THE WITNESS:  Or pardon.

21             THE COURT:  Or pardon.  Any type of release

22   does not include parole?

23             THE WITNESS:  According to Chaparro, no.

24             THE COURT:  So that's a very close reading

25   of Chaparro that you have received from the department

 1   of -- the Attorney General's Office; is that correct?

 2              THE WITNESS:  Yes.

 3              THE COURT:  Okay.  Go ahead.

 4              MR. JOHNSTUN:  Thank you, Your Honor.

 5   BY MR. JOHNSTUN:

 6       Q.   Ms. Cassiano, let me ask you this:  Are you

 7   familiar with a case before Chaparro called Dawson

 8   that -- applicable to inmates getting released earlier

 9   than they should if their sentence provided for that?

10       A.   No, I am not familiar with that.

11              MR. JOHNSTUN:  No further questions.

12              THE COURT:  Ms. Orozco, anything further?

13              MS. OROZCO:  Yes, Your Honor.

14                   REDIRECT EXAMINATION

15   BY MS. OROZCO:

16       Q.   Community supervision, can you just tell me

17   what that is?

18       A.   Community supervision is -- it's when the

19   inmate is sentenced to, say, seven years, they

20   serve -- they have to be under supervision upon

21   release, and that supervision is determined by one day

22   for every six days that they serve; so it would be --

23   it comes out to 14.3 percent of the sentence would

24   have to be served under community supervision.  So

25   it's a separate sentence upon release from custody at

1   department of corrections, and they will be supervised

2   by community corrections for 14.3 percent of what they

3   were sentenced to.

4        Q.   And you're using a word called "Release,"

5   correct?

6        A.   Yes.

7        Q.   So is community supervision a type of

8   release, in general?

9        A.   I don't know how to answer that question.

10  So --

11            MS. OROZCO:  That's fine, Ms. Cassiano.  I

12  have no further questions.  Thank you so much for your

13  time.

14            THE WITNESS:  No problem.  Thank you.

15            THE COURT:  Anything further, Mr. Johnstun?

16            MR. JOHNSTUN:  No, Your Honor.

17            THE COURT:  All right.  Ms. Cassiano, thank

18  you so much for calling in this morning.  It has been

19  very enlightening testimony, and I hope you have a

20  good day.

21            THE WITNESS:  Thanks.  You too.

22            THE COURT:  All righty.  Do you have any

23  other witnesses, Ms. Orozco?

24            MS. OROZCO:  Mr. Crago, Your Honor.

25            THE COURT:  All right.  Mr. Crago, I'm going

1    to ask you to raise your right hand and be sworn by

2    the clerk of court.

3                (Witness sworn.)

4                THE COURT:  Go ahead.

5                          EARL FELTON CRAGO,

6    having been duly sworn, testified as follows:

7                          DIRECT EXAMINATION

8    BY MS. OROZCO:

9         Q.   Mr. Crago, can you please say and spell your

10   name.

11        A.   Earl Felton Crago, E-A-R-L  F-E-L-T-O-N

12   C-R-A-G-O.

13        Q.   And how old are you?

14        A.   I'm 49.

15        Q.   And how old were you when you went into

16   custody on this case?

17        A.   I was 23.

18        Q.   And have you been in custody since you were

19   23 years old?

20        A.   Yes, ma'am.

21        Q.   And when you arrived in prison on this case,

22   had you been to prison before?

23        A.   No, ma'am.

24        Q.   Did you know what community supervision was?

25        A.   Just from talking to the lawyer, it was

1    specified that it was release.  I would go out and do

2    community service of a type, which I was unsure of

3    what that meant that I would be released.

4         Q.   When you were sentenced by Judge Borowiec,

5    do you remember that day?

6         A.   Yes, ma'am.

7         Q.   And what do you think he told you when you

8    were sentenced?

9         A.   He told me I would be released at 25 years

10   to do the three years and seven months community

11   supervision.  They had did a mitigation aggravation

12   hearing.  They found -- I think they had found four to

13   five mitigation factors, and one aggravating factor,

14   being the death of the victim.

15        Q.   Okay.  And when you arrived at DOC, you

16   received a time calculation, correct?

17        A.   Yes, ma'am.

18        Q.   And was that time calculation the same as

19   what you thought your sentence would be?

20        A.   Yes, ma'am, and I received one of those

21   approximately every 11 months like clockwork for many

22   years.  I just -- I never saved them because there

23   were so many.  I just happened to have that one still

24   in one of my legal boxes.

25        Q.   And you're talking about Appendix 3 that we

1  have submitted as Defense Exhibit B, correct?

2       A.   Yes, ma'am, and the reason I thought the

3  sentence would never change, if you look at that time

4  computation, it says that the sentence expiration date

5  will never change, so the community supervision

6  sentence date is the expiration date.

7       Q.   You were able to hear Ms. Cassiano testify,

8  correct?

9       A.   Yes, ma'am.

10      Q.   Does 2006 sound about right when you

11 received notice that they were changing your sentence?

12      A.   I got it in -- I got it in late 2008.  The

13 last thing I received from the DOC stating that the

14 sentence was the same was February 19th, 2008, and it

15 was from Correctional Officer 3, D. Straub, and it

16 still shows my sentence expiration date from the

17 25-year sentence as 9-12-2019, and then it went into

18 the 1.5 years for the other issue that I got into when

19 I was in prison; and it reads exactly the same as she

20 was saying it would read under 25 years.

21      Q.   Now, when you went into custody, did you

22 have familial and friend relationships?

23      A.   Yes, ma'am.

24      Q.   And was one of those people named Lori

25 Williams?

1      A.   Yes, ma'am.

2      Q.   And what was she to you?

3           MR. JOHNSTUN:  Objection.  Relevance.

4           THE COURT:  Overruled.

5      A.   She was my girlfriend.  We had been friends

6 since we were 12 years old.  Our birthdays are about

7 three months apart.  We grew up together.

8      Q.   And what does she have to do with your time

9 calculation?

10     A.   She was the one that notified me in 2008,

11 late 2008, that they had changed the sentence on the

12 AIMS.

13     Q.   And what is the AIMS?

14     A.   That is the Automated Inmate Management

15 System that they have on the public website for the

16 department of corrections.

17     Q.   So you had friends and family checking that

18 date in anticipation of your release?

19     A.   Yes, ma'am.  You know, they were always

20 checking for disciplinary and things like that too, so

21 they were on there every week.  They told me right

22 away when it changed.

23     Q.   And did that impact you in 2008?

24     A.   Yeah.  Yeah, it impacted everything.

25     Q.   How?

```
 1              MR. JOHNSTUN:  Your Honor, if the record

 2   could show a continuing objection to this line of

 3   questioning.

 4              THE COURT:  The record may so reflect.

 5       A.   It just caused a lot of anxiety and worry.

 6   It changed my reclassification, which later took me

 7   out of the ability to attend the programming that they

 8   offer in here for inmates to prepare for release, such

 9   as --

10       Q.   I'll ask you about that later, but let's

11   focus on --

12       A.   Okay.

13       Q.   -- your friends and family and how that

14   impacted you.

15       A.   Well, Lori became so depressed that she --

16   she couldn't take it much longer after that and we

17   stopped talking, because she couldn't understand how

18   it changed to life, and then my daughters both became

19   so depressed that their mothers suggested that we stop

20   talking for a while, because the change from having a

21   release to having no release, it just -- it really

22   overwhelmed everybody.

23       Q.   Now, you --

24       A.   My youngest daughter -- I'm sorry.  Go

25   ahead.  I was going to say my youngest daughter later
```

1    attempted suicide, and it's just -- that change is

2    just overwhelming to everything, and no matter how

3    much I told them that that was not the sentence, with

4    the DOC telling them it was the sentence and showing

5    them that on the public website, it was just affected

6    everything down to the most basic level.

7        Q.    Now let's talk about how it affected you as

8    an inmate.  You were classified -- were you classified

9    as a life inmate prior to 2008?

10       A.    No, ma'am.  I had a sentence expiration

11   date.

12       Q.    And what does that mean in DOC?

13       A.    Well, that means that I can attend the

14   college programming that they offer.  I can obtain

15   what's called a Class C work clearance so that I could

16   work jobs at the administration building.  I could

17   work the jobs.  I was the CO-3 clerk at the time,

18   which is a trustee position, which you can't have as a

19   life -- with a life sentence.  So once they changed

20   the sentence, they later began not allowing me to

21   attend college courses anymore and not allowing me to

22   have certain jobs, like, for instance, right now had

23   my sentence remained 25 years flat, I would have been

24   eligible to go down to minimum custody approximately

25   five years ago, and I would have been able to work the

1    ACI jobs and build up savings to help prepare for

2    release.

3            And I would have been able to obtain an

4    associate's degree through the Rio Salado College or

5    the Central Arizona College, depending on which yard

6    they would have had me housed on.

7        Q.   Now, when -- excuse me, before 2008, did you

8    obtain any certificates?

9        A.   I took everything that they offered back

10   then.  I took anger management courses.  I took

11   parenting courses.  I took the work-based education

12   courses through Rio Salado.  I'm federally certified

13   as a HVAC technician.  I have my HVAC refrigerant

14   certifications.  I also was certified through the

15   National Center for Construction, Education and

16   Research as an electrician, as a carpenter and as a

17   plumber.

18       Q.   Now, did you pursue all of that because you

19   anticipated staying the rest of your life in DOC?

20       A.   No, ma'am.  I was doing everything I could

21   to prepare for release because I'll be coming out of

22   prison with a felony conviction, which makes it, you

23   know, already harder than it is for even the normal

24   person, so I was taking everything I could to prepare

25   for work so that I could successfully reenter to

1    society.

2        Q.    Now, now that you have been in DOC for 25

3    years, have you been around people with different

4    types of sentences?

5        A.    Yes, ma'am.

6        Q.    And have you been around people that are

7    considered lifers?

8        A.    Yes, ma'am.

9        Q.    In your opinion, do those lifers behave

10   differently than people with a release date?

11       A.    Yes, ma'am, they do.  Their only hope is to

12   get down to the lowest custody facilities they can so

13   they will -- they will allow people to assault them

14   and, you know, worse to stay out of trouble.  They

15   won't fight back.  They -- and because they are going

16   to be old in here and this is all they have, so they

17   try to get down to the lowest custody units that allow

18   the most freedom for lifers, medium custody, I'm

19   sorry.

20       Q.    In your opinion, did you act as a lifer

21   since 1994?

22       A.    No, ma'am.  I have never conducted myself as

23   if I was doing a life sentence.

24            MS. OROZCO:  I have no further questions.

25   Thank you.  Oh, actually, I'm sorry, I do have one

1   follow-up question.

2       Q.   When you were proceeding to trial, were you

3   offered a plea agreement?

4       A.   Yes, ma'am, to second-degree murder.

5       Q.   For how much time?

6       A.   It carried 22 years.

7       Q.   And in your evaluation of the case, were you

8   balancing the plea agreement of 22 years against a

9   natural life sentence?

10      A.   No, ma'am.  I was -- We were speaking with

11  Judge Borowiec at the time, and it was explained to me

12  that if I turned down the plea and went to trial, I

13  would receive a 25-year sentence, and that was the

14  only reason I declined the 22-year sentence, because

15  there was only a three-year difference; and there was

16  the possibility of acquittal or less, a lesser charge.

17          MS. OROZCO:  I have no further questions.

18  Thank you.

19          THE COURT:  All right.  Thank you.

20  Mr. Johnstun, do you have any questions?

21          MR. JOHNSTUN:  Thank you, Your Honor.

22                   CROSS-EXAMINATION

23  BY MR. JOHNSTUN:

24      Q.   Mr. Crago, have you received a transcript of

25  your sentencing hearing?

1    A.    Yes, sir, I have.

2    Q.    Have you read it?

3    A.    Yes, sir.

4    Q.    Okay.  Is it correct, to the best of your

5  knowledge and recollection?

6    A.    I have no reason to doubt it, so yes, sir,

7  it is.

8    Q.    Okay.  And you previously filed a number of

9  Rule 32 petitions in this case?

10    A.    Eight, yes, sir.

11    Q.    Okay.  And you're familiar with the 2011

12  ruling by the Court of Appeals regarding your

13  community supervision claim?

14    A.    Yes, sir.

15    Q.    And the Court of Appeals ruled against you?

16    A.    All I was -- you have to remember what I was

17  requesting.  All I was requesting was that the DOC be

18  ordered to correct the entry on the AIMS, and then

19  over time that progressed into other things.  The

20  Court would shift the motions to a Rule 32, and there

21  just weren't any grounds under Rule 32 to raise it.

22        I did attempt to raise the argument about

23  the plea at one point, but the Court notified me that

24  they didn't keep records back then of pleas that were

25  declined.  They started doing something called a

1  Donaldson hearing or something now where they keep the

2  records.  I just wanted AIMS to correct the sentence

3  on the AIMS because it was affecting my family so

4  badly, and it was affecting my position inside of the

5  prison for education and work; but, you know, my

6  youngest daughter, she became so depressed that she

7  attempted to take her life, and I was just -- all I

8  was really trying to do was to get AIMS to correct it.

9  I tried doing a special action.  I didn't have the

10  money to pay for it.

11      Q.  But the Court of Appeals said that it was

12  within DOC's authority to remove the community

13  supervision portion from your AIMS, correct?

14      A.  I didn't take that away from it.

15      Q.  Okay.

16      A.  Because DOC is an administrative agency.

17  How can they possibly be allowed to change a judicial

18  sentence?

19      Q.  And the Court of Appeals always said that

20  your -- also said that your sentence was a life

21  sentence, correct?

22      A.  Well, and, you know, the definition of life

23  has changed since I was sentenced because now the

24  definition of life is until you die, where back then

25  the definition of life was 25 years.

1           MR. JOHNSTUN:  No further questions.

2           THE COURT:  Anything further, Ms. Orozco?

3           MS. OROZCO:  No, Your Honor.  Thank you.

4           THE COURT:  All right.  Any further

5   witnesses?

6           MS. OROZCO:  No, Your Honor.

7           THE COURT:  All right.  Anything the State

8   wants to put on in terms of evidence?

9           MR. JOHNSTUN:  No, no evidence, Your Honor.

10          THE COURT:  All right.  Let's hear some

11  argument.

12          MS. OROZCO:  Do I begin, Your Honor?

13          THE COURT:  You bet.

14          MS. OROZCO:  Okay.  The -- 1994 was a

15  confusing year for first-degree murder.  In 1994 the

16  statute changed, and it changed to one in which an

17  individual could either receive natural life -- and

18  I'm reading from 13-703.  In 1994 it said an order

19  sentencing the defendant to natural life is not

20  subject to commutation or parole, work furlough or

21  work release.  If the Court does not sentence the

22  defendant to natural life, the defendant shall not be

23  released on any basis until the completion of the

24  service of 25 calendar years, if the victim was 15

25  years of age or older.

1    Judges across the State interpreted that

2  statute differently and at times interpreted that

3  statute incorrectly.  In this case Judge Borowiec

4  interpreted the statute incorrectly by looking at this

5  language and saying, "Okay.  25 calendar years,

6  released on any basis.  Community supervision is a

7  type of release.  I am calculating that to reflect 25

8  years.  Here is community supervision for a 25-year

9  sentence."

10    That has to be read in context of his

11  sentence, because he said no one is going to know what

12  Mr. Crago will be like after 25 years, because he had

13  calculated community supervision at 25 years.  The

14  unfairness of this is clear from DOC itself.  DOC told

15  Mr. Crago from 1994 to 2006 or 2008, depending on

16  whether it's Mr. Crago or DOC, that he had a community

17  supervision release date of September 2019.  He was

18  told that for at least 12 years, 12 years of

19  operating, telling his friends and family, "I'm

20  getting out on this date.  Wait for me until this

21  date.  Give me this opportunity, because I'm getting

22  out on this date," and then that's arbitrarily taken

23  away by an AG opinion.

24    Chaparro is clear that the AG's opinion and

25  DOC's adherence with Chaparro was incorrect, because

1   it was the intent of the judge at the time to impose

2   parole.  That is not the argument here.  It was the

3   intent of the judge at the time to impose community

4   supervision.  Now, what Ms. Cassiano said was usually

5   what happened in these sentences when they got messed

6   up, was they just imposed community supervision

7   arbitrarily.  They did not provide a calculation.

8   They did not provide a calculation because it was at

9   least 25 years.

10          That's not the case here.  He calculated 25

11   years.  He sentenced life.  DOC testified that they

12   treated life as 25 years for at least 12 years.  How

13   is it fair that an Attorney General working in Phoenix

14   can change the life of all of these people and ignore

15   what the judge put into a sentence just arbitrarily?

16   And I submit that it is arbitrary to ignore an entire

17   part of a sentence.

18          Mr. Crago, in light of Chaparro, should have

19   the section of his community supervision abided by.

20   Community supervision is a part of a sentence.  It

21   cannot be ignored, and in interpreting the community

22   supervision to be extraneous or illegal or

23   unenforceable is directly contrary to Chaparro.

24          We ask that all of the provisions of Judge

25   Borowiec's sentence be abided by, that he receive the

1   community supervision release date he was told he had

2   until at least 2006, that he has submitted in writing

3   that he had a community supervision release date.

4   We're asking that that be followed so that he can have

5   begun serving his 1.5-year consecutive sentence and

6   that the calculations that were taken from the

7   original sentencing document be abided by and followed

8   and that the community supervision not be taken out.

9   It's just an essential part of the sentence.  It was

10  part of the intent from Judge Borowiec.  And I thank

11  you for your time.

12          THE COURT:  Mr. Johnstun.

13          MR. JOHNSTUN:  Your Honor, I think defense

14  counsel's arguments are rational, and they make a lot

15  of sense in light of Chaparro except there's a couple

16  of things in the defendant's case.  This is not an

17  issue of first impression.  This has already been

18  litigated and decided by the Court of Appeals, and the

19  applicable law was the same in 2011 as it is now when

20  the Court of Appeals ruled against the defendant.

21          THE COURT:  Isn't the Court of Appeals 2011

22  decision, however, contrary to the provisions in

23  Chaparro?

24          MR. JOHNSTUN:  It seems to me that it is,

25  and -- but the legal principle of a defendant being

1    entitled to the benefit of an illegally lenient

2    sentence was not part of the ruling in the 2011

3    opinion, and so we are left to wonder whether the

4    Court of Appeals was just ignorant of that legal

5    principle in Arizona or if they were aware of it, but

6    there's some overriding principle as concerns the

7    defendant's case or as concerns community supervision.

8           Because Dawson was not raised in the prior

9    Rule 32, we don't know what the Court of Appeals would

10   have done with that legal principle applied to the

11   defendant.  We know that they ruled against the

12   defendant very emphatically, both procedurally saying

13   it was precluded and substantively saying Court of

14   Appeals was well within its province to disregard the

15   community supervision and that the defendant is

16   serving a natural life sentence unless it's commuted.

17   And -- is serving a life sentence unless it's

18   commuted.

19          The defendant's sentence is and always has

20   been a life sentence.  His sentence will end at the

21   end of his life.  That's what the Court of Appeals

22   said and so we, like I say, if this was an issue of

23   first impression, then I think the -- but we don't

24   know where the Court of Appeals was coming from when

25   they ruled against the defendant in 2011, because the

1    current law under Chaparro was already the law in

2    Arizona.

3              THE COURT:  Anything further?

4              MR. JOHNSTUN:  No, Your Honor.

5              THE COURT:  Final argument, Ms. Orozco.

6              MS. OROZCO:  The law under Chaparro clearly

7    was not the law until 2020 because Chaparro came out,

8    and they were not applying the law correctly.  And

9    Justice Ginsburg addressed issue preclusion and said

10   that even when the elements of issue preclusion are

11   met, however, an exception may be warranted if there

12   has been an intervening change in the applicable legal

13   context.  That is from Herrera versus Wyoming, 139 S.

14   Ct. 1686.  It doesn't say it has to be a change in the

15   law.  It doesn't say it has to be a new legislative

16   decision or a new court decision.  It's just the

17   applicable legal context.  Chaparro is absolutely a

18   change in the applicable legal context.

19             The State has conceded that the 2011

20   decision is contrary to Chaparro, so it can't be the

21   law that is followed.  And the argument that life is

22   the end of his life makes the word "Natural" redundant

23   in a sentence of 13-703.  Because if life means the

24   end of his life, then why have a distinction between

25   natural life and life?

1          That was a choice that Judge Borowiec had,

2    and he chose life, which was 25 years before any type

3    of release, and in this case Judge Borowiec imposed

4    release in the form of community supervision of three

5    years and seven months.

6          The intent is clear.  Chaparro clearly is a

7    change in the applicable legal context in this case.

8    The issue should not be precluded.  Even if the issue

9    is precluded because of Dawson, it should not be

10   precluded because this argument was not ripe until he

11   was being held past his sentence.

12          For all of those reasons, we ask that the

13   sentencing minute entry be abided by and that his

14   community supervision -- or that he be released to

15   community supervision of three years and seven months

16   after serving his 1.5-year consecutive sentence.

17   Thank you.

18          MR. JOHNSTUN:  Your Honor.

19          THE COURT:  Yes, Mr. Johnstun.

20          MR. JOHNSTUN:  Could I be heard on the

21   applicable legal context?

22          THE COURT:  Sure.

23          MR. JOHNSTUN:  Subject to counsel's right to

24   final say.

25          THE COURT:  Sure.

1          MR. JOHNSTUN:  Thank you, Your Honor.  Your

2     Honor, that's not the law in Arizona.

3          THE COURT:  Which is not the law in Arizona?

4          MR. JOHNSTUN:  That issue preclusion doesn't

5     apply if there's a change in the applicable legal

6     context.  Your Honor, the federal cases cited by the

7     defense, one was a case where their statehood required

8     Native Americans to get hunting licenses after Wyoming

9     became a state, and the change in the applicable

10    context was a comparison with federal treaties with

11    other Indian tribes, and the other case, Bobby v. Bies

12    cited by the defense, that was a situation where a

13    mildly retarded defendant had been sentenced to death;

14    and then there was a U.S. Supreme Court opinion

15    stating that people who are retarded cannot be -- are

16    not subject to the death penalty and the -- because

17    that had not been the law, the severity of the

18    defendant's retardation had never been litigated; and

19    because of that change in the law and because the

20    defendant was asking for a reduction in his sentence

21    from death, then the Supreme Court held that it was

22    not double jeopardy for the State to fully litigate

23    how severely that defendant was retarded.

24          But in Arizona there's no -- there's no

25    legal authority that I'm aware of or that has been

1  cited by the defense that a change in the legal

2  context is how you get around preclusion.  In Arizona

3  it's Rule 32.1(g) of the Rules of Criminal Procedure

4  that requires a significant change in the law that if

5  determined to apply to defendant's case -- and so it's

6  not a change in the legal context.  The rule actually

7  provides -- requires a significant change in the law.

8          THE COURT:  Anything further, Ms. Orozco?

9          MS. OROZCO:  If Chaparro versus Shinn is not

10  a significant change in the law, I don't know what is,

11  and Mr. Crago has been told -- he was told for a very

12  long time his sentence was what he thought it would

13  be, and then it was arbitrarily taken away.  That's in

14  violation of Chaparro.

15          THE COURT:  If I understand your argument,

16  Mr. Johnstun, you're saying decisional law is not law,

17  only statutory law would be law?

18          MR. JOHNSTUN:  No, Your Honor, I'm saying

19  that because of Dawson, the law -- the holding in

20  Chaparro was required by Dawson.  That had the same

21  exact holding, that the defendant is entitled to an

22  illegally lenient sentence that was not appealed by

23  the State.  That was the holding in the 1990 case of

24  Dawson, and so Chaparro was simply following that law,

25  and so --

1          THE COURT:  Okay.

2          MR. JOHNSTUN:  That was already the law in

3   2011, and for some reason the Court of Appeals didn't

4   follow it.

5          THE COURT:  Ms. Orozco.

6          MS. OROZCO:  I just enjoy quoting RBG.

7          THE COURT:  All right.  Oh, my God.  This

8   better not happen very often.  This is like -- these

9   are hard cases.  All right.  I have been preparing on

10  this case now for a while, but I'm not going to rule

11  from the bench on this.  I'm going to write a decision

12  and get this out as quickly as possible because I do

13  think that it merits a written decision, and it may

14  have to go farther.  Who knows?

15          But we sure do have a lot of -- a lot of law

16  going on here, statutory law, antique law and

17  administrative law all just like colliding to

18  Mr. Crago's detriment and to our mutual confusion.

19          So I appreciate you guys briefing this out

20  for me and getting some testimony in, and I will get a

21  decision out posthaste.  Thank you both very much.

22  Thank you, Mr. Crago, for appearing here live and in

23  person, and stay in touch with Ms. Orozco.

24          THE DEFENDANT:  Your Honor, I just want to

25  say thank you all for having the hearing.

64

1          THE COURT:  You bet.

2          Interesting issues.  Thanks very much.

3          MS. OROZCO:  Thank you.

4          (Hearing concluded at 10:39 A.M.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          CERTIFICATE

2          I, Lee Ann Eaton, Registered Merit Reporter,

3    Certified Realtime Reporter, do hereby certify that

4    the foregoing 64 pages constitute a full, true and

5    accurate transcript of the proceedings had in the

6    foregoing matter, all done to the best of my skill and

7    ability.

8          SIGNED and dated this 18th day of January

9    2021.

10

11

12

         /S/ *Lee Ann Eaton*, RMR, CRR, CSR
13       Certificate No. 50963

14

15

16

17

18

19

20

21

22

23

24

25

RECEIVED

FEB 03 2021

COCHISE COUNTY
LEGAL ADVOCATE