# EXHIBIT A

**FILED**

AUG 23 1995

DENISE LUNDIN GLASS
CLERK SUPERIOR COURT
BY_____DEPUTY

Time_____M

OFFICE DISTRIBUTION
| | APPEALS
| | BONDS: REFUND/FORFEITURE
|xx| FINES/ATTY. FEES/RESTITUTION Jack Kennedy
| | ATTORNEY: APPT & CLAIMS
|xx| COUNTY ATTY./Gerald F. Till
|xx| DEFENSE ATTY./Ralph Malanga, Esq.
|xx| ARIZONA DEPART OF CORRECTIONS
|xx| C.C.S.O. JAIL
|xx| ADULT PROBATION DEPARTMENT
| | MAILED 8-21-95
CASE

## SUPERIOR COURT OF ARIZONA
### COUNTY OF COCHISE
### Date August 21, 1995

**STATE OF ARIZONA**          vs.          **EARL FELTON CRAGO, JR.**
Date of Birth:  **10-16-71**

---

# SENTENCE OF IMPRISONMENT          CASE NO: CR94000471

---

JUDGE **HONORABLE MATTHEW W. BOROWIEC**          **DENISE LUNDIN GLASS, CLERK**
DIVISION **One**
COURT REPORTER **Merle R. Briefer**          By **Stephanie L. Williams 8/22/95**, Deputy
ADDRESS & PHONE          Docketed by

---

**2:13 p.m.**  The State is represented by **Deputy County Attorney, Gerald F. Till**; the Defendant is present with counsel, **Ralph Malanga, Esq.**

Court Reporter, **Merle R. Briefer** is present.

The Defendant is advised of the charge, the determination of guilt and is given the opportunity to speak.

Pursuant to A.R.S. Section 13-607, the Court finds as follows:

|XX|  JURY VERDICT  The determination of guilt was based upon a verdict of guilty after a jury trial.

THE RECORD MAY SHOW Stanley Davidson, grandfather of the victim, addressed the court and Lottie Ross, sister of the victim, addressed the court.

Case 4:22-cv-00339-SAS Document 61-1 Filed 09/28/22 Page 3 of 112

| One Div | August 21, 1995 Date | HONORABLE MATTHEW W. BOROWIEC Judge | Stephanie L. Williams Deputy |
|---|---|---|---|

No. **CR94000471**     STATE vs **EARL FELTON CRAGO, JR.**

Having found no legal cause to delay rendition of judgment and pronouncement of sentence, the Court enters the following judgment and sentence:

IT IS THE JUDGMENT OF THE COURT that the Defendant is guilty of the following crime(s), that upon due consideration of the facts, law and circumstances relevant here, the Court finds that suspension of sentence and a term of probation are not appropriate and that a sentence of imprisonment with the Department of Corrections is appropriate.

THE COURT FURTHER FINDS that there are circumstances sufficiently substantial to call for a **LIFE** term as indicated on the following page. These circumstances are stated by the Court on the record.

AS PUNISHMENT, IT IS ORDERED that the Defendant is sentenced to a term of imprisonment and is committed to the Arizona Department of Corrections as follows:

| One Div | August 21, 1995 Date | HONORABLE MATTHEW W. BOROWIEC Judge | Stephanie L. Williams Deputy |

---

No. **CR94000471**   STATE vs **EARL FELTON CRAGO, JR.**

OFFENSE:                                 **murdered Carl H. Davidson, Jr.**

FELONY CLASS:                   **class one (1) felony and Count II of the Indictment**

IN VIOLATION OF A.R.S. §§:   **13-1105, 13-1101, 13-604, 13-703 and 13-701**

DATE OF OFFENSE:            **on or about the 28th day of September, 1994**

SENTENCE:                          **committed to a LIFE term in the Department of Corrections**

| | NONDANGEROUS |XX| DANGEROUS PURSUANT TO A.R.S. §13-604

|XX| NONREPETITIVE | | REPETITIVE PURSUANT TO A.R.S. §13-604

| | NONDANGEROUS BUT VIOLATIVE OF A.R.S. §13-604.01(B)   | | DANGEROUS AND VIOLATIVE OF A.R.S.§13-604.01(A)

This sentence is to date from **this date, August 21, 1995**. The Defendant is to be given credit for **337 days** served prior to sentencing.

**IT IS ORDERED:   That the Defendant must serve every day of twenty-five (25) years of the sentence imposed before he is eligible for any type of release.**

**IT IS FURTHER ORDERED:   That pursuant to A.R.S. §13-603(1), the Defendant will be required to do mandatory community supervision sentence—one day for every seven days sentenced to, for a total of 3 years, 7 months.**

### RESTITUTION

   **IT IS ORDERED:   That the Defendant shall pay restitution to the victim of this crime for their economic loss through the Clerk of the Superior Court, P.O. Drawer CK, Bisbee, AZ 85603, in the total amount of $3,610.00.**

169

493

| One Div | August 21, 1995 Date | HONORABLE MATTHEW W. BOROWIEC Judge | Stephanie L. Williams Deputy |
|---------|----------------------|-------------------------------------|------------------------------|

No. CR94000471    STATE vs **EARL FELTON CRAGO, JR.**

### ATTORNEY'S FEES

**IT IS ORDERED:** That the Defendant shall reimburse Cochise County for the costs of legal representation through the Clerk of the Superior Court, P.O. Drawer CK, Bisbee, AZ 85603, in the total amount of $7,000.00.

The Court advised the Defendant of his right to appeal and written notice of those rights is provided to the Defendant.

ORDERED remanding the Defendant to the custody of the Sheriff of Cochise County and authorizing the Sheriff to deliver the Defendant to the custody of the Arizona Department of Corrections and authorizing the Department of Corrections to carry out the term of imprisonment set forth herein.

ORDERED that the Clerk of the Superior Court shall remit to the Department of Corrections a copy of this Order, together with all pre-sentence reports, probation violation reports, medical and psychological reports relating to the Defendant and involving this cause.

Let the record reflect that the Defendant's fingerprint is permanently affixed to this Sentencing Order in Open Court.

FILED:  Notice of Rights of Review after Conviction, signed by the Defendant and Defendant's handwritten statement read to the court.

**2:37 p.m.** Hearing Concludes.

JUDGE OF THE SUPERIOR COURT

Page 4

494

# EXHIBIT B




FILED BY CLERK

MAR 18 1999

COURT OF APPEALS
DIVISION TWO

IN THE COURT OF APPEALS
STATE OF ARIZONA
DIVISION TWO

| | | |
|---|---|---|
| THE STATE OF ARIZONA, | ) | 2 CA-CR 95-0488 |
| | ) | 2 CA-CR 98-0230-PR |
| Appellee/Respondent, | ) | (Consolidated) |
| | ) | DEPARTMENT A |
| v. | ) | |
| | ) | MEMORANDUM DECISION |
| EARL FELTON CRAGO, JR., | ) | Not for Publication |
| | ) | Rule 111, Rules of the |
| Appellant/Petitioner. | ) | Supreme Court |
| | ) | |

APPEAL AND PETITION FOR REVIEW
FROM THE SUPERIOR COURT OF COCHISE COUNTY

Cause No. CR94000471

Honorable Matthew W. Borowiec, Judge

AFFIRMED IN PART; REMANDED IN PART
PETITION FOR REVIEW GRANTED; RELIEF GRANTED IN PART

Janet Napolitano, Arizona Attorney General
  By Paul J. McMurdie and Diane M. Acosta

Tucson
Attorneys for Appellee/Respondent

Harriette P. Levitt

Tucson
Attorney for Appellant/Petitioner

P E L A N D E R, Presiding Judge.

¶1        Appellant/petitioner Earl Crago was convicted after a jury trial of first-degree murder and was sentenced to life in prison without possibility of parole for twenty-five years. He raises five issues on appeal, none of which merits reversal. In his consolidated petition for review of the trial court's summary dismissal of his request for post-conviction relief, filed pursuant to

he was searching for something." According to that witness, that person then picked up the victim, placed him in the passenger side of the car, got in the car himself, and drove away.

¶4      The victim's body was discovered four days later in the desert, partially covered with a piece of plywood. The autopsy showed that the victim had suffered three gunshot wounds, one that entered his leg from the front and the other two that entered his back. The only fatal wound was a gunshot in his upper back that severed his aorta.

¶5      Crago was arrested in Texas the day after the murder. On October 5, after the victim's body had been found, two Sierra Vista police officers traveled to Texas to search Crago's vehicle and return him to Arizona. The police found a holster in his car and what appeared to be bloodstains on the front passenger seat. At trial, Crago admitted he had shot the victim, but claimed he had acted in self-defense.

APPEAL

I. Motion for Judgment of Acquittal

¶6      Crago contends the trial court erred in denying his motion for a judgment of acquittal, made pursuant to Rule 20, Ariz. R. Crim. P. He argued below that, because the state had failed to present substantial evidence of premeditation, he was entitled to an acquittal on the charge of first-degree murder. We will affirm a trial court's denial of a Rule 20 motion if there is substantial evidence to support the verdict. *State v. Scott*, 177 Ariz. 131, 865 P.2d 792 (1993). "Substantial evidence is more than a mere scintilla and is such proof that 'reasonable persons could accept as adequate and sufficient to support a conclusion of defendant's guilt beyond a reasonable doubt.'" *State v. Mathers*, 165 Ariz. 64, 67, 796 P.2d 866, 869 (1990), *quoting State v. Jones*, 125 Ariz. 417, 419, 610 P.2d 51, 53 (1980).

3

premeditation. *State v. Sellers*, 106 Ariz. 315, 475 P.2d 722 (1970). *See also State v. Ruiz*, 1 CA-CR 96-0940, 1998 WL 436557 (Ariz. Ct. App. Aug. 11, 1998).

¶10        In addition, two Cochise County detention officers testified that they had heard Crago tell another inmate at the county jail in mid-October 1994 "how he blew this guy away" and "motioning that how he had a gun and he killed someone." Crago argues that that testimony related only to his "identification as the perpetrator, but not to his intent before the offense." Like the evidence of his attempt to dispose of the victim's body, however, this evidence related to the circumstances surrounding the killing and suggested that it was not self-defense, as Crago claimed.

¶11        Finally, Crago argues that the state failed to present any evidence of his motive and, "[w]ith no evidence as to the facts leading up to the shooting, the mere fact that the fatal shot entered the victim through the back is insufficient to prove premeditation." The state is not required, however, to prove a motive because that is not an element of premeditated murder. *See State v. Hunter*, 136 Ariz. 45, 664 P.2d 195 (1983). There was substantial evidence of premeditation, and the trial court did not err in denying Crago's motion for a judgment of acquittal.

II. Prosecutorial Misconduct

¶12        Crago contends the state engaged in misconduct by failing to disclose the "secret terms" of a plea agreement with Thomas Godfrey, a rebuttal witness for the state, in violation of Rule 15.1, Ariz. R. Crim. P., 16A A.R.S., and his due process rights under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). Although Crago had the information upon which this claim is based on May 11, 1995, he failed to raise this issue at the hearing on his motion for new trial or at sentencing, both of which occurred in August 1995. Thus, he has

Godfrey, until after Crago's trial ended. Rheinheimer filed a similar affidavit that recounted the same series of events.

¶15    Without citing any authority, Crago asserts that he "was entitled to conduct further inquiry" into the discussions between "Godfrey, his counsel and the State beforehand concerning whether the State might consider a better disposition of Godfrey's charges depending on the impact of his testimony." He also claims that, "taken on its face, the affidavits filed by Mr. Rheinheimer and Mr. Aldridge [sic] lead to serious questions concerning non-disclosure of *Brady* evidence."

¶16    *Brady* established that a defendant has a due process right to disclosure of any evidence that is favorable to the defense and material to either guilt or punishment. Evidence is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 3383, 87 L. Ed. 2d 481, 494 (1985). *See also State v. Dumaine*, 162 Ariz. 392, 405, 783 P.2d 1184, 1197 (1989) ("The test for a *Brady* violation is whether the undisclosed material would have created a reasonable doubt had it been presented to the jury."). The state's disclosure obligation includes evidence that is useful for impeaching a prosecution witness. *Giglio v. United States*, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972); *Napue v. Illinois*, 360 U.S. 264, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959).

¶17    Rule 15.1(a), Ariz. R. Crim. P., which essentially codifies *Brady*, *see State v. Holsinger*, 115 Ariz. 271, 564 P.2d 1238 (1977), provides that "the prosecutor shall make available to the defendant for examination and reproduction . . . [a]ll material or information which tends to mitigate or negate the defendant's guilt as to the offense charged, or which would tend to reduce the defendant's punishment therefor." A defendant must demonstrate prejudice

7

subsequent proceeding." A.R.S. § 13-4013(B). This statute does not apply to defendants in noncapital cases, however, although "[c]onstitutional considerations may mandate the appointment of experts . . . if the denial would substantially prejudice the defendant." *State v. Peeler*, 126 Ariz. 254, 257, 614 P.2d 335, 338 (App. 1980); *see also Mason v. Arizona*, 504 F.2d 1345 (9th Cir. 1974). The decision to approve funds is left to the trial court's sound discretion and will not be disturbed absent a clear showing of abuse of that discretion and substantial prejudice. *See State v. Williams*, 183 Ariz. 368, 904 P.2d 437 (1995); *Peeler*.

¶21        Crago relies on *State v. Eastlack*, 180 Ariz. 243, 883 P.2d 999 (1994), to support his claim that he was entitled to funds for an expert witness. *Eastlack*, however, was a capital case and therefore governed by § 13-4013. In addition, the court there found that the defendant's trial testimony had raised "numerous 'red flags' concerning defendant's psychological makeup" and required the appointment of a psychological expert for mitigation purposes. *Id.* at 263, 883 P.2d at 1019. In contrast, no evidence in this case suggested that Crago suffered from psychological problems, and Crago testified that he was not under the influence of methamphetamine or other drugs when he shot the victim and that he had not used any drugs for approximately a week before that. There was no indication here "that a presentence mental health exam [might] well have produced additional evidence supporting mitigation," *Williams*, 183 Ariz. at 381, 904 P.2d at 450, and the trial court did not abuse its discretion in denying funds for such an exam.

¶22        Finally, Crago suffered no prejudice from the absence of a psychology expert at sentencing. Because Crago was convicted of first-degree murder, only two prison sentences could be imposed: life without possibility of parole for twenty-five years or natural life. A.R.S. § 13-

non-indigent would not have had to request money from the court and, therefore, would not have opposition from the State," as Crago argues, does not violate due process. *See State v. Apelt*, 176 Ariz. 349, 861 P.2d 634 (1993) (defendant has no right, based on due process or any other ground, to an ex parte hearing to request investigative funds). There was no due process violation here, and the trial court did not abuse its discretion in denying Crago's requests.

## V. Attorney's Fees

¶27  Finally, Crago argues, and the state agrees, that the trial court erred in ordering him to reimburse the county for $7,000 in attorney's fees without making any findings as to his financial resources or ability to pay, in violation of A.R.S. § 13-4013(A) and Rule 6.7, Ariz. R. Crim. P. Although Crago failed to object to the reimbursement order at sentencing, the trial court's failure to make specific findings on "hardship" under Rule 6.7(d) constitutes fundamental error. *State v. Lopez*, 175 Ariz. 79, 853 P.2d 1126 (App. 1993). Because the trial court did not make the requisite findings, we vacate the reimbursement order and remand the issue to the trial court for a hardship determination.

## PETITION FOR REVIEW

¶28  In his petition for review, Crago contends the trial court erred in denying an evidentiary hearing on his claims that counsel was ineffective in failing to present evidence of the effects of long-term methamphetamine use, failing to request a jury instruction on manslaughter, and failing to investigate the mechanical condition of Crago's vehicle at the time of the murder.[1]

---

[1] Appellate counsel's attempt to argue the issues relating to the Rule 32 proceedings by including the petition for review in her opening brief does not comply with Rule 32.9(c), Ariz. R. Crim. P., and is not authorized by that rule or any order of this court. Nonetheless, Crago filed a petition for review *pro se*, "present[ing] to this court for review all issues that were presented to the trial court in the petition for post-conviction relief" and also seeking review of the trial court's denial of an evidentiary hearing. Although the state correctly notes that claims

11

offense. *See State v. Vickers*, 159 Ariz. 532, 768 P.2d 1177 (1989); *State v. White*, 144 Ariz. 245, 247, 697 P.2d 328, 330 (1985) ("[B]y finding defendant guilty of the highest offense, to the exclusion of the immediately lesser-included offense, second degree murder, the jury necessarily rejected all other lesser-included offenses. The error, if indeed it was error, of not instructing as to such offenses was harmless.").

¶31    We reach a different conclusion, however, with respect to the other two aspects of Crago's Rule 32 claim of ineffective assistance of counsel. Crago primarily contends that his trial counsel's "decision to virtually ignore the physiological, psychological, and metabolical effects of crystal methamphetamine use . . . by both the defendant and [victim]" was unreasonable and prejudiced his defense. He claims that evidence on those points could have established that he was unable to premeditate the crime, *see State v. Christensen*, 129 Ariz. 32, 628 P.2d 580 (1981), and would have shown that methamphetamine abuse "exacerbated the [victim's] already violent tendencies," thereby bolstering Crago's self-defense theory. *See State v. Plew*, 155 Ariz. 44, 745 P.2d 102 (1987). As noted earlier, Crago testified that he had used methamphetamine in the past but was not under the influence of it when he shot the victim and had not used the drug for approximately one week before that. Although trial counsel might have had a reasoned basis for relying solely on a self-defense theory and not attempting to delve further into Crago's and the victim's prior drug use, as the state argued in the trial court, the record does not necessarily compel that conclusion as a matter of law. As to those issues, Crago presented a colorable claim and, therefore, should have been accorded an evidentiary hearing.

¶32    Crago also argues that counsel was ineffective in failing to investigate and present evidence about the mechanical condition of his vehicle at the time of the homicide. Crago testified

13

prejudiced, an evidentiary hearing on this issue was warranted.[2] The trial court abused its discretion in denying that.

¶34     Crago's Rule 32 petition raised several other issues relating to counsel's decisions to enter into certain stipulations with the prosecution, to not impeach certain prosecution witnesses, and to not call certain witnesses.  These were clearly tactical decisions that had a reasoned basis, and counsel's performance with respect to those decisions, therefore, was not unreasonable. *Meeker.*

## DISPOSITION

¶35     Crago's conviction and sentence are affirmed, the order for reimbursement of attorney's fees is vacated, and the case is remanded for further proceedings on that issue.  We grant review of Crago's petition for review and relief to the extent noted above.

_____
JOHN PELANDER, Presiding Judge

CONCURRING:

_____
WILLIAM E. DRUKE, Chief Judge

_____
M. JAN FLOREZ, Judge

_____

     [2] According to Crago's supplemental petition for post-conviction relief, he "is no longer in a position to corroborate the mechanical condition of the automobile because [Texas law enforcement officials] sold the automobile at an auction in May of 1995, one month after [his] jury trial."

15

# EXHIBIT C

25-1147

```
 1            IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

 2               IN AND FOR THE COUNTY OF COCHISE

 3

 4    STATE OF ARIZONA,        )   DIVISION ONE
                               )   BISBEE, ARIZONA
 5         Plaintiff,          )
                               )
 6         -vs-                )   NO.CR94000471
                               )
 7    EARL FELTON CRAGO, JR.   )
                               )   Volume III of V
 8         Defendant.          )
      _____ )   Jury Trial
 9

10            REPORTER'S TRANSCRIPT OF PROCEEDINGS
                   (FOR PURPOSES OF APPEAL)
11
                        April 5, 1995
12

13    APPEARANCES:

14              MR. GERALD TILL
                for the Plaintiff,
15
                MR. JAMES WHITE
16              for the Defendant.          COPY

17

18

19         BE IT REMEMBERED that on the 5th day of April,

20    1995, the above-entitled matter came on for hearing before

21    the Hon. Matthew W. Borowiec, Judge of the Superior Court,

22    Division One.

23              HOLLY R. JOHNSON
                Court Reporter
24              P.O. Box 221
                Sierra Vista, Arizona  85636
25              (520)  378-6683
```

2

```
1                    I N D E X

2                                              Page

3    KEITH SCHUBERT
             Direct Examination by Mr. Till        3
4            Cross Examination by Mr. White       21

5    MOTION FOR ACQUITTAL BY MR. WHITE            30

6    MOTION DENIED                                30

7    STATE RESTS                                  30

8    TOVAH SITTS
             Direct Examination by Mr. White      34
9            Cross Examination by Mr. Till        51
             Re-direct Examination by Mr. White   68
10
     WARREN BEEL
11           Direct Examination by Mr. White      72
             Cross Examination by Mr. Till        97
12           Re-direct Examinatin by Mr. White   117

13   EARL CRAGO
             Direct Examination by Mr. White     130
14           Cross Examinatin by Mr. Till        199

15

16

17
                   E X H I B I T S
18
     EXHIBIT          DESCRIPTION         ADMITTED
19
     Defendant's 45    drawing              195
20

21

22

23

24

25
```

1 her know I was going to pay her the rest of the money.

2 Q.  Okay.  So you heard as you just described--you

3 heard Miss Brown say something--threat towards you; right?

4 A.  She specifically said, "Is this all he brung?  I'm

5 tired of playing with the son of a bitch.  Kill him."

6 Q.  What did you do?

7 A.  Ran out of the house to my car.  I got in my car

8 and tried to crank it immediately.  All's you have to do

9 when the fuse is in, is turn the ignition because the key is

10 broke off in the ignition.

11 Q.  All right.

12 A.  I tried to crank it and the car didn't crank and I

13 realized I--didn't realize, I remembered I took the master

14 fuse out.

15 Q.  Where was Mr. Davidson at this time?

16 A.  I didn't see him at that time.  This is taking

17 seconds.  I mean under 30 seconds I would say. I reached

18 over to the center console and grabbed the fuse and bent

19 down to put it in.  Like I said the fuse box is located

20 under the dashboard--driver's side firewall.  It's not long

21 cylinder fuses, it's the computer chip like they use-- it

22 has two little prongs on them like this that you slide.  And

23 I couldn't see under the dash, and I was feeling for the

24 slot that it went in, and I was pretty sure it was the

25 fourth or fifth from the top.

1    I was bent down trying to put the fuse in and
2    trying to listen for Charlie to come out.  I was thinking he
3    was just going to come out shooting at me. I didn't expect
4    nothing else but that.  I was shaking a little bit trying to
5    put the fuse in.  And--
6    Q.    Well, if you thought he was going to come out the
7    door after you, why didn't you just grab your gun at that
8    time?
9    A.    I was more worried about getting out of there then
10    grabbing my gun.
11    Q.    Okay.  What happened?
12    A.    I was trying to put the fuse in.  I didn't hear
13    Charlie come out the door. I assumed the glass door didn't
14    lock or something because I was specifically listening for
15    him to come out of the door.  And I didn't hear him come
16    out, but by the time I seen him he's already reaching
17    through the window and he grabbed me around the throat with
18    hands.  It wasn't like this.  (Demonstrating.)  It was one
19    hand in the front, one hand on the back.  He reached in from
20    the side and he started choking me.  He never said nothing.
21    He never punched me.  He didn't try to pull me out of the
22    car.  He was just--just was choking me.
23    Q.    Okay.  What did you do?  What happened next?
24    A.    I don't remember exactly every detail.
25    Q.    Do the best you can.

1    A.      I was automatically--started trying to grab my

2    pistol. When I grabbed the pistol, it was in my left hand.

3    Q.      All right. Are you left handed or right handed?

4    A.      No, sir, right handed.

5    Q.      Okay.

6    A.      I raised the pistol up, was going to fire, but

7    Charlie turned me loose. I assumed he seen the gun because

8    he turned me loose. He didn't run off though. He stepped

9    back just out of arm's reach pretty much.

10    Q.      What was he in position in relation to your car?

11    A.      If you had a drawing of the car, he was just from

12    in front of the driver's side of the rear-view mirror.

13    Q.      How far from where you were?

14    A.      Probably two feet.

15    Q.      All right.

16    A.      I stuck the pistol out the window --if this was the

17    edge of the car, the window is about right here. I stuck

18    the pistol out the window like pointed it out at him. I

19    told him to lay down.

20    Q.      Why did you tell him lay down?

21    A.      I--I--I don't know. Just--I just wanted to get out

22    of there more or less than anything else. You know. Maybe

23    put your hands up, might have been more appropriate, I don't

24    know.

25    Q.      Okay.

1   A.      I told him to lay down.  At that point in time he

2   reached for it and tried to grab the pistol, and I fired.

3   That was the shot that struck him in the leg.  I'm positive.

4   I didn't think I'd hit him at that time because he didn't

5   fall down.

6           A .380 is not a real small pistol, but it's not a

7   real big pistol; and being shot, I would think he would fall

8   down.  If I was shot, I would fall down.

9   Q.      Were you aiming at that time?

10  A.      No, sir, it was more of a reaction than anything

11  else.  He reached for--he tried to grab the gun, and I told

12  him to lay down, and I fired.

13  Q.      All right.

14  A.      At the time he hopped back a couple feet.

15  Q.      How was he standing--I'll be you.  Here like this,

16  I'll be in the car.  Why don't you show the jury how he was

17  standing as you recall up against the car there when he was

18  grabbing the gun?

19  A.      This was the door of the car, he was standing

20  almost like--

21  Q.      Stand up and show the jury.  Come out here behind

22  the jury box--the witness box and show what position you

23  were standing in.

24  A.      He was facing this way and standing there just like

25  this--

1           MR. TILL: Your Honor, I'm having trouble

2 picking this up, again. If he could just--

3           THE COURT: You're going to need to speak up.

4 Q.     (By Mr. White) I'm you, Earl. I'm sitting in the

5 car. You show me how--was he facing you?

6 A.     Yes, sir. You would have to step over farther this

7 way.

8 Q.     Okay I'll do that.

9 A.     He was standing outside the car, almost like he was

10 going to set up on the hood, facing this way.

11 Q.     Slightly turned.

12 A.     Yes, sir.

13 Q.     All right.

14 A.     I told him to lay down, he reached forward and

15 grabbed the gun, that's when I fired.

16 Q.     Now, about distance? Are we about the same

17 distance apart?

18 A.     No, sir. He was--

19 Q.     Tell me when--

20 A.     About right there.

21 Q.     About right here.

22 A.     It just now, he reached out for the gun.

23 Q.     He reached for the gun and you fired?

24 A.     Yes, sir.

25 Q.     Okay. Go ahead and have a seat. You say he didn't

1  fall at that time?

2  A.        No, sir, he didn't even holler.

3  Q.        Would that explain, perhaps, the--the grazing wound

4  on his leg?

5  A.        That would be exactly the wound.

6  Q.        Okay.  What happened next?

7  A.        He hopped back a couple of feet, and it just was a

8  brief period of time in between the first shot and the last

9  two shots--seconds.  It's hard to say how many seconds.  I

10 would say under five seconds.  It was going extremely fast.

11 He hopped back a couple steps and he said "You're fucking

12 dead" was his exact words.  And he run to get the gun, and I

13 didn't have no idea where he left the gun.

14 Q.        Okay.  When he--after he got through choking you

15 and you  grabbed the gun, and he was standing against the

16 car, did you feel like you were out of danger at that point

17 in time as far as Mr. Davidson was concerned?

18 A.        I felt the altercation was over for a brief second.

19 I was hoping it was over.  I didn't want to shoot the man.

20 I was--I was raised with guns and I've been fishing all my

21 life and that is the very last option you use in any

22 situation.  You have to have no other options.

23 Q.        Can you tell whether--I mean when he was choking

24 you, you obviously--could you tell at that time that he

25 didn't have anything--any kind of weapon in his hand?

1   A.      I couldn't see his right hand.  When he was choking
2   me?
3   Q.      Right.
4   A.      I assumed he didn't have any weapons in his hands.
5   Q.      Could you see his hands?
6   A.      No, sir I couldn't see--
7   Q.      When he was standing outside the car?
8   A.      I could see his left hand.
9   Q.      Okay.  That was the one closest to you as--faces
10  like a turn?
11  A.      Yes.
12  Q.      You could see this hand here?
13  A.      Yes, sir.
14  Q.      You couldn't see this hand?
15  A.      No, sir, not at all.
16  Q.      Okay.  Did that concern you at all?
17  A.      At the time, I would say it concerned me a lot.
18  Q.      Okay.  These events are happening very quickly; is
19  that right?
20  A.      Yes, sir, they are.
21  Q.      Is it difficult to separate one from another?
22  A.      Not in the manner of order.
23  Q.      As far as time goes.  Are you able to say, you
24  know, this happened there and then there a break, and this
25  happened there and there was a break and this happened there

1  or did it all seem to come flow in one continuous line of

2  events?

3  A.       It was very fast.

4  Q.       Okay.  All right.

5  A.       I can decipher the events in the order they came

6  in, but not really the time that occurred in between.

7  Q.       Right.  Okay.  After he said this to you, what did

8  he do if anything?

9  A.       He said "You're fucking dead," he immediately

10 started to run and he was at the front of the car and if he

11 would have run to the right he would have been out of line

12 of fire.  In fact he would have--there was no way you could

13 have shot him at that immediate time, but he after he said

14 "You're fucking dead" he run to the left.

15 Q.       Which was what direction?

16 A.       Which was this direction, right here.  The car was

17 parked close to the sidewalk and he started to run he was

18 right here at the top of the sidewalk, pretty much at the

19 front of the car.  And he run and--

20 Q.       Would it be fair to say that if he had run to the

21 right there may not have been need for you to shoot him

22 because, as far as to the right, you weren't aware there was

23 any danger over on that side?

24 A.       He wouldn't have made the statement that he made

25 and just run, I wouldn't have shot him.  I was--

1   Q.      Okay.  He started to head back toward to the house;

2  is that right?

3   A.      Yes, sir.

4   Q.      Where was the rifle?

5   A.      I have no idea.

6   Q.      Was that a concern of yours as far as where the

7  rifle was?

8   A.      After that statement, that was my only concern.

9   Q.      Okay.  And so what did you do as he was running

10  back toward the house?

11   A.      I fired again.

12   Q.      How many did you fire?

13   A.      The gun fired twice.

14   Q.      Did you take careful aim and fire?

15   A.      No, sir, I did not.

16   Q.      What did you do?

17   A.      I was--I was aiming toward his butt more or less.

18   Q.      Why did you do that?

19   A.      I just want to try to stop him.  I just wanted to

20  stop him.  I didn't fire anymore shots after he fell.

21   Q.      This weapon that you--this gun that you had was a

22  .380 semi-automatic pistol; is that right?

23   A.      Yes, sir, it was seven rounds in the clip and one

24  in the chamber.

25   Q.      Seven rounds in the clip and one in the chamber?

241

```
 1                    C E R T I F I C A T E
 2     STATE OF ARIZONA    )
                           )      ss.
 3     COUNTY OF COCHISE   )
 4
 5          I, Holly R. Johnson, having been appointed as
 6     official court reporter, do hereby certify that the
 7     foregoing pages numbered 1 through 241, inclusive,
 8     constitutes a full, true and corret transcript of all the
 9     proceedings of the matter as set forth in the title page,
10     all done to the best of my skill and ability.
11
12
13
14                Dated this 29th day of September, 1995.
15
16
17     Holly R. Johnson
       Court Reporter
18
19
20
21
22
23
24
25
```

# EXHIBIT D

1     IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2       IN AND FOR THE COUNTY OF COCHISE

3

4  STATE OF ARIZONA,    )  DIVISION ONE
                  )  BISBEE, ARIZONA

5      Plaintiff,    )
                  )

6     -vs-         )  NO.CR94000471
                  )

7  EARL FELTON CRAGO, JR. )
                  )  Volume V

8     Defendant.    )
    _____)  Jury Trial

9

10     REPORTER'S TRANSCRIPT OF PROCEEDINGS

11         April 7, 1995

12

13  APPEARANCES:

14         MR. GERALD TILL
          for the Plaintiff,

15
         MR. JAMES WHITE

16         for the Defendant.

17

18

19      BE IT REMEMBERED that on the 7th day of

20  April, 1995, the above-entitled matter came on for

21  hearing before the Hon. Matthew W. Borowiec, Judge of

22  the Superior Court, Division One.

23         HOLLY R. JOHNSON
          Court Reporter

24         P.O. Box 221
          Sierra Vista, Arizona  85636

25         (520)  378-6683

COPY

1           I N D E X

2      SURREBUTTAL:

3      CHRISTOPHER SLAUGHTER
               Direct Examination by Mr. White      3
4              Cross Examination by Mr. Till        8
               Re-direct Examination by Mr. White   20
5
       REBUTTAL (Cont.)
6
       CECILIA BROWN
7              Cross Examination Mr. White          23
               Re-direct Examination by Mr. Till    37
8
       CLOSING ARGUMENT BY MR. TILL                 43
9
       CLOSING ARGUMENT BY MR. WHITE                73
10
       REBUTTAL BY MR. TILL                         96
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    that he owed for drugs.  The evidence was that Mr.

2    Crago went in.  Mr. Davidson insisted that he give--

3    that Mr. Crago give him the money.  He gave him the

4    money.  Mr. Davidson went to Miss Brown's bedroom,

5    that a light was on, he couldn't see her.  He could

6    see that there was a light on inside.

7         Shortly thereafter, Mr. Crago heard, "I'm

8    tired of playing with the son of a bitch.  Kill him."

9    Mr. Crago  ran out of the house, got into his car,

10   which was parked in the driveway.  He was reaching

11   down to put the fuse into the car, so he could start

12   it and get out of there.  Next thing he knows Mr.

13   Davidson has him around the neck and is choking him.

14   Mr.  Crago reaches down underneath the seat to get his

15   pistol, brings it up outside the window, tells Mr.

16   Davidson to lie down.

17        Then Mr. Crago testified that he just wanted

18   Mr. Davidson to leave him alone, so he could get out

19   of there.  And that Mr.  Davidson was standing within

20   about two feet of him.  And Mr. Crago went--during the

21   process of Mr. Crago put the gun out the window and

22   told Mr. Davidson to lie down.  Mr. Davidson reached

23   for the gun, Mr. Crago fired, no reaction from Mr.

24   Davidson.  Mr.  Davidson then steps back a couple

25   steps and says, "Your fucking dead."  And starts to

1    run into the house--toward the house.

2            Mr. Crago testified that he shot twice at Mr.

3    Davidson.  Not intending to kill him, but intending to

4    stop him from going inside because Mr. Crago was aware

5    of the fact that--there were a lot of facts.  One

6    thing he knew is that Mr.Crago--Mr. Davidson had a

7    violent reputation.  In fact Mr. Davidson has

8    previously bragged about his violent behavior towards

9    Miss Brokaw in the presence of Mr. Crago.

10           Mr. Crago was also concerned because he saw a

11   .22 rifle that you heard about in this case.  In fact

12   he saw it in the hand of Mr.  Davidson.  Mr.  Crago

13   also testified that when Mr.  Davidson was standing

14   next to the car, before the first shot was fired, he

15   could see Mr. Davidson's--let's say Mr.  Crago was

16   over here and Mr.  Davidson was standing like this--he

17   could see Mr. Davidson's left hand, but couldn't see

18   what was in his right hand.

19           We must understand that all these events

20   apparently happened very quickly.  Mr. Crago testified

21   that Mr. Davidson after the second--or the third

22   shot-- Mr. Davidson went down approximately in the

23   area right here, that on the sidewalk that leads to

24   the front door.  Mr. Crago then testified that he

25   released the brake on the car, and he let the car roll

```
 1                    C E R T I F I C A T E

 2   STATE OF ARIZONA    )
                         )    ss.
 3   COUNTY OF COCHISE   )

 4        I, Holly R, Johnson, having been appointed as
     official court reporter, do hereby certify that the
 5   foregoing pages numbered 1 through 105, inclusive,
     constitutes a full, true and correct transcript of all
 6   the proceedings of the matter as set forth in the
     title page, all done to the best of my skill and
 7   ability.

 8

 9

10

11             Dated this 4th day of August, 1995.

12

13

14             Holly R. Johnson
               Court Reporter
15

16

17

18

19

20

21

22

23

24

25
```

# EXHIBIT E

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF COCHISE

STATE OF ARIZONA,                    )
   Plaintiff,                     )
     vs.                        )        CR94000471
EARL FELTON CRAGO, JR.,              )
   Defendant.                     )

COURT REPORTER'S TRANSCRIPT OF PROCEEDINGS

EVIDENTIARY HEARING ON PETITION FOR POST CONVICTION RELIEF

April 21, 2000

BEFORE HON. MATTHEW W. BOROWIEC

COPY

APPEARANCES:

On Behalf of the State of Arizona:
Gerald F. Till, Deputy County Attorney

On Behalf of the Defendant:
Harriette P. Levitt, Esq.

CYNTHIA A. REED
Official Court Reporter
Cochise County Superior Court
Division II
P.O. Box W
Bisbee, AZ  85603
(520) 432-9340

1

<u>I N D E X</u>

Testimony of Dr. John Davis Palmer

    Direct Examination by Ms. Levitt:        5
    Cross Examination by Mr. Till:        14
    Re-Direct Examination by Ms. Levitt:    18

Testimony of Steven Ramey:

    Direct Examination by Ms. Levitt:        20
    Cross Examination by Mr. Till:        26
    Re-Direct Examination by Ms. Levitt:    27

Testimony of Robert Annenberg:

    Direct Examination by Ms. Levitt:        31

Testimony of James Connell:

    Direct Examination by Ms. Levitt:        41
    Cross Examination by Mr. Till:        46

Testimony of James White:

    Direct Examination by Mr. Till:        49
    Cross Examination by Ms. Levitt:     62
    Re-Direct Examination by Mr. Till:    80

49

1   trial, the attorney for the Defendant, Jim White, to the

2   stand.

3          THE COURT:  All right.

4

5              JAMES G. WHITE,

6

7   having been first duly sworn to tell the truth, the whole

8   truth and nothing but the truth, was examined and testified

9   as follows:

10

11         THE COURT:  How are you, Mr. White?  I haven't seen

12  you for a while.

13         THE WITNESS:  I know.

14         THE COURT:  Where are you, in Tucson?

15         THE WITNESS:  Yes.

16         THE COURT:  All right.  Go ahead, Mr. Till.

17

18         D I R E C T   E X A M I N A T I O N

19

20  BY MR. TILL:

21      Q.  Would you state your name for the record, please?

22      A.  James White.

23      Q.  And are you an attorney licensed in the State of

24  Arizona?

25      A.  Yes.

1    Q.    Were you the trial attorney for Earl Felton Crago,

2  Jr. at his murder trial back in 1995?

3    A.    Yes.

4    Q.    At that time, which office were you with?

5    A.    I believe I was with the Cochise County Legal

6  Defender's Office.

7    Q.    The Legal Defender's Office.    And you were

8  appointed to represent Mr. Crago?

9    A.    The office was, yes.

10   Q.    At the trial  -- first of all, have you had an

11 opportunity to read some of the transcript of the trial?

12   A.    Yes, I have.

13   Q.    And are you intimately familiar with all the facts

14 at this time?

15   A.    Given the fact that the trial was five years ago,

16 and the fact that I have reviewed some of the transcripts, I

17 believe that I am fairly familiar with the facts.

18   Q.    What type of a defense did you present at the

19 trial?

20   A.    Self defense.

21   Q.    And with regard to the role of methamphetamine in

22 this case, do you recall your client's testimony of his use

23 of methamphetamine?

24   A.    Yes, I do.

25   Q.    Had he used it on a regular basis for some time?

1    A.   As I recall, he had, up until a week or two prior

2    to the incident.

3    Q.   And did he claim to have been influenced by the

4    methamphetamine at the time of his -- at the time of the

5    murder in this case?

6    A.   You're talking about his trial testimony?

7    Q.   Yes.

8    A.   Okay.   His trial testimony was that he was not

9    feeling any of the affects of methamphetamine.

10   Q.   And was there testimony that the victim in this

11   case, or was there evidence that he had methamphetamine in

12   his system?

13   A.   Yes.

14        THE COURT:   The victim did?

15        MR. TILL:   The victim did.

16   BY MR. TILL:

17   Q.   Was that through blood tests?

18        THE COURT:   You're not talking about anything you

19   were told by Mr. Crago?

20        THE WITNESS:   At this time, Your Honor, I'm

21   testifying only about what was presented at trial.

22   BY MR. TILL:

23   Q.   We had a stipulation of a lab result in evidence

24   that the victim, Mr. Davidson, had methamphetamine in his

25   blood.   Do you recall that?

52

1    A.    Yes.

2    Q.    And what evidence, if any, did you present at trial

3    regarding the effects of methamphetamine?

4    A.    Primarily, if I recall, it was through the medical

5    testimony, through Dr. Flores, the medical examiner.

6    Q.    And he testified that the effects are long lasting

7    and could be paranoia and irrationality?

8         MS. LEVITT:  Objection.  Leading.

9         THE COURT:  Yes.  Sustained.

10   BY MR. TILL:

11   Q.    Do you recall what he testified, briefly?

12   A.    Yes.  That, as you say, that methamphetamine use

13   could lead to paranoia, loss of touch with reality,

14   irrational behavior, basically.

15        THE COURT:  Do you remember if Dr. Flores so

16   testified, or has your recollection been refreshed by reading

17   the transcript?

18        THE WITNESS:  Your Honor, I would say it's a

19   combination of the two.

20        THE COURT:  All right.  You believe that that's

21   what he did testify?

22        THE WITNESS:  That's correct, Your Honor.

23        THE COURT:  All right.  Go ahead.

24   BY MR. TILL:

25   Q.    Do you recall, from the trial, what your client

53

1    testified precipitated the immediate self defense action on

2    his part?

3         A.   As I recall, there were a number of things that

4    went through his mind leading up to the shooting of Mr.

5    Davidson.  And, as I recall, we presented evidence of those

6    things at trial.  One of the factors that -- one of the

7    things that was going through Mr. Crago's mind was the fact

8    that Mr. Davidson -- he knew of Mr. Davidson's violent past.

9    That Mr. Davidson had -- I don't know how -- told -- I'll

10   say told Mr. Crago, in his social contacts with Mr. Davidson,

11   that he had been engaged in assaultive behavior, and, as I

12   recall, maybe even boasted about that fact.

13        Q.   The victim?

14        A.   Mr. Davidson.  Correct.

15        Q.   Did you present any evidence of his propensity to

16   violence at the trial?

17        A.   Yes, we did.  As I recall, we called several

18   officers.  I believe they were primarily Sierra Vista Police

19   Officers to testify about incidents where they had appeared

20   on the scene and investigated incidents of assaultive

21   behavior by Mr. Davidson on previous occasions.

22        Q.   And what was the testimony at trial from Mr. Crago

23   regarding Davidson's position at the house where the murder

24   occurred?

25             MS. LEVITT:  Judge, this really is irrelevant.

54

1         THE COURT:  The discussion at the house?

2         MR. TILL:  No.  What was the testimony at trial

3  from Mr. Crago regarding his position --

4         THE COURT:  Go ahead.  Rephrase your question.  I

5  want to hear it again.

6  BY MR. TILL:

7      Q.  You testified that the propensity to violence on

8  the part of the victim was some evidence that you presented

9  as a self defense defense.  My question to you is, in

10  addition to that, what did Mr. Crago testify at trial was the

11  role of the victim in that particular house where the murder

12  occurred?

13         MS. LEVITT:  Objection.  It's irrelevant.

14         MR. TILL:  Your Honor, it's very relevant to show

15  -- he's challenged  --  she's alleging that he was

16  ineffective.  So the defense of self defense  --  I'm

17  certainly allowed to bring out that there was something in

18  addition to the propensity for violence brought out by

19  counsel in putting his client on the stand.  Primarily

20  testifying that this victim was an enforcer for Sissy Brown

21  in that house.  Obviously another factor he presented to the

22  jury, through his client, on the issue of self defense.

23         THE COURT:  How would he know that?  From Mr. Crago

24  or from someone else at the house?

25         MR. TILL:  Well, the question was what was the

1    testimony at trial from his client.

2              THE COURT:  Overruled.  He may answer.  Do you

3    understand the question?

4              THE WITNESS:  Yes.  I think I do.  I believe that

5    Mr. Crago testified at trial that Mr. Davidson was an

6    enforcer for Ms. Brown.

7    BY MR. TILL:

8         Q.   And was there any testimony from him that he

9    overheard any testimony from Ms. Brown and the victim prior

10   to the shooting?

11             MS. LEVITT:  Your Honor, this is irrelevant.  The

12   transcripts speak for themselves.  The question here is not

13   what he did do, it's what he didn't do and why.

14             MR. TILL:  The question is what he did do and why

15   he didn't do certain things counsel alleges he should have

16   done and didn't.  That's very relevant.

17             THE COURT:  So he had some knowledge that

18   influenced the way he presented the case.  That's what you're

19   trying to show.

20             MR. TILL:  Exactly.

21             THE COURT:  Yeah.  Inasmuch as it is a claim of

22   ineffective assistance, the transcript could be hollow in

23   that regard.  Overruled.  You may answer.

24             THE WITNESS:  I'm sorry.  I forgot the question.

25             THE COURT:  Repeat the question, counsel.

56

BY MR. TILL:

Q.   Did your client testify at trial that he overheard a conversation between Sissy Brown and her enforcer, that being the victim in this case?

A.   Yes.

Q.   What was that?

A.   Something to the effect of get him or kill him or something of that nature.

Q.   What did he say he did after he heard that order, for a lack of a better word?

A.   Immediately left Sissy Brown's home.

Q.   And then that's when the confrontation occurred outside the home?  The victim had apparently followed him out; is that right?

A.   That was his testimony, yes.

Q.   Why, under the circumstances, didn't you present anymore evidence of the affects of methamphetamine on either the victim or the Defendant?

A.   Well, as I said before, this was -- there were three elements to the self defense defense in this case, and I didn't think that any one element was any more important than the other.  Again, we had the fact that Mr. Crago was aware of Mr. Davidson's violent background.  His propensity for violence, as we said before.  Two, was the fact that Mr. Crago was aware of the fact that he was the object of Sissy

1   Brown's rath against him, in the nature of a contract.

2          I believe there was testimony that a week or two

3   prior to this that Mr. Crago was aware, through the

4   grapevine, that Sissy Brown had ordered a contract on Mr.

5   Crago, which we believed to mean was a threat on his life.

6   And the third fact was the methamphetamine factor. However,

7   we didn't think that applied to Mr. Crago. Again, because of

8   his testimony that he had not used methamphetamine

9   immediately prior to the incident, and that he was not

10  feeling the effects of the methamphetamine. And, again, we

11  were able to bring out, through Dr. Flores -- and I was here

12  and I heard Dr. -- well, the --

13         MS. LEVITT: I'm going to object to the witness

14  commenting on the testimony for today's hearing, Your Honor.

15  It's not the question before him, and it's not his place to

16  comment on it.

17         MR. TILL: Well, he's simply using that point of

18  reference to make an answer, Your Honor.

19         THE COURT: Overruled. You may answer.

20         THE WITNESS: Anyway, I heard the testimony of the

21  doctor who testified at this hearing before, and to me, at

22  least, it was the same or similar to what Dr. Flores said,

23  and that is that methamphetamine had the effects of

24  irrational behavior, basically. And we were also able to

25  present some evidence, too, through lay witnesses. If you

LASER BOND FORM B    PENGAD • 1-800-631-6989

1   recall, Sissy Brown testified at the trial, and I questioned

2   her quite intently about her admitted methamphetamine use,

3   and she testified, as well, about the effects of

4   methamphetamine. And there was even a question of whether

5   she was under the influence of methamphetamine at the time of

6   her testimony, because she was exhibiting similar symptoms.

7          So, again, it wasn't any one thing. It was a

8   combination of things. Certainly, it boiled down to the fact

9   that Mr. Crago reasonably believed that his life was

10  endangered by Mr. Davidson, and that Mr. Davidson was going

11  in to Ms. Sissy Brown's home to retrieve a .22 rifle that Mr.

12  Crago had seen inside the home. And, again, that under the

13  circumstances he acted reasonably. That was the defense.

14     Q.   Do you see any difference in defending against this

15  man, on the part of Mr. Crago, because he overheard this

16  order to kill him, versus whether the intent to kill was the

17  result of methamphetamine induced paranoia?

18     A.   I would have to say if one believes that one's life

19  is in danger, it wouldn't -- it wouldn't make any difference

20  to me whether the person was under the influence of

21  something, or not, if I reasonably believed that I was in

22  peril.

23     Q.   Was there, to your knowledge, an instruction given

24  in this case regarding a self defense instruction, a

25  reasonable person's use of force, under the circumstances?

1    A.    Yes.

2    Q.    And the fact that Mr. Crago had testified that he

3 had been a chronic methamphetamine user, and the fact that he

4 said he had stopped a week before the hearing, did that play

5 any role in not bringing out detailed testimony regarding

6 methamphetamine use?

7    A.    Well, I thought we had brought out detailed

8 testimony.  And, again, it was these three factors that we

9 were trying to show the jury, or were going through Mr.

10 Crago's mind.  That was the approach.  And, again, it was not

11 any one factor that was more important than any other factor.

12 It was a combination of the three.

13    Q.    With regard to the second issue in this hearing,

14 that is the alleged mechanical defects regarding the vehicle.

15 Do you recall, from the facts of this case, whether there was

16 anyone else with Mr. Crago at the time he parked that car at

17 the murder scene, at about 5:00 in the morning on the 28th of

18 September, 1994?

19    A.    There was no testimony of that.

20    Q.    Do you have any knowledge that there was anyone

21 else with him at that time, who could testify, in addition to

22 Mr. Crago, about whether he, in fact, removed the fuse, or

23 not?

24    A.    Then we're getting into attorney/client privilege,

25 I believe.

1    THE COURT:  Independent of anything your client may

2  have told, did you have any information about anybody else

3  being present?

4    THE WITNESS:  No, I didn't.

5    THE COURT:  All right.

6  BY MR. TILL:

7    Q.    Why didn't you bring in any additional evidence of

8  defects of the vehicle in this case?

9    A.    Well, to fully explain that, I would have to get

10  into attorney/client relationship -- communications.

11    MR. TILL:  Well, actually, I believe ineffective

12  assistance waives that privilege, Your Honor.  Well, maybe I

13  can ask the question a different way.  Shall I try?

14    THE COURT:  Yes.

15  BY MR. TILL:

16    Q.    Do you recall at what stage you learned of the

17  alleged mechanical defect in the vehicle?

18    A.    As I recall, it was -- and I can't give an exact

19  date nor time, but as I recall it was relatively shortly

20  before trial.

21    THE COURT:  Like a month, a week, an hour?

22    THE WITNESS:  Well, that's what I say, Your Honor.

23  Probably within two weeks of trial, perhaps.

24  BY MR. TILL:

25    Q.    And did your client testify at trial that he, at

1    times, used this method of removing the fuse to protect his

2    vehicle from theft?

3        A.   At trial he testified to that, yes, he did.

4        Q.   And did he also testify that there were times that

5    he didn't take it out?

6        A.   Yes.

7        Q.   And do you recall the witness, Tova Sitts

8    (phonetic)?

9        A.   Yes.

10       Q.   Whose witness was she, in this case, initially?

11            MS. LEVITT:   Objection.   That's irrelevant.   A

12   witness doesn't belong to a side, Your Honor.   A witness is

13   called to testify truthfully, not take some --

14            THE COURT:   Overruled.

15            THE WITNESS:   I believe the Defense called that

16   witness.

17   BY MR. TILL:

18       Q.   She was a girlfriend of Mr. Crago's?

19       A.   Well, I think she characterized her relationship as

20   a friend.

21       Q.   All right.   And, at one time, had romantic

22   interests, I believe the transcript reflects.   But, at any

23   rate, do you recall that the state recalled her in rebuttal

24   in this case?

25       A.   Yes.

1    Q.   And do you know what was established through her?

2    A.   Ms. Sitts testified that she had ridden in Mr.

3  Crago's car on numerous occasions, and could not recall

4  seeing him removing a fuse or putting a fuse back in to start

5  the vehicle.

6    Q.   All right. Did she testify as to how long she had

7  known Mr. Crago?

8    A.   I believe she said about a year.

9    Q.   And do you recall if there was trial testimony as

10  to when this defect occurred -- of the vehicle. The key in

11  the ignition?

12    A.   I don't recall. But my best recollection was that

13  he had not had the car that long, so it was relatively recent

14  to this incident, is my best recollection.

15    MR. TILL:  All right. That's all I have, Your

16  Honor.

17

18          C R O S S   E X A M I N A T I O N

19

20  BY MS. LEVITT:

21    Q.   How long have you been in practice, Mr. White?

22    A.   Sixteen years.

23    Q.   And how long were you with the Legal Defender's

24  Office before you undertook this case?

25    A.   Let's see. I was appointed as the Legal Defender

63

1   by the Board of Supervisors in March -- I'm trying to think

2   what year.  In '94, I believe.  Or '93.

3       Q.   So you had only recently joined that office when

4   you were appointed to represent Mr. Crago; is that correct?

5       A.   That's correct.  That was not my first job, though.

6       Q.   I understand that.  You've been in practice for 16

7   years.

8       A.   That's right.  As a public defender and criminal

9   defense for several years prior to that.

10      Q.   Prior to representing Mr. Crago, how many murder

11  trials had you handled as first chair?

12      A.   You know, I'm not sure.  That may have been the

13  first one.

14      Q.   However, you had represented defendants on prior

15  felonies prior to this case; correct?

16      A.   That's correct.

17      Q.   And you get a case, and what's the first thing you

18  do when you get a case?

19      A.   What was the first thing I did in this case, or in

20  general?

21      Q.   Well, what's your practice?

22      A.   Well, what's the first thing you do when you get a

23  case.  Well, I would say you contact the client.

24      Q.   You get his story?

25      A.   You get his story  -- eventually, yes.

1    Q.    Did you do that in this case?

2    A.    Pardon me?

3    Q.    Did you do that in this case?

4    A.    Did I get his story?

5    Q.    Not a story.  Mr. Crago's story.

6    A.    Well, I got several stories.

7    Q.    Mr. Crago tells you, at some point in time, that he

8    shot Mr. Davidson in self defense.

9    A.    He said that he shot Mr. Davidson, yes.

10    Q.    Did he say it was self defense?

11    A.    We developed that defense, yes, we did.

12    Q.    While you're developing this offense, you have

13    police reports and an autopsy report that is given to you by

14    the State; is that correct?

15    A.    That's correct.

16    Q.    And your autopsy report says that the victim was

17    shot in the back several times; right?

18    A.    Twice, I believe, yes.

19    Q.    What do you think that does for your self defense

20    claim?

21    A.    It makes it tough.

22    Q.    Okay.  Did you evaluate this case in terms of

23    whether you could win or lose it?

24    A.    This was a very difficult case --

25    Q.    That's not my question.  Did you evaluate this case

1    in terms of whether you could win or lose it; yes, or no?

2         A.   Of course.

3         Q.   Did you think  -- well, when did you make the

4    evaluation  -- at what point in time?

5         A.   It was continually being evaluated.

6         Q.   When you first made an evaluation, when you first

7    sat down and thought about this case, did you think you could

8    win the case?

9         A.   Well, the first time I got the case, there's no way

10   of telling that.   When you first get the case you have no

11   reports.   The discovery process takes a while.

12        Q.   But my question is not did you think you could win

13   it when you first got the case, my question is did you think

14   you could win it when you first evaluated it?

15        A.   I thought there was a reasonable self defense

16   claim, yes.

17        Q.   Did you think you could win the case?

18        A.   Yes.

19        Q.   When did you think you could win the case?

20        A.   When we had all the information that we felt was

21   available to us.   And by "us," I mean myself, Mr. Crago and

22   the investigator we hired, as well.

23             THE COURT:  Were you assisted by other counsel?

24             THE WITNESS:  No, Your Honor.  I was by myself.

25             THE COURT:  Okay.

66

BY MS. LEVITT:

Q.  Was that more than two weeks before trial?

A.  The evaluation of the case?

Q.  Yeah.

A.  Yes.  Again, it was under continual evaluation.

Q.  Did you conduct any research into the effects of methamphetamine on the human body?

A.  Personally?

Q.  Yeah.

A.  No.

THE COURT:  You mean you didn't try any methamphetamine?

THE WITNESS:  I didn't try any.  I didn't --

THE COURT:  What do you mean research?  Do you mean scientific research or legal research?

MS. LEVITT:  I can ask additional questions to develop that, Your Honor.

THE COURT:  All right.

BY MS. LEVITT:

Q.  You know that there are magazine articles in medical journals that explains what methamphetamine does to people?  Are you aware of that?

A.  Yes.

Q.  Did you look at any?

A.  I didn't need to.

1    Q.    Did you look at any?

2    A.    I didn't need to.

3    Q.    I'm not asking what you thought you needed, I'm

4    asking what you did.  Did you look at any articles?

5    A.    No, I didn't.

6    Q.    Did you call up any experts to talk about that?

7    A.    I don't recall that I did.

8    Q.    Now, you testified earlier, in response to Mr.

9    Till's questions, that you didn't think that the issue

10   mattered, because you didn't think Mr. Crago was under the

11   influence of methamphetamine at the time of the shooting; is

12   that correct?

13   A.    That was his statement to me, yes.

14   Q.    I'm not asking you his statement to you.  I'm

15   asking your evaluation of the issue of the effect of

16   methamphetamine was not important to the case because of Mr.

17   Crago's statement that he was not under the influence.

18   A.    And not feeling the effects.

19   Q.    Right.  Is that your evaluation?

20   A.    Partially.

21   Q.    Okay.  You had an autopsy report and a lab report

22   that showed that Mr. Davidson was under the effects of

23   methamphetamine; correct?

24   A.    Correct.

25   Q.    And you felt that Dr. Flores, the State's medical

1    examiner, covered the effects of what methamphetamine has on

2    a person; correct?

3         A.    He was one of the witnesses that testified about

4    the effects, yes.

5         Q.    And isn't it true that Dr. Flores has some

6    difficulty speaking English?

7         A.    Yes, he does.

8         Q.    And isn't it also true, sir, that he does not have

9    a degree in pharmacology?

10        A.    I don't believe he does.

11        Q.    Did you do any checking into his background, as far

12   as his credentials go?

13        A.    Yes.  I believe he testified at trial regarding his

14   credentials.

15        Q.    I'm not asking you what he testified at trial.  Did

16   you check into his credentials?

17        A.    I had had prior contacts with Dr. Flores, so I knew

18   what his credentials were.

19        Q.    Okay.  Do you consider him to be an expert on drug

20   use?

21        A.    No, I don't think he held himself out to be an

22   expert on drug abuse.

23        Q.    And you would not call him as one; would you?

24        A.    Not on that specific subject, no, I would not.

25        Q.    When you're trying to defend somebody, do you think

1  it's a good idea to just go with what your client tells you

2  and present that testimony, or do you think it's a good idea

3  to try to get as much evidence to back up what your client is

4  saying as you possibly can?

5      A.    I think it's a combination of the two.

6      Q.    Well, you got a guy that's an admitted drug dealer,

7  and he's charged with murder and he looks like this

8  (indicating).  Do you think a jury is really going to believe

9  everything he tells them?

10     A.    I would have to say that he presented a very tough

11 image for the jury, yes.

12     Q.    Don't you think it would have been a good idea to

13 have people who could corroborate his testimony?

14     A.    Such as?  Which part of his testimony?

15     Q.    I'm asking you do you think it would have been a

16 good idea to have people who could corroborate his testimony?

17     A.    In general?

18     Q.    Yes.

19     A.    If possible.

20     Q.    When he tells you:  This guy was using meth.  I

21 thought he was gonna kill me.  It never occurred to you to

22 find out if the meth use could have affected Davidson's

23 behavior; did it?

24     A.    No, that's not correct.

25     Q.    You did think it was important to establish how the

70

1  meth use could have affected Davidson's behavior?

2      A.   Yes.   And that's why that was brought out on Dr.

3  Flores' testimony.

4      Q.   Did you cross examine Dr. Flores regarding

5  Davidson's behavior that night?

6      A.   No.   We talked about it in general.   I don't think

7  he was aware of Mr. Davidson's behavior that night.

8      Q.   You didn't question Dr. Flores about the likelihood

9  that Davidson would behave irrationally that night; did you?

10     A.   I don't know that Dr. Flores could have testified

11 as to Davidson's state of mind that night.

12     Q.   Because he's not an expert in drug use; is he?

13     A.   He had never met Mr. Davidson or was not there that

14 night.

15     Q.   And that's your criteria for determining whether an

16 expert can give testimony about a person's state of mind,

17 based on their drug use?

18         MR. TILL:   Objection.   She's argumentative at this

19 time.   It's been asked and answered.

20         THE COURT:   I'm sorry, counsel?

21         MR. TILL:   She's argumentative at this time.

22         THE COURT:   Yes you are, counsel.

23 BY MS. LEVITT:

24     Q.   Is that your criteria for determining what kind of

25 questions to ask of a witness, sir?

1     A.   I'm sorry.  I've lost the point of the question.

2     Q.   You're saying that Dr. Flores wasn't there that

3   night and had never met Mr. Davidson.  Is that your criteria

4   for determining what kind of questions you could ask a

5   medical doctor?

6          THE COURT:  About Mr. Davidson?

7          MS. LEVITT:  Yeah.

8          THE WITNESS:  I think the question would be, and,

9   as I recall, this is how the testimony came down  --

10  BY MS. LEVITT:

11    Q.   No, sir, I'm not asking you how you recall the

12  testimony.  I'm asking you your criteria --

13    A.   Well, I'm trying to explain that, through the way

14  the trial was conducted, counsel.  So if you will allow me to

15  do that.  First, there was a stipulation presented to the

16  jury that Mr. Davidson had evidence of methamphetamine in his

17  system.

18         Second, when Dr. Flores took the stand, I informed

19  Dr. Flores that we had stipulated to the fact that Mr.

20  Davidson, the victim in this case, had evidence of

21  methamphetamine in his system.  Then we went on to the

22  effects, in general, because, again, I thought it would have

23  been ridiculous to try to pinpoint those effects on Mr.

24  Davidson, because of the lack of knowledge by Dr. Flores of

25  Mr. Davidson.  So we have to talk, as your witness did, as

72

1  far as in general. There's no way we can, especially when we

2  have a deceased person, as in this case -- there's no way

3  any expert could ethically testify as to what that particular

4  person -- what was going through that particular person's

5  mind or what that particular person was experiencing at the

6  time.

7      Q.   It's your testimony, sir, that you listened to Dr.

8  Palmer testify earlier this morning?

9      A.   That's correct.

10     Q.   And you don't think that Dr. Palmer said anything

11 more than Dr. Flores said?

12     A.   I didn't think so, because I thought, as far as the

13 immediate effects, I thought their testimony was very close.

14 Dr. Palmer could not seem to testify with any certainty as to

15 the effects on people who have quit using the drug. I think

16 that might be part of your point here. What residual

17 effects, if any, were there on Mr. Crago.

18     Q.   You're focussing on Mr. Crago; aren't you?

19     A.   Well, because I'm telling you what the testimony

20 was today.

21     Q.   All right. Let's go on to something else, sir.

22     A.   Okay.

23     Q.   You did agree earlier, that when you're defending

24 somebody in this kind of situation, it would be helpful to

25 have someone corroborate their testimony, if possible;

73

1  correct?

2        A.   That's correct.

3        Q.   You had an investigator; correct?

4        A.   Yes.

5        Q.   Did you look for the car?

6        A.   No.

7        Q.   Why not?

8        A.   As I said, the issue raised by Mr. Crago at trial

9  regarding the fuse, that I recall, came very late, and as we

10  were approaching trial, which was several months after he was

11  arrested in Texas, where I believe the car was left.  And,

12  secondly, I believe, also, and this was Mr. Crago's

13  testimony, that he would not remove the fuse from his vehicle

14  on every occasion.  That he would do so only if he thought

15  that there was a possibility or a likelihood that the car

16  would be stolen.

17             And, under these circumstances, it didn't seem

18  reasonable to me, because, as I recall, his testimony was

19  that he went by Sissy Brown's house to pay a debt, and that

20  he was going to Texas immediately thereafter.  And it didn't

21  seem reasonable to me, at the time, to present to the jury

22  the fact that he would have removed the fuse from his vehicle

23  when he was going to stop in just briefly to give her some

24  money.  And it didn't seem to be any belief, or reasonable

25  belief or Mr. Crago believed that there was anybody around at

1  that time, that morning -- I believe it was 4- or 5:00 in

2  the morning, to steal his vehicle.  So it didn't seem all

3  that important, in the grand scheme of things.

4      Q.  You, basically, didn't think he had removed the

5  fuse that night.  Is that what you're telling us?

6      A.  No.

7      Q.  You did present testimony that he did remove the

8  fuse; didn't you?

9      A.  That's what he testified to.  That's correct.

10      Q.  And he told you that before trial?

11      A.  As I recall, shortly before trial.

12      Q.  And you're telling us that the first time he told

13  you about this was a couple of weeks before the trial?

14      A.  That's as I recall, yes.

15      Q.  And you didn't say:  How come you never told me

16  this before?

17      A.  Again, this was involving --

18      Q.  Well, sir --

19      A.  If I could --

20      Q.  Sir, I'm asking you a specific --

21      THE WITNESS:  Could I answer the question, Your

22  Honor?

23      THE COURT:  Yes.  Let him answer the question.

24      MS. LEVITT:  Well, Your Honor --

25      THE COURT:  Let him answer the question, Ms.

1    Levitt. Go ahead. Answer the question.

2                THE WITNESS: This case evolved from the very

3    beginning.

4                THE COURT: As all do.

5                THE WITNESS: As all do. And this particular case,

6    I thought, was a little unusual, because the theory of the

7    defense changed on a number of occasions. So that's how the

8    case evolved.

9    BY MS. LEVITT:

10       Q.   Two weeks before trial your client is telling you:

11   The car had problems. I couldn't turn it off. I pulled out

12   the master fuse. You didn't ask for a continuance; did you?

13       A.   No.

14       Q.   You could have; couldn't you?

15       A.   Two weeks before trial in this case? I suppose I

16   could have.

17       Q.   You client was facing life in prison; correct?

18       A.   That was the maximum sentence. That's correct.

19       Q.   And you had a new investigative lead; correct?

20       A.   That's correct.

21               THE COURT: That may have been important. You've

22   tried cases; have you not?

23               MS. LEVITT: Yes, I have, Your Honor.

24               THE COURT: All right. Then you know that cases do

25   evolve, and you get shot sometimes by the changes in the

1    stories that your clients sometimes tell you.

2          MS. LEVITT:  Yes, Your Honor.

3          THE COURT:  And sometimes you're forced to proceed

4    with a case in which you are not too comfortable.  <u>Did you</u>

5    <u>give any consideration</u>, as a trained lawyer, to a <u>possible</u>

6    <u>claim of self defense</u>, based on the fact that the Defendant

7    might have believed that Mr. Davidson was going into the

8    house to get a gun to shoot him, so he <u>then shot him in the</u>

9    <u>back</u>?

10         THE WITNESS:  Yes.

11         THE COURT:  And did you evaluate that from a legal

12    standpoint?

13         THE WITNESS:  Of course.

14         THE COURT:  And did you think that there was any

15    merit to presenting such a claim?

16         THE WITNESS:  Under the circumstances, Your Honor,

17    that was the best claim we had.

18         THE COURT:  There was something else about a fight

19    right there and being shot.  I remember -- I'm sorry.  My

20    recollection is flawed because I haven't read the transcript.

21    I don't know if I should have read the transcript.  I don't

22    even know whether it was available to me.  It seems to me

23    there was some shift in position that had to do with a claim

24    of self defense right there at the car, because they were

25    struggling and a gun went off and somebody was shot in the

LASER BOND FORM B ● PENGAD • 1-800-631-6989

1   leg.  Was somebody shot in the leg?

2          THE WITNESS:  Yes.  I believe that was Mr. Crago's

3   testimony, Your Honor.  That Mr. Crago was in the car.  Mr.

4   Davidson reached in through the window of the car and began

5   to choke Mr. Crago.  That there was a struggle.  Mr. Crago

6   had a gun in the car and the gun went off and struck Mr.

7   Davidson in the thigh.  And then, subsequently, Mr. Davidson

8   bolted for the door of the Brown residence, where the rifle

9   was.

10         THE COURT:  It seems to me -- I may be wrong, and,

11  again, I haven't read the transcript, but there seems to be

12  some shift in position, somehow, in that period of time, when

13  Mr. Crago's testifying, that I thought that that was the

14  claim of self defense to shooting him in the thigh, and that

15  the shooting in the back was very closely related.  I'm not

16  sure.  I knew it was in the back.  But it finally came out,

17  in the trial, that he was  -- Mr. Davidson was heading back

18  to the house and he got shot.

19         THE WITNESS:  Well, it was a chain of events, all

20  happening, of course, very quickly.  So Mr. Crago was really

21  unable to, under the circumstances, because things were

22  happening so fast -- him leaving the house.  Mr. Davidson

23  following him out of the house.  Mr. Crago getting into his

24  car.  Mr. Davidson actually coming up to the car, actually

25  reaching into the car and attempting to choke him.  Mr. Crago

1    attempting to defend himself.  He had a pistol in the car.

2    He grabbed the pistol, which went off in the struggle.  These

3    things, as I recall, and the testimony was that there was no

4    break in between.  This was a continuous sequence of events.

5            THE COURT:    I allowed an instruction on self

6    defense.  And I may be wrong on this, but it seems to me that

7    I was not aware of any claim of self defense that Mr. Crago

8    had a fear that he was going to come back and kill him, until

9    on an appeal.  I don't know.  You're saying now that you

10   considered that -- the self defense of shooting somebody in

11   the back because he was going to get a gun and kill you.

12           THE WITNESS:    Yes.  I believe that was part and

13   parcel of the entire incident.

14           THE COURT:  All right.  Go ahead, counsel.

15   BY MS. LEVITT:

16       Q.    Now, before Mr. Crago revealed to you the issue

17   about the car, up until that moment, or two weeks before

18   trial, according to your testimony, did you think you could

19   win the case?

20       A.    Yeah.  I thought, under the circumstances, we had

21   a viable self defense, or I would not even have approached

22   that.

23       Q.    And  did  you  think  corroborating  testimony

24   concerning his inability to leave quickly would have helped

25   win the case?

1    A.    Well, in hindsight, possibly. I knew, at the time,

2    that the State didn't have access to that vehicle.  And, of

3    course, at that point in time the State had never heard a

4    statement by Mr. Crago regarding exactly what happened,

5    because, basically, he had not made a statement after he was

6    arrested.  So the State did not have any benefit of being

7    able to review any prior statements by Mr. Crago and to

8    critically review those statements.  So, anyhow, I felt

9    fairly assured, at the time of trial, knowing at that time

10   what Mr. Crago, what he testified to, that the State would

11   not be able to present the vehicle.

12   Q.    Did you make any effort to ask Mr. Crago whether he

13   had anybody who could corroborate his testimony, who saw him

14   operate the vehicle in the manner he was going to describe at

15   trial?

16   A.    You know, I don't recall.

17   Q.    And you just testified that you thought that you

18   had, let's say, an edge, because the State didn't have access

19   to the vehicle, so you didn't expect that they could refute

20   his testimony on that score; is that fair to say?

21   A.    As far as having the vehicle available to the jury

22   to -- if the Court would have allowed that, or the Court and

23   counsel would have allowed that and for them to inspect the

24   vehicle, I knew as far as that stage of the proceedings the

25   State had never presented any photographs of the car, the

1    ignition system or the fuse box or anything of that nature.

2        Q.   So would it be fair to say that the testimony of

3    Tova Sitts took you by surprise when she was called in

4    rebuttal?

5        A.   Not necessarily.  It certainly wasn't helpful, but

6    I didn't think it was devastating, in that, again, one could

7    certainly argue that he had used the fuse only on occasions

8    -- again, his testimony was that he removed the fuse only on

9    occasions when he believed that the car was vulnerable to

10   theft.  And, so, she had said that she had been with him on

11   a number of occasions and had never seen him use the key.

12   But that doesn't tell the whole story because, again, one can

13   argue that on those occasions when she was with him, that his

14   state of mind was not that his car was vulnerable to theft.

15       Q.   Yet you, yourself, testified that you didn't think

16   it was an important issue, because if he was just stopping

17   off to pay a drug debt at 4:00 in the morning, why would he

18   pull the fuse out anyway; right?

19       A.   Well, I thought that that was -- again, given Mr.

20   Crago's testimony, that was a difficult issue.

21           MS. LEVITT:  All right, sir.  I have no further

22   questions.

23           MR. TILL:  Just a couple, Your Honor.

24           THE COURT:  All right.

25

R E - D I R E C T   E X A M I N A T I O N

BY MR. TILL:

Q.  Mr. White, counsel is asking why you didn't further investigate methamphetamine use by the victim.  What difference, if any, would it be to you if I, with the intent to kill you, approached you to strangle you, based on orders from somebody else to do so, or whether it's because I'm in a methamphetamine induced state of paranoia?

A.  Well, under these circumstances presented in this case, I don't know that it was absolutely critical, given, again, the totality of the circumstances where, again, we have Mr. Crago's knowledge of the violent background of the victim.  Where Mr. Crago knows or he believes or has reason to believe his life is in danger and that Sissy Brown and Mr. Davidson are primary actors in that threat to his life, and, again, the methamphetamine thing.

So, again, the way I approached the case, and the way we approached the case, it was the totality of factors.  That one factor didn't take precedence over any other.  And to directly answer your question, Mr. Crago believed that Mr. Davidson was going to go in that house and grab that rifle and shoot him.  And Mr. Crago believed that his actions were reasonable, under the circumstances, to defend himself.  And I'm not sure that it would have made -- again, that it was  -

1   - I don't know that he even knew that Mr. Davidson was under

2   the influence of methamphetamine.  I mean, he knew that Mr.

3   Davidson was a methamphetamine user.  Again, I don't know

4   that he could say for certain that he knew that Mr. Davidson

5   was under the influence at the time.  I think he may have

6   assumed that.

7       Q.   But he did know that Sissy Brown had told Davidson

8   to kill him.  At least, that's what he testified.

9       A.   That's what he testified.  That he heard that

10  immediately before he left the house.

11      Q.   So what's the difference whether his killer, that

12  he believes is going to kill him, is doing it because of an

13  order to kill or whether it's because of methamphetamine in

14  the system.  What difference does it make?

15      A.   I think I understand your point.  And, again, maybe

16  under these circumstances it didn't make a lot of difference,

17  because if he believed, again, Mr. Davidson was going to go

18  into the house and follow through with the orders of Sissy

19  Brown, and that he knew there was a .22 rifle inside, close,

20  I think within 10 feet or 10 to 15 feet inside the door was

21  the testimony of the officers who showed up later -- and,

22  incidently, I think they, when they saw the weapon, the

23  weapon was loaded.  Now, I don't know that Mr. Crago knew

24  that and I don't know, necessarily, that Mr. Davidson knew

25  that.  But that even added, in my opinion, at least, that

1　even added more credibility to the situation if that weapon

2　had been -- let's say if the weapon had been somehow

3　disabled or it wasn't loaded, then that fact may not have had

4　that much impact on the jury. But I felt the fact, again,

5　that law enforcement, who showed up shortly thereafter, and,

6　apparently, that weapon was in the same location it was in

7　when Mr. Crago was there and it was loaded, would have,

8　again, more of an impact on the jury.

9　　　Q.　Is there any other viable defense, in your opinion,

10　as good as self defense in this case?

11　　　A.　Well, ultimately, no. Again, there were a number

12　of approaches in this case that were looked at and discussed

13　with Mr. Crago. Sometimes with the investigator present,

14　sometimes not. And, under the circumstances of this case,

15　that seemed to be the most viable, legal defense.

16　　　　　MR. TILL:　I have no other questions. Thank you.

17　　　　　THE COURT:　You may step down, Mr. White.

18　　　　　THE WITNESS:　Thank you, Your Honor.

19　　　　　THE COURT:　You're excused. You're free to go.

20　　　　　MR. TILL:　The State has no further witnesses, Your

21　Honor.

22　　　　　THE COURT:　All right. Counsel want to argue?

23　　　　　MS. LEVITT:　Yes, Your Honor.

24　　　　　THE COURT:　All right. You may proceed, Ms.

25　Levitt.

96

STATE OF ARIZONA    )
                         )   SS.
COUNTY OF COCHISE    )

       I, CYNTHIA A. REED, do hereby certify that as Official Court Reporter for Cochise County, I was present at the foregoing proceedings; that while there I took down, in shorthand, all of the oral testimony adduced and proceedings had; that the shorthand notes were transcribed by me; and that the foregoing contains a full, true and correct transcript of the matter set forth in the title page hereto to the best of my ability.

*Cynthia A. Reed*

CYNTHIA A. REED

May 10, 2000

# EXHIBIT F

FILED

Time_____

APR 2 4 2000

DENISE L. LUNDIN
CLERK SUPERIOR COURT
BY _____ DEPUTY

# SUPERIOR COURT OF ARIZONA
## COUNTY OF COCHISE
### DATE: April 21, 2000

[ ] APPEALS
[ ] BONDS: REFUND/FORFEITURE
[ ] FINES/ATTY FEES/RESTITUTION
[ ] CHANGE OF VENUE
[ ] JURY FEES
[ ] ATTORNEY: APP'T & CLAIMS
[ ] SUPPORT
[ ] DIVISION
[ ] _____ FILED 4-25-00

CASE: STATE OF ARIZONA, Plaintiff, vs. EARL FELTON CRAGO, JR., Defendant.

MINUTE ENTRY ACTION: DECISION ON PETITION FOR POST CONVICTION RELIEF    119

CASE NO: CR94000471

JUDGE: HONORABLE MATTHEW W. BOROWIEC

DIVISION: ONE

DENISE I. LUNDIN, CLERK

By Stephanie L. Williams 04/21/00, Deputy

Docketed by _____

**IN CHAMBERS:**

This case was remanded to the trial court for an evidentiary hearing, which was held on the 14th day of April, 2000. The purpose of the remand to this court was to determine whether the defendant's counsel was ineffective; whether he should have explored the physiological, psychological and metabolic effects of crystal methamphetamine use by both the defendant and victim which might establish, first, that defendant was unable to premeditate the crime; and that the methamphetamine abuse by the victim exacerbated his already violent tendencies, thereby somehow bolstering defendant's self-defense claim.

Defendant also complains that trial counsel did not investigate and present evidence about the mechanical condition of defendant's vehicle at the time of the homicide to support defendant's position that the key had been broken in the ignition making it easy for anyone to start the car without a key, and of defendant's custom of removing the master fuse in the vehicle to disable it when not in use. He claims on the night of the killing, he drove to the home of Sissy Brown and the victim to deliver to them money from drug transactions. He had less than the full amount and was going to request some additional time to pay the balance. He gave the money to the victim who took it to Sissy Brown in her bedroom. He heard her instruct the victim to kill the defendant, so he quickly departed intending to leave the area. He was followed out of the home by the victim where a struggle ensued and he shot the victim in the leg. The defendant knew it would take some time to reinstall the fuse to allow him to drive off, so when the victim proceeded to return to the house, presumably to retrieve a gun to shoot the defendant, defendant shot the victim twice in the back, killing him. The defendant claims this was self defense and this defense would have been bolstered by evidence that the key in fact was broken in the ignition.

The evidence shows that trial counsel for defendant considered the victim's use of methamphetamine, which was presented as existing in the victim's body by the testimony of the pathologist. It was shown that defendant feared or had reason to fear the victim, known to be the "enforcer" for drug dealer Sissy Brown, which caused him to leave the home quickly on hearing Sissy Brown instruct the victim to kill the defendant. Little more could be added to demonstrate reason for defendant's fear of the victim. In thought, is there really a difference in the fear generated from an known killer and a crazed methamphetamine user? Or, is a known killer more to be feared if he is also under the influence of methamphetamine? It was the reasoning of defense counsel that the point was well made and that psychological or physiological testimony would add little to the issue.

The question of defendant's own methamphetamine use was of little moment to the resolution of this matter as he testified he had not used methamphetamine for some time and had not been under its influence. To pursue this avenue, that is, the residual effect of methamphetamine on the defendant, and the misperceptions of a situation that might occur, would be pure conjecture as there was no evidence of a unusual conduct on the part of defendant. This did not appear a potential defense to counsel, nor to this court. Trial counsel was not remiss in not pursuing these avenues.

A self defense instruction was given. It was given as it applied to the altercation between defendant and the victim at his automobile, and as said event might have been interpreted by the jury. The claim of self defense as it applied to the necessity of shooting the victim twice in the back to allow for time for the defendant to reinstall the main fuse in the automobile to make his escape was not considered by the court, nor would it have if presented in that form, and even now, this court finds it difficult in light of the present status of the law pertaining to self-defense to give any credence to this scenario as a basis for self -defense. Whether or not the key was broken in the ignition was of no moment to this court, which accepted that point as fact. It nevertheless does not bring into application the law of self-defense. One cannot avail himself of the law of justifiable homicide by shooting another in the back on the belief, reasonable or otherwise, that that person was going to get a gun to kill the defendant. The law is otherwise.

A defendant is justified in using or threatening physical force in self-defense if a reasonable person in defendant's situation would have believed that physical force was immediately necessary to protect against another's use or attempted use of unlawful physical force, and the defendant used or threatened no more physical force than would have appeared necessary to a reasonable person in the defendant's situation. *Recommended Arizona Jury Instructions - Criminal, # 4.04.* [Emphasis supplied].

The court finds no ineffective assistance of counsel.

It is **ORDERED** the petition for post conviction relief is **DENIED**.

Cc: County Attorney--Till
Harriette P. Levitt, Esq., 485 S. Main Avenue, Tucson, AZ 85701
Roylan Mosley--Appeals Clerk

**EXHIBIT G**

OFFICE DISTRIBUTION
APPEALS
BONDS: REFUND/FORFEITURE
FINES/ATTY. FEES/RESTITUTION
CHANGE OF VENUE
JURY FEES
ATTORNEY APPT & CLAIMS
SUPPORT
DIVISION
MAILED 8/23/01
CASE:

**SUPERIOR COURT OF ARIZONA**
COUNTY OF COCHISE
Date **August 22, 2001**

FILED

01 AUG 23 AM 8: 30

DEN... LUNDIN
CLERK ... ...ER COURT
BY _____

| | | |
|---|---|---|
| **STATE OF ARIZONA,** | VS. | **EARL F. CRAGO, JR.** |
| Plaintiff | | Defendant |

---

MINUTE ENTRY ACTION: **DECISION - POST CONVICTION RELIEF RULING (119)**          CASE NO.: **CR94000471**

---

JUDGE **HONORABLE CHARLES A. IRWIN**          DENISE I. LUNDIN, CLERK

DIVISION **FOUR**
COURT REPORTER          ----------
ADDRESS & PHONE          ----------

By **Heidi Tanner (08/22/01)**, Deputy (dp)
Docketed by _____

PRESENT:          ----------

The Court having duly reviewed the Petition (May 29, 2001), the Response (June 20, 2001), and the Reply (July 6, 2001) filed herein, as well as the files and records contained within the record, and determines that no material issue of fact or law exists which would entitle Defendant to relief.

**THEREFORE, IT IS ORDERED: DISMISSING** the Petition.

This Order is based upon the following **FINDINGS**

1. After a jury trial, Defendant was convicted of first-degree murder and the trial Court sentenced him to life imprisonment.

2. A consolidated Appeal and Petition for Review was filed and the trial Court summarily dismissed the Defendant's first Petition for Post-Conviction Relief.

3. The Appellate Court affirmed Defendant's conviction and sentence on appeal but remanded the case for an evidentiary hearing on two issues of ineffective assistance of counsel raised in Defendant's Rule 32 Petition (memorandum decision filed March 18, 1999).

4. After the evidentiary hearing was held, the trial Court again dismissed Defendant's Petition for Post-Conviction Relief, finding that he had been provided effective trial counsel.

5. Defendant filed his Petition for Review of the Court's dismissal with the Appellate Court, which granted review but DENIED relief (memorandum decision filed March 13, 2001). Defendant's Petition for Review to the Supreme Court was DENIED.

6. On May 7, 2001, Defendant filed his 2nd Notice of Post-Conviction Relief, followed by the Petition herein alleging his counsel in the preceding Post-Conviction proceeding was ineffective due to her unwillingness

Page No. Two          Date: August 22, 2001          Case No. CR94000471

MINUTE ENTRY ORDER

to accuse the trial judge of falsifying "the facts of evidence/record in his minute entry decision to support his

ruling denying relief."

Based upon the above **FINDINGS**, the Court notes as a matter of law that Defendant's Sixth Amendment

right to counsel does not extend to state collateral proceedings. Bonin v. Vasquez, 999 F.2d 425, 430 (9th Cir.

1993); State v. Mata, 185 Ariz 319, 336 (1996).

Defendant having failed to present a material question of fact or law having any appearance of validity,

THEREFORE, his 2nd Petition for Post-Conviction Relief is **SUMMARILY DISMISSED**. Rule 32.6(c), Arizona

Rules of Civil Procedure.

xc:  Gerald Till, Deputy County Attorney
     Carl F. Crago #115357, ASPC Eyman - SMU-2, P.O Box 3400, Florence, AZ 85232
     Karina Rubio, Appeals Clerk

# EXHIBIT H



FILED BY CLERK

FEB 19 2002

COURT OF APPEALS
DIVISION TWO

IN THE COURT OF APPEALS
STATE OF ARIZONA
DIVISION TWO

| | | |
|---|---|---|
| THE STATE OF ARIZONA, | ) | 2 CA-CR 01-0381-PR |
| | ) | DEPARTMENT B |
| Respondent, | ) | |
| | ) | |
| v. | ) | <u>MEMORANDUM DECISION</u> |
| | ) | Not for Publication |
| EARL FELTON CRAGO, JR., | ) | Rule 111, Rules of |
| | ) | the Supreme Court |
| Petitioner. | ) | |
| | ) | |

PETITION FOR REVIEW FROM THE SUPERIOR COURT OF COCHISE COUNTY

Cause No. CR94000471

Honorable Charles Irwin, Judge

REVIEW GRANTED; RELIEF DENIED

Chris M. Roll, Cochise County Attorney
  By Gerald F. Till

Bisbee
Attorneys for Respondent

Earl F. Crago, Jr.

Florence
In Propria Persona

H O W A R D, Presiding Judge.

¶1      After a jury trial, petitioner Earl Felton Crago, Jr., was convicted of first-degree murder and was sentenced to life in prison. He filed a petition for post-conviction relief pursuant to Rule 32, Ariz. R. Crim. P., 17 A.R.S., raising claims of ineffective assistance of trial counsel, which the trial court summarily dismissed. A consolidated appeal and petition for review of the trial court's dismissal followed. We affirmed petitioner's conviction and sentence on appeal but remanded the case for an evidentiary hearing on two claims of ineffective assistance of trial

counsel. *State v. Crago*, Nos. 2 CA-CR 95-0488, 2 CA-CR 98-0230-PR (consolidated) (memorandum decision filed March 18, 1999).

¶2      Following an evidentiary hearing, the trial court found that trial counsel had not been ineffective and again dismissed the petition for post-conviction relief. Petitioner then sought review of that dismissal. We denied relief, finding that the trial court had not abused its discretion in rejecting petitioner's claims. *State v. Crago*, No. 2 CA-CR 00-0259-PR (memorandum decision filed March 13, 2001). Petitioner then filed a second petition for post-conviction relief, claiming that counsel in the first post-conviction proceeding had been ineffective. The trial court summarily dismissed that petition, and petitioner then filed this petition for review, asking that we vacate his conviction and remand the case for a new trial. We will not overturn a trial court's denial of post-conviction relief absent an abuse of discretion. *State v. Schrock*, 149 Ariz. 433, 719 P.2d 1049 (1986).

¶3      In remanding this matter to the trial court for an evidentiary hearing, we found, inter alia, that petitioner had presented a colorable claim that trial counsel had been ineffective in failing to investigate and present evidence about the mechanical condition of petitioner's vehicle at the time of the homicide to support his claim that he had shot the victim in self-defense because he had been unable to leave the scene in his car. In denying relief following the evidentiary hearing, the trial court found that counsel had not been ineffective, stating:

> Whether or not the key was broken in the ignition was of no moment to this court, which accepted that point as fact. It nevertheless does not bring into application the law of self-defense. One cannot avail himself of the law of justifiable homicide by shooting another in the back on the belief, reasonable or otherwise, that the person was going to get a gun to kill the defendant.

¶4      To prove ineffective assistance of counsel, a defendant must show that counsel's performance was deficient and fell below an objective standard of reasonableness and that the

2

deficient performance prejudiced the defendant. *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. Nash*, 143 Ariz. 392, 694 P.2d 222 (1985). Petitioner contends that, in denying his second Rule 32 petition, the trial court "threw out the factual findings of the Appellate Court [and] reversed their ruling," thus committing fundamental error. He also argues that, because he had presented a colorable claim of ineffective assistance of Rule 32 counsel, he was entitled to an evidentiary hearing on that claim.

¶5        To the extent we understand petitioner's argument, he seems to be claiming that, when we found he had presented a colorable claim of ineffective assistance of trial counsel and remanded the case to the trial court for an evidentiary hearing, we made a factual finding that counsel had, in fact, been ineffective. He thus contends that Rule 32 counsel was ineffective for failing to show that the trial court had falsified facts to support its own ruling in defiance of this court's "factual finding." Contrary to petitioner's belief, we merely found that he had raised a colorable claim, that is, one that, if true, "might have changed the outcome." *Schrock*, 149 Ariz. at 441, 719 P.2d at 1057. We thus remanded this matter to the trial court for an evidentiary hearing in that court to determine whether counsel had been ineffective. The trial court's ruling was, of course, subject to our review by a petition for review, which petitioner ultimately filed.

¶6        As we found in our denial of that petition for review:

> Based on this record, we do not find that trial counsel was ineffective in failing to present evidence about the status of petitioner's ignition. Because petitioner himself testified that he did not always remove the master fuse and because no one else could testify that he always removed it or that he had removed the fuse that morning, counsel was entitled to conclude, as he did, that it was not relevant or material whether petitioner would have removed the fuse at 4:00 or 5:00 a.m. in a residential neighborhood where he had simply stopped to pay a debt. In addition, counsel had relied on the facts that petitioner's vehicle was unavailable for examination and that petitioner had not made his self-defense claim to the police. . . . Because petitioner had testified that he had believed [the

3

victim] was trying to run into Cissy's house to retrieve his rifle, the court concluded he would not have been entitled to a self-defense instruction on that theory. We agree.

Because we found that the trial court had not abused its discretion in denying petitioner's claim of ineffective assistance of trial counsel, it follows that Rule 32 counsel was not ineffective either.

¶7    Moreover, petitioner filed an appeal in which he was represented by counsel. As the trial court correctly noted, the right to counsel does not extend to collateral proceedings like this one. *See State v. Mata*, 185 Ariz. 319, 916 P.2d 1035 (1996). In that case, the supreme court rejected the notion that a defendant should be permitted to file endless claims of ineffective assistance of counsel, stating that to do so would entitle the defendant "not to effective representation, but to perpetual representation." *Id.* at 336, 916 P.2d at 1052. We note, in addition, that petitioner is mistaken that we are required to search the record for fundamental error on a petition for review from the denial of post-conviction relief. *See State v. Smith*, 184 Ariz. 456, 910 P.2d 1 (1996).

¶8    The petition for review is granted, but relief is denied.

_____
JOSEPH W. HOWARD, Presiding Judge

CONCURRING:

_____
PHILIP G. ESPINOSA, Chief Judge

_____
WILLIAM E. DRUKE, Judge

4

# EXHIBIT I

NOTICE: THIS DECISION DOES NOT CREATE LEGAL PRECEDENT AND
MAY NOT BE CITED EXCEPT AS AUTHORIZED BY APPLICABLE RULES.
*See* Ariz. R. Supreme Court 111(c); ARCAP 28(c); Ariz. R. Crim. P. 31.24

FILED BY CLERK

SEP -9 2011

COURT OF APPEALS
DIVISION TWO

IN THE COURT OF APPEALS
STATE OF ARIZONA
DIVISION TWO

| | | |
|---|---|---|
| THE STATE OF ARIZONA, | ) | 2 CA-CR 2011-0162-PR |
| | ) | DEPARTMENT A |
| Respondent, | ) | |
| | ) | MEMORANDUM DECISION |
| v. | ) | Not for Publication |
| | ) | Rule 111, Rules of |
| EARL FELTON CRAGO JR., | ) | the Supreme Court |
| | ) | |
| Petitioner. | ) | |
| | ) | |

PETITION FOR REVIEW FROM THE SUPERIOR COURT OF COCHISE COUNTY

Cause No. CR94000471

Honorable Wallace R. Hoggatt, Judge

REVIEW GRANTED; RELIEF DENIED

| | |
|---|---|
| Earl F. Crago | Buckeye |
| | In Propria Persona |

E C K E R S T R O M, Presiding Judge.

¶1        Following a jury trial, petitioner Earl Crago was convicted in 1995 of first-degree murder, was sentenced to life in prison without the possibility of release for twenty-five years, and was ordered to serve community supervision for three years and seven months upon his release. We affirmed Crago's conviction and sentence on appeal, denied relief in part on a consolidated petition for review of the denial of his first petition

for post-conviction relief filed pursuant to Rule 32, Ariz. R. Crim. P., and remanded for an evidentiary hearing on two claims of ineffective assistance of counsel. *State v. Crago*, Nos. 2 CA-CR 95-0488, 2 CA-CR 98-0230-PR (consolidated) (memorandum decision filed Mar. 18, 1999). We subsequently denied relief on Crago's petition for review of the denial of post-conviction relief after the evidentiary hearing, *State v. Crago*, No. 2 CA-CR 2000-0259-PR (memorandum decision filed Mar. 13, 2001), and on his petitions for review of the denial of relief on his second and third petitions for post-conviction relief. *State v. Crago*, No. 2 CA-CR 2001-0381-PR (memorandum decision filed Feb. 19, 2002); *State v. Crago*, No. 2 CA-CR 2004-0224-PR (decision order filed Mar. 29, 2005).

¶2      Crago then filed a petition for writ of habeas corpus, which the trial court deemed a petition for post-conviction relief, followed by a petition for special action, both of which the court dismissed; we denied relief on Crago's petition for review of the denial of the former, but remanded the court's dismissal of the petition for special action. *State v. Crago*, No. 2 CA-CR 2008-0396-PR (memorandum decision filed May 12, 2009). In 2010, Crago filed his fifth petition for post-conviction relief, which the court dismissed, and this petition for review followed. We will not disturb a trial court's summary denial of post-conviction relief absent an abuse of the court's discretion. *State v. Bennett*, 213 Ariz. 562, ¶ 17, 146 P.3d 63, 67 (2006). We find no abuse here.

¶3      Relying on Rule 32.1(c) and (d),[1] Crago argues, as he did below, that when the Arizona Department of Corrections (ADOC) noted in 2008 he was not eligible for

---

[1]Rule 32.1(c), Ariz. R. Crim. P., provides a ground for post-conviction relief when the sentence imposed exceeds the maximum authorized by law or is not in accordance

community supervision, it essentially converted his sentence from one of life imprisonment without the possibility of release for twenty-five years to one of natural life.  In support of his argument, Crago contrasts ADOC's 1996 release date calculation form, which showed his community supervision term beginning on September 17, 2019 and ending on April 13, 2023, with ADOC's time computation memorandum prepared in 2006, which showed a life sentence without community supervision.  Crago asserts, as he did below, that he "is now being required to serve a sentence beyond the sentence which was imposed."

¶4        In its response to the petition for post-conviction relief the state argued that, because Crago was not sentenced to a determinate twenty-five year term, but can only "be considered for a recommendation for release" in twenty-five years, the original sentence erroneously provided that he serve community supervision upon his release in 2019.  The state asserted "the community supervision statute does not logically apply" to Crago and the imposition of community supervision thus constituted an illegal sentence. *See State v. Cowles*, 207 Ariz. 8, ¶ 14, 82 P.3d 369, 372 (App. 2004) (community supervision part of sentence imposed).  The state thus requested that Crago's petition be "granted to the extent he is asking to be considered for release by way of commutation, pardon or reprieve after serving 25 years," but "that the community supervision clause in [Crago]'s sentence b[e] stricken as contrary to law."  Crago further contends that if the state had objected to the illegal sentence at sentencing, he would have argued on appeal

with the law, while Rule 32.1(d) provides potential relief if the person is being held in custody after the sentence imposed has expired.

that he had rejected the twenty-two year plea offer the state had made in reliance on the court's assurance he was receiving a twenty-five year sentence.

¶5         In its ruling denying the petition for post-conviction relief, the trial court determined that, although the community supervision portion of Crago's sentence was illegal, it was unable to correct his sentence because of the time constraints imposed in Rule 24.3, Ariz. R. Crim. P., which allows a trial court to correct an illegal sentence within sixty days of the judgment and sentence but before perfection of the appeal. The court further determined:

> . . . [Crago] was not sentenced to serve twenty-five years in prison. Such a sentence would have been illegal. Rather, [Crago] was sentenced to serve life in prison, with the possibility that after serving twenty-five years, he could achieve his release if recommended by the Board of Executive Clemency and the sentence [is] commuted by the Governor. Release after the service of twenty-five years is a possibility but isn't guaranteed.
>
> [Crago] contends that the Department of Corrections, through its Time Computation Unit, has converted his sentence from a sentence of life imprisonment to one of natural life. Not so. Nothing that the Department of Corrections did has precluded Mr. Crago from exercising his right, after he serves the required twenty-five calendar years, to apply to the Board of Executive Clemency and the Governor for release.
>
> . . . .
>
> Because the court followed the law by imposing a life sentence without possibility of release for twenty-five calendar years, and also because [Crago] has not yet served twenty-five calendar years, it cannot be said [Crago] is being held in custody after the sentence has expired. Indeed, even after he has served twenty-five calendar years, he could not be held in custody after the expiration of the sentence because the sentence is one of life imprisonment.

4

> Further, the sentence imposed was not clearly excessive nor contrary to law . . . however, as the State correctly notes in its response, the imposition of community supervision of three years and seven months *was* contrary to law. The imposition of community supervision in any amount would be.

¶6      Crago asserts the trial court's ruling is "conflicting, befuddled, [and] confusing" and asks that he be released after twenty-five years, or alternatively, that his conviction be vacated and remanded "for new proceedings," or that his conviction be "downgrade[d]" to second-degree murder and this matter be remanded for resentencing. We initially note that Crago previously has raised the issue now before us. As we stated in our 2009 memorandum decision,

> [i]n March 2008, Crago filed a pro se petition for writ of habeas corpus asserting that, although the trial court had sentenced him to life imprisonment without the possibility of parole for twenty-five years, . . . [ADOC] was instead treating his sentence as "a 'natural life' sentence with no release date, and no community supervision [d]ate, and no parole eligibility date."

*Crago*, No. 2 CA-CR 2008-0396-PR, ¶ 2. In that matter, the trial court deemed Crago's habeas corpus petition a Rule 32 petition and permitted Crago to file a pro se petition when counsel reported he was unable to find any meritorious issues to raise. After Crago failed to file a pro se petition, the court dismissed the notice of post-conviction relief, and Crago immediately filed a petition for special action, again raising the same claim he had raised in his habeas corpus petition, and the same claim now before us. The court dismissed the special action petition on the grounds Crago had alleged the same issue he had asserted in the habeas corpus petition and noted Crago had not presented his claim in

a pro se Rule 32 petition.  On review, we denied relief on Crago's petition for review of the denial of the notice of post-conviction relief, but remanded the court's dismissal of the petition for special action.

¶7      Accordingly, the claim now before us, which Crago has raised to some extent in two prior pleadings, is precluded.  *See* Ariz. R. Crim. P. 32.2(a).  However, to the extent Crago may have been confused by our prior ruling remanding his special action petition, and in light of the trial court's finding that the instant claim was not precluded, we nonetheless address it.

¶8      We note at the outset that Crago's argument is based on the unsupported notion that his original sentence was converted from a determinate term of twenty-five years to one of natural life, thereby "eliminat[ing]" his release eligibility.  First, his original sentence expires at the end of his life, an indeterminate period, not in twenty-five years, as he asserts.  The court committed Crago "to a Life term in the Department of Corrections," and ordered him to "serve every day of twenty-five . . . years of the sentence imposed before he is eligible for any type of release."[2]  Second, ADOC's 2006 time computation memorandum did not change Crago's sentence to one of natural life, as he asserts.  Rather, it removed the community supervision requirement, but did not, as Crago claims, make him ineligible for release.

---

[2]Former A.R.S. § 13-703, the statute under which Crago was sentenced, provided: "If the court does not sentence the defendant to natural life, the defendant shall not be released on any basis until the completion of the service of twenty-five calendar years . . . ."  *See* 1993 Ariz. Sess. Laws, ch. 153, § 1; *see also* 2008 Ariz. Sess. Laws, ch. 301, §§ 26, 38 (renumbering former § 13-703 as current A.R.S. § 13-751).

6

¶9       Moreover, we are unaware of any authority, statutory or otherwise, that supports the imposition of community supervision following a life sentence. The trial court imposed community supervision under A.R.S. § 13-603(I), which provides that it "shall be served consecutively to the actual period of imprisonment." However, Crago never had, nor does he now have a sentence that assures he will be released after twenty-five years, or for that matter, during his lifetime. His sentence was and always has been one of life, and his sentence expiration date was and always has been the end of his life. Accordingly, the court correctly concluded "the imposition of community supervision . . . *was* contrary to law."

¶10      Conversely, we do not find any evidence in the record to support Crago's position that he somehow is ineligible to be considered for release after serving twenty-five years. *See* A.R.S. § 31-402(C)(2), (4) (allowing board of executive clemency to recommend commutation); *see also McDonald v. Thomas*, 202 Ariz. 35, ¶ 12, 40 P.3d 819, 824 (2002) (governor's ultimate decision to approve or reject commutation). By the very terms of his original sentence, Crago is required to serve twenty-five years "before he is eligible for any type of release." ADOC's 2008 time computation memorandum did not change this fact. *See State v. Womble*, 225 Ariz. 91, ¶ 41, 235 P.3d 244, 254 (2010) (Arizona law does not prohibit release of defendant given life sentence once defendant serves twenty-five years); *see also* § 31-402(C)(2), (4). However, because Crago began serving his sentence in 1994, he may not be considered for release until 2019.

¶11      Finally, to the extent we understand Crago's argument that ADOC's removal of the erroneous imposition of community service somehow prejudiced him, we

7

reject that argument. The imposition of community supervision had no bearing on Crago's life sentence or his eligibility to have that sentence commuted.

¶12        Accordingly, although we grant the petition for review, we deny relief.


/s/ *Peter J. Eckerstrom*
_____
PETER J. ECKERSTROM, Presiding Judge


CONCURRING:

/s/ *Joseph W. Howard*
_____
JOSEPH W. HOWARD, Chief Judge


/s/ *J. William Brammer, Jr.*
_____
J. WILLIAM BRAMMER, JR., Judge

# EXHIBIT J

# SUPERIOR COURT, STATE OF ARIZONA, In and for the County of Cochise

| STATE OF ARIZONA, | Case No. CR9400471 | **FILED** |
| --- | --- | --- |
| PLAINTIFF, | | Clerk's Office use only |
| vs. | DECISION AND ORDER RE: PETITION FOR POST-CONVICTION RELIEF | 2020 NOV -4 PM 4: 09 |
| EARL FELTON CRAGO, | | AMY J HUNLEY CLERK OF SUPERIOR COURT BY _____ |
| DEFENDANT. | | DEPUTY |

| HONORABLE LAURA CARDINAL DIVISION ONE | Date: 10/29/2020 |
| --- | --- |

The matter came before the court for evidentiary hearing on Defendant's ninth Petition for Post-Conviction relief, filed December 23, 2019. The matter was stayed during the pendency of appeal on Defendant's eighth Petition for Post-Conviction Relief at the Court of Appeals (Memorandum Decision in State v. Crago, 2 CA-CR 2019-0234-PR, issued on March 26, 2020; mandate issued September 9, 2020). Defendant, acting in pro per, supplemented his Petition on April 27, 2020 and again on June 4, 2020; in both supplements he raised as grounds a change in the law affecting the length and definition of the Defendant's sentence, based on the recently decided Arizona Supreme Court case, Chaparro v. Shinn, 248 Ariz. 138, 459 P.3d 50 (March 5, 2020). The case was referred to the Office of Indigent Defense for appointment of counsel on June 11, 2020. Defense counsel filed her Memorandum in Support of Petition on August 13, 2020; the State filed its Response on September 10, 2020; and the Defense filed a Reply on October 8, 2020. Defendant makes two claims for post-conviction relief in his ninth petition:

1.   That the Defendant continues to be, or will continue to be, in custody after his sentence expires, and that there has been a significant change in the law affecting his sentence, to wit, Chaparro v. Shinn, 248 Ariz. 138, 459 P.3d 50 (March 5, 2020), and

2.   Ineffective assistance of counsel by his initial attorney on post-conviction relief, in failing to raise a claim for ineffective assistance of trial counsel and appellate counsel.

At the hearing on October 20, 2020, Defendant appeared via video-conference from the Arizona Department of Corrections and was represented by his appointed attorney, Xochitl Orozco, the Cochise County Legal Advocate; Cochise County Deputy Attorney Doyle Johnstun appeared on behalf of the State of Arizona.

The court has considered the pleadings filed in this matter, the exhibits admitted during the hearing, and the testimony of the witnesses presented at the hearing, and the court's file, including the transcript of the 1995 sentencing hearing, previous orders of the trial court and the court of appeals in this case, and **FINDS** as follows:

**1.** **That the Defendant continues to be, or will continue to be, in custody after his sentence expires, and that there has been a significant change in the law affecting his sentence, to wit, Chaparro v. Shinn, 248 Ariz. 138, 459 P.3d 50 (March 5, 2020).**

The Defendant asserts that he has served the sentence imposed--that although the sentence imposed was "an illegally lenient" sentence, that he is now eligible for release-- but that he continues in custody due to error committed by the Arizona Department of Corrections.

The record reflects that the Defendant was convicted by a jury of a class one felony, a murder committed on September 28th, 1994. He was sentenced on August 21, 1995 to "… a life term in the Arizona Department of Corrections," that he "must serve every day of twenty-five (25) years of the sentence imposed before he is eligible for any type of release," and was given credit for 337 days of presentence incarceration credit. See Sentencing of Imprisment, dated August 21,1995, page 3. The sentencing judge, the Hon. Matthew Borowiec1, further ordered that upon release from prison, the Defendant is to serve community supervision, ordered pursuant to A.R.S.§13-603(1), for a term equal to one-seventh of the sentence imposed, "…three years, 7 months," which is equal to one-seventh (15%) of 25 years. See Sentence of Imprisonment, dated August 21, 1995, page 3.

The defense concedes that the sentence imposed was inconsistent with the sentencing statutes in effect in 1995 for offenses committed after January 1, 1994, and that it is an illegally lenient sentence. The state concedes that the sentence was not appealed by the state, nor corrected or amended by the sentencing court.

It is further understood that the Arizona Department of Corrections (hereinafter ADOC) time computation department told the Defendant, in reliance on the sentencing order, that he was, indeed, eligible for release on September 17, 2019 ("Sentence Expiration Date", hereinafter "SED"). This status of release was maintained by the ADOC from the beginning of his incarceration in 1995 until mid-2006, when, apparently on advice from the Arizona attorney general, Defendant's release eligibility and status within the corrections system was modified to reflect that he was serving a "life" sentence without possibility of release, and that the community supervision portion of the sentencing document had been "revoked" and extended to "life." See Exhibits A and B, to the hearing.

The State of Arizona contends that this issue is precluded, relying on a Court of Appeals' memorandum decision on Defendant's fifth petition for post-conviction relief, 2 CA-CR**2011**-0162PR. In that 2011 memorandum decision, the Court of Appeals reviewed a previous decision in Defendant's case, State v. Crago, 2 CA-CR **2008**-0396-PR, in which Defendant attempted to raise the sentencing issue first through a *pro se* petition for writ of habeas corpus. That habeas petition was deemed a Rule 32 petition by the trial court, but was then dismissed by the trial court for Defendant's failure to file a *pro se* petition for post-conviction relief. A special action claim was raised in the trial court and also dismissed. The 2008 petition for review of the

---

1 Matthew Borowiec served as Cochise County Superior Court judge from 1979 to 2000.

habeas/Rule 32 was reviewed by relief denied by the Court of Appeals. The Court of Appeals in 2011, therefore deemed the issue of modification of the sentence from "life with possibility of release in 25 years" to "life" as precluded as having been raised before. The state relies on that decision in asking the court to find preclusion now.

This court can, therefore, find the issue of sentencing terms imposed in 1995, raised here in Defendant's ninth Petition for Post Conviction Relief, precluded pursuant to Rule 32.2, Ariz. R. Crim. Proc., unless Defendant has raised grounds for relief on the issue which are not precluded. See Rule 32.2(b), Ariz. R. Crim. Proc.

In his ninth petition for post-conviction relief, the Defendant has raised in supplemental pleadings filed *pro se*, and through appointed counsel, the argument that there has been "a significant change in the law" which would affect the sentence imposed in his case. See Rule 32.1(g), Ariz. R. Crim Proc. "Claims for relief based on Rule 32.1(b) through (h) are not subject to preclusion under Rule 32.2(a)(3)." Defendant has timely raised the issue. See Rule 32.2(b), Ariz. R. Crim. Proc.

The threshold question is whether the *Chaparro* decision by the Arizona Supreme Court qualifies as "a significant change in the law." "Rule 32 does not define 'a significant change in the law.' But plainly a change in the law requires some transformative event, a clear break from the past." *State v. Shrum*, 220 Ariz. 115, 203 P.3d 1175, 1178 (2009), *quoting State v. Slemmer,* 170 Ariz. 174, 182, 823 P.2d 41, 49 (1991); *State v. Poblete*, 227 Ariz. 537, 540, 260 P.3d 1102, 1105 (Ct. App. 2011). "It is admittedly often difficult to determine when a case announces a new rule, and we do not attempt to define the spectrum of what may or may not constitute a new rule for retroactivity purposes. In general, however, a case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government." *Teague v. Lane*, 489 U.S. 288, 301, 109 S. Ct. 1060, 1070, 103 L. Ed. 2d 334 (1989).

The *Chaparro* case involves a set of circumstances on all fours with this case. Mr. Chaparro committed a first-degree murder in May 1995, for which he was convicted and sentenced in September 1996, in Maricopa County Superior Court. He was ordered to serve a life sentence without possibility of parole until he had served 25 years. Upon his release, he was sentenced to serve a term of community supervision. As in *Crago*, the state did not appeal the sentence. Chaparro filed numerous petitions for post-conviction relief through the years. In 2017, when Chaparro learned that his sentence had been reconsidered by ADOC and that he would not be deemed eligible for parole after serving 25 years, he initiated a complaint in federal district court under 42 U.S.C. § 1983 alleging equal protection violation (based on the provisions of A.R.S. §13-718, which affords parole eligibility to those serving life sentences for first degree murder who pled to the charge); a due process violation due to the failure of the state to enforce the legal, un-appealed sentence; and a due process violation

for the state's refusal to certify Plaintiff eligible for parole. The matter was referred to the U.S. District Court. See *Chaparro v. Ryan*, 2019 WL 3290328, (D. Ariz. July 22, 2019).

The State filed a motion for certification or dismissal in the federal court, arguing that the key issue in the matter—"whether Chaparro's sentence of 'life without the possibility of parole for 25 years' means he becomes parole-eligible after 25 years or whether the sentence should be construed as never resulting in parole eligibility"— was an "unresolved question of state law" and more suited to resolution by the state's supreme court. *Chaparro v. Ryan*, id. The district court judge agreed, writing,

> Through certification of novel or unsettled questions of state law for authoritative answers by a State's highest court, a federal court may save time, energy, and resources and hel[p] build a cooperative judicial federalism." Arizonans for Official English v. Arizona, 520 U.S. 43, 77 (1997) (citations and internal quotation marks omitted). The Supreme Court has explained that certification is particularly appropriate "when a federal court is asked to invalidate a State's law, for the federal tribunal risks friction-generating error when it endeavors to construe a novel state Act not yet reviewed by the State's highest court." Id. at 79. Nevertheless, "[n]ovel, unsettled questions of state law ... are necessary before federal courts may avail themselves of state certification procedures." Id. See also Harris v. Arizona Indep. Redistricting Comm'n, 993 F. Supp. 2d 1042, 1068 (D. Ariz. 2014) ("A basic prerequisite for a court to certify a question to the Arizona Supreme Court is the existence of a pending issue of Arizona law not addressed by relevant Arizona authorities."). Furthermore, the Arizona Supreme Court may accept a request for certification only if the question to be resolved "may be determinative of the cause then pending in the certifying court and as to which it appears to the certifying court there is no controlling precedent in the decisions of the supreme court and the intermediate appellate courts of this state." A.R.S. § 12-1861.
>
> All of these requirements are satisfied here. First, this case presents a "novel or unsettled question[ ] of state law" as to which "there is no controlling precedent" from the Arizona appellate courts. Arizonans for Official English, 520 U.S. at 77; A.R.S. § 12-1861. Neither party has cited a case by the Arizona Supreme Court or Arizona Court of Appeals addressing how to interpret a sentence of "life without the possibility of parole for 25 years" that was imposed for a crime committed after Arizona's eradication of parole in 1993. Although Chaparro argues that such a sentence should be construed to provide parole eligibility after 25 years—why else mention the unavailability of parole for the first 25 years?—the State has some counter-arguments in its arsenal. Because this is a pure question of state law, it should be an Arizona state court, not a federal court in a § 1983 action, that resolves it in the first instance.

*Chaparro v. Ryan*, No. CV1900650PHXDWLMHB, 2019 WL 3290328, at *4–5 (D. Ariz. July 22, 2019)

The court **FINDS** that the decision reached by the Arizona Supreme Court in *Chaparro v. Shinn*, 248 Ariz. 138, 459 P.3d 50 (S2020), is a "significant change in the law" that is a transformative event and a clear break from the past, which if applied to Defendant Crago's case, would have an effect on his sentence.

**IT IS THEREFORE THE FINDING OF THE COURT**, that the issue of the definition and terms of the sentence imposed, raised in Defendant's Ninth Petition (supplemented) **IS NOT PRECLUDED**.

The court **FINDS** that the sentence imposed by Judge Borowiec in 1995 is the same in all essential ways with the sentence imposed by the trial court in *Chaparro* in 1996. The only distinction is Borowiec's use of the word "release" rather than "parole," as used in the Chaparro sentencing. The Arizona Supreme Court in *Chaparro v. Shinn* made much of the distinction between "parole" and "commutation," and found that the two words were not synonymous forms of release. The Chaparro court wrote, "'Parole' has a distinct meaning from 'commutation' in the dictionary." Chaparro, id, 248 Ariz. at 141. The Court wrote,

> In sum, although the trial court's use of 'parole' and 'community supervision' was ambiguous, the sentencing hearing and December Order clarify the trial court's intent to provide the opportunity for parole. And because the meaning of 'parole' is not ambiguous or synonymous with other forms of release, Chaparro is eligible for parole after serving 25 years."

Chaparro, id, 248 Ariz. at 142.

This court has reviewed the Crago sentencing transcript, sentencing minute entry and clerk's notes in the Crago matter. The court concludes from the sentencing transcript that consensus among the criminal justice community in 1995 was that there were two options for sentencing in non-capital, first degree murder cases: natural life, or, life with the possibility of parole after 25 years. (That conclusion is borne out in the sentence imposed in Chaparro's case.) Both the state's attorney (Gerald Till) and the defense attorney (Rafael Malanga), as well as the victim (Lottie Ross) who spoke at sentencing, all believed that there were those two sentencing options before the judge:

• See Mr. Till's comments, page 19, lines 9-13: "It appears that the court really has in this case really two options. One is the life in prison as mandated however subject to parole in 25 years, and the other is natural life in prison"; page 19-20, lines 24-25, 1: "He will probably [sic]47 years old when he gets out if he is given the opportunity for parole in 25 years."

• See Mr. Malanga's comments, page 23, lines 7-9: "I don't think under those facts that Mr. Crago should receive the ultimate penalty of life without possibility of parole." Page 24, lines 2-4: "With that in mind, I just—it seems harsh to sentence Mr. Crago to life without possibility of parole." Page 24, lines 21-22: "I would ask the court to sentence the defendant to life with the possibility of parole in 25 years."

• See Lottie Ross's comments, the sister of the victim, page 18, lines 20-22: "And I think after 25 years, I think he's going to be too institutionalized to get back on the street."

There is nothing to suggest that Judge Borowiec intended in imposing a sentence of "life" without the possibility of release "... on any basis until the completion of the service of 25 years," that "release" meant anything other than "parole." Judge Borowiec stated, "...no one of course can know if Mr. Crago fulfills 25 years in prison what he will be like."

It is the further conclusion of this court that the imposition of "community supervision" was Judge Borowiec's acknowledgment of the recent change in the law – a change which made no clear provision for these types of cases.

The Court, therefore, **FINDS** that the use of the term "release" rather than "parole" does not affect the intent of the sentencing court, which was to impose a life sentence with the possibility of parole or other release (work furlough or work release, but distinct from "commutation") after the Defendant had served 25 years in prison, with credit for presentence incarceration.

The Court **FURTHER FINDS**, that application of the ruling in *Chaparro v. Shinn*, supra, is appropriate, fair and just in Defendant Crago's case. "Retroactivity is properly treated as a threshold question, for, once a new rule is applied to the defendant in the case announcing the rule, evenhanded justice requires that it be applied retroactively to all who are similarly situated." *Teague v. Lane*, 489 U.S. 288, 300, 109 S. Ct. 1060, 1070, 103 L. Ed. 2d 334 (1989). Crago is similarly situated to Chaparro.

**IT IS THEREFORE THE ORDER OF THE COURT**, that regardless of A.R.S. 41-1604.09, Defendant Crago is eligible for parole after serving 25 years pursuant to his sentence, and his illegally lenient sentence is final under Arizona law. See *Chaparro v. Shin*, 248 Ariz. 138, 143, 459 P.3d 50, 55 (2020.)

**IT IS THE FURTHER ORDER OF THE COURT**, that Defendant Crago shall be placed on community supervision for the term imposed by the sentencing judge, subject to the terms and conditions of the community supervision program.

2. **Ineffective assistance of counsel by his initial attorney on post-conviction relief, in failing to raise a claim for ineffective assistance of trial counsel and appellate counsel.**

The Defendant's very first petition for post-conviction relief was filed by the same attorney who filed his appeal, Paul Newman, Esq. In that first PCR, Newman raised the issue of ineffective assistance of trial counsel. Subsequent petitions filed by Defendant continued to raise the issue of ineffective assistance of counsel, and the issue has been extensively reviewed, through appeal, post-conviction relief review, and petitions for review to the appellate courts.

In neither of Defendant's pro per supplements to his Petition, nor in his appointed attorney's Memorandum in Support of Petition and Reply to the State's Response to Petition, was the issue of ineffective assistance of prior counsel addressed. The State does not address this claim.

Having reviewed the Defendant's extensive file, and being familiar with the claims made in post conviction proceedings,

   **IT IS THE FINDING OF THE COURT**, that the Defendant has exhaustively briefed the issue of ineffective assistance of trial counsel, and that the issue is precluded, pursuant to Rule 32.2(a)(2), Ariz. R. Crim. Proc., having been previously addressed in postconviction proceedings.

   **IT IS THE FURTHER FINDING OF THE COURT**, that the Defendant has waived the issue of ineffective assistance of appellate counsel, and that the issue is precluded, pursuant to Rule 32.2(a)(3), Ariz. R. Crim. Proc. having failed to timely pursue this claim in any of his subsequent petitions for post-conviction relief (numbers 2-8).

   This is a final order, pursuant to Rule 33.13, Ariz. R. Crim. Proc.

   DATED THIS 4 DAY OF NOVEMBER, 2020,

   _____
   LAURA CARDINAL
   JUDGE OF THE SUPERIOR COU

mailed/distributed: (date)(initials) 11/04/2020
cc: Doyle Johnstun, Esq., Cochise County Attorney's Office, Bisbee, AZ E
    Xochitl Orozco, Esq., Cochise County Legal Advocate, Bisbee, AZ E

# EXHIBIT K

**SUPERIOR COURT, STATE OF ARIZONA, In and for the County of Cochise**

| STATE OF ARIZONA, | Case No. CR9400471 | Clerk's Office use only |
| | | |

STATE OF ARIZONA,

        **PLAINTIFF,**

**vs.**

**EARL FELTON CRAGO,**

        **DEFENDANT.**

Case No. CR9400471

2020 DEC 18 AM 8:41

**DECISION AND ORDER RE: MOTION FOR CLARIFICATION**

---

**HONORABLE LAURA CARDINAL**
**DIVISION ONE**
                                    **Date: 12/18/2020**

The court has reviewed Defendant's Motion for Clarification filed December 8, 2020, and having set the time for a non-appearance review on an expedited basis for this date, and the State not having filed any response to the motion,

IT IS THE ORDER OF THE COURT **GRANTING** THE MOTION, as follows:

The November 4, 2020 Decision and Order, stated:

> "*IT IS THEREFORE THE ORDER OF THE COURT, that regardless of A.R.S. 41-1604.09, Defendant <u>Crago is eligible for parole after serving 25 years</u> pursuant to his sentence, and his illegally lenient sentence is final under Arizona law. See Chaparro v. Shin, 248 Ariz. 138, 143, 459 P.3d 50, 55 (2020.)*
> *IT IS THE FURTHER ORDER OF THE COURT, that Defendant Crago shall be placed on community supervision for the term imposed by the sentencing judge, subject to the terms and conditions of the community supervision program.*"

**THE COURT NOW CLARIFIES** the November 4, 2020 Decision and Order as follows:

> *IT IS THEREFORE THE ORDER OF THE COURT, THAT REGARDLESS OF A.R.S. 41-1604.09, DEFENDANT <u>CRAGO IS ELIGIBLE FOR RELEASE AFTER SERVING 25 YEARS</u> PURSUANT TO HIS SENTENCE, AND HIS ILLEGALLY LENIENT SENTENCE <u>IS FINAL</u> UNDER ARIZONA LAW. SEE <u>CHAPARRO V. SHIN</u>, 248 ARIZ. 138, 143, 459 P.3D 50, 55 (2020.)*
>
> **IT IS THE FURTHER ORDER OF THE COURT, THAT DEFENDANT CRAGO SHALL BE PLACED ON COMMUNITY SUPERVISION FOR THE TERM IMPOSED BY THE SENTENCING JUDGE, SUBJECT TO THE TERMS AND CONDITIONS OF THE COMMUNITY SUPERVISION PROGRAM.**"

This is a final order, pursuant to Rule 33.13, Ariz. R. Crim. Proc.

DATED THIS 18 DAY OF DECEMBER, 2020.

                              LAURA CARDINAL
                              JUDGE OF THE SUPERIOR COU

1

# EXHIBIT L

IN THE

# ARIZONA COURT OF APPEALS

DIVISION TWO

THE STATE OF ARIZONA,
*Petitioner,*

*v.*

EARL FELTON CRAGO JR.,
*Respondent.*

No. 2 CA-CR 2021-0011-PR
Filed March 25, 2021

THIS DECISION DOES NOT CREATE LEGAL PRECEDENT AND
MAY NOT BE CITED EXCEPT AS AUTHORIZED BY APPLICABLE RULES.
NOT FOR PUBLICATION
*See* Ariz. R. Sup. Ct. 111(c)(1); Ariz. R. Crim. P. 31.19(e).

Petition for Review from the Superior Court in Cochise County
No. S0200CR94000471
The Honorable Laura Cardinal, Judge

**REVIEW GRANTED; RELIEF GRANTED**

COUNSEL

Brian McIntyre, Cochise County Attorney
By Doyle B. Johnstun, Deputy County Attorney, Bisbee
*Counsel for Petitioner*

Cochise County Office of the Legal Advocate, Bisbee
By Xochitl Orozco, Legal Advocate
*Counsel for Respondent*

STATE v. CRAGO
Decision of the Court

---

**MEMORANDUM DECISION**

Judge Eckerstrom authored the decision of the Court, in which Presiding Judge Espinosa and Vice Chief Judge Staring concurred.

---

E C K E R S T R O M, Judge:

¶1          The state seeks review of the trial court's ruling granting Earl Crago Jr.'s successive petition for post-conviction relief filed pursuant to Rule 32, Ariz. R. Crim. P.  In its ruling, the court ordered that Crago is eligible for release from prison and placed him on community supervision. We will not disturb the ruling unless the court abused its discretion.  *See State v. Roseberry*, 237 Ariz. 507, ¶ 7 (2015).  Because the state has established such abuse here, we grant review and relief.

**Factual and Procedural Background**

¶2          In 1994, a defendant convicted of first-degree murder could be sentenced to prison for natural life or for life without the possibility of release "on any basis until the completion of the service of twenty-five calendar years."  1993 Ariz. Sess. Laws, ch. 153, § 1.  The statutes at the time did not provide for community supervision after a term of life imprisonment.  *See* 1994 Ariz. Sess. Laws, ch. 358, § 5 (prisoners shall earn release credits "except for those prisoners who are sentenced to serve the full term of imprisonment imposed by the court"); 1993 Ariz. Sess. Laws, ch. 255, § 87 (same).

¶3          After a jury trial, Crago was convicted of first-degree murder committed in September 1994.  The sentencing court imposed a term of "life" in prison, ordering that Crago "must serve every day of twenty-five (25) years of the sentence imposed before he is eligible for any type of release."  The court also ordered that Crago was "required to do mandatory community supervision sentence—one day for every seven days sentenced to, for a total of 3 years, 7 months."

¶4          This court affirmed Crago's conviction and sentence on appeal, denied relief in part on a consolidated petition for review of the denial of his first petition for post-conviction relief, and remanded for an

2

STATE v. CRAGO
Decision of the Court

evidentiary hearing on two claims of ineffective assistance of counsel. *State v. Crago*, Nos. 2 CA-CR 95-0488, 2 CA-CR 98-0230-PR (consol.) (Ariz. App. Mar. 18, 1999) (mem. decision). We subsequently denied relief on Crago's petition for review of the denial of post-conviction relief after the evidentiary hearing. *State v. Crago*, No. 2 CA-CR 00-0259-PR (Ariz. App. Mar. 13, 2001) (mem. decision). In the years that followed, we also denied relief on seven additional petitions for review from the denials of post-conviction relief. *State v. Crago*, No. 2 CA-CR 2019-0234-PR (Ariz. App. Mar. 26, 2020) (mem. decision); *State v. Crago*, No. 2 CA-CR 2014-0379-PR (Ariz. App. Feb. 25, 2015) (mem. decision); *State v. Crago*, No. 2 CA-CR 2013-0402-PR (Ariz. App. Mar. 11, 2014) (mem. decision); *State v. Crago*, No. 2 CA-CR 2011-0162-PR (Ariz. App. Sept. 9, 2011) (mem. decision); *State v. Crago*, No. 2 CA-CR 2008-0396-PR (Ariz. App. May 12, 2009) (mem. decision); *State v. Crago*, No. 2 CA-CR 2004-0224-PR (Ariz. App. Mar. 29, 2005) (decision order); *State v. Crago*, No. 2 CA-CR 01-0381-PR (Ariz. App. Feb. 19, 2002) (mem. decision).

¶5            In December 2019, Crago filed the current petition for post-conviction relief. Relying on Rule 32.1(d), Crago argued that he was being held beyond the term of his sentence.[1] He reasoned that, by imposing community supervision of three years and seven months, the sentencing court effectively "capped [his] sentence to the minimum allowed of 25 years," which he had completed. Thereafter, Crago filed a notice of supplemental authority, citing *Chaparro v. Shinn*, 248 Ariz. 138 (2020), for the proposition that "if the state fails to timely correct or appeal an illegally lenient sentence then the illegally lenient sentence is final under Arizona law." The trial court sua sponte appointed counsel for Crago. Counsel subsequently filed a memorandum in support of Crago's pro se petition, arguing that, like in *Chaparro*, Crago's "illegally lenient sentence" of twenty-five calendar years "must now stand" because the state had failed to timely challenge it.

---

[1] In his petition, Crago also raised several claims of ineffective assistance of counsel under Rule 32.1(a). The trial court, however, concluded that those claims were precluded as previously adjudicated or waived. *See* Ariz. R. Crim. P. 32.2(a)(2), (3). Because Crago does not seek review of the court's denial of relief on those claims, we do not address them further. *See* Ariz. R. Crim. P. 32.16(c)(4) ("A party's failure to raise any issue that could be raised in the petition for review or cross-petition for review constitutes a waiver of appellate review of that issue.").

¶6            In response, the state maintained that the issue raised in Crago's latest petition was precluded because he had raised it previously and courts had addressed it on the merits. The state further asserted that *Chaparro* was not a significant change in the law warranting relief because it was previously settled in *Arizona v. Dawson*, 164 Ariz. 278 (1990), that an appellate court cannot correct an illegally lenient sentence that was not timely appealed. The state argued that the sentencing court had ordered Crago to serve a term of life in prison without the possibility of release for twenty-five years, not twenty-five calendar years, and that the imposition of community supervision was "not illegally lenient" but was "illegally harsh" because "there is no legal requirement for any community supervision, let alone three years and seven months" thereof.

¶7            After an evidentiary hearing, the trial court ruled Crago was "eligible for release after serving 25 years pursuant to his sentence" and ordered he "be placed on community supervision for the term imposed by the sentencing judge."[2] The court explained that it could "find the issue of sentencing terms imposed in 1995 . . . precluded pursuant to Rule 32.2," because it had been previously raised in post-conviction proceedings, unless Crago had "raised grounds for relief on the issue which are not precluded." The court then determined that Crago's timely argument that *Chaparro* was a significant change in the law that would affect his sentence under Rule 32.1(g) was not subject to preclusion. In so finding, the court relied on the district court's decision certifying the issue in *Chaparro* to the Arizona Supreme Court—the district court's decision described the issue as "novel or unsettled." The court then found that application of *Chaparro* was "appropriate, fair and just" in this case, noting that Crago was "similarly situated to Chaparro." Based on the sentencing minute entry, transcript, and clerk's notes, the court concluded that the sentencing court had intended "to impose a life sentence with the possibility of parole or other release (work furlough or work release, but distinct from 'commutation') after [Crago] had served 25 years in prison." This petition for review followed.

## Discussion

¶8            The state argues the trial court erred in concluding that Crago's sentencing claim was not precluded under Rule 32.2. As it did

---

[2]The ruling originally specified that Crago was "eligible for parole after serving 25 years," but the trial court later clarified that he was "eligible for release after serving 25 years."

STATE v. CRAGO
Decision of the Court

below, the state maintains that Crago's current petition for post-conviction relief "alleged that he was sentenced to a determinate 25-year term of imprisonment and that he was still imprisoned after 25 years" but Crago had "raised that same issue in his fourth and fifth Rule 32 petitions." And the state points out that both the trial court and this court "adjudicated that issue on the merits in conjunction with [Crago's] fifth Rule 32 proceeding." The state therefore reasons that Crago is precluded "from raising the issue a third time."

¶9  Rule 32.1(d) provides post-conviction relief when "the defendant continues to be or will continue to be in custody after his or her sentence expired." However, such claims are subject to preclusion if they were "finally adjudicated on the merits in an appeal or in any previous post-conviction proceeding." Ariz. R. Crim. P. 32.2(a)(2), (b).

¶10  As part of his fifth post-conviction proceeding, Crago argued that he was "being required to serve a sentence beyond the sentence which was imposed" because the Arizona Department of Corrections (ADOC) had "essentially converted his sentence from one of life imprisonment without the possibility of release for twenty-five years to one of natural life." *Crago*, No. 2 CA-CR 2011-0162-PR, ¶ 3. He pointed out that, while ADOC's release-date form originally reflected that his community-supervision term began on September 17, 2019, it had been amended in 2006 to show "a life sentence without community supervision." *Id.* In its response, the state argued that, "because Crago was not sentenced to a determinate twenty-five year term, but can only 'be considered for a recommendation for release' in twenty-five years, the original sentence erroneously provided that he serve community supervision upon his release in 2019." *Id.* ¶ 4. The state thus asked the trial court to strike the community-supervision order from Crago's sentence. *Id.*

¶11  The trial court denied Crago's fifth petition, reasoning that the community-supervision order was illegal but it was unable to correct the order in the absence of a timely request by the state. *Id.* ¶ 5. The court further determined that, because Crago had been "sentenced to serve life in prison, with the possibility that after serving twenty-five years, he could achieve his release if recommended by the Board of Executive Clemency and the sentence [is] commuted by the Governor." *Id.* The court observed: "[E]ven after he has served twenty-five calendar years, he could not be held in custody after the expiration of the sentence because the sentence is one of life imprisonment." *Id.*

¶12　　　　On review, this court determined that Crago's claim was precluded because he had raised it "to some extent in two prior pleadings." *Id.* ¶ 7. We nonetheless addressed the merits of his argument, explaining that Crago's "sentence expires at the end of his life, an indeterminate period, not in twenty-five years," and that "ADOC's 2006 time computation memorandum did not change Crago's sentence to one of natural life" or "make him ineligible for release." *Id.* ¶ 8. We agreed with the trial court that the imposition of community supervision was contrary to the law. *Id.* ¶ 9. But we noted, "[t]he imposition of community supervision had no bearing on Crago's life sentence or his eligibility to have that sentence commuted." *Id.* ¶ 11.

¶13　　　　In his current petition for post-conviction relief, Crago again argues that the sentencing court had imposed a determinate twenty-five-year prison term and that ADOC, at the direction of the Arizona Attorney General, had improperly disregarded the community-supervision clause of his sentence. Although the language may be slightly different, this amounts to the same issue we addressed in Crago's fifth proceeding for post-conviction relief. *See id.* ¶¶ 7-11.

¶14　　　　Crago nevertheless contends that he is not precluded from raising this claim because "it was not ripe until 2019" after he had served his twenty-five-year term. But the question is not one of ripeness. The relevant inquiry under Rule 32.2(a)(2) is whether the issue was previously raised and addressed on the merits. *Compare State v. Martinez*, 226 Ariz. 464, ¶ 7 (App. 2011) (claim for post-conviction relief precluded under Rule 32.2(a)(2) where allegation encompassed by previous claim and adjudicated on merits), *with In re Estate of Stewart*, 230 Ariz. 480, ¶ 12 (App. 2012) (ripeness "prevents a court from rendering a premature judgment or opinion on a situation that may never occur"). As discussed above, that happened here.

¶15　　　　That said, Rule 32.1(g) provides post-conviction relief when "there has been a significant change in the law that, if applicable to the defendant's case, would probably overturn the defendant's judgment or sentence."[3] And such a claim may be raised in an untimely or successive

---

[3]Crago did not characterize *Chaparro* as a significant change in the law under Rule 32.1(g) until he filed his reply to the state's response below. *See State v. Lopez*, 223 Ariz. 238, ¶¶ 6-7 (App. 2009) (no abuse of discretion where trial court declined to address issues first raised in reply to state's response and defendant failed to seek leave to amend petition). However,

STATE v. CRAGO
Decision of the Court

petition for post-conviction relief. Ariz. R. Crim. P. 32.2(b), 32.4(b)(3)(B). Thus, as the trial court pointed out, Crago's claim may proceed if *Chaparro* is a significant change in the law that would probably affect his sentence.

**¶16** Our post-conviction relief rules do not define what constitutes "a significant change in the law." Ariz. R. Crim. P. 32.1(g); *see also State v. Shrum*, 220 Ariz. 115, ¶ 15 (2009). "But plainly a 'change in the law' requires some transformative event, a 'clear break from the past.'" *Shrum*, 220 Ariz. 115, ¶ 15 (quoting *State v. Slemmer*, 170 Ariz. 174, 182 (1991)). "Such change occurs, for example, 'when an appellate court overrules previously binding case law' or when there has been a 'statutory or constitutional amendment representing a definite break from prior law.'" *State v. Werderman*, 237 Ariz. 342, ¶ 5 (App. 2015) (quoting *Shrum*, 220 Ariz. 115, ¶¶ 16-17).

**¶17** Our supreme court announced two holdings in *Chaparro*: (1) "a sentence imposing 'life without possibility of parole for 25 years' means the convicted defendant is eligible for parole after serving 25 years' imprisonment despite [A.R.S.] § 41-1604.09's prohibition of parole for persons convicted of offenses occurring on or after January 1, 1994," and (2) "a court lacks jurisdiction to correct an illegally lenient sentence absent timely correction or appeal." 248 Ariz. 138, ¶ 2. As to the former, the issue centered on the defendant's sentence of "life without possibility of parole for 25 years." *Id.* ¶ 1. The supreme court conducted a fact-specific review of the record to ascertain the sentencing court's intent with regard to parole. *Id.* ¶¶ 11-12, 23. It was not overruling previously binding case law or interpreting a statutory or constitutional amendment. *See Werderman*, 237 Ariz. 342, ¶ 5; *cf. State v. Poblete*, 227 Ariz. 537, ¶ 10 (App. 2011) (United States Supreme Court's rejection of approach to ineffective assistance of counsel claim constituted significant change in law).

**¶18** As to the supreme court's latter holding — that courts cannot correct illegally lenient sentences without a timely challenge — that rule was well established at least twenty years earlier. Indeed, in *Chaparro*, the court cited *Dawson*, 164 Ariz. at 283-84, and Rule 24.3, Ariz. R. Crim. P., for the proposition that "[i]llegally lenient sentences are final under Arizona law absent timely appeal or post-judgment motion." 248 Ariz. 138, ¶ 19. It therefore cannot be seen as "a clear break from the past." *Shrum*, 220 Ariz. 115, ¶ 15 (quoting *Slemmer*, 170 Ariz. at 182).

---

because *Chaparro* was decided after Crago had filed his current petition and because the trial court addressed the issue on the merits, we do as well.

STATE v. CRAGO
Decision of the Court

¶19          Here, the sentencing court imposed a term of "life" in prison, explaining that Crago "must serve every day of twenty-five (25) years of the sentence imposed before he is eligible for any type of release." Unlike in *Chaparro*, the court did not mention parole. We thus fail to see how the fact-specific inquiry in *Chaparro* constitutes a significant change in the law that would probably affect Crago's sentence. *See State v. Pandeli*, 242 Ariz. 175, ¶ 4 (2017) (court abuses discretion if it makes error of law).

¶20          The district court's decision certifying the issue in *Chaparro* to the Arizona Supreme Court does not convince us otherwise. While the district court may have viewed the issue presented as "novel" and "unsettled," the supreme court did not overrule previously binding caselaw or otherwise break new ground in its opinion. *Chaparro v. Ryan*, No. CV 19-00650-PHX-DWL, 2019 WL 3361244 (D. Ariz. July 25, 2019). In determining whether a case represents a significant change in the law under Rule 32.1(g), the focus is on the language and holdings of that decision, not how it was initially assessed by another court.

¶21          As we have previously stated, Crago's sentence "expires at the end of his life, an indeterminate period, not in twenty-five years." *Crago*, No. 2 CA-CR 2011-0162-PR, ¶ 8. Given that he has now served twenty-five years, he is eligible to be considered for release. *See id.* ¶ 10 (discussing board of clemency's decision to recommend commutation and governor's decision to grant commutation). "The imposition of community supervision had no bearing on Crago's life sentence or his eligibility to have that sentence commuted." *Id.* ¶ 11. Because we previously addressed on the merits the issue raised in Crago's current petition for post-conviction relief, it is now precluded.[4] *See* Ariz. R. Crim. P. 32.2(a)(2); *see also State v. Whelan*, 208 Ariz. 168, ¶ 8 (App. 2004) ("law of the case" is "practice of refusing to reopen questions previously decided in the same case by the same court or a higher appellate court") (emphasis omitted) (quoting *Davis v. Davis*, 195 Ariz. 158, ¶ 13 (App. 1999)).

**Disposition**

¶22          For the reasons stated above, we grant review and relief.

_____

[4]Because we agree with the state that the issue is precluded, we need not address the state's additional arguments that the trial court erred in concluding Crago was eligible for parole and erred in ordering his release on community supervision.