*Earl Felton Crago v. Shinn*, CV 22-00339-TUC-JAS (LAB)

**INDEX OF EXHIBITS**

Exhibit A.    Cochise County Superior Court order, 8/21/95

Exhibit B.    Transcript, sentencing hearing, 8/21/95

Exhibit C.    Arizona Court of Appeals memo decision, 3/18/99

Exhibit D.    Cochise County Superior Court order, 4/5/11

Exhibit E.    Arizona Court of Appeals memo decision, 9/9/11

Exhibit F.    Ninth Circuit Court of Appeals order, 11/15/13

Exhibit G.    PCR notice, 11/30/18

Exhibit H.    PCR petition, 11/20/18

Exhibit I.    Cochise County Superior Court order, 8/16/19

Exhibit J.    Crago's Petition for review

Exhibit K.    Arizona Court of Appeals memo decision, 3/16/20

Exhibit L.    Arizona Court of Appeals mandate, 11/9/20

Exhibit M.    PCR notice, 11/12/19

Exhibit N.    PCR petition, 12/23/19

# EXHIBIT A

**FILED**

Time_____M

AUG 23, 1995

DENISE LUNDIN GLASS
CLERK SUPERIOR COURT
BY_____DEPUTY

OFFICE DISTRIBUTION
| | APPEALS
| | BONDS- REFUND/FORFEITURE
|xx| FINES/ATTY FEES/RESTITUTION.Jack Kennedy
| | ATTORNEY- APPT & CLAIMS
|xx| COUNTY ATTY./Gerald F. Till
|xx| DEFENSE ATTY./Ralph Malanga, Esq.
|xx| ARIZONA DEPART OF CORRECTIONS
|xx| C.C.S O  JAIL
|xx| ADULT PROBATION DEPARTMENT
| | MAILED

# SUPERIOR COURT OF ARIZONA
## COUNTY OF COCHISE
### Date **August 21, 1995**

**STATE OF ARIZONA**          VS.          **EARL FELTON CRAGO, JR.**

Date of Birth:  **10-16-71**

## SENTENCE OF IMPRISONMENT

CASE NO: **CR94000471**

JUDGE **HONORABLE MATTHEW W. BOROWIEC**
DIVISION **One**
COURT REPORTER **Merle R. Briefer**
ADDRESS & PHONE

**DENISE LUNDIN GLASS, CLERK**

By **Stephanie L. Williams** 8/__/95, Deputy
Docketed by_____

**2:13 p.m.**  The State is represented by **Deputy County Attorney, Gerald F. Till**; the Defendant is present with counsel, **Ralph Malanga, Esq.**

Court Reporter, **Merle R. Briefer** is present.

The Defendant is advised of the charge, the determination of guilt and is given the opportunity to speak.

Pursuant to A.R.S. Section 13-607, the Court finds as follows:

|XX|  JURY VERDICT  The determination of guilt was based upon a verdict of guilty after a jury trial.

THE RECORD MAY SHOW Stanley Davidson, grandfather of the victim, addressed the court and Lottie Ross, sister of the victim, addressed the court.

Page 1

MINUTES DIV. I

BOOK 5B PAGE 34

| | | | |
|---|---|---|---|
| **One**<br>Div | **August 21, 1995**<br>Date | **HONORABLE MATTHEW W. BOROWIEC**<br>Judge | **Stephanie L. Williams**<br>Deputy |

No. **CR94000471**   STATE vs **EARL FELTON CRAGO, JR.**

Having found no legal cause to delay rendition of judgment and pronouncement of sentence, the Court enters the following judgment and sentence:

IT IS THE JUDGMENT OF THE COURT that the Defendant is guilty of the following crime(s), that upon due consideration of the facts, law and circumstances relevant here, the Court finds that suspension of sentence and a term of probation are not appropriate and that a sentence of imprisonment with the Department of Corrections is appropriate.

THE COURT FURTHER FINDS that there are circumstances sufficiently substantial to call for a **LIFE** term as indicated on the following page. These circumstances are stated by the Court on the record.

AS PUNISHMENT, IT IS ORDERED that the Defendant is sentenced to a term of imprisonment and is committed to the Arizona Department of Corrections as follows:

168

| One<br>Div | August 21, 1995<br>Date | HONORABLE MATTHEW W. BOROWIEC<br>Judge | Stephanie L. Williams<br>Deputy |
|---|---|---|---|

No. **CR94000471**   STATE vs **EARL FELTON CRAGO, JR.**

OFFENSE:                **murdered Carl H. Davidson, Jr.**

FELONY CLASS:           **class one (1) felony and Count II of the Indictment**

IN VIOLATION OF A.R.S. §§:   **13-1105, 13-1101, 13-604, 13-703 and 13-701**

DATE OF OFFENSE:         **on or about the 28th day of September, 1994**

SENTENCE:               **committed to a LIFE term in the Department of Corrections**

| | NONDANGEROUS |XX| DANGEROUS PURSUANT TO A.R.S. §13-604

|XX| NONREPETITIVE | | REPETITIVE PURSUANT TO A.R.S. §13-604

| | NONDANGEROUS BUT VIOLATIVE OF A.R.S. §13-604.01(B)        | | DANGEROUS AND VIOLATIVE OF A.R.S.§13-604.01(A)

This sentence is to date from **this date, August 21, 1995.** The Defendant is to be given credit for **337 days** served prior to sentencing.

**IT IS ORDERED:  That the Defendant must serve every day of twenty-five (25) years of the sentence imposed before he is eligible for any type of release.**

**IT IS FURTHER ORDERED:  That pursuant to A.R.S. §13-603(1), the Defendant will be required to do mandatory community supervision sentence—one day for every seven days sentenced to, for a total of 3 years, 7 months.**

### RESTITUTION

**IT IS ORDERED:  That the Defendant shall pay restitution to the victim of this crime for their economic loss through the Clerk of the Superior Court, P.O. Drawer CK, Bisbee, AZ 85603, in the total amount of $3,610.00.**

| One Div | August 21, 1995 Date | HONORABLE MATTHEW W. BOROWIEC Judge | Stephanie L. Williams Deputy |
|---|---|---|---|

No. **CR94000471**   STATE vs **EARL FELTON CRAGO, JR.**

## ATTORNEY'S FEES

**IT IS ORDERED:  That the Defendant shall reimburse Cochise County for the costs of legal representation through the Clerk of the Superior Court, P.O. Drawer CK, Bisbee, AZ 85603, in the total amount of $7,000.00.**

The Court advised the Defendant of his right to appeal and written notice of those rights is provided to the Defendant.

ORDERED remanding the Defendant to the custody of the Sheriff of Cochise County and authorizing the Sheriff to deliver the Defendant to the custody of the Arizona Department of Corrections and authorizing the Department of Corrections to carry out the term of imprisonment set forth herein.

ORDERED that the Clerk of the Superior Court shall remit to the Department of Corrections a copy of this Order, together with all pre-sentence reports, probation violation reports, medical and psychological reports relating to the Defendant and involving this cause.

Let the record reflect that the Defendant's fingerprint is permanently affixed to this Sentencing Order in Open Court.

FILED:  Notice of Rights of Review after Conviction, signed by the Defendant and Defendant's handwritten statement read to the court.

**2:37 p.m.** Hearing Concludes.

JUDGE OF THE SUPERIOR COURT



Page 4

# EXHIBIT B

1           IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2             IN AND FOR THE COUNTY OF COCHISE

3

4   STATE OF ARIZONA,     )

5       Plaintiff,    )

6   vs.              )         CR94000471

7   EARL FELTON CRAGO JR.,  )

8       Defendant.    )

9   _____)

10

11        REPORTER'S TRANSCRIPT OF PROCEEDINGS (ON APPEAL)
                    August 21, 1995

12

13   APPEARANCES: MR. GERALD TILL
               Deputy County Attorney

14            For the State

15            MR. RALPH MALANGA
            Attorney at Law

16            For the Defendant

17

18

19   BEFORE:  THE HONORABLE MATTHEW W. BOROWIEC

20

21

22   _____
                   MERLE RHODES BRIEFER

23     Court Reporter, Cochise County Superior Court
                   Drawer CT

24          Bisbee, Arizona 85603
             (520) 432-9332

25

I N D E X

WITNESS                                                    PAGE

Ms. Virginia Cluen

        Direct Examination by Mr. Malanga              9

        Cross-examination by Mr. Till                 12

1

2

3

4                        P R O C E E D I N G S

5

6      THE COURT:   This is State of Arizona vs. Earl

7  Felton Crago Jr., CR94000471.

8      MR. MALANGA:   Ralph Malanga for Mr. Crago,

9  present in custody.

10     THE COURT:   All right.

11     MR. MALANGA:   Something has come to my attention

12  I would like to address the court about.   It seems

13  under Rule 24, one of the aspects of Rule 24 is newly

14  discovered evidence.

15          Yesterday I spoke to a woman named Amy

16  Slaughter, who -- and the reason I am informing the

17  court at this point -- I don't know whether the court

18  would like me to supplement the Rule 24 or not.   I

19  think it's significant, but here's what occurred.

20          Ms. Slaughter was at the time of this

21  incident in September of 1994, she was this fellow

22  DeWitz's girlfriend.   Mr. DeWitz, if the court remembers

23  the trial, there was one individual -- and I forgot his

24  name offhand, but I can give it to you.   I think his

25  name is Warren Beel.   He testified for the defense

1    that the evening prior to the shooting he was

2    staying at the trailer and Cissy Brown showed up

3    with a Carl Davidson and another individual looking

4    for Mr. Crago.  The other individual was this Mr.

5    DeWitz.

6              What occurred in this conversation was

7    Ms. Slaughter indicated to me that Mr. DeWitz was

8    released on his own recognizance on a felony charge

9    and fled the jurisdiction.  He's somewhere but he was

10   charged with drugs.

11             She indicated to me that Mr. DeWitz

12   told her Cissy Brown had in fact solicited him and

13   Carl Davidson to work for her in the capacity of

14   taking care of individuals; in other words, killing

15   them or whatever goes on in this drug culture.

16        THE COURT:  There was some testimony to that

17   at trial.

18        MR. MALANGA:  There's some -- there was some

19   testimony -- I'm not sure who it came in from --

20   if it was just Mr. Crago that testified to that.

21             This would certainly add to that.

22   But more importantly, he was arrested the afternoon

23   of the homicide.  And prior to his arrest, he told

24   Amy Slaughter again -- and she was going to be here.

25   She called at noon and said her daughter was sick

4

1   at school.  She didn't have anyone to stay with her.

2   I told her to try to get here.

3              He in fact told her the reason Davidson

4   got killed was because he tried to do the thing alone.

5   He didn't know what he was doing.  He was inexperienced

6   and got himself killed.

7              The gist of it is that Cissy Brown got

8   DeWitz and Carl Davidson to either assault or whatever,

9   kill, Mr. Crago -- whatever her preference was.

10  THE COURT:  Even if that is true, under the

11  circumstances of the case, what difference does that

12  make as far as this charge against Mr. Crago is concerned?

13  MR. MALANGA:  Mr. Crago's defense was self-defense,

14  and there was no real evidence involved that Mr. Davidson

15  was in fact an aggressor  in this situation except what

16  came through Mr. Crago and his testimony regarding the

17  incident outside the house.

18             Everyone else -- Ms. Brown denied that

19  any of that sort of behavior was going on -- that she

20  hired anybody or anything else when she was called on

21  rebuttal.  She indicated that didn't occur.

22             This would give credence to Mr. Crago's

23  theory of the defense that in fact Davidson and DeWitz

24  were supposed to kill him for Cissy Brown or whatever

25  she wanted from them and it would give additional

1   evidence as to that theory.

2          The only evidence I understand that came

3   in from my reading of the transcript was Mr. Crago --

4   there was nothing to support that -- and certainly,

5   given that additional information, the jury could

6   conclude Mr. Crago was acting in fear of his life

7   when he acted out there on the morning of the 24th.

8       THE COURT:  Perhaps the initial acts, but from

9   the testimony as Mr. Davidson fled and was shot in

10  the back, that doesn't look like self-defense.

11      MR. MALANGA:  That's true, but apparently there

12  was a weapon inside the house that was available to

13  Mr. Davidson.

14      THE COURT:  There was also a weapon available

15  to Mr. Crago; that is, the automobile.

16          He could have turned the key on and

17  gotten out of there.

18      MR. MALANGA:  That's true.  In terms of the

19  testimony at the trial, that may be significant.

20          Since we have litigated the Rule 24,

21  it may be that this would be a better subject for

22  a Rule 32 being filed with an affidavit.  I don't

23  know how the court would like to proceed.

24      THE COURT:  You've gotten some indication as

25  to my feeling based -- or my belief based on the testimony.

1    MR. MALANGA:  Right.

2    THE COURT:  You are entitled to file another

3  motion for new trial based on that but the indication

4  from me is that I don't -- based on the evidence I

5  heard as the trial judge in this, it's going to be

6  denied.

7    MR. MALANGA:  Your Honor, I would prefer to

8  file the motion to preserve the record since this is

9  a class 1 felony.  It's a serious offense.  If it was

10  some other situation, I would not.  I would prefer to

11  file that and prefer to have Ms. Slaughter testify

12  about those facts rather than me giving the secondhand

13  rendition of the facts.

14         It may be that I am not stating it as

15  accurately as possible.

16    THE COURT:  It will be given full faith.

17  Submit an affidavit from her.  I won't take testimony.

18  I will consider it as true.  You are entitled to --

19  and I am satisfied that the motion is going to be

20  denied, but you are entitled to file your motion if

21  you want to do that.

22         Do you want to do that?

23    MR. MALANGA:  I think I should do that.

24    THE COURT:  After sentencing or before?

25    MR. MALANGA:  I should file it before sentencing.

1      THE COURT:  You have 15 days before sentencing

2  to file motions for a new trial.

3      MR. MALANGA:  Is that what the rule says?

4      THE COURT:  I will check it.

5      MR. MALANGA:  If it's 15 after sentencing, I

6  guess we could proceed.

7      THE COURT:  It used to be.

8          Counsel, I don't get too many of these.

9      MR. MALANGA:  I'm not doing this in any way in

10  bad faith.  This is just what I learned.

11      THE COURT:  It's not Rule 24.

12      MR. MALANGA:  It's not?

13      THE COURT:  No.

14      MR. MALANGA:  I don't have the books here.

15      THE COURT:  Is there one on the shelf there?

16          24.1.  It is 24.1

17      MR. MALANGA:  It is Rule 24, is it not?

18      THE COURT:  Well, 24.1.  You have 10 days after

19  the verdict is rendered for a motion for new trial.

20  Sorry.

21      MR. MALANGA:  Motion to vacate judgment --

22      THE COURT:  That's 24.2, and that's 60 days

23  after the entry of judgment.

24      MR. MALANGA:  That's no problem then.

25          I thought if I had to file it prior

8

1    to sentencing -- I've got 60 days to file it.

2    I can get an affidavit in the file.

3         THE COURT:  Any objection to proceeding?

4         MR. MALANGA:  With sentencing?  No, Judge.

5         THE COURT:  All right.  Will you and your client

6    step up, please.

7         MR. MALANGA:  Before we proceed, I would like to

8    call Mr. Crago's grandmother to testify in mitigation.

9         THE COURT:  Did we set this for a mitigation

10   hearing?

11        MR. MALANGA:  That's why we set it this afternoon.

12   I informed the court I would probably have a witness.

13        THE COURT:  All right.

14

15                  VIRGINIA CLUEN,

16   called as a witness by the defendant, having been

17   first duly sworn, testified, on her oath, as follows:

18

19                 DIRECT EXAMINATION

20

21   BY MR. MALANGA:

22

23        THE COURT:  She already testified?

24        MR. MALANGA:  That was on another motion.

25   That wasn't in mitigation.

1      THE COURT:  How many witnesses do you have?

2            Does the state have any witnesses?

3      MR. TILL:  Not as such.  We may have a victim

4  or two who would like to be heard.

5      THE COURT:  All right.

6      Q      (By Mr. Malanga):  Please state your

7  full name.

8      A      Virginia Cluen.

9      Q      And your occupation?

10     A      I am a caregiver for elderly.

11     Q      Is that your own business?

12     A      Yes, it is.

13     Q      What is your relationship to Mr. Crago?

14     A      I am his grandmother.

15     Q      What I would like to ask you about today

16  is a little bit of Earl's background growing up.

17            Can you tell the court whether or not

18  Mr. Crago had a, quote, normal family life, when he

19  was growing up?

20     A      I think that would depend on your

21  term "normal."

22     Q      I don't want to banter with you.

23     A      I don't either.

24     Q      I will ask a direct question.

25            Is it true that both Mr. Crago's

1    parents were charged with felonies and were out

2    of his life on the lam, so to speak?

3          A        As a child?  No.

4          Q        How old was he when that occurred?

5          A        I think Earl was pretty close to his

6    18th birthday when that occurred.

7          Q        Prior to that, what kind of family

8    life did he have?  His parents apparently were involved

9    in some criminal conduct prior to his 18th birthday.

10   I would say that was not normal.

11                  Why don't we go from that position.

12         A        Okay.  I would say his family life was

13   on a par with migrant workers.  His father always

14   saw the grass on the other side of the fence as greener.

15   They moved a lot.  Sometimes they lived high on the hog;

16   sometimes they had nothing. It fluctuated.  You can't

17   say what's normal.  What's normal for what?

18         Q        They had a nomadic lifestyle?

19         A        True.

20         Q        How many children were involved in

21   this situation?

22         A        They have four children -- three boys

23   and one girl.

24         Q        They were all moved around a lot?

25         A        This is true.

1    Q      Are you Earl's father's mother or
2  mother's mother?
3    A      His mother's.
4    Q      Can you describe what kind of person
5  Earl's father was?  Was he abusive to the children?
6    A      His father was physical with the
7  children.  His manner of disciplining Earl and
8  his brothers was to have a free-for-all with them.
9  Once they were big enough, he invited them out.
10   Q      And did whatever?
11   A      That's what they did.
12   Q      Was there alcohol involved?
13   A      His father is an alcoholic.  He's
14  always under the influence of alcohol and I know
15  his father smokes pot.  With the two combined, he
16  becomes --
17   Q      In short, this family could be
18  described as dysfunctional?
19   A      Absolutely.
20   Q      When did Earl come to -- was he
21  living with you at some point?
22   A      All of those children have lived with
23  me at some point.
24   Q      He was living in Phoenix with you?
25   A      Right.

1       Q      And do you know how long it's been

2  since Earl has seen his mother and father at all,

3  had any contact with them?

4       A      I think Earl saw his mother and

5  father last year.

6       Q      Is this on an infrequent basis that

7  they see each other?

8       A     Yes.

9       Q      Would you say that this family life

10  that he participated in as a child contributed to

11  the problems he has had as an adult?

12       A      I think all children's family life

13  contributes to what they do as an adult.  So yeah.

14      MR. MALANGA:  That's all I have.

15      THE COURT:  Mr. Till, any questions?

16      MR. TILL:  Just a couple.

17

18                 CROSS-EXAMINATION

19

20  BY MR. TILL:

21

22       Q      Did you say you had the defendant

23  living with you in Phoenix for some time?

24       A     Yes.

25       Q      For a short period of time or for some time?

1   A       He stayed with me for a year one time

2   and then he would be there for four, five months or

3   three months.

4   Q       How old was he the first time you had

5   him?

6   A       When he first came to my home, he was

7   just between 17 and 18.

8   Q       That's when he lived with you for a year?

9   A       Yes.

10   Q       Did you provide him a good home when

11   he was there?

12   A       I thought so.

13   Q       Were you married at the time yourself?

14   A       Yes.

15   Q       So you had his grandfather with you

16   helping to care for him?

17   A       Yes.

18   Q       And did you have children of your own

19   that you had in the home as well?

20   A       No, my children are all grown.  My

21   youngest daughter is one year older than Earl.  She

22   was married.

23   Q       What type of work do you do?

24   A       I have an adult foster care home.

25   Q       Were you doing that at the time?

14

```
 1          A       Yes.

 2          Q       At that time was his mother or father

 3   in prison, do you know?

 4          A       No, they were not.

 5          Q       He has a brother in prison?

 6          A       Yes, he does.

 7          Q       In Colorado?

 8          A       Yes.

 9          MR. TILL:  That's all I have.

10          THE COURT:  Anything further?

11          MR. MALANGA:  Nothing further.  No further

12   questions.

13          THE COURT:  You may step down.

14                  Is there anything further, counsel?

15   Any other witnesses?

16          MR. MALANGA:  Not for the defendant.

17          THE COURT:  Then we can proceed to sentencing.

18                  Will you have your client approach the

19   lectern, please.

20                  You are Earl Felton Crago Jr.?

21          DEFENDANT CRAGO:  Yes.

22          THE COURT:  You are 22 years of age; is that right?

23          DEFENDANT CRAGO:  Yes, sir.

24          THE COURT:  By reason of the verdict of the

25   jury on the 7th day of April, 1995, wherein you were
```

found guilty of murder in the first degree, a class

1 felony, in violation of Arizona Revised Statutes

section 13-1105, committed on or about the 28th day of

September, 1994, it is the judgment of this court that

you are guilty of this crime of murder in the first degree.

Does the state have a recommendation to

the court?

MR. TILL:  Yes, Your Honor, we do.

Before I speak, I would like to ask if

there are any victims who want to address the court.

Mr. Stanley Davidson?

THE COURT:  He can use the microphone at your

table, Mr. Till.

MR. MALANGA:  Would you like us to be seated?

THE COURT:  Yes, why don't you be seated for now.

MR. TILL:  Would you tell the court your name.

MR. DAVIDSON:  My name is Stanley Davidson.

I am Carl Davidson's grandfather.  No outbursts today,

Your Honor.

While I was in church yesterday, it came

to me that I committed a sin Friday letting my emotions

overcome my brain and my tongue.  I asked the Lord's

forgiveness and at this time I would like to ask the

forgiveness of the defense counsel.

This last almost 11 months has been a

1    very traumatic time for my family.  This grandson of

2    ours, which we -- well, the first ten years of his

3    life, we had him approximately half the time.  From the

4    time he was ten years old until he reached his majority,

5    we were his legal guardians.  He was very close to us.

6    And even in the last few years -- well, for a while, when

7    he was in California, we didn't see him often, but when

8    he was here invariably we would see him two or three

9    times a week.

10                One of his sisters would see him practically

11   every day.  He was living with her.

12                The funeral there had to be a closed

13   casket.  We had services at the cemetery.  I took my

14   wife down there.  She couldn't attend the services.

15   She collapsed and had to be taken home.  She still can't

16   build up whatever it takes to go to the cemetery.  It's

17   been very traumatic.  We loved that child as if he was

18   our very own.  We raised him as if he was our very own.

19   And it's been very hard.  It's still hard and it will

20   continue to be hard and I ask the court to take that into

21   consideration.

22                Thank you, Your Honor.

23        THE COURT:  Thank you, Mr. Davidson.

24                Any questions?

25        MR. MALANGA:  No.

1     MR. TILL:  I'm not sure if there are any others.

2  I believe the victim's two sisters are present.  I

3  don't know if they wish to address the court or not.

4            Tell the court your name.

5     MS. ROSS:  My name is Lottie Ross.

6            I don't think that's a very good excuse

7  for what he did, saying that he had a dysfunctional

8  family.

9            Charlie didn't have that good of a life

10  neither, and he's only what, 23, 24 years old, and he

11  can go out and kill somebody?  There ain't no reason

12  for that.

13            Charlie wasn't an angel.  I mean, yeah,

14  he did drugs.  They found it in his system.  But he

15  wasn't out there selling drugs to your kids or my

16  kids like he was.

17            It's very easy to sit there and make

18  somebody out to be a bad person like the plaintiffs

19  (sic) did when Charlie is not here to defend himself.

20            He wasn't an angel.  Yeah, he went to

21  jail for domestic violence and DWI's, but he never

22  did anything bad enough, you know, like killing somebody.

23            Nobody here knows his ex-girlfriend, the

24  one that he went to jail several times for domestic

25  violence with.  I don't see how people can sit here and

1    say he was a bodyguard for that woman.  When you see

2    the size of her, she don't need no bodyguard.

3               And if he was a bodyguard or a drug dealer,

4    he would have had a lot more money than he had in his

5    pocket.  And if he had a chance to grab a weapon, he

6    probably would have taken a weapon out there the first

7    time, as he said, when he had to strangle him through

8    his car.

9               We are talking about somebody that was

10   afraid to get a tattoo.  He wasn't into pain.  He never

11   did anything to hurt anybody, and I think he is

12   mistaken in his reasons for shooting him.  I don't think

13   he shot the right person, and I don't know how many

14   years you are going to give him.

15              But he obviously, in my eyes, doesn't

16   have any remorse for what he did.  Prison doesn't

17   help people anyways.  They have no form of, I guess,

18   reforming them, letting them get back into society,

19   it just makes them even worse.

20              And I think after 25 years, I think

21   he's going to be too institutionalized to get back on

22   the street.  He's going to be a threat not only to

23   himself but to everybody else.

24              He is only 23 or 24 years old right

25   now.  What is he going to be like then?

1          I think you should give him as many
2     years as you possibly can.
3          THE COURT:  Any questions?
4          MR. MALANGA:  No, Judge.
5          THE COURT:  Anybody else?  Any other relatives.
6     All right.
7               Mr. Till, do you have a recommendation
8     to the court?
9          MR. TILL:  Yes, Judge.
10               It appears that the court really has
11    in this case really two options.  One is the life in
12    prison as mandated however subject to parole in 25
13    years, and the other is natural life in prison.
14               I believe the last witness addressed the
15    court and summed it up quite well.
16               This was a victim who was unarmed, who
17    was shot in the back.  There was no attempt to save
18    that individual or commit anyone else to save him
19    since he was dumped in the desert.
20               The defendant himself admitted his
21    involvement in the drug trade, which he testified he
22    was aware anybody could get killed at any given time
23    in that line of work.
24               He will be probably 47 years old when
25    he gets out if he is given the opportunity for parole

1   in 25 years.

2              There is enough information we know about

3   him to show that he's a real threat to society.

4              And for that reason and that reason alone,

5   we would ask that the court impose the sentence of

6   natural life; that being really something I believe the

7   court has discretion to do.

8              I believe that fits this particular case.

9   Thank you.

10       THE COURT:  Mr. Malanga?

11       MR. MALANGA:  Thanks, Judge.

12              Judge, this court has been involved

13   in numerous homicide cases.  I know the court has

14   been sitting for a long time.  I have been involved

15   in numerous homicide cases also and I have -- I

16   think the natural life law is written for those cases

17   that are especially egregious in nature, and I am not

18   underplaying in any way this case.

19              I know the victims are sensitive to what

20   I say, but essentially, Judge, Mr. Davidson was involved

21   in whatever manner in drugs and this side of life.

22              He chose to be in that situation.  What

23   exactly occurred on September 24 there in the morning,

24   I don't know.  I don't know if anyone will know the

25   true facts in terms of what we have is what Mr. Crago

1   said and everything else is circumstantial as to what

2   occurred.

3           You know, he disposed of the body.  He

4   did place -- and if we want to get down to the fine

5   points that some of these witnesses testify, Mr. Crago

6   picked up the body gently in one of those kinds of ways

7   and set the body into the car.  He didn't dump the body

8   in the car.

9           The fact that he left Mr. Davidson's body

10  where he left it, once he was dead, it wasn't like he

11  could help him in any way.

12          And the problem I have with the natural

13  life is that because of the circumstances, this isn't --

14  it's difficult for me to believe under the facts, the

15  way they came in, that Mr. Crago simply said, after

16  dropping off Tovah Sitts -- well, I think I will go

17  over to Cissy Brown's and blast the victim.

18          Under the facts, it's difficult to say

19  that was his mindset.

20          What transpired was a set of circumstances

21  that I don't believe the defendant, Mr. Davidson, or

22  anybody else could have predicted were going to transpire.

23  It wasn't some sort of execution style shooting as is

24  set forth in the presentence report.  It was a situational

25  type of incident.

1        Whether or not Mr. Crago acted above and

2   beyond self-defense, which it appears from the facts the

3   way the court heard them and the way the transcript

4   reads that maybe he did do that -- but the fact of the

5   matter is Mr. Davidson also was involved.  He was

6   obviously high on methamphetamines.

7        It was 5:00 in the morning.  There was

8   no testimony brought forth in the trial about what the

9   effects of methamphetamine would have been on Mr.

10  Davidson at that point in time.  And unfortunately,

11  the jury didn't have the advantage of any expert testimony

12  on that.

13        The point is it was 5:00 in the morning.

14  Mr. Crago didn't go up as some executioner:  I'm going

15  to kill Mr. Davidson.

16        This court sentences people for drugs

17  all the time.  It's one of the problems of society,

18  this meth culture that's arising in Sierra Vista and

19  all over.

20        And for whatever reason, you know, Carl

21  Davidson was a young man -- Crago is a young man.  And

22  it's a tragedy for both of them that this occurred.

23        Mr. Davidson lost his life.  Mr. Crago

24  has lost his liberty.  And essentially lost his life.

25  It's one of those things, Judge, and I in no way diminish

23

1    the victims' pain.

2              Any time there is a loss, and they said

3    he wasn't a great guy, but he didn't deserve to die.

4    Certainly, that's true.

5              In that scenario, given a twist, Mr.

6    Crago could be dead and Mr. Davidson standing here.

7    It's that kind of environment.  I don't think under

8    those facts that Mr. Crago should receive the ultimate

9    penalty of life without possibility of parole.

10             The argument that he will be institutionalized,

11   people are sentenced, as this court well knows, to long

12   terms of prison.  That goes with the territory that they

13   are institutionalized, and also the presentence report

14   listed no mitigation.

15             I am a little concerned when I see that.

16   It's as if there is no effort whatsoever to try to find

17   some aspect of the defendant's character that is worthy

18   of taking a look at.

19             When I see "none" it bothers me.

20   Earl Crago is 23.  He is not a kid but he is still a

21   young man.  He's got no prior felony record whatsoever.

22   And in addition to that, like I have said, primarily

23   the circumstances of this case, the drugs and alcohol

24   involved, the whole thing is a mess, and it could be

25   Carl Davidson standing here before the court.  That's

1     all there is to it under the circumstances.

2             With that in mind, I just -- it seems

3     harsh to sentence Mr. Crago to life without possibility

4     of parole.

5             I know this court has sat in cases that

6     were more egregious, cold-blooded.  We sat in the

7     Mulkey/Mears case.  In that case, he point blank blew

8     somebody's head off and that was in my opinion far more

9     egregious factually than what occurred and the

10    circumstances here.  There was nothing that could

11    mitigate that behavior, that conduct.

12            And this case is different.  It's one

13    of those cases where it was anybody's bet what was going

14    to occur when Earl Crago went over to that house.  And

15    it doesn't appear he went over there with any intent

16    to kill Mr. Davidson.  It seems like it was a circumstance.

17            He's going to pay a price for that.  He

18    is 23 years old.  He is going to spend the best part of

19    his life in prison.

20            When he gets out, he's going to be a shell.

21    I would ask the court to sentence the defendant to life

22    with the possibility of parole in 25 years.

23            I think under the facts of this case

24    it's a just result.

25        THE COURT:  Mr. Crago, do you have anything to say?

1      DEFENDANT CRAGO:  Yes, Your Honor.

2           Your Honor, in refusing my request for

3   new defense counsel approximately three months before

4   trial I was forced to go to trial with an incompetent

5   defense lawyer who I had a very strong conflict of

6   interest with.  I told Jim White on several different

7   occasions I wanted a different defense lawyer but he

8   refused to withdraw.  I wrote the court asking you to

9   appoint different counsel for my defense.  You stated

10  Jim White was very competent and I would have to talk

11  with him concerning the prospect of new counsel.  Jim

12  White told me unless I had funds to obtain private

13  counsel, new counsel would not be appointed.

14       THE COURT:  Mr. Crago, we are not going to argue

15  that motion.  We are talking about sentencing at this

16  point.

17       DEFENDANT CRAGO:  I just have a few things to say.

18  Isn't that my right, Your Honor?

19       THE COURT:  Do you want to talk about your --

20       DEFENDANT CRAGO:  Yes, I do.

21       MR. MALANGA:  He just has a little bit more,

22  Your Honor.

23       THE COURT:  Go ahead.

24       DEFENDANT CRAGO:  Jim White's gross negligence

25  at trial guaranteed my conviction.  Jim White's opening

1   statements biased the jury towards me and had absolutely

2   no relevance in my case.  He did not confer with me

3   prior to making the speech and I was as shocked as I

4   was surprised by the statements he made in opening

5   argument.

6          Second, Jim White refused to impeach

7   Scott Adkins.  He had prior tape-recorded statements

8   by Scott Adkins that would have impeached him on every

9   word of his testimony with the exception of his name

10  and address and relatives.  I told Jim White twice to

11  impeach Scott Adkins on cross-examination.  Jim refused

12  to do it.

13         COURT REPORTER:  A little slower, please.

14         DEFENDANT CRAGO:  He told me he was not going to

15  impeach Scott.  Because we all know the prosecution

16  based its sole argument on Scott Adkins's testimony.

17         Thirdly, Jim White refused to question

18  Detective Bob Pearce on his statements made three weeks

19  prior to trial.  Detective Pearce stated in a tape-

20  recorded interview that from his investigation there

21  was absolutely no proof of premeditation.  In fact,

22  he said he didn't understand how I had been indicted

23  on first-degree murder.  He made these statements after

24  the Sierra Vista Police Department had been investigating

25  the shooting for six months.

1        Considering Detective Pearce interviewed

2    almost all of the state's witnesses and was in charge

3    of collecting evidence for the state's case, we have

4    to assume the statements made by Detective Pearce with

5    the fact there was no new evidence other than a man --

6    that testimony showed he was entering into a conspiracy,

7    lying in court, and still allowed to testify.

8        There was nothing else entered into the

9    state's case between the time statements were made and

10   the trial took place.

11       In short, Your Honor, I feel my constitutional

12   rights to a fair trial by effective assistance of counsel

13   has not been fulfilled.  This man purposely lost my

14   trial.  And you forced me to go to trial with him.

15       I didn't kill that man on first-degree

16   murder.  You know, I did mouth-to-mouth resuscitation

17   on him.  You know, the man spit up a lot of blood.

18   Shit, I couldn't do nothing else.  I did not mean to

19   kill that man.  He attacked me.  He pulled a rifle on me.

20   The man chased me out of the house.  I was trying to leave.

21   He insulted me.  I tried to get him to stop every way

22   I could.  I was trying to leave.  This man told me that

23   I was dead, you know.  He had a gun.  The police testified

24   they found a gun in the house that was loaded, the

25   safety was off.  They didn't even put it into evidence.

1    I did not want that man to die.  I didn't

2  even know the man.  I have nothing else to say, Your Honor.

3    THE COURT:  All right.  Any legal cause why

4  sentence should not be imposed at this time?

5    MR. TILL:  No.

6    MR. MALANGA:  No.

7    THE COURT:  I have considered the circumstances

8  presented to the court, and this is one of those --

9  I am satisfied this is one of those critical by-products

10  of the drug culture, there is more than Mr. Crago

11  involved in it.

12    Among the witnesses that testified on

13  the trial, no one of course can know if Mr. Crago

14  fulfills 25 years in prison what he will be like.  And

15  this is a period of time that's much longer or longer

16  than he has already lived.

17    And I am going to impose the sentence of

18  life with the condition that he serve at least 25 years,

19  every day of 25 years.

20    No legal cause appearing, it is the

21  judgment of this court and sentence that you be imprisoned

22  for the term of life and that you not be released on

23  any basis until the completion of the service of 25 years.

24    You are given credit for -- what is the

25  time actually now?  There's been some continuances.

1    MR. TILL:  337 days.

2    PROBATION OFFICER:  That's correct.

3    THE COURT:  337 days spent in incarceration

4  against that term.

5    Further, you are advised you have the

6  right to appeal.  If you cannot afford a lawyer, one

7  will be appointed for you.  That includes the necessary

8  records and transcripts.

9    MR. MALANGA:  We have some of the transcripts

10  and I will file a notice of appeal within the time.

11    THE COURT:  There is restitution of $3610.

12  Ordered that be paid.  Further ordered that you reimburse

13  Cochise County for the cost of legal representation in

14  the sum of $7000.  I am sure it's more than that.

15    Ordered that the defendant is remanded

16  to the custody of the sheriff for transportation to the

17  Department of Corrections.

18    It is further ordered that you will

19  serve three years and seven months community supervision

20  once you are released from prison.

21    For Department of Correction classification

22  purposes, this is a class 1 felony of a dangerous nature,

23  no prior conviction having been alleged.

24    Counsel, will you have your client

25  execute the notice of right of review and have him

1    fingerprinted.

2        MR. MALANGA:  I am going to file this.  It was

3    his statement.

4        THE COURT:  Very well.

5        MR. MALANGA:  May I have leave to withdraw

6    when I file the notice of appeal?

7              At this point, if they want to appoint

8    me on the appeal --

9        THE COURT:  Do you want to serve as attorney on

10   the appeal?

11       MR. MALANGA:  I would prefer not to, Your Honor.

12       THE COURT:  Put it in writing and we will

13   consider it.

14

15              (whereupon, the court proceeded

16               to hear other matters)

C E R T I F I C A T E

STATE OF ARIZONA      )
                      )   SS.
COUNTY OF COCHISE     )


     I, Merle Rhodes Briefer, having been appointed as official court reporter herein, do hereby certify that the foregoing pages numbered 1 through 30, inclusive, constitute a full, true and correct transcript of all the proceedings of the matter as set forth in the title page hereto, all done to the best of my skill and ability.

     Dated this 27th day of September, 1995.


_____
MERLE RHODES BRIEFER

# EXHIBIT C



IN THE COURT OF APPEALS
STATE OF ARIZONA
DIVISION TWO

FILED BY CLERK

MAR 1 8 1999

COURT OF APPEALS
DIVISION TWO

| | | |
|---|---|---|
| THE STATE OF ARIZONA, | ) | 2 CA-CR 95-0488 |
| | ) | 2 CA-CR 98-0230-PR |
| Appellee/Respondent, | ) | (Consolidated) |
| | ) | DEPARTMENT A |
| v. | ) | |
| | ) | MEMORANDUM DECISION |
| EARL FELTON CRAGO, JR., | ) | Not for Publication |
| | ) | Rule 111, Rules of the |
| Appellant/Petitioner. | ) | Supreme Court |
| | ) | |

APPEAL AND PETITION FOR REVIEW
FROM THE SUPERIOR COURT OF COCHISE COUNTY

Cause No. CR94000471

Honorable Matthew W. Borowiec, Judge

AFFIRMED IN PART; REMANDED IN PART
PETITION FOR REVIEW GRANTED; RELIEF GRANTED IN PART

---

Janet Napolitano, Arizona Attorney General
 By Paul J. McMurdie and Diane M. Acosta

Tucson
Attorneys for Appellee/Respondent

Harriette P. Levitt

Tucson
Attorney for Appellant/Petitioner

---

P E L A N D E R, Presiding Judge.

¶1        Appellant/petitioner Earl Crago was convicted after a jury trial of first-degree

murder and was sentenced to life in prison without possibility of parole for twenty-five years. He

raises five issues on appeal, none of which merits reversal. In his consolidated petition for review

of the trial court's summary dismissal of his request for post-conviction relief, filed pursuant to

Rule 32, Ariz. R. Crim. P., 17 A.R.S., Crago primarily contends that his trial counsel was ineffective and that the trial court should have granted an evidentiary hearing on that claim. We affirm Crago's conviction and sentence, grant review and grant relief in part on his petition for review, vacate the trial court's order for reimbursement of defense attorney's fees, and remand for further proceedings on that issue and for an evidentiary hearing on certain ineffective assistance of counsel claims.

## FACTS

¶2        We view the facts in the light most favorable to upholding the jury's verdict and "resolve all conflicts of evidence and all reasonable inferences therefrom against the defendant." *State v. Zmich*, 160 Ariz. 108, 109, 770 P.2d 776, 777 (1989). At approximately 5:00 a.m. on September 28, 1994, several people reported hearing gunshots in their neighborhood in Sierra Vista. S., a fifteen-year-old resident, was awakened by three gunshots, with a pause between the first shot and the last two shots. From his bedroom window, S. saw Crago, an acquaintance of S.'s mother, standing next to his Nissan 300ZX in the driveway. S. lay back down in his bed, but then got up and went into the living room, from where he saw Crago pick up the victim's body from the driveway. The victim was S.'s mother's boyfriend. After returning to his bedroom, S. heard the car drive away and then woke his mother to tell her what he had seen and heard.

¶3        Several other neighbors heard the gunshots and gave similar descriptions of the incident. The neighbors generally testified that they had heard three shots and had seen a man lying near a small hatchback vehicle in the driveway of S.'s home. One witness had observed a person "looking down at the ground [between the victim and the car] and picking things up, like

he was searching for something." According to that witness, that person then picked up the victim, placed him in the passenger side of the car, got in the car himself, and drove away.

¶4          The victim's body was discovered four days later in the desert, partially covered with a piece of plywood. The autopsy showed that the victim had suffered three gunshot wounds, one that entered his leg from the front and the other two that entered his back. The only fatal wound was a gunshot in his upper back that severed his aorta.

¶5          Crago was arrested in Texas the day after the murder. On October 5, after the victim's body had been found, two Sierra Vista police officers traveled to Texas to search Crago's vehicle and return him to Arizona. The police found a holster in his car and what appeared to be bloodstains on the front passenger seat. At trial, Crago admitted he had shot the victim, but claimed he had acted in self-defense.

<div align="center">APPEAL</div>

I. Motion for Judgment of Acquittal

¶6          Crago contends the trial court erred in denying his motion for a judgment of acquittal, made pursuant to Rule 20, Ariz. R. Crim. P. He argued below that, because the state had failed to present substantial evidence of premeditation, he was entitled to an acquittal on the charge of first-degree murder. We will affirm a trial court's denial of a Rule 20 motion if there is substantial evidence to support the verdict. *State v. Scott*, 177 Ariz. 131, 865 P.2d 792 (1993). "Substantial evidence is more than a mere scintilla and is such proof that 'reasonable persons could accept as adequate and sufficient to support a conclusion of defendant's guilt beyond a reasonable doubt.'" *State v. Mathers*, 165 Ariz. 64, 67, 796 P.2d 866, 869 (1990), *quoting State v. Jones*, 125 Ariz. 417, 419, 610 P.2d 51, 53 (1980).

<div align="center">3</div>

¶7   To commit first-degree murder, a defendant must intentionally or knowingly cause the death of another with premeditation.  A.R.S. § 13-1105(A)(1).  A defendant premeditates the crime if the defendant intends or knows that his or her acts will kill another human being and if the intention or knowledge precedes the killing by a length of time sufficient to permit reflection.  A.R.S. § 13-1101; *State v. Neal*, 143 Ariz. 93, 692 P.2d 272 (1984); *State v. Haley*, 287 Ariz. Adv. Rep. 3 (Ct. App. July 2, 1998).  "The necessary premeditation, however, may be as instantaneous as successive thoughts of the mind and may be proven by either direct or circumstantial evidence."  *State v. Kreps*, 146 Ariz. 446, 449, 706 P.2d 1213, 1216 (1985); *see also State v. Ovind*, 186 Ariz. 475, 924 P.2d 479 (App. 1996).  Viewed in the light most favorable to sustaining the verdict, *see State v. Jones*, 188 Ariz. 388, 937 P.2d 310 (1997), *cert. denied*, ___ U.S. ___, 118 S. Ct. 705 (1998), the evidence was sufficient to establish premeditation in this case.

¶8   Two witnesses and Crago himself testified that there was a brief pause between the first gunshot and the last two shots.  Crago testified that he shot the victim in the leg first and then twice in the back only after the victim had threatened Crago's life and begun to run toward the house, ostensibly to retrieve a rifle from the living room.  Only the second or third shot caused the victim's death.  Based on that scenario, Crago had sufficient time to reflect on his actions and, thus, to commit premeditated murder.

¶9   The state also presented evidence, including Crago's own testimony, that he had attempted to dispose of the body after the shooting and then immediately fled the jurisdiction.  A defendant's attempt to dispose of a murder victim's body may be considered as evidence of

4

premeditation. *State v. Sellers*, 106 Ariz. 315, 475 P.2d 722 (1970). *See also State v. Ruiz*, 1 CA-CR 96-0940, 1998 WL 436557 (Ariz. Ct. App. Aug. 11, 1998).

¶10     In addition, two Cochise County detention officers testified that they had heard Crago tell another inmate at the county jail in mid-October 1994 "how he blew this guy away" and "motioning that how he had a gun and he killed someone." Crago argues that that testimony related only to his "identification as the perpetrator, but not to his intent before the offense." Like the evidence of his attempt to dispose of the victim's body, however, this evidence related to the circumstances surrounding the killing and suggested that it was not self-defense, as Crago claimed.

¶11     Finally, Crago argues that the state failed to present any evidence of his motive and, "[w]ith no evidence as to the facts leading up to the shooting, the mere fact that the fatal shot entered the victim through the back is insufficient to prove premeditation." The state is not required, however, to prove a motive because that is not an element of premeditated murder. *See State v. Hunter*, 136 Ariz. 45, 664 P.2d 195 (1983). There was substantial evidence of premeditation, and the trial court did not err in denying Crago's motion for a judgment of acquittal.

II. Prosecutorial Misconduct

¶12     Crago contends the state engaged in misconduct by failing to disclose the "secret terms" of a plea agreement with Thomas Godfrey, a rebuttal witness for the state, in violation of Rule 15.1, Ariz. R. Crim. P., 16A A.R.S., and his due process rights under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). Although Crago had the information upon which this claim is based on May 11, 1995, he failed to raise this issue at the hearing on his motion for new trial or at sentencing, both of which occurred in August 1995. Thus, he has

5

waived any claims, including constitutional claims, relating to this issue. *State v. Tison*, 129 Ariz. 526, 633 P.2d 335 (1981); *see also State v. Dickens*, 187 Ariz. 1, 926 P.2d 468 (1996), *cert. denied*, ___ U.S. ___, 118 S. Ct. 311 (1997).  Even assuming Crago preserved this issue for appeal, however, his argument is without merit.

¶13      Godfrey testified that, while sharing a jail cell with him for two days, Crago had told him he had shot the victim because the victim had stolen methamphetamine from him, but that Crago intended to testify in court that "it was self defense."  Godfrey further testified about the specific story that Crago intended to tell, an account remarkably similar to that Crago gave at trial. Godfrey also testified that he had entered into a plea agreement that required him to testify truthfully at trial and plead guilty to a class four felony charge of possessing methamphetamine. In exchange, the state would drop a class six felony charge of possession of marijuana and a misdemeanor charge of possession of a weapon and would stipulate that he would be eligible for probation on the methamphetamine possession charge.

¶14      Approximately one month after trial, the state filed an opposition to Crago's motion for a new trial and judgment of acquittal.  That opposition included an affidavit from Bruce Alldredge, a Deputy Cochise County Public Defender who had represented Godfrey during and after Crago's trial.  According to the affidavit, Deputy Cochise County Attorney Edward Rheinheimer had told Alldredge that, if Godfrey's testimony in Crago's trial were consistent with his statements to the County Attorney's investigator, his safety in prison "would be severely at risk."  Rheinheimer, therefore, intended to dismiss all charges against Godfrey after he testified in Crago's trial.  Alldredge's affidavit further stated that Rheinheimer's decision was not communicated to Gerald Till, the Deputy County Attorney who had prosecuted Crago, or to

6

Godfrey, until after Crago's trial ended. Rheinheimer filed a similar affidavit that recounted the same series of events.

¶15       Without citing any authority, Crago asserts that he "was entitled to conduct further inquiry" into the discussions between "Godfrey, his counsel and the State beforehand concerning whether the State might consider a better disposition of Godfrey's charges depending on the impact of his testimony." He also claims that, "taken on its face, the affidavits filed by Mr. Rheinheimer and Mr. Aldridge [sic] lead to serious questions concerning non-disclosure of *Brady* evidence."

¶16       *Brady* established that a defendant has a due process right to disclosure of any evidence that is favorable to the defense and material to either guilt or punishment. Evidence is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 3383, 87 L. Ed. 2d 481, 494 (1985). *See also State v. Dumaine*, 162 Ariz. 392, 405, 783 P.2d 1184, 1197 (1989) ("The test for a *Brady* violation is whether the undisclosed material would have created a reasonable doubt had it been presented to the jury."). The state's disclosure obligation includes evidence that is useful for impeaching a prosecution witness. *Giglio v. United States*, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972); *Napue v. Illinois*, 360 U.S. 264, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959).

¶17       Rule 15.1(a), Ariz. R. Crim. P., which essentially codifies *Brady, see State v. Holsinger*, 115 Ariz. 271, 564 P.2d 1238 (1977), provides that "the prosecutor shall make available to the defendant for examination and reproduction . . . [a]ll material or information which tends to mitigate or negate the defendant's guilt as to the offense charged, or which would tend to reduce the defendant's punishment therefor." A defendant must demonstrate prejudice

from any violation of Rule 15 in order to obtain reversal on that basis. *See State v. Stewart*, 139

Ariz. 50, 676 P.2d 1108 (1984); *Holsinger.*

¶18         The undisclosed information here was neither material nor prejudicial.  When he

testified, Godfrey was unaware that all charges against him would be dismissed.  It was only after

he testified that he first learned of Rheinheimer's intention in that regard.  Godfrey acknowledged

to the jury that he was receiving a substantial benefit in exchange for his testimony.  Moreover,

after Godfrey testified, Crago called a surrebuttal witness who testified that Godfrey had asked

him to "back[] up" his story that Crago had talked about his case in their pod in the county jail,

and the witness said he could not because he had never heard Crago talk about his case.  That

witness substantially impeached Godfrey's credibility and, viewed in combination with Godfrey's

own testimony as to the only plea agreement he had negotiated and knew about at the time, the

additional, undisclosed information would not have "created a reasonable doubt had it been

presented to the jury." *Dumaine*, 162 Ariz. at 405, 783 P.2d at 1197.  Crago, therefore, was not

prejudiced by the state's failure to disclose the new plea agreement of which Godfrey was unaware

when he testified.

III. Expert Witness Funds

¶19         Crago next contends the trial court erred in denying his post-trial request for funds

for a psychologist "to assist in the presentation of mitigating evidence as well as to determine

whether there was additional evidence which might impact the verdict."  He argued below that the

psychologist "could explore the extent and history of [appellant's] drug addiction."

¶20         Indigent defendants charged with capital offenses are entitled to the appointment

of experts "as are reasonably necessary adequately to present [a] defense at trial and at any

8

subsequent proceeding." A.R.S. § 13-4013(B). This statute does not apply to defendants in noncapital cases, however, although "[c]onstitutional considerations may mandate the appointment of experts . . . if the denial would substantially prejudice the defendant." *State v. Peeler*, 126 Ariz. 254, 257, 614 P.2d 335, 338 (App. 1980); *see also Mason v. Arizona*, 504 F.2d 1345 (9th Cir. 1974). The decision to approve funds is left to the trial court's sound discretion and will not be disturbed absent a clear showing of abuse of that discretion and substantial prejudice. *See State v. Williams*, 183 Ariz. 368, 904 P.2d 437 (1995); *Peeler*.

¶21      Crago relies on *State v. Eastlack*, 180 Ariz. 243, 883 P.2d 999 (1994), to support his claim that he was entitled to funds for an expert witness. *Eastlack*, however, was a capital case and therefore governed by § 13-4013. In addition, the court there found that the defendant's trial testimony had raised "numerous 'red flags' concerning defendant's psychological makeup" and required the appointment of a psychological expert for mitigation purposes. *Id.* at 263, 883 P.2d at 1019. In contrast, no evidence in this case suggested that Crago suffered from psychological problems, and Crago testified that he was not under the influence of methamphetamine or other drugs when he shot the victim and that he had not used any drugs for approximately a week before that. There was no indication here "that a presentence mental health exam [might] well have produced additional evidence supporting mitigation," *Williams*, 183 Ariz. at 381, 904 P.2d at 450, and the trial court did not abuse its discretion in denying funds for such an exam.

¶22      Finally, Crago suffered no prejudice from the absence of a psychology expert at sentencing. Because Crago was convicted of first-degree murder, only two prison sentences could be imposed: life without possibility of parole for twenty-five years or natural life. A.R.S. § 13-

703(A).  Crago received the former sentence, the lighter of the two options.  Thus, additional

mitigation evidence, even if available, could not have altered his sentence.

¶23        Crago also apparently objects to the trial court's denial of several other requests for

investigative services, although he fails to discuss these or cite authority supporting his claims.

These claims, therefore, are waived.  *State v. Bolton*, 182 Ariz. 290, 896 P.2d 830 (1995); *State

v. Styers*, 177 Ariz. 104, 865 P.2d 765 (1993).  Some of these requests were raised in his

supplemental petition for post-conviction relief and, therefore, are not properly addressed as part

of his appeal.

IV.  State's Opposition to Funds Request

¶24        Crago next contends, without citing any authority, that "the state's repeated

oppositions to appellant's requests for funds improperly interfered with appellant's due process

rights."  He argues that the state's opposition "not only requires a defendant to justify his request

to the court, but also requires an indigent defendant to establish his defense prior to obtaining the

necessary evidence to do so."

¶25        The argument is without merit because Crago received funds for an investigator

before trial, and the requests mentioned here related only to post-trial and/or Rule 32 proceedings.

The denial of those requests, therefore, did not require Crago to "establish his defense" without

necessary evidence.  Moreover, Crago does not cite any authority to support his claim that the

state cannot oppose a request for investigative funds, and his brief therefore fails to comply with

Rule 31.13(c), Ariz. R. Crim. P.

¶26        Crago argues only that he was deprived of due process by the state's intervention,

not that the trial court abused its discretion in denying funds.  *See Williams.*  The fact that "[a]

10

non-indigent would not have had to request money from the court and, therefore, would not have opposition from the State," as Crago argues, does not violate due process. *See State v. Apelt*, 176 Ariz. 349, 861 P.2d 634 (1993) (defendant has no right, based on due process or any other ground, to an ex parte hearing to request investigative funds). There was no due process violation here, and the trial court did not abuse its discretion in denying Crago's requests.

V.  Attorney's Fees

¶27        Finally, Crago argues, and the state agrees, that the trial court erred in ordering him to reimburse the county for $7,000 in attorney's fees without making any findings as to his financial resources or ability to pay, in violation of A.R.S. § 13-4013(A) and Rule 6.7, Ariz. R. Crim. P.  Although Crago failed to object to the reimbursement order at sentencing, the trial court's failure to make specific findings on "hardship" under Rule 6.7(d) constitutes fundamental error. *State v. Lopez*, 175 Ariz. 79, 853 P.2d 1126 (App. 1993).  Because the trial court did not make the requisite findings, we vacate the reimbursement order and remand the issue to the trial court for a hardship determination.

<div align="center">PETITION FOR REVIEW</div>

¶28        In his petition for review, Crago contends the trial court erred in denying an evidentiary hearing on his claims that counsel was ineffective in failing to present evidence of the effects of long-term methamphetamine use, failing to request a jury instruction on manslaughter, and failing to investigate the mechanical condition of Crago's vehicle at the time of the murder.[1]

---

[1] Appellate counsel's attempt to argue the issues relating to the Rule 32 proceedings by including the petition for review in her opening brief does not comply with Rule 32.9(c), Ariz. R. Crim. P., and is not authorized by that rule or any order of this court.  Nonetheless, Crago filed a petition for review *pro se*, "present[ing] to this court for review all issues that were presented to the trial court in the petition for post-conviction relief" and also seeking review of the trial court's denial of an evidentiary hearing.  Although the state correctly notes that claims

"A defendant is entitled to an evidentiary hearing when he presents a colorable claim, that is[,] a claim which, if defendant's allegations are true, might have changed the outcome." *State v. Watton*, 164 Ariz. 323, 328, 793 P.2d 80, 85 (1990). Whether to grant an evidentiary hearing is within the discretion of the trial court, but the court should grant such a hearing "when doubt exists." *State v. D'Ambrosio*, 156 Ariz. 71, 73, 750 P.2d 14, 16 (1988).

¶29     To prevail on a claim of ineffective assistance of counsel, Crago was required to show that counsel's performance was deficient and fell below an objective standard of reasonableness and that the deficient performance prejudiced the defense. *State v. Nash*, 143 Ariz. 392, 694 P.2d 222 (1985); *see also Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. Salazar*, 173 Ariz. 399, 844 P.2d 566 (1992). Prejudice will be found only if "there is a reasonable probability that, but for counsel's unprofessional errors, the result" would be different. *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068, 80 L. Ed. 2d at 698.

¶30     Trial counsel's tactical decisions or trial strategy do not constitute ineffective assistance if they have a reasoned basis. *See State v. Meeker*, 143 Ariz. 256, 693 P.2d 911 (1984). Crago's trial counsel's failure to request a manslaughter jury instruction constituted a tactical decision that conformed to Crago's specific instructions to counsel to argue that Crago was guilty of "first-degree or nothing." Furthermore, even if counsel erred in that decision, Crago was not prejudiced by the absence of a manslaughter instruction because the jury was instructed on the lesser-included offense of second-degree murder, but found him guilty of the greater

---

of ineffectiveness of counsel "should be developed through a post-conviction proceeding, rather than being considered *via* direct appeal," this court ordered consolidation of "[a]ny petition for review of the Rule 32 proceedings . . . with the reinstated appeal." Thus, we address the claims of ineffective assistance. Although the state acknowledges that Crago's petition for review "is presently pending in the Court" and chose not to respond to it, the state incorrectly cites *State v. Crago*, 2 CA-CR 97-0427-PR, which involves a totally different case and defendant.

offense. *See State v. Vickers*, 159 Ariz. 532, 768 P.2d 1177 (1989); *State v. White*, 144 Ariz. 245, 247, 697 P.2d 328, 330 (1985) ("[B]y finding defendant guilty of the highest offense, to the exclusion of the immediately lesser-included offense, second degree murder, the jury necessarily rejected all other lesser-included offenses. The error, if indeed it was error, of not instructing as to such offenses was harmless.").

¶31     We reach a different conclusion, however, with respect to the other two aspects of Crago's Rule 32 claim of ineffective assistance of counsel. Crago primarily contends that his trial counsel's "decision to virtually ignore the physiological, psychological, and metabolical effects of crystal methamphetamine use . . . by both the defendant and [victim]" was unreasonable and prejudiced his defense. He claims that evidence on those points could have established that he was unable to premeditate the crime, *see State v. Christensen*, 129 Ariz. 32, 628 P.2d 580 (1981), and would have shown that methamphetamine abuse "exacerbated the [victim's] already violent tendencies," thereby bolstering Crago's self-defense theory. *See State v. Plew*, 155 Ariz. 44, 745 P.2d 102 (1987). As noted earlier, Crago testified that he had used methamphetamine in the past but was not under the influence of it when he shot the victim and had not used the drug for approximately one week before that. Although trial counsel might have had a reasoned basis for relying solely on a self-defense theory and not attempting to delve further into Crago's and the victim's prior drug use, as the state argued in the trial court, the record does not necessarily compel that conclusion as a matter of law. As to those issues, Crago presented a colorable claim and, therefore, should have been accorded an evidentiary hearing.

¶32     Crago also argues that counsel was ineffective in failing to investigate and present evidence about the mechanical condition of his vehicle at the time of the homicide. Crago testified

at trial that he had had no choice but to shoot the victim in the back after they had struggled and the victim began to run toward the house, because the victim had threatened to kill him, and Crago was unable to immediately flee the scene because he had removed the "master fuse" from under his vehicle's dashboard when he arrived at the house.  Crago testified that he always did that as a security measure because the key previously had broken off in the ignition and the ignition system needed repair.  The state argued in opposing Crago's Rule 32 petition that "the State did not have any evidence to disprove his assertions [about the vehicle]."  At trial, however, the state called T., Crago's former girlfriend, as a rebuttal witness.  She testified that she had ridden in Crago's vehicle many times, never saw him "take a fuse out of some place up underneath the vehicle," and was sure the vehicle was "locked a few times" when she had ridden in it.  In addition, the prosecutor vigorously cross-examined Crago on these issues, suggesting that he had not really removed the master fuse "as a security device" but, rather, had "to use that as an explanation for these events" in order "[t]o slow [his] ability to leave this scene."

¶33          In our view, Crago also has presented a colorable claim as to this aspect of trial counsel's alleged ineffectiveness.  The temporary inoperability of Crago's vehicle at the time he shot the victim was a significant component of his self-defense theory.  If the jury disbelieved Crago's testimony that he could not quickly start his car and immediately leave the area before any confrontation with the victim, Crago would have had no reason to shoot the victim in the back, instead of just leaving the area, when the victim began to run away from the car toward the house.  Defense counsel did not present any evidence at trial other than Crago's testimony on the mechanical condition of his vehicle.  Because this is a colorable claim which, if proven true, might have changed the outcome, and because we cannot say as a matter of law that Crago was not

14

prejudiced, an evidentiary hearing on this issue was warranted.[2]   The trial court abused its discretion in denying that.

¶34        Crago's Rule 32 petition raised several other issues relating to counsel's decisions to enter into certain stipulations with the prosecution, to not impeach certain prosecution witnesses, and to not call certain witnesses.   These were clearly tactical decisions that had a reasoned basis, and counsel's performance with respect to those decisions, therefore, was not unreasonable.   *Meeker.*

## DISPOSITION

¶35        Crago's conviction and sentence are affirmed, the order for reimbursement of attorney's fees is vacated, and the case is remanded for further proceedings on that issue.   We grant review of Crago's petition for review and relief to the extent noted above.

_____
JOHN PELANDER, Presiding Judge

CONCURRING:

_____
WILLIAM E. DRUKE, Chief Judge

_____
M. JAN FLÓREZ, Judge

--------------------------------

[2] According to Crago's supplemental petition for post-conviction relief, he "is no longer in a position to corroborate the mechanical condition of the automobile because [Texas law enforcement officials] sold the automobile at an auction in May of 1995, one month after [his] jury trial."

15

# EXHIBIT D

SUPERIOR COURT, STATE OF ARIZONA, In and for the County of Cochise. FILED

| STATE OF ARIZONA,  Plaintiff,<br><br>vs.<br><br>EARL FELTON CRAGO, JR.,  Defendant. | May 04, 2011<br><br>Case No. CR94000471<br><br>DECISION and ORDER | 2011 MAY -4  PM 4:09<br><br>MARY LEE GUNAP<br>CLERK OF SUPERIOR COURT<br><br>BY _____ DEPUTY |
|---|---|---|
| **HONORABLE WALLACE R. HOGGATT**<br>**DIVISION Three** | | By: Stephanie L. Williams (05/02/11)<br>Judicial Administrative Assistant |

As noted in this court's Rule 125 order of April 20, 2011, this is defendant's fifth petition for post-conviction relief. This is not an of-right petition.

On August 21, 1995, defendant was sentenced to a life term for first degree murder. The sentence was not a natural life term; it allowed for the possibility of release after serving twenty-five calendar years. Defendant was given credit for 337 days of presentence incarceration, and thus his sentence began, for all practical purposes, on the date the murder was committed: September 28, 1994. The sentencing court also added a requirement that defendant serve community supervision, consisting of one day for every seven days of incarceration, amounting to three years and seven months. Evidently that figure was calculated by estimating one-seventh of twenty-five years.

As the State correctly notes in its response, defendant was not sentenced to serve twenty-five years in prison. Such a sentence would have been illegal. Rather, defendant was sentenced to serve life in prison, with the possibility that after serving twenty-five years, he could achieve his release if recommended by the Board of Executive Clemency and the sentence commuted by the Governor. Release after the service of twenty-five years is a possibility but isn't guaranteed.

Defendant contends that the Department of Corrections, through its Time Computation Unit, has converted his sentence from a sentence of life imprisonment to one of natural life. Not so. Nothing that the



Department of Corrections did has precluded Mr. Crago from exercising his right, after he serves the required twenty-five calendar years, to apply to the Board of Executive Clemency and the Governor for release.

By law, the sentencing court could not have imposed a sentence any less than life imprisonment without possibility of release for twenty-five calendar years. That is precisely what the court did. Although the sentencing court added a provision for community supervision, addressed below, in terms of the life sentence itself, the court followed the applicable law.

Because the court followed the law by imposing a life sentence without possibility of release for twenty-five calendar years, and also because the defendant has not yet served twenty-five calendar years, it cannot be said that defendant is being held in custody after the sentence has expired. Indeed, even after he has served twenty-five calendar years, he could not be held in custody after the expiration of the sentence because the sentence is one of life imprisonment.

Further, the sentence imposed was not clearly excessive nor contrary to law. In the imposition of the life sentence without a possibility of release for twenty-five years; however, as the State correctly notes in its response, the imposition of community supervision of three years and seven months *was* contrary to law. The imposition of community supervision in any amount would be.

The State requests that that portion of the sentence imposing community supervision be vacated; in reply, the defendant contends that to do so would violate due process. The court disagrees that correcting the sentence would violate due process. Defendant has himself put the legality of his sentence at issue, and cannot be heard to complain that the Constitution is somehow violated by a review of an issue closely connected with the claim defendant himself made.

Although defendant's due-process objection is not well-taken, this court is nonetheless prohibited from correcting the illegal portion of the sentence. Under Rule 24.3, Arizona Rules of Criminal Procedure, "The court may correct any unlawful sentence or one imposed in an unlawful manner within 60 days after the entry of judgment and sentence but before the defendant's appeal, if any, is perfected ...." Obviously, the time limit has been exceeded.

DECISION and ORDER  Date: May 04, 2011  Case No. CR94000471

The court has conducted the review required by Rule 32.6, Arizona Rules of Criminal Procedure.  The defendant's current claims are not precluded, but it has no merit.  Defendant's claims do not present an issue of fact or law which would entitle him to post-conviction relief.  No purpose would be served by further proceedings.

IT IS HEREBY ORDERED:

A.     Defendant's current petition for post-conviction relief is DISMISSED, and all relief requested therein is DENIED.

B.     The State's request to vacate that portion of the sentence imposing three years and seven months of community supervision is DENIED as untimely, although the court agrees with the State that the challenged provision was (and is) illegal.

DATED this _____04th_____ day of May, 2011.

_____
THE HONORABLE  WALLACE R. HOGGATT
JUDGE OF THE SUPERIOR COURT

mailed/distributed: 5/4/11  JM
xc:   Doyle B. Johnstun, Chief Criminal Deputy County Attorney
       Mark A. Suagee, Public Defender
       Earl Felton Crago, Jr., ADOC #115357, Arizona State Prison Complex—Lewis, P.O. Box 70, Buckeye, AZ 85326
       The Honorable Thomas Horne, Attorney General—Criminal Division, 1275 West Washington, Phoenix, AZ 85007

# EXHIBIT E

NOTICE: THIS DECISION DOES NOT CREATE LEGAL PRECEDENT AND
MAY NOT BE CITED EXCEPT AS AUTHORIZED BY APPLICABLE RULES.
*See* Ariz. R. Supreme Court 111(c); ARCAP 28(c); Ariz. R. Crim. P. 31.24

FILED BY CLERK

SEP -9 2011

COURT OF APPEALS
DIVISION TWO

IN THE COURT OF APPEALS
STATE OF ARIZONA
DIVISION TWO

| | | |
|---|---|---|
| THE STATE OF ARIZONA, | ) | 2 CA-CR 2011-0162-PR |
| | ) | DEPARTMENT A |
| Respondent, | ) | |
| | ) | <u>MEMORANDUM DECISION</u> |
| v. | ) | Not for Publication |
| | ) | Rule 111, Rules of |
| EARL FELTON CRAGO JR., | ) | the Supreme Court |
| | ) | |
| Petitioner. | ) | |
| | ) | |

PETITION FOR REVIEW FROM THE SUPERIOR COURT OF COCHISE COUNTY

Cause No. CR94000471

Honorable Wallace R. Hoggatt, Judge

REVIEW GRANTED; RELIEF DENIED

Earl F. Crago                                                                Buckeye
                                                                    In Propria Persona

E C K E R S T R O M, Presiding Judge.

¶1         Following a jury trial, petitioner Earl Crago was convicted in 1995 of first-
degree murder, was sentenced to life in prison without the possibility of release for
twenty-five years, and was ordered to serve community supervision for three years and
seven months upon his release.  We affirmed Crago's conviction and sentence on appeal,
denied relief in part on a consolidated petition for review of the denial of his first petition

for post-conviction relief filed pursuant to Rule 32, Ariz. R. Crim. P., and remanded for an evidentiary hearing on two claims of ineffective assistance of counsel. *State v. Crago*, Nos. 2 CA-CR 95-0488, 2 CA-CR 98-0230-PR (consolidated) (memorandum decision filed Mar. 18, 1999). We subsequently denied relief on Crago's petition for review of the denial of post-conviction relief after the evidentiary hearing, *State v. Crago*, No. 2 CA-CR 2000-0259-PR (memorandum decision filed Mar. 13, 2001), and on his petitions for review of the denial of relief on his second and third petitions for post-conviction relief. *State v. Crago*, No. 2 CA-CR 2001-0381-PR (memorandum decision filed Feb. 19, 2002); *State v. Crago*, No. 2 CA-CR 2004-0224-PR (decision order filed Mar. 29, 2005).

¶2        Crago then filed a petition for writ of habeas corpus, which the trial court deemed a petition for post-conviction relief, followed by a petition for special action, both of which the court dismissed; we denied relief on Crago's petition for review of the denial of the former, but remanded the court's dismissal of the petition for special action. *State v. Crago*, No. 2 CA-CR 2008-0396-PR (memorandum decision filed May 12, 2009). In 2010, Crago filed his fifth petition for post-conviction relief, which the court dismissed, and this petition for review followed. We will not disturb a trial court's summary denial of post-conviction relief absent an abuse of the court's discretion. *State v. Bennett*, 213 Ariz. 562, ¶ 17, 146 P.3d 63, 67 (2006). We find no abuse here.

¶3        Relying on Rule 32.1(c) and (d),[1] Crago argues, as he did below, that when the Arizona Department of Corrections (ADOC) noted in 2008 he was not eligible for

_____

[1]Rule 32.1(c), Ariz. R. Crim. P., provides a ground for post-conviction relief when the sentence imposed exceeds the maximum authorized by law or is not in accordance

community supervision, it essentially converted his sentence from one of life imprisonment without the possibility of release for twenty-five years to one of natural life. In support of his argument, Crago contrasts ADOC's 1996 release date calculation form, which showed his community supervision term beginning on September 17, 2019 and ending on April 13, 2023, with ADOC's time computation memorandum prepared in 2006, which showed a life sentence without community supervision. Crago asserts, as he did below, that he "is now being required to serve a sentence beyond the sentence which was imposed."

¶4        In its response to the petition for post-conviction relief the state argued that, because Crago was not sentenced to a determinate twenty-five year term, but can only "be considered for a recommendation for release" in twenty-five years, the original sentence erroneously provided that he serve community supervision upon his release in 2019. The state asserted "the community supervision statute does not logically apply" to Crago and the imposition of community supervision thus constituted an illegal sentence. *See State v. Cowles*, 207 Ariz. 8, ¶ 14, 82 P.3d 369, 372 (App. 2004) (community supervision part of sentence imposed). The state thus requested that Crago's petition be "granted to the extent he is asking to be considered for release by way of commutation, pardon or reprieve after serving 25 years," but "that the community supervision clause in [Crago]'s sentence b[e] stricken as contrary to law." Crago further contends that if the state had objected to the illegal sentence at sentencing, he would have argued on appeal

_____

with the law, while Rule 32.1(d) provides potential relief if the person is being held in custody after the sentence imposed has expired.

3

that he had rejected the twenty-two year plea offer the state had made in reliance on the court's assurance he was receiving a twenty-five year sentence.

¶5        In its ruling denying the petition for post-conviction relief, the trial court determined that, although the community supervision portion of Crago's sentence was illegal, it was unable to correct his sentence because of the time constraints imposed in Rule 24.3, Ariz. R. Crim. P., which allows a trial court to correct an illegal sentence within sixty days of the judgment and sentence but before perfection of the appeal.  The court further determined:

> . . . [Crago] was not sentenced to serve twenty-five years in prison.  Such a sentence would have been illegal.  Rather, [Crago] was sentenced to serve life in prison, with the possibility that after serving twenty-five years, he could achieve his release if recommended by the Board of Executive Clemency and the sentence [is] commuted by the Governor.  Release after the service of twenty-five years is a possibility but isn't guaranteed.
>
> [Crago] contends that the Department of Corrections, through its Time Computation Unit, has converted his sentence from a sentence of life imprisonment to one of natural life.  Not so.  Nothing that the Department of Corrections did has precluded Mr. Crago from exercising his right, after he serves the required twenty-five calendar years, to apply to the Board of Executive Clemency and the Governor for release.
>
> . . . .
>
> Because the court followed the law by imposing a life sentence without possibility of release for twenty-five calendar years, and also because [Crago] has not yet served twenty-five calendar years, it cannot be said [Crago] is being held in custody after the sentence has expired.  Indeed, even after he has served twenty-five calendar years, he could not be held in custody after the expiration of the sentence because the sentence is one of life imprisonment.

4

> Further, the sentence imposed was not clearly
> excessive nor contrary to law . . . however, as the State
> correctly notes in its response, the imposition of community
> supervision of three years and seven months *was* contrary to
> law.   The imposition of community supervision in any
> amount would be.

¶6      Crago asserts the trial court's ruling is "conflicting, befuddled, [and]

confusing" and asks that he be released after twenty-five years, or alternatively, that his

conviction be vacated and remanded "for new proceedings," or that his conviction be

"downgrade[d]" to second-degree murder and this matter be remanded for resentencing.

We initially note that Crago previously has raised the issue now before us.  As we stated

in our 2009 memorandum decision,

> [i]n March 2008, Crago filed a pro se petition for writ
> of habeas corpus asserting that, although the trial court had
> sentenced him to life imprisonment without the possibility of
> parole for twenty-five years, . . . [ADOC] was instead treating
> his sentence as "a 'natural life' sentence with no release date,
> and no community supervision [d]ate, and no parole
> eligibility date."

*Crago*, No. 2 CA-CR 2008-0396-PR, ¶ 2.  In that matter, the trial court deemed Crago's

habeas corpus petition a Rule 32 petition and permitted Crago to file a pro se petition

when counsel reported he was unable to find any meritorious issues to raise.  After Crago

failed to file a pro se petition, the court dismissed the notice of post-conviction relief, and

Crago immediately filed a petition for special action, again raising the same claim he had

raised in his habeas corpus petition, and the same claim now before us.  The court

dismissed the special action petition on the grounds Crago had alleged the same issue he

had asserted in the habeas corpus petition and noted Crago had not presented his claim in

5

a pro se Rule 32 petition.  On review, we denied relief on Crago's petition for review of the denial of the notice of post-conviction relief, but remanded the court's dismissal of the petition for special action.

¶7      Accordingly, the claim now before us, which Crago has raised to some extent in two prior pleadings, is precluded.  *See* Ariz. R. Crim. P. 32.2(a).  However, to the extent Crago may have been confused by our prior ruling remanding his special action petition, and in light of the trial court's finding that the instant claim was not precluded, we nonetheless address it.

¶8      We note at the outset that Crago's argument is based on the unsupported notion that his original sentence was converted from a determinate term of twenty-five years to one of natural life, thereby "eliminat[ing]" his release eligibility.  First, his original sentence expires at the end of his life, an indeterminate period, not in twenty-five years, as he asserts.  The court committed Crago "to a Life term in the Department of Corrections," and ordered him to "serve every day of twenty-five . . . years of the sentence imposed before he is eligible for any type of release."[2]  Second, ADOC's 2006 time computation memorandum did not change Crago's sentence to one of natural life, as he asserts.  Rather, it removed the community supervision requirement, but did not, as Crago claims, make him ineligible for release.

---

[2] Former A.R.S. § 13-703, the statute under which Crago was sentenced, provided: "If the court does not sentence the defendant to natural life, the defendant shall not be released on any basis until the completion of the service of twenty-five calendar years . . . ."  *See* 1993 Ariz. Sess. Laws, ch. 153, § 1; *see also* 2008 Ariz. Sess. Laws, ch. 301, §§ 26, 38 (renumbering former § 13-703 as current A.R.S. § 13-751).

¶9    Moreover, we are unaware of any authority, statutory or otherwise, that supports the imposition of community supervision following a life sentence. The trial court imposed community supervision under A.R.S. § 13-603(I), which provides that it "shall be served consecutively to the actual period of imprisonment." However, Crago never had, nor does he now have a sentence that assures he will be released after twenty-five years, or for that matter, during his lifetime. His sentence was and always has been one of life, and his sentence expiration date was and always has been the end of his life. Accordingly, the court correctly concluded "the imposition of community supervision . . . *was* contrary to law."

¶10    Conversely, we do not find any evidence in the record to support Crago's position that he somehow is ineligible to be considered for release after serving twenty-five years. *See* A.R.S. § 31-402(C)(2), (4) (allowing board of executive clemency to recommend commutation); *see also McDonald v. Thomas*, 202 Ariz. 35, ¶ 12, 40 P.3d 819, 824 (2002) (governor's ultimate decision to approve or reject commutation). By the very terms of his original sentence, Crago is required to serve twenty-five years "before he is eligible for any type of release." ADOC's 2008 time computation memorandum did not change this fact. *See State v. Womble*, 225 Ariz. 91, ¶ 41, 235 P.3d 244, 254 (2010) (Arizona law does not prohibit release of defendant given life sentence once defendant serves twenty-five years); *see also* § 31-402(C)(2), (4). However, because Crago began serving his sentence in 1994, he may not be considered for release until 2019.

¶11    Finally, to the extent we understand Crago's argument that ADOC's removal of the erroneous imposition of community service somehow prejudiced him, we

reject that argument.  The imposition of community supervision had no bearing on Crago's life sentence or his eligibility to have that sentence commuted.

¶12        Accordingly, although we grant the petition for review, we deny relief.


/s/ *Peter J. Eckerstrom*
_____
PETER J. ECKERSTROM, Presiding Judge


CONCURRING:

/s/ *Joseph W. Howard*
_____
JOSEPH W. HOWARD, Chief Judge

/s/ *J. William Brammer, Jr.*
_____
J. WILLIAM BRAMMER, JR., Judge

8

# EXHIBIT F

FILED

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

NOV 25 2013

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| EARL FELTON CRAGO, Jr., | No. 13-73476 |
| Petitioner, | |
| v. | ORDER |
| RICHARD A. BOCK, | |
| Respondent. | |

Before:    CANBY, TROTT, and THOMAS, Circuit Judges.

The application for authorization to file a second or successive 28 U.S.C. § 2254 habeas corpus petition in the district court raises issues that warrant a response, including whether authorization to file a second or successive § 2254 petition is unnecessary based on entry of a new or amended judgment in connection with petitioner's 1995 first-degree murder conviction, *see Magwood v. Patterson*, 561 U.S. 320 (2010); *Wentzell v. Neven*, 674 F.3d 1124 (9th Cir. 2012). *See* 9th Cir. R. 22-3(d).

Within 21 days after the date of this order, respondent shall file a response. Petitioner may file a reply within 14 days after service of the response.

The Clerk shall serve this order and a copy of the application on

respondent's counsel, Arizona Attorney General Tom Horne, at

cadocket@azag.gov.

# EXHIBIT G

ORIGINAL

CR94000471

FILED

2018 NOV 30  AM 10: 09

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF _COCHISE_

---

STATE OF ARIZONA
-vs-

    [CASE NO.]

    **NOTICE OF POST-
CONVICTION RELIEF**

  _EARL F. CRAGO_
Defendant (FIRST, MI, LAST)

---

### NOTICE OF POST-CONVICTION RELIEF

**Instructions:** When the notice is complete, mail it to the clerk of the court for the county in which conviction occurred.

A person unable to pay costs of this proceeding and to obtain the services of a lawyer without substantial personal or family hardship should indicate this by requesting counsel in Question 8 of this notice and execute the affidavit of indigency on page 3. In the event an attorney is not appointed, a Request for Preparation of Post-Conviction Relief Record form must be filed by the defendant if some portion of the record is needed and has not previously been obtained.

**NO ISSUE WHICH HAS ALREADY BEEN RAISED AND DECIDED ON APPEAL OR IN A PREVIOUS PETITION MAY BE USED AS A BASIS FOR A SUCCESSIVE PETITION.**

1.   Defendant's Name: _EARL F CRAGO_

    Defendant's prison number (if any): _115357_

2.   Defendant's address: _ASPC-LEWIS, BUCKLEY; PO BOX 3400; BUCKEYE, AZ, 85326_

3.   (A)  Defendant was convicted of the following crimes: _Murder-First Degre_

    (B)  Defendant was sentenced on _____, _1995_, to a term of _LIFE_____, commencing on _Sept.___, 1994_, following a:

      [✓]   Trial by jury
      [ ]   Trial to Judge without a Jury
      [ ]   Plea of Guilty
      [ ]   Plea of No Contest

---

Form #24(b)

[ ]   Probation Revocation Admission
[ ]   Probation Revocation Violation Hearing in the Superior Court in _____ County with judicial
      officer _____ presiding.

(C)   The file number of the case was CR- _9 4 0 0 0 4 7 l_____.

4.   Defendant has taken the following actions to secure relief from his convictions or sentences:

(A)   Direct Appeal: [✓] Yes [ ] No
(B)   Previous Rule 32 Proceedings: [✓] Yes [ ] No

5.   Defendant was represented by the following lawyers at: (provide name of counsel and counsel's address, if
     known)
     Trial or change of plea: ___James White_____

     Sentencing hearing: ___Ralph Malanga_____

     Appeal (if any): ___Harriette Levitt_____

     Previous Rule 32 proceedings (if any): ___Don't Have Records_____

6.   Is the defendant raising a claim of ineffective assistance of counsel? [ ] Yes [✓] No

7.   *Defendant is presently represented by a lawyer? [ ] Yes [✓] No*

     *If yes, provide name and address:* _____
     _____

8.   If you are not currently represented by a lawyer, do you want the court to appoint a lawyer for this proceeding?
     [✓] Yes [ ] No

9    **Respond to this section only if this is an untimely notice or the defendant has filed a previous Rule 32
     petition in this case.**

(A)   Is a claim pursuant to Rule 32.1(d), (e), (f), (g) or (h) being raised in this petition? [✓] Yes [ ] No

(B)   If yes, identify the specific exception:

      [ ]   The defendant is being held in custody after the sentence imposed has expired.

      [✓]   Newly discovered material facts exist which probably would have changed the verdict or sentence.

[ ]   The defendant's failure to file a timely notice of post-conviction relief or notice of appeal was without fault on the defendant's part.

There has been a significant change in the law that would probably overturn the conviction or sentence.

☑   OTHER: Prosecutor Suppressed material evidence in violation of BRADY V. MARYLAND, 373 US 83 (1963) AND ITS Progeny,

(C)   State the facts that support the claim and the reasons for not raising the claim in the previous petition or in a timely manner: See Statement of Facts attached to the Petition For Post conviction Relief Filed Contemperaneously herewith.

I am requesting post-conviction relief. I declare under penalty of perjury that the information contained in this form and in any attachments is true to the best of my knowledge or belief. I also understand that failure to raise any known ground for relief in my petition will prohibit me from raising it at any future date.

_____

_____

_____

_____

11/6/18
Date

Earl F. Crago
Defendant


## AFFIDAVIT OF INDIGENCY

I have requested the appointment of a lawyer to represent me in post-conviction proceedings. I swear under oath and penalty of perjury that I am indigent and because of my poverty I am financially unable to pay for the cost of a lawyer to represent me without incurring substantial hardship to myself or my family.

06NOV2018
Date

EARL F CRAGO
Defendant

State of Arizona    )
               )ss.
County of MARICOPA )

Subscribed and sworn to or affirmed before me on:

06NOV2018
Date

My Commission Expires
29DEC 2021

DOUG BLUTH
Notary Public



DOUG BLUTH
Notary Public - State of Arizona
MARICOPA COUNTY
My Commission Expires
December 29, 2021

Form #24(b)

Page 3 of 3

# EXHIBIT H

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA  2018 NOV 30  AM 10: 09

IN AND FOR THE COUNTY OF ___COCHISE___

_C R 94000491_

| | |
|---|---|
| STATE OF ARIZONA<br>-vs- | [CASE NO.] |

_EARL F. CRAGO_
**Defendant (FIRST, MI, LAST)**

**PETITION FOR POST-CONVICTION RELIEF**

## PETITION FOR POST-CONVICTION RELIEF

Instructions: **In order for this petition to receive consideration by the court, you should first file a Notice of Post-Conviction Relief.**

Each applicable question must be answered fully but concisely in legible handwriting or by typing. When necessary, an answer to a particular question may be completed on an additional blank page, making clear to which question such continued answer refers.

Any false statement of fact made and sworn to under oath in this petition could serve as the basis for prosecution and conviction for perjury. Therefore, exercise care to assure that all answers are true and correct.

**NO ISSUE WHICH HAS ALREADY BEEN RAISED AND DECIDED ON APPEAL OR IN A PREVIOUS PETITION MAY BE USED AS A BASIS FOR THIS PETITION.**

**TAKE CARE TO INCLUDE EVERY GROUND FOR RELIEF WHICH IS KNOWN AND WHICH HAS NOT BEEN RAISED AND DECIDED PREVIOUSLY, SINCE FAILURE TO RAISE ANY SUCH GROUND IN THIS PETITION WILL BAR ITS BEING RAISED LATER.**

When the petition is complete, mail it to the clerk of the court for the county in which conviction occurred.

1.  Petitioner's Name: _EARL F. CRAGO_

    Petitioner's inmate number (if any): _# 115357_

2.  Petitioner is now: [ ] On Community Supervision [ ] On Parole [ ] On Probation [✗] Confined in: A.D.C.

3.  Petitioner is eligible for relief because of:

    [ ]  The introduction at trial of evidence obtained pursuant to an unlawful arrest.

    [ ]  The introduction at trial of evidence obtained by an unconstitutional search and seizure.

    [ ]  The introduction at trial of an identification obtained in violation of constitutional rights.

    [ ]  The introduction at trial of a coerced confession.

Form #25                                                                 Page 1 of 4

[ ] The introduction at trial of a statement obtained in the absence of a lawyer at a time when representation is constitutionally required.

[ ] Any other infringement of the right against self-incrimination.

[ ] The denial of the constitutional right to representation by a competent lawyer at every critical stage of the proceeding.

[✗] The unconstitutional suppression of evidence by the state.

[ ] The unconstitutional use by the state of perjured testimony.

[ ] An unlawfully induced plea of guilty or no contest.

[ ] Violation of the right not to be placed twice in jeopardy for the same offense.

The abridgement of any other right guaranteed by the constitution or the laws of this state, or the constitution of the United States, including a right that was not recognized as existing at the time of the trial if retrospective application of that right is required.

[✗] The existence of newly-discovered material which require the court to vacate the conviction or sentence.
[Specify when petitioner learned of these facts for the first time, and show how they would have affected the trial.]

....*October 2, 2018*................................................................................................................

........................................................................................................................................................

[ ] The lack of jurisdiction of the court which entered the conviction or sentence.

[ ] The use by the state in determining sentence of a prior conviction obtained in violation of the United States or Arizona constitutions.

[ ] Sentence imposed other than in accordance with the sentencing procedures established by rule and statute.

[ ] Being held beyond the term of sentence or after parole or probation has been unlawfully revoked.

[ ] The failure of the judge at sentencing to advise petitioner of his right to appeal and the procedures for doing so.

[ ] The failure of petitioner's attorney to file a timely notice of appeal after being instructed to do so.

[ ] The obstruction by state officials of the right to appeal.

Any other ground within the scope of Rule 32, Rules of Criminal Procedure (please specify):

Form #25                                                                                                          Page 2 of 4

4.   The facts in support of the alleged error(s) upon which this petition is based are contained in Attachment: [State facts clearly and fully; citations or discussions of authorities need not be included].

5   Supporting Exhibits:  *SEE "INDEX OF EXHIBITS" ATTACHED HERETO.*

A. ..................................................................................................................................
      The following exhibits are attached in support of the petition:

      Affidavits [Exhibit(s) # _____

      Records [Exhibit(s) # _____

      Other supporting evidence [Exhibit(s) # _____

B    No affidavits, records or other supporting evidence are attached because

6    Petitioner has taken the following actions to secure relief from his convictions or sentences:

A.   Direct Appeal: [X] Yes [ ] No (If yes, list the courts to which appeals were taken, date, number, and result.)

      *I Do not have this information*

B    Previous Rule 32 Proceedings: [X] Yes [ ] No (If yes, name the court in which such petitions were filed, dates, numbers, and results, including all appeals from decisions on such petitions.)

      *I Do not have this information*

C    Previous Habeas Corpus or Special Action Proceedings in the Courts of Arizona:
      [X] Yes [ ] No (If yes, name the courts in which such petitions were filed, dates, numbers, and results, including all appeals from decisions on such petitions.)

      *I Do Not have this information*

D    Habeas Corpus or Other Petitions in Federal Courts: [X] Yes [ ] No (If yes, name the districts in which petitions were filed, dates, court numbers--civil action or miscellaneous.

Form #25                                                                                          Page 3 of 4

and results, including all appeals from decisions on such petitions.)

*I Do Not Have This Information*

7    The issues which are raised in this petition have not been finally decided nor raised before
      because

*ISSUE 1: The Prosecutor Suppressed the Evidence And Lied*
*To The Court In Contempt of The Court's Order To*
*Produce The Evidence.*

8.   Because of the foregoing reasons, the relief which the petitioner desires is:

A.   [✗] Release from custody and discharge.

B.   [✗] A new trial.

C.   [ ] Correction of sentence.

D.   [ ] The right to file a delayed appeal.

E.   [ ] Other relief (specify):

I declare under penalty of perjury that the information contained in this form and in any attachments is true to
the best of my knowledge or belief.

*11/6/18*
Date

*Earl F. Crago*
Defendant

State of Arizona              )
                                    )ss.
County of *MARICOPA*    )

My Commission Expires
*29 DEC 2021*

Subscribed and sworn to or affirmed before me on:

*06 NOV 2018*
Date

*Doug Bluth*
Notary Public



DOUG BLUTH
Notary Public - State of Arizona
MARICOPA COUNTY
My Commission Expires
December 29, 2021

Form #25

## STATEMENT OF FACTS

### Summary

This case will show the prosecutor lying to the defense at the pretrial stage about DNA results to induce the defendant into self-admitting guilt and then suppressing material DNA results to carry forward the lie in violation of the U.S. Constitution, Amendment XIV, Section 1, as defined by *Brady v. Maryland*, 373 U.S. 83 (1963) and it's progeny.

This issue was raised in the previous Rule 32 but is not barred because the prosecutor committed perjury and suppressed material DNA evidence in contempt of the court's order to produce it. This resulted in a constitutionally incomplete record which rendered the fact finding process defective and any decision based upon that process unreliable. *Taylor v. Maddox*, 366 F.3d 992, 999-1001, (9th Cir. 2004).

### Facts

Mr. Crago was charged with first-degree murder, Kidnapping, and death penalty eligible. Upon arrest and transport back to Arizona Mr. Crago told detectives he did not Know the victim (Ex. C, pg. 137). When interviewed by defense investigator, Len Foster, Mr. Crago said he was on the army base when the murder took place (Ex. E). Mr. Crago filed a notice of defense denying involvement in the crime (Ex. F). In short for the first five months of incarceration Mr. Crago maintained his innocence.

Mr. Crago submitted a motion for production of all "physical examinations, scientific tests, experiments and comparisons, including written reports..." The motion also cited *Brady v. Maryland*, supra, to put the prosecutor on notice of his duty to disclose all favorable evidence (Ex. G).

In February 1995, defense counsel notified Mr. Crago that prosecutor Gerald Till said DNA analysis had identified the victim's blood in Mr. Crago's car (Ex. A ¶ 1  ).

On February 22, 1995, Mr. Crago filed a request for production of the victim's criminal history to support possibly arguing self defense in the light of Mr. Till's disclosure about the DNA results. (Ex. H.).

Mr. Crago's case notes from 1995, show that Mr. Crago met with Gerald Till and James White on March 31, 1995. Mr. Till personally advised Mr. Crago that DNA results identified the victim's blood in Mr. Crago's car, and reminded Mr. Crago that he was death penalty eligible with a kidnapping and murder charge pending against him. Mr. Till then advised Mr. Crago that Mr. Till would drop the kidnapping charge and remove the death penalty if Mr. Crago would stipulate to killing the victim and using his car to dump the victim's body. Mr. White advised that in the light of the DNA results Mr. Crago should accept the offer and plead self defense. Mr. Crago agreed. (Ex. A ¶ 2).

Later in the day all parties went before the judge and notified the court they were in the process of putting together stipulations that this was not a death penalty case, the kidnapping would be dismissed and Mr. Crago would admit to killing the victim and using his car to dump the body. (Ex. I).

Mr. Crago was subsequently convicted for murder based on his admission to killing the victim and dumping his body.

3-years after trial Mr. Crago had reason to believe the DNA analysis did not identify the victim's blood in his car, and filed a pro se motion for reconsideration. The state still did not disclose any DNA results and the court denied the motion. Mr. Crago filed a pro se petition for review, it was denied because Mr. Crago could not show DNA analysis did not identify the victim's blood in his car. (Ex. J, pg. 11 n. 1).

19-years after trial Mr. Crago received a letter from an employee of the prosecutor's office saying a review of the DNA records in Mr. Crago's case file show DNA analysis did not identify the victim's blood in Mr. Crago's car, and that a note that was found in the

file said "DNA not a match, defendant doesn't know, go ahead and tell the jury the victim's blood was found in the defendant's car." (Ex. A ¶ 3; Ex. K).

Based on the notification Mr. Crago filed a Rule 32. Judge Hoggatt ordered Doyle Johnstun to attach a copy of all DNA records to his response to the Rule 32. (Ex. L).

Doyle Johnstun responded by averring to the court that no DNA analysis were performed before trial and DNA analysis after trial identified the victim's blood in Mr. Crago's car. (Ex. M).

The Rule 32 court dismissed the Rule 32. (Ex. N)

The Court of Appeal held "Crago does not identify ... evidence contradicting the [lower] court's determination that the only DNA tests were completed after trial." (Ex. O ¶ 4).

On October 2, 2018, Mr. Crago received a copy of the DNA records for the above captioned case from the Arizona Dep't. of Public Safety which were forwarded to him by Lacy Black. (Ex. A ¶ 4; Ex. P).

The DNA records show a DNA analysis was completed March 23, 2018, two full weeks before trial began. The results were listed as "inconclusive". Inconclusive means that the victim's blood was not identified in Mr. Crago's car. Inconclusive is in fact a zero match. (Ex. A ¶ 4; Ex. P).

On October 16, 2018, Mr. Crago filed a Rule 15.7 motion requesting sanctions against Doyle Johnstun for perjury and suppression of DNA analysis records in contempt of Judge Hoggatts order. The court advised Mr. Crago to first file a Rule 32. This Rule 32 followed the Court's instructions. (Ex. Q).

The above facts show that the prosecutor's office lied about and suppressed the DNA analysis dated March 23, 1995, in the pretrial discovery phase, in the post trial appeal stage, and in contempt of this court's order in the previous Rule 32 stage to prevent this court's review of the issue. The State's perjury and suppression of evidence gives this court grounds to rehear the issue. See *Taylor v. Maddox*, 366 F.3d. 992, 999-1001 (9th Cir. 2004).

3 a.

## The Law On Suppression Of Evidence

The controlling law for the suppression of evidence is *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny. To underline this *Brady* was cited in Crago's pretrial motion for production (Ex.G).

*Brady* requires the state court to apply a 3-factor test to determine if a conviction should be vacated for the prosecutor's suppression of favorable evidence. The 3 factors are:

1. Is the undisclosed evidence favorable to the defense?

2. Did the prosecutor timely disclose the evidence?

3. Was the defendant prejudiced by the untimely disclosure?

See *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

If the state court fails to apply this 3-factor test to a suppression of evidence claim then the court's decision is contrary to clearly established federal law. *Milke v. Ryan*, 711 F.3d 998, 1002-1004 (9th Cir. 2013).

Favorable evidence is any evidence that calls into question the State's case. See *Strickler*, 527 U.S. at 290. Favorable evidence includes evidence that might meaningfully alter a defendant's choices before trial on which defense to present, what evidence to pursue, whether to testify and so on. *U.S. v. Burke*, 571 F.3d 1048, 1054 (10th Cir. 2009). See also *Milke*, F.3d at 1000-1001.

Suppression of evidence focuses on whether the prosecutor disclosed the evidence in a timely manner regardless of good or bad faith/intent or negligence. *Brady*, 373 U.S. at 87. *Brady* places an affirmative obligation upon the prosecutor "to learn of any favorable evidence known to others acting on the government's behalf in the case and requires disclosure by the prosecutor ... of all information in the possession of the prosecutor's office, the police and others acting on behalf of the prosecution." *Kyles v. Whitley*, 514 U.S. 419, 438 (1995).

Prejudice is said to exist "when the suppressed evidence is material for Brady purposes." See Banks v. Dretke, 540 U.S. 668, 691 (2004).

For Brady purposes "prejudice" and "materiality" have come to have the same meaning. Benn v. Lambert, 283 F.3d 1040, 1053 n.9 (9th.Cir 2002).

Evidence is material if there is a reasonable probability the evidence would have brought about a different result. The Supreme Court explains the test for prejudice as follows:

"The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial.... A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression undermines confidence in the outcome of the trial." Kyles, 514 U.S. at 434

A Brady violation is demonstrated "by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Kyles, 514 U.S. at 434-35

Suppressed evidence is to be considered collectively not item by item. Kyles, 514 U.S. at 436.

"In evaluating the question of prejudice, it is necessary to consider all the relevant evidence that the jury would have before it if the defense pursued a different path - not just the mitigation evidence the defense could have presented, but also the other evidence that almost certainly would have come in with it." Wong v. Belmontes, 558 U.S. 15; 130 S.Ct 383, 386 (2009).

The reasonable probability standard says that the petitioner need only show that the new evidence undermines confidence in the verdict. Kyles, 514 U.S. at 434.

<u>Argument</u>

The prosecutor lied about the DNA results and suppressed the DNA results because there was no credible evidence showing that Mr. Crago murdered the victim. The prosecutor's only hope was to induce Mr. Crago

5a

to self admit his guilt, This robbed Mr. Crago of his constitutional protections against self incrimination and due process of law.

The Count must remember there were no witnesses to the crime and no direct evidence to who killed the victim. No witness seen who shot the victim, no finger prints on shell casings, no weapon, no evidence that Mr. Crago ever owned a .380 handgun. No witness seen Mr. Crago with a firearm on the morning of the shooting, and the witness who was with Mr. Crago 30 minutes before the shooting occurred said Mr. Crago was normal and asking her to come home with him.

The only witness who put Mr. Crago at the scene of the crime was 15 year old Scott Adkins, but Mr. Adkins was adamant he did not see Mr. Crago with a gun and he did not see who shot the victim. Mr. Adkins said he was awakened by gun shots and laid in bed for about 30 seconds before glancing out the window where he seen Mr. Crago standing by his car but nothing looked out of the ordinary and he went back to bed (Ex. B, pg. 105 ln. 15-20, pg. 107 ln. 4-10).

As proof that Mr. Crago shot the victim the prosecutor presented two prison guards who said they were standing 20-30 feet away hidden down in a stair-well when they heard Crago laughing and bragging about killing "someone", ". this guy".

Officer Larimen said she heard Crago "saying he killed someone" but she did not hear the context of the conversation nor could she recall what Crago actually said (Ex. C, pg. 185 ln. 7-13, pg. 186 ln. 23-25).

Officer Velasquez said he heard Mr. Crago "laughing and bragging to the affect how he took this guy killed him, how he blew this guy away..." but again Mr. Velasquez also said he did not hear the whole conversation (Ex. C, pg. 190-91 ln. 23-1, pg. 193 ln. 4-5).

Just as a matter of law a witness may testify to what they heard someone say but may not testify to what they thought the person meant or felt. Neither Larimen nor Velasquez

say what they heard Mr. Crago speak, both only say what they think Mr. Crago meant by the words he spoke. More importantly neither of them said who or what Mr. Crago was referring to. Mr. Crago was an avid hunter and could have simply been recounting a hunting adventure. Mr. Crago was also an athlete and could have been talking about a basketball game. in which he "killed him" and "blew him away". The officers' testimonies were conjecture and both called for speculation to be applied to a crime of murder. Neither would have been allowed before the jury if the prosecutor had not suppressed the DNA results and lied about identifying the victim's blood in Mr. Crago's car to induce him to self admit guilt in return for dismissing a kidnapping charge and taking the death penalty off of the table.

The record before the court shows that without Mr. Crago's self admission to the crime there was no evidence of who killed the victim. The only reason Mr. Crago was on trial was because a 15 year old boy said he seen Mr. Crago at the scene of the crime after the victim was already shot. The prosecutor did not even have enough evidence to bring a case for premeditated murder against Mr. Crago until he lied about and suppressed the DNA evidence to induce Crago to stipulate he killed the victim.

The testimony of Mr. Adkins, Ms. Larimer, and Mr. Velasquez hardly present proof beyond a reasonable doubt that Mr. Crago premeditated the murder of the victim.

The U.S. Supreme Court said the question is not whether there is a more likely than not chance that the evidence would have brought about a different verdict but whether Mr. Crago received a fair trial process without the evidence. Kyles, 514 U.S. at 434.

If Mr. Crago had chose to deny involvement in the crime and never signed stipulations admitting guilt and his lawyer never changed defenses to argue self defense Mr. Crago could have traveled a different path and presented different evidence to raise a reasonable doubt about his guilt.

<u>Evidence That Tended To Raise Reasonable Doubts</u>

The following evidence was never fully developed because the prosecutor suppressed the DNA results and lied about identifying the victim's blood in Mr. Crago's car which made it impossible for Crago to deny being at the scene at that time.

1. DNA testing was done but did not identify the victim's blood in Mr. Crago's car (Ex. P).

2. Scott Adkins grandfather said Scott was "tutored" to lie to police by his mom Cecilia Brown (Ex. R).

3. Judge Hoggatt noted that all of the other witnesses said the car used in the crime was dark colored and photos of Mr. Crago's car clearly show it was light colored (Ex. N, pg 20 n. 14).

4. Tovah Sitts testified that Mr. Crago drove her home to the Ft Huachuka army base and stayed there with her to approximately 4:30 a.m., she said Mr. Crago was normal even happy and asked her to come home with him (Ex. D, pg. 43-44, 46).

5. Frankie P. Barnes served 32 years in the U.S. Navy and retired with an honorable discharge. He testified that as a visitor to a military installation Mr. Crago's vehicle would have been searched for firearms before being allowed to enter. It can be reasonably assumed that Mr. Crago did not have a firearm in his car when he entered the base (Ex. S).

6. State's witness Gregory Dootson said that while police were at the scene a car drove up and "somebody yelled, THAT'S THE CAR, THAT'S THE CAR." Police stopped the car and put the driver on the ground (Ex. T, pg. 5).

7. State's witness Gertrude Steinman said the police thought a young man who pulled up to the house in a sports car was the suspect but let him go when a woman in the house said "you picked the wrong one." (Ex. V., pg 17).

8. State's witness Cecilia Brown said John Wood was with the victim when she went to bed, but was not there when she woke up. That he came down the street in the victim's car and was stopped by the police at gun point and she ran out screaming "that's not him, that's not Earl." (Ex. V, pg. 10, 50).

9. Rachel Caipen was John Wood's mother in law. She contacted police to notify them John Wood was in new mexico. She said Mr. Wood told her police had stopped him at the crime in the victim's car, searched him, and accused him of killing the victim (Ex. X).

10. Officer Fuentes testified that a witness pointed out a vehicle as the suspect vehicle, the officers stopped the vehicle searched it and the driver, they turned the vehicle and the driver loose after Cecilia Brown said he was not involved in the crime. (Ex. C, pg 63-64 ln 6-3).

11. Defense witness Randy Beel testified that on the morning of the crime he seen Cecilia Brown, John Wood, and the victim at Danny Masons house. John Wood had a semi automatic firearm in a holster on his hip. Brown, Wood, and the victim left together at 4:15 am. [the victim was shot at 5:10 am] (Ex. D, pg. 83-85, 91-93).

12. Detective Pearce testified that he had spoken to John Wood and arranged to meet with him on monday. Mr. Wood did not show up. Detective Pearce drove to Mr. Wood's residence on Tuesday or Wednesday and found that Mr. Wood had moved away from the area. (Ex. C, pg. 179-80).

A summary of the above evidence is that Mr. Crago could have argued Cecilia Brown and John Wood killed the victim. John Wood

9 a.

then took the victim's body to the wash and got rid of the gun that Mr. Beel seen him with at 4:15 but police did not find on him when they stopped him and searched in the middle of the street. While Wood was getting rid of evidence Cecilia Brown, according to her father Cecil Carlisle, was "tutoring" her sons to lie to the police. When Mr. Wood returned from dumping the body and the witness began yelling "That's the car, That's the car," it really was the car. When Cecilia ran out screaming to police, who were holding Wood at gun point, that's not him, she was lying, it really was the killer. Then later when Wood agreed to meet with police but instead packed up his residence and left the area it was because he was the killer. In addition is the evidence showing every witness except Mr. Adkins said the car used in the crime was a "dark sports car" while Mr. Crago's car was light colored. Tovah Sitts said Mr. Crago was on base with her 30 minutes before the crime and seemed normal and asked her to go back to his house with him. Mr. Barnes said Mr. Crago would have not been allowed onto the army base with a firearm in his car.

None of this evidence proves Mr. Crago is innocent but taken collectively it certainly may have caused a reasonable juror to have a reasonable doubt about Mr. Crago's guilt. And the test under Brady is "a reasonable probability of a different result." Kyles, 514 U.S. at 434-35.

The Supreme Court held that "in evaluating the question of prejudice it is necessary to consider all the relevant evidence the jury would have had before it if the defense had pursued a different path — not just the mitigation evidence, but also the other evidence that almost certainly would have come in with it." Wong v. Belmontes, 558 U.S. 15, 130 S.ct. 383, 386 (2009).

Suppressed evidence is to be considered collectively not item by item. Kyles, 514 U.S. at 436. When determining prejudice the question is not whether the defendant would have

10-a.

received a different verdict with the evidence; The question is did Mr. Crago receive a fair trial process without the evidence. Kyles, 514 U.S. at 434-35.

Mr. Crago Avers that the suppression of the evidence showing that the victim's blood was not identified in his car combined with the prosecutor's lie that DNA analysis had identified the victim's blood in Mr. Crago's car altered the defendant's choices before trial on which defense to present, what evidence to pursue, and whether to testify at trial causing him prejudice. See Burke, 571 F.3d at 1054; See Milke, F.3d. at 1000-1001.

There were no witnesses who seen who killed the victim. No witnesses seen Mr. Crago with a weapon on the morning of the shooting. There was substantial evidence to impeach the 15 year old boy. that said he seen Mr. Crago at the scene immediately after the shooting occurred. There was substantial evidence to suggest John Wood killed the victim.

Mr. Crago was denied due process when Mr. Till lied about the DNA evidence to induce Mr. Crago to self admit guilt and then suppressed the March 23, 1995 DNA analysis to keep Mr. Crago from discovering the lie. The DNA results were favorable because they showed the victim's blood was not identified in Mr. Crago's car by DNA analysis. The DNA results were suppressed. Mr. Crago was prejudiced by the suppression.

Prosecutor Doyle Johnstun understood this when he refused to obey the court's order in the last Rule 32 and suppressed the March 23, 1995 DNA analysis and averred to the court the analysis did not exist, to keep the court from vacating Mr. Crago's unlawful conviction.

### Conclusion

Mr. Crago has made a colorable claim, He requests appointment of counsel and requests an evidentiary hearing. Mr. Crago requests his conviction and sentence be vacated. Mr. Crago requests all other relief this court deems equitable and just.

Respectfully Presented November 5, 2018. By _Earl H. Crago_

Pro Se.

CERTIFICATE OF SERVICE

I hereby certify that I mailed the original plus copies to the clerk of the cochise County Superior Court, P.O. Drawer CK, Bisbee AZ, 85603, On 5 November 2018,

By Earl F. Erago

Pro Se

12a

# EXHIBIT I

SUPERIOR COURT, STATE OF ARIZONA, In and for the County of Cochise

| | | |
|---|---|---|
| STATE OF ARIZONA,<br><br>　　　　　Plaintiff,<br><br>vs.<br><br>EARL FELTON CRAGO, JR.,<br><br>　　　　　Defendant. | Case No. CR94000471<br><br>**DECISION AND ORDER RE: PETITION FOR POST CONVICTION RELIEF (No. 8); DECISION AND ORDER RE: MOTION FOR DISCLOSURE VIOLATIONS AND SANCTIONS** | file stamp only<br><br>2019 AUG 16 AM 8: 14 |

| | |
|---|---|
| **HONORABLE LAURA CARDINAL<br>DIVISION ONE** | By:  Debbee Watkins  (08/15/19)<br>**Judicial Administrative Assistant** |

　　　　Defendant Earl F. Crago seeks relief from his conviction for first-degree murder.   This is Mr. Crago's eighth petition for post-conviction relief.

　　　　The court has reviewed the Defendant's current Petition for Post-Conviction Relief, filed *pro se* on or about November 30, 2018, together with the exhibits attached thereto; the Defendant's Notice of Error and Correction, filed *pro se* on December 12, 2018, together with the exhibits attached thereto; the State's Opposition to Petition for Post-Conviction Relief, filed February 13, 2019, together with the exhibits attached thereto; and the Defendant's Reply to State's Response to Petition for Post Conviction Relief, prepared by Harriette P. Levitt, Esq., counsel appointed to represent Defendant, and filed on April 3, 2019.

　　　　On December 13, 2018, during the pendency of this Petition, Defendant filed a "Motion for Disclosure Violations and Sanctions" pursuant to Rule 15.7, Ariz. Rules of Criminal Procedure.   The motion details the disclosure issue related to DNA evidence complained of by Defendant in his petition.   On January 17, 2019, the State responded to the motion for disclosure and Sanctions.   No ruling has been entered on the motion.

　　　　The case was transferred from Division III of the court (Judge Hoggatt) to Division VI (Judge Bannon), at the end of 2018.   Thereafter, some orders in the matter were signed by Judge Bannon, including the March 5, 2019 order extending time to file the Reply brief.   The case was reassigned to undersigned for final disposition, pursuant to Cochise County Administrative Order 2018-015.

　　　　Defendant bases his eighth petition for post-conviction relief on the following grounds:

1) There was unconstitutional suppression of evidence by the State;

2) Newly discovered evidence, learned of for the first time on October 2, 2018;

COPY OF ORIGINAL

Page Two                         August 15, 2019                         Case No. CR94000471

He seeks release from custody and a new trial.   See Petition for Post-Conviction Relief, filed November 30, 2018.

The specific evidence which Defendant claims was suppressed by the State and that is newly discovered, is DNA testing results of blood samples taken from the Defendant, the victim, and from stains taken from the interior of Defendant's vehicle.   This same issue – effects of non-pretrial disclosure of DNA testing results – was included for review in the Defendant's seventh Petition for Post Conviction Relief.   See Decision and Order, dated July 29, 2014, pp 3-4.

> In his latest filing of July 11, 2014, Defendant submits a number of documents of uncertain provenance.   Exhibits 1 through 5 inclusive purport to be documents relating to "DNA tests" on March 23, 1995, May 01, 1995, May 04, 1995, (at 6:19 p.m.), May 04, 1995 (at 6:02 p.m.), and June 02, 1995.

In his "Reply to Supplemental Response," to Defendant's seventh PCR, filed July 11, 2014, Defendant attached all the DPS laboratory test results, including June 1995 reports.   It is therefore plain the Defendant had possession of the DNA laboratory evidence at least by 2014.

Judge Hoggatt also found that in April 1998, Defendant filed two *pro se* documents – requests for reconsideration by the trial court – which addressed the issue of DNA evidence.   He wrote in those requests that trial counsel, James White, failed to inform Defendant that there were no "positive matches from the blood samples."   See Page 14, Decision and Order, July 29, 2014.   Judge Hoggatt quoted from the request, "The defendant did not find out until several weeks after the trial that the prosecutor had never obtained any physical evidence, blood matches or otherwise, to link him to the shooting."   The request for reconsideration was denied by Judge Borowiec on April 20, 1998.

Defendant's seventh Petition for Post Conviction Relief sought review of the following:

- Coerced Confession
- Infringement of right against self incrimination
- Unconstitutional suppression of evidence
- Unconstitutional use of perjured testimony by the state
- Newly discovered evidence
- Prosecutorial misconduct
- Actual innocence

Although counsel was not appointed to represent Defendant in connection with his seventh Petition, Defendant's pleadings were well done and addressed issues in a clear and comprehensible manner.   After a thorough examination of the pleadings filed by both sides, as well as the extensive appellate and post-conviction work in the case, Judge Hoggatt found the Defendant's claim that the prosecutor lied and suppressed evidence

Page Three                     August 15, 2019                     Case No. CR94000471

regarding the DNA test results, was precluded from further review because Defendant had raised the issue in a "previous collateral proceeding" in 1998, and because Defendant failed to appeal Judge Borowiec's denial of that 1998 motion for reconsideration.

This court has made a thorough review of the post-conviction and appellate history of this case and finds that the evidence alleged to be "newly discovered evidence" is not newly discovered; Defendant has possessed knowledge of this claim, and the supporting documents, since 2014, if not earlier.   He raised the same issues – lack of disclosure, ineffective assistance of counsel, etc. – with the original trial judge, Judge Borowiec; then he raised the issue in his seventh Petition, with all the alternate outcomes at trial that might have occurred if he had not testified to committing the murder in self-defense because of the nondisclosure, and Judge Hoggatt gravely considered the Defendant's claims, and found them wanting.   In Defendant's eighth petition, he again raises the claim, recast as prosecutorial misconduct, but the analysis remains the same as that afforded Defendant in Judge Hoggatt's 2014 decision and order.

Pursuant to Rule 32.2, Ariz. Rules of Crim. Proc., the Court finds that the Defendant is precluded from relief, because the issues identified by the Defendant, which are intertwined, were finally adjudicated in Defendant's 2014 Petition for Post Conviction Relief, as well as earlier proceedings before the trial judge, in 1998.

For the foregoing reasons, the Defendant's Eighth Petition for Post Conviction Relief is dismissed.

It is the further order of the court, denying the Defendant's Motion for Disclosure Violations and Sanctions.

SIGNED this _____ day of August, 2019.

_____
LAURA CARDINAL
JUDGE OF THE SUPERIOR COURT

mailed/distributed: (date)(initials) 8/16/19 _____

xc:     Doyle B. Johnstun, Deputy County Attorney
        ✓Harriette P. Levitt, Esq., 5363 E. Pima Street, Suite 101, Tucson, AZ 85712

# EXHIBIT J

IN THE COURT OF APPEALS

STATE OF ARIZONA

DIVISION TWO

| | | |
|---|---|---|
| STATE OF ARIZONA, | ) | No. 2 CA-CR 2019-0234-PR |
| | ) | |
| Respondent, | ) | |
| | ) | Cochise County Superior |
| vs. | ) | Court No. CR9400071 |
| | ) | |
| EARL FELTON CRAGO, JR., | ) | **PETITION FOR REVIEW** |
| | ) | |
| Petitioner. | ) | |
| _____ | ) | |

¶1.   COMES NOW the Petitioner, by and through his attorney undersigned, and pursuant to Rule 32.9, Arizona Rules of Criminal Procedure, petitions the Court of Appeals for a review of the denial of his Petition for Post-Conviction Relief.

**FACTS:**

¶2.   Following a jury trial in April 1995, Petitioner was convicted of first-degree murder.  He was sentenced to a term of life without possibility of parole

before 25 years.  His conviction and sentence were upheld on appeal.

¶3.     Petitioner has since filed eight successive petitions for postconviction relief, pursuant to Rule 32 Arizona Rules of Criminal Procedure.  All were denied without evidentiary hearings.  Petitioner filed a petition for review to the Arizona Court of Appeals after the denial of the first petition for postconviction relief, which was consolidated with his direct appeal.  The Court of Appeals remanded the matter to the Superior Court for an evidentiary hearing on two issues related to ineffective assistance of counsel.  All other grounds for relief were denied. Following an evidentiary hearing, relief on those two issues was likewise denied. Petitioner was never appointed counsel in any subsequent Rule 32 proceeding.

¶4.     Petitioner has contended throughout the postconviction process that the prosecutor on his case falsely told defense counsel that blood which was found in his vehicle was matched to the blood of the victim, Carl Davidson.  Defense counsel conveyed this false information to petitioner and advised him to change his defense from one of denial to an admission that he shot the victim in self-defense.  On February 22, 1995 defense counsel filed a notice with the court disclosing the affirmative defense of self-defense.

¶5.     The case proceeded to trial on April 3, 1995.  Petitioner testified in his own defense that he had shot and killed Davidson, but did so in self-defense.

2

The jury rejected Petitioner's version of events and found him guilty as charged. Petitioner has since avowed that he did not shoot the victim in self-defense, and that he only testified to this version of events on the basis of his attorney's bad advice. Petitioner has since contended, as he did before he filed a notice of self-defense, that he did not shoot the victim at all, nor was he present at the time of the murder.

¶6.    In 2014, Petitioner filed his seventh pro se petition for postconviction relief, arguing, among other things, that he had recently obtained a DNA report from the DPS crime laboratory dated June 27, 1995, which established that DNA testing was conducted after his trial and after sentence was imposed. The results of the DNA testing were inconclusive as to whether the blood on the seat of petitioner's vehicle came from Davidson. Petitioner also presented two other reports, one which was prepared on February 23, 1995 and another which was prepared on March 15, 1995. The February report is a serology report stating that human bloodstains were found on the front passenger seat of petitioner's vehicle. The second report, dated March 15, 1995 is also a serology report. It states that the blood could have come from the victim, but not from Petitioner. (Exhibit N to Rule 32)

¶7.    Petitioner again contended that he was denied his constitutional right to effective assistance of counsel and that he was induced by his attorney to make

3

a false admission to the crime on the basis of inaccurate information about DNA test results. In a lengthy decision, former Superior Court Judge Wallace Hoggatt denied relief without an evidentiary hearing. In 2015, Division 2 of the Arizona Court of Appeals granted review, but also denied relief.

¶8.    Petitioner filed his latest petition for postconviction relief in October 2018, arguing that he now had a certified copy of the June 27, 1995 DNA test results, which he had not previously had. On this basis, he argued newly discovered evidence. He again argued ineffective assistance of counsel, and that his conviction was obtained because he was induced to admit to shooting Davidson on the basis of false information.

¶9.    On August 16, 2019, the Honorable Laura Cardinal summarily denied the petition as well as a motion for disclosure violations and sanctions which Petitioner had separately filed. Judge Cardinal found that all of the issues which Petitioner raised were precluded. The court found that the DNA test results were not newly discovered because Petitioner had possession of the laboratory evidence at least by 2014. (Exhibit 1). The court granted Petitioner's motion to extend the deadline for filing a petition for review to this Court, to October 11, 2019. (Exhibit 2)

**ISSUE PRESENTED FOR REVIEW:**

**The Trial Court Committed Reversible Error When It Denied**

**Petitioner An Evidentiary Hearing and Summarily Dismissed Petitioner's Eighth Petition For Postconviction Relief.**

**ARGUMENTS:**

**1. Ineffective assistance of counsel.**

¶10.   The standard for determining whether counsel is effective is whether, under the circumstances, the attorney showed at least minimal competence in representing the criminal defendant. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Schultz*, 140 Ariz. 222, 681 P.2d 374 (1984); *State v. Watson*, 134 Ariz. 1, 653 P.2d 351 (1982).   Under this standard our courts have held that whether defense counsel showed minimal competence depends on whether his acts or omissions are a crucial part of the defense.   In addition, counsel's performance will be judged upon the basis of reasonableness under the prevailing professional norms. *State v. Nash*, 143 Ariz. 392, 694 P.2d 222 (1985).

¶11.   The defendant who alleges he was denied effective assistance of counsel must "first establish that counsel's errors or omissions reflect a failure to exercise skill, judgment or diligence of a reasonably competent attorney, and

second, defendant must establish that he was prejudiced by counsel's errors or omissions." *United States v. Hoffman*, 733 F.2d 596 at 602, cert. denied, 105 S. Ct. 521, 469 U.S. 1039, 83 L. Ed. 2d 409 (9th Cir. 1984).

¶12.   Petitioner also has a right to effective assistance of counsel on a Rule 32 petition. *Martinez v. Ryan,* (cite). Assuming, as Judge Cardinal found in her ruling, that petitioner had access to the June 27, 1995 DNA report early on, his first Rule 32 attorney should have raised this issue at the time he filed the first petition. He apparently did not raise the issue of the inconclusive DNA result.

¶13.   While it is true that petitioner changed his defense from claiming he was not present to claiming self-defense, even with the new defense, the existence of an inconclusive DNA result would have been relevant to show the jury that he was not necessarily lying to police when he initially denied having put the victim's body in his car. At trial, the prosecutor cross-examined Petitioner about when he changed his defense. He brought out the fact that petitioner had initially made statements to police which were inconsistent with his claim of self-defense.

¶14.   Petitioner was arrested in Senora, Texas about a day after the victim's body was discovered in the desert outside Sierra Vista. On the drive back to Arizona, petitioner told police that he did not know the victim and that he was on the Army post at Fort Huachuca at the time of the murder. When police

questioned him about finding what appeared to be blood on the front passenger seat of his car, petitioner stated he was told when he bought the car that someone had died in it.  An inconclusive DNA test result would have been relevant to corroborate petitioner's statement.

¶15.   Of course, petitioner maintains that he never would have changed his defense to an admission that he shot and killed Davidson if he had known that there was no conclusive evidence establishing that Davidson's blood was found on the front passenger seat of his car.

## 2.  Newly discovered evidence.

¶16.   In order to be entitled to post-conviction relief on the ground of newly discovered evidence under Rule 32.1(e), a defendant must establish that the evidence was discovered after trial although it existed before trial; that it could not have been discovered and produced at trial through reasonable diligence; that it is neither cumulative nor impeaching, unless the impeachment evidence substantially undermines testimony which was of critical significance at trial such that the evidence probably would have changed the verdict or sentence; that it is material and that it probably would have changed the verdict.  *State v. Saenz*, 197 Ariz. 487, 4 P.3d 1030 (App. 2000).  The defendant must prove newly discovered evidence by a preponderance of the evidence.  *State v. Verdugo*, 183 Ariz. 135, 139, 901 P.2d 1165, 1169 (App. 1995).

¶17.   In 2014, Judge Hoggatt noted that there were a total of three DPS laboratory reports.  The first was dated February 23, 1995.  That report was a serology report which only found that the blood stain in petitioner's vehicle was human blood.  The second report was dated March 15, 1995.  It was also a serology report and the analyst stated that she could not determine to a certainty that the blood came from the victim, only that it could have come from him.  The only DNA report was the June 27, 1995 report.  After examining the DNA from the blood stain on petitioner's vehicle, the DNA test results were inconclusive as to whether the blood came from the victim. (Exhibit N to petition).  At trial, the parties stipulated that the jury would not hear any testimony regarding blood test results, and that was because by then petitioner had agreed to state that he shot Davidson, albeit in self-defense.

¶18.   Petitioner did not have a certified copy of the June 27, 1995 report until October, 2018 when he filed his most recent petition.  He based his newly discovered evidence argument on the fact that Judge Hoggatt had previously discounted the validity of the documents petitioner was submitting with his seventh PCR petition.  As noted *supra,* petitioner proceeded pro se on all of his Rule 32 petitions, with the exception of the first one, which did not discuss the issues petitioner has since raised, to any significant level.

¶19.   In *Haines v. Kerner*, 404 U.S. 519 (1972) the United States Supreme

Court held that prisoner pro se pleadings are to be held to less stringent standards than formal pleadings drafted by lawyers. 404 US at 520. The court articulated an additional approach to the review of pro se pleadings, indicating that such pleadings should only be dismissed where it appears beyond a reasonable doubt that the complainant can prove no set of facts in support of his claim which would entitle him to relief. 404 US at 520-521.

¶20.   In 2014, Judge Hoggatt dismissed petitioner's claims in part, because he felt that the DPS laboratory report from February 23, 1995 could not have influenced petitioner to change his notice of defenses, since it was written after petitioner filed his notice of self-defense on February 22, 1995, and because the County Attorney did not receive the written report until March 7, 1995. But the date of issuing or mailing the report does not preclude the possibility that the prosecutor spoke with the laboratory analyst before she prepared her written report and conveyed information about the presence of human blood on the seat to Petitioner's attorney.

¶21.   Petitioner has repeatedly avowed that his attorney, Jim White convinced him to claim self-defense by telling him that DNA test results showed that the blood on the vehicle belonged to the victim. In all these years, the Superior Court has never granted petitioner an evidentiary hearing in which to have Mr. White testify as to what he told petitioner. Even though the court accepted the

state's position that Mr. Till did not relay false information to Mr. White, the Court has never afforded petitioner the opportunity to establish what Mr. White actually told him in order to get him to assert the claim of self defense.

¶22.   Judge Cardinal's recent decision relied almost exclusively on Judge Hoggatt's 2014 decision.  Likewise, petitioner's 2018 petition relates directly to Judge Hoggatt's 2014 ruling.  Accordingly, the proceedings in 2014 are relevant to the current petition and to this petition for review.  Moreover, because Judge Hoggatt related his findings to issues raised as far back as 1998, when petitioner had his first PCR proceeding, the issue of his first PCR attorney's ineffectiveness has now become relevant.  It is for these reasons that Petitioner has raised these issues in this petition for review and asked the court to grant relief.

**CONCLUSION:**

¶23.   In conclusion it is respectfully submitted that Petitioner did establish sufficient grounds to entitle him to an evidentiary hearing on the issues he has raised in his successive petitions for postconviction relief.  He was without counsel nearly the entire time; therefore, his pleadings should have been construed liberally and, pursuant to *Haines v. Kerner*, he should have been held to a more relaxed standard in determining whether he had presented a *prima facie* case entitling him to an evidentiary hearing.  It is respectfully

submitted that review should be granted and relief should be granted, to wit:
an order remanding the matter for an evidentiary hearing in the Superior Court.

An appellate court will reverse a trial court's summary dismissal of a post-conviction petition only if an abuse of discretion affirmatively appears. *State v. Bowers*, 966 P.2d 1023 (App. 1998). In the instant case, as set forth above, it is submitted that the trial court abused its discretion. Petitioner is entitled to a reversal of the trial court's summary dismissal of Rule 32 petition.

¶24.   RESPECTFULLY submitted this 3rd day of October, 2019.

<div style="text-align:right">

*s/ Harriette P. Levitt*
HARRIETTE P. LEVITT
Attorney for Petitioner

</div>

Copies of the foregoing e-mailed
this 3rd day of October, 2019, to:

Joseph Maziarz, Esq.
Office of the Arizona Attorney General
1275 W. Washington
Phoenix, Arizona 85007

and mailed to:

Doyle Johnston, Esq.
Deputy Cochise County Attorney
P.O. Drawer CA
Bisbee, AZ 85603

Earl Crago, Jr.
#115357
ASPC Lewis-Buckley
PO Box 3400
Buckeye, AZ 85326

# EXHIBIT K

IN THE
# ARIZONA COURT OF APPEALS
DIVISION TWO

--------

THE STATE OF ARIZONA,
*Respondent,*

*v.*

EARL FELTON CRAGO JR.,
*Petitioner.*

No. 2 CA-CR 2019-0234-PR
Filed March 26, 2020

--------

THIS DECISION DOES NOT CREATE LEGAL PRECEDENT AND
MAY NOT BE CITED EXCEPT AS AUTHORIZED BY APPLICABLE RULES.
NOT FOR PUBLICATION
*See* Ariz. R. Sup. Ct. 111(c)(1); Ariz. R. Crim. P. 31.19(e).

--------

Petition for Review from the Superior Court in Cochise County
No. CR94000471
The Honorable Laura Cardinal, Judge

**REVIEW GRANTED; RELIEF DENIED**

--------

COUNSEL

Harriette P. Levitt, Tucson
*Counsel for Petitioner*

STATE v. CRAGO
Decision of the Court

---

**MEMORANDUM DECISION**

Judge Brearcliffe authored the decision of the Court, in which Presiding Judge Staring and Chief Judge Vásquez concurred.

---

B R E A R C L I F F E, Judge:

¶1  Earl Crago Jr. seeks review of the trial court's order denying his successive petition for post-conviction relief filed pursuant to Rule 32, Ariz. R. Crim. P.[1] We will not disturb that order unless the court abused its discretion. *See State v. Roseberry*, 237 Ariz. 507, ¶ 7 (2015). Crago has not met his burden of establishing such abuse here.

¶2  After a jury trial, Crago was convicted of first-degree murder, and the trial court sentenced him to life in prison without the possibility of release for twenty-five years. We affirmed Crago's conviction and sentence on appeal, denied relief in part on a consolidated petition for review of the denial of his first petition for post-conviction relief, and remanded for an evidentiary hearing on two claims of ineffective assistance of counsel. *State v. Crago*, Nos. 2 CA-CR 95-0488, 2 CA-CR 98-0230-PR (consolidated) (Ariz. App. Mar. 18, 1999) (mem. decision). We subsequently denied relief on Crago's petition for review of the denial of post-conviction relief after the evidentiary hearing. *State v. Crago*, No. 2 CA-CR 00-0259-PR (Ariz. App. Mar. 13, 2001) (mem. decision). We also denied relief on six more petitions for review from denials of post-conviction relief. *State v. Crago*, No. 2 CA-CR 2014-0379-PR (Ariz. App. Feb. 25, 2015) (mem. decision); *State v. Crago*, No. 2 CA-CR 2013-0402-PR (Ariz. App. Mar. 11, 2014) (mem. decision); *State v. Crago*, No. 2 CA-CR 2011-0162-PR (Ariz. App. Sept. 9, 2011) (mem. decision); *State v. Crago*, No. 2 CA-CR 2008-0396-PR (Ariz. App. May 12, 2009) (mem. decision); *State v. Crago*, No. 2 CA-CR 2004-0224-PR (Ariz. App. Mar. 29, 2005) (decision order); *State v. Crago*, No. 2 CA-CR 01-0381-PR (Ariz. App. Feb. 19, 2002) (mem. decision).

---

[1] Effective January 1, 2020, our supreme court amended the post-conviction relief rules. Ariz. Sup. Ct. Order R-19-0012 (Aug. 29, 2019). The amendments apply to all cases pending on the effective date unless a court determines that "applying the rule or amendment would be infeasible or work an injustice." *Id.* Because it is neither infeasible nor works an injustice here, we cite to and apply the current version of the rules.

STATE v. CRAGO
Decision of the Court

¶3　　　　In November 2018, Crago filed his eighth petition for post-conviction relief, raising claims of newly discovered material evidence and unconstitutional suppression of evidence.[2]  Specifically, Crago asserted that before trial the prosecutor had advised him the victim's blood was found in Crago's car, causing Crago to maintain at trial that he killed the victim in self-defense.  Crago argued he had learned in 2014 through a note from an employee at the prosecutor's office that "the DNA analysis did not identify the victim's blood in . . . Crago's car."  Crago recognized that "[t]his issue was raised in the previous Rule 32" petition but argued it was not precluded because "the prosecutor committed perjury and suppressed material DNA evidence."

¶4　　　　The trial court summarily dismissed Crago's petition.  It determined that the evidence was not newly discovered because Crago "possessed knowledge of this claim, and supporting documents, since 2014, if not earlier," and Crago raised the claim in his seventh petition for post-conviction relief.  The court also noted that Crago had filed motions for reconsideration in April 1998, which were denied at that time, asserting, in part, that his trial counsel had failed to inform him that there were no "positive matches from the blood samples."  Although Crago "recast" his claims in the eighth petition as "prosecutorial misconduct," the court determined that "the analysis remain[ed] the same."  Accordingly, the court found that Crago's "intertwined" claims "were finally adjudicated in [Crago's] 2014 Petition for Post Conviction Relief, as well as earlier proceedings before the trial judge, in 1998."  This petition for review followed.

¶5　　　　On review, Crago argues the trial court erred in dismissing his Rule 32 petition without an evidentiary hearing.  He contends he presented colorable claims of newly discovered material evidence and ineffective assistance of Rule 32 counsel.  Relying on *Haines v. Kerner*, 404 U.S. 519 (1972), Crago also suggests that he was entitled to an evidentiary hearing because "pro se pleadings are held to less stringent standards."[3]

---

[2]Along with his petition, Crago filed a motion seeking sanctions for purported disclosure violations, which the trial court denied after dismissing his petition.  Crago does not challenge that denial on review, and we do not address it further.

[3]Although Crago filed the eighth petition for post-conviction relief himself, counsel joined the case in January 2019 and filed the reply on his behalf.

STATE v. CRAGO
Decision of the Court

¶6          *Haines*, however, is not controlling here.   Generally, in Arizona, "a defendant acting in propria persona is subject to the same rules as an attorney." *State v. Cornell*, 179 Ariz. 314, 331 (1994).  Moreover, *Haines* is factually distinguishable.  In that case, the petitioner was an inmate who sought to recover damages for claimed injuries and deprivation of rights while in prison.  *Haines*, 404 U.S. at 519-20.  The United States Supreme Court held the petitioner's "inartfully pleaded" complaint to "less stringent standards" and concluded it was sufficient to allow him an opportunity to offer proof.  *Id.* at 520-21.  Here, by contrast, at issue is Crago's petition for post-conviction relief, in which he needed to "make a colorable showing that the allegations, if true, would have changed the verdict," in order to obtain an evidentiary hearing.  *State v. Krum*, 183 Ariz. 288, 292 (1995).  But the court need not even reach the colorable-claim determination if the claims are otherwise precluded.  *See* Ariz. R. Crim. P. 32.2(a)(2).

¶7          As to Crago's claim of newly discovered material evidence, he raised the same claim based on the victim's DNA evidence not matching blood found in Crago's car as part of his seventh petition for post-conviction relief.  *See Crago*, No. 2 CA-CR 2014-0379-PR, ¶ 3.  That claim was finally adjudicated on the merits and is, therefore, precluded in this proceeding.  *See* Ariz. R. Crim. P. 32.2(a)(2), (b).

¶8          As to Crago's claim of ineffective assistance of Rule 32 counsel, that claim was not raised below.  We do not address claims raised for the first time on review.  *See* Ariz. R. Crim. P. 32.16(c)(2)(B) (petition for review must contain "issues the trial court decided that the defendant is presenting for appellate review"); *see also State v. Ramirez*, 126 Ariz. 464, 467-68 (App. 1980).  And, in any event, as a non-pleading defendant, Crago has no constitutional right to the effective assistance of Rule 32 counsel.  *See State v. Escareno-Meraz*, 232 Ariz. 586, ¶ 4 (App. 2013).

¶9          Accordingly, although we grant the petition for review, we deny relief.

# EXHIBIT L

FILED BY CLERK

SEP 09 2020

COURT OF APPEALS
DIVISION TWO

COURT OF APPEALS
STATE OF ARIZONA
DIVISION TWO

**M A N D A T E**

2 CA-CR 2019-0234-PR
Department A
Cochise County
Cause No. CR94000471

RE: STATE OF ARIZONA v. EARL FELTON CRAGO JR.

To:   The Superior Court of Cochise County and the Hon. Laura Cardinal, Judge,
in relation to Cause No. CR94000471.

This cause was brought before Division Two of the Arizona Court of Appeals
in the manner prescribed by law.  This Court rendered its Memorandum Decision and
it was filed on March 26, 2020.

No Motion for Reconsideration or Petition for Review was filed and the time
for filing such has expired.


NOW, THEREFORE, YOU ARE COMMANDED to conduct such proceedings as required
to comply with the accompanying Memorandum Decision of this Court.

I, Jeffrey P. Handler, Clerk of the Court of Appeals, Division Two, hereby
certify the accompanying Memorandum Decision (see link below) to be a full and
accurate copy of the decision filed in this cause on March 26, 2020.

To view the decision, please click on the following link:
https://www.appeals2.az.gov/APL2NewDocs1/COA/860/3552501.pdf

DATED:  September 09, 2020


JEFFREY P. HANDLER
Judge Pro Tempore



2 CA-CR 2019-0234-PR

Cochise County Superior Court Number CR94000471

    Superior Court Record returned on September 09, 2020

        CONFIDENTIAL DOCUMENTS - 5 Envelopes


RECEIVED:_____
Clerk, Cochise County Superior Court


BY:_____
     Deputy Clerk

2 CA-CR 2019-0234-PR
Cochise County Superior Court Number CR94000471

Copies to:

ARIZONA ATTORNEY GENERAL
1275 W. Washington
Phoenix, AZ 85007

COCHISE COUNTY ATTORNEY'S OFFICE
P.O. Drawer CA
Bisbee, AZ 85603

Harriette P. Levitt
5363 E. Pima Street, Suite 101
Tucson, AZ 85712

Xochitl Orozco
Cochise County Office of the Legal Advocate
P.O. Box 106
Bisbee, AZ 85603

Laura Cardinal
Judge
COCHISE COUNTY SUPERIOR COURT
P.O. Box Drawer CT
Bisbee, AZ 85603

Amy Hunley
Clerk of the Court
Cochise County Superior Court
P.O. Drawer CK
Bisbee, AZ 85603
(ORIGINAL MANDATE)

# EXHIBIT M

Person Filing: _Earl Felton Crago # 115357_
Address (if not protected): _ASPC - Eyman/SMU P.O.Box 4000_
City, State, Zip Code: _Florence, AZ, 85132_
Telephone: _____
Email Address: _____
Lawyer's Bar Number: _____

Representing  ☒ Self, without a Lawyer  or  ☐ Attorney for  ☐ Petitioner  OR  ☐ Respondent

# SUPERIOR COURT OF ARIZONA
## IN _____ COUNTY

_____
State of Arizona

_Earl Felton Crago_
Defendant (First, MI, Last)

Case Number: _94000471_

### NOTICE OF REQUEST FOR
### POST- CONVICTION RELIEF
_Appointment of Counsel Requested_

## STATEMENTS MADE TO THE COURT, UNDER OATH OR AFFIRMATION:

**1.   INFORMATION ABOUT ME, the DEFENDANT:**

Name: _Earl Felton Crago_
Address: _ASPC - Eyman/SMU P.O.B 4000, Florence, AZ 85132_
Date of Birth: _10 - 16 - 1971_
Prison/Inmate Number (if any): _115357_

**2.   INFORMATION ABOUT MY CONVICTION:** I was convicted of the following crime(s):

| Common Name | Statute Number (A.R.S.) |
|---|---|
| _Murder, First Degree_ | _13-1105, 13-1101,_ |
| | _13-604, 13-703,_ |
| | _13-701._ |

**3.   INFORMATION ABOUT MY SENTENCE:**

Defendant was Sentenced on (date): _August 12_ , _1995_

To a TERM of _25 years_ , beginning on (date) _September 27, 1994_

© Superior Court of Arizona
ALL RIGHTS RESERVED

CRPCR12F-031516

Case No. 94000471

Following a: (Place a check mark in the box below that applies.)

- ☒ Trial by jury
- ☐ Trial to Judge without a Jury
- ☐ Plea of Guilty
- ☐ Plea of No Contest
- ☐ Probation Revocation Admission
- ☐ Probation Revocation Violation Hearing in the Superior Court in _____ County with judicial officer _____ presiding.

The file number of this case was CR- 94000471 _____.

**4.    OTHER ACTIONS TO SECURE RELIEF:** Defendant has taken the following actions to get relief from his/her convictions or sentences. (Check the box below that applies to you):

☐ Direct Appeal - YES ☒   or   NO ☐

☐ Previous Rule 32 Proceedings - YES ☒   or   NO ☐

**5.    INFORMATION ABOUT ATTORNEY REPRESENTATION:** (Check the boxes that apply.)

A.   Defendant was represented by the following lawyers:
(Write in the name and address of the lawyer below):

- Trial or Change of Plea: _JAMES G. WHITE_
- Sentencing Hearing: _RALPH MALANGA_
- Appeal (if any): _HARRIETTE LEVITT_
- Previous Rule 32 Proceedings (if any): _HARIETTE LEVIT_

B.   Is Defendant raising a claim of ineffective assistance of counsel?  YES ☒   or   NO ☐

C.   Is Defendant presently represented by a lawyer?  YES ☐   or   NO ☒  If "Yes", write lawyer's name and address here:
_____

D.   If at this time you are not represented by a lawyer; do you want the court to appoint a lawyer for this Post-Conviction proceeding?   YES ☒   or   NO ☐

**6.    UNTIMELY NOTICE or PREVIOUS RULE 32 CASE:** Answer this section **ONLY IF** this is an untimely notice -or- the defendant has filed a previous Rule 32 petition in this case.

- Is a claim pursuant to Rule 32.1(d), (e), (f), (g), or (h) being raised in this petition?  YES ☒   or   NO ☐
- If YES, place a check mark in the appropriate box:

    ☒   The defendant is being held in custody after the sentence imposed has been expired.

    ☐   Newly discovered material facts exist which probably would have changed the verdict or sentence.

© Superior Court of Arizona
ALL RIGHTS RESERVED
CRPCR12F-031516

Case No. 4400047١

☐     The defendant's failure to file timely notice of post-conviction relief or notice of appeal was without fault on the defendant's part.

☒     There has been a significant change in the law that would probably overturn the conviction or sentence.

☐     Facts exist which establish by clear and convincing evidence that the defendant is actually innocent.

- **STATE THE FACTS** that support the claim and the reasons for not raising the claim in the previous petition or in a timely manner.

  _See STATEMENT OF FACTS attached at pages 3a - 3f_

7.     **NOTICE: I AM REQUESTING a HEARING FOR POST-CONVICTION RELIEF.**

**DECLARATION:** I declare under penalty of perjury that the information contained in this form and in any attachments is true to the best of my knowledge or belief. I also understand that the failure to raise any known ground for relief in my petition will prohibit me from raising it at a future date.

_October 23, 2019_
Date

_Earl Crago_
Signature

8.     **AFFIDAVIT OF INDIGENCY:** I have requested the appointment of a lawyer to represent me in post-conviction proceedings. I swear under oath and penalty of perjury that I am indigent and because of my poverty I am financially unable to pay for the cost of a lawyer to represent me without incurring substantial hardship to myself or my family.

_10/23/2019_
Date

_Earl Crago_
Defendant

STATE OF _Arizona_

COUNTY OF ~~Maricopa~~ _Pinal_ 》

Subscribed and sworn to or affirmed before me this: _10/23/2019_
(date)
by

_Earl F Crago_

_____
Deputy Clerk or Notary Public

(notary seal)

JUSTIN YETT
Notary Public - State of Arizona
MARICOPA COUNTY
My Commission Expires
October 31, 2020

© Superior Court of Arizona
ALL RIGHTS RESERVED

Page 3 of 3

CRPCR12F-031516

# STATEMENT OF FACTS

## ISSUE 1

Defendant is being held in custody after the sentence imposed has expired. Defendant request a Rule 32 hearing.

Defendant's crime occurred in September 1994, and the defendant was sentenced under the Arizona Revised Statutes and Criminal Laws as they existed in 1994.

Defendant was convicted of Premeditated First Degree Murder. He was over the age of 18 at the time of the crime. The State did not seek the death penalty. The Court found several mitigating factors. Defendant was sentenced pursuant to ARS 13-1105 and ARS 13-603(I), as they existed in 1994.

The sentencing transcripts state that the defendant is sentenced to "the term of life and that you not be released on any basis until the completion of the service of 25 years. ... It is further ordered that you will serve three years and seven months community supervision once you are released from prison." (R.T. 8/21/95, page 28-29, EXHIBIT 8).

Pursuant to ARS 13-607 and ARS 13-701(B) the judge prepared a Judgment of Guilt and Sentence document that prescribed the length of imprisonment and condition and time of release. A certified copy of the document was then given to the department of corrections. This is the only document that governs the amount of time the DOC may keep the defendant imprisoned. (EXHIBIT 1).

The Judgment of Guilt and Sentence document on file at the DOC says exactly what the Sentencing Transcripts say. The defendant is "committed to a life term in the Department of Corrections ... IT IS ORDERED: that the defendant must serve every day of twenty-five (25) years of the Sentence imposed before he is eligible for any type of release ..... IT IS FURTHER ODERED: That pursuant to ARS 13-603(I), the Defendant will be required to do mandatory community supervision Sentence - one day for every seven days sentenced to, for a total of 3 years, 7 months." (EXIBIT 1, page 3).

The DOC originally calculated the sentence as having a sentence of imprisonment expiration date ("SED") of September 17, 2019, and a community sentence expiration date ("CSED") of April 13, 2023. (EXIBIT 2).

At some point after 1994 the Arizona Revised Statutes and Criminal Laws for ARS 13-1105 and ARS 13-603(I) were added to and amended to raise the mandatory minimum for premeditated murder from Life to Natural Life: ARS 13-1105(A)(1) requires the defendant to be sentenced under ARS 13-752(A) and states "the court shall impose a sentence of natural life."

ARS 13-752 was added in 2002 as ARS 13-703.01 then renumbered and amended to ARS 13-752 in 2008. It did not exist as part of the relevent sentencing statutes in 1994.

ARS 13-1105 has been amended, i.e., changed five different times since 1994: Amended 1996, 2000, 2005, 2008, and 2009. With each amendment the sentencing grew harsher and more restrictive, till finally the only two sentences are Natural Life or Death.

The DOC has notified the defendant that the amended and added laws and changes to Arizona Revised Statutes are being applied ex post facto to the defendant's sentence. The DOC has changed terms of release. Now the sentence reads "Life or Death" "No Community Supervision Parole". (See EXHIBIT 3).

Defendant filed previous Rule 32 requesting the court to order DOC to correct their records so that defendant could receive pre-release programming. However, the issue was said not to be ripe for adjudication until the 25 years are completed. (EXHIBIT 5).

The 25 year sentence was completed September 17, 2019. The DOC is still refusing to release the defendant, saying that the order for release after 25 years is an illegal sentence under the amended A.R.S 13-1105.

The defendant notes the following:

First, it violates the Fifth Amendment's Due Process clause to apply an amendment of law ex post facto in a manner that enhances the term of imprisonment beyond the original order of release. See Collins V. Youngblood, 497 U.S. 37 (1990).

Second, the defendant has a liberty interest in keeping an unlawfully lenient sentence; Rule 24.3 Ariz.R.Crim.P. states that the State Court cannot change an unlawfully lenient sentence if more than 60 days has passed from the issuance of the judgment of Guilt and Sentence.

Third, There was nothing in the case laws or A.R.S. that prohibited the judge in 1994 from ordering that the defendant's sentence of life be terminated after the completion of 25 years.

The life Sentencing Statutes in 1994 only mandate that the defendant not be released on any basis before 25 years were served. The statute left it to the judges discretion what type of release and when that release should occur after 25 years were served. It is clear from a review of the amendments made after 1994 that people were not happy with the judges using their discretion to terminate a life sentence after 25 years, but these amendments are not retroactive and cannot be applied ex post facto to the defendant's sentence. See Collins V. Youngblood, supra.

Therefore, Under Rule 32 the defendant requests the court to order ADC to terminate his life sentence and backdate his community supervision to September 17, 2019.


ISSUE 2.

In 2001, defendant filed his second Rule 32 raising the sole claim that his first Rule 32 attorney was ineffective. In Arizona a defendant must raise a claim of ineffective assistance of trial counsel in a Rule 32 proceeding. This makes the first Rule 32 a mandatory part of the criminal appeal process.

The Superior Court Summarily dismissed the 2nd. Rule 32 holding that "defendant's sixth Amendment right does not extend to collateral proceedings". (EXHIBIT 6, page 2).

Defendant appealed the decision and the Court of Appeals upheld the Superior Court's decision holding "the right to counsel does not extend to collateral proceedings" (EXHIBIT 7, page 4).

There are no law libraries nor access to case law in the DOC. (EXHIBIT 4). Defendant spoke with attorney Harriette Levitte, who told him that the law was effectively changed in Arizona by Martinez V. Ryan, 132 S.Ct. 1309, 182 L.Ed. 2d. 272 (2012). Mrs. Levitt could not raise the issue because she said it created a conflict of interests for her because she was the attorney of record on the first Rule 32 and the direct appeal. Mrs. Levitt advised the defendant that the law does apply back to defendant's first Rule 32, and that it invalidates the state court's decisions in the 2nd Rule 32.

Therefore, based on the change of law in Martinez, Ibid, invalidating the court's ruling in the 2nd Rule 32, defendant requests the court allow him to file a Rule 32 presenting the claim that counsel in the first Rule 32 was ineffective for failing to present evidence of constitutional violations including: Jurors being allowed to drink alcohol and socialize with the victims during recess periods, the sheriff shackling the defendant with a stunbelt without a hearing being held before the judge to show cause for shackling, the state's failure to disclose under Brady that state's witness T. Godfrey was given a plea bargain in return for trial testimony, and the state's failure to disclose that DNA results had been inconclusive as to whether the victim's blood was in the defendant's car. Each of these claims were deemed waived because direct appeal counsel did not raise them, and Rule 32 counsel did not raise them in the Rule 32 of right, ie., first Rule 32. This court's prior ruling that there is no

3 f

right to counsel in the first Rule 32 has now been overturned in Martinez v. Ryan by the U.S. Supreme Court and the defendant should now be allowed to re-raise the claim that counsel was ineffective in the first Rule 32. And the Court should appoint counsel to perfect the Rule 32.

   Attorney Robert D. Roberto works the Bisbee, AZ. area and would be a good candidate for appointment.

Exhibit 1

FILED

Time _____ M

AUG 23 1995

DENISE LUNDIN GLASS
CLERK SUPERIOR COURT
BY _____ DEPUTY

## SUPERIOR COURT OF ARIZONA
### COUNTY OF COCHISE

**Date August 21, 1995**

OFFICE DISTRIBUTION

| | APPEALS
| | BONDS - REFUND/FORFEITURE
|xx| FINES/ATTY. FEES/RESTITUTION Jack Kennedy
| | ATTORNEY: APPT & CLAIMS
|xx| COUNTY ATTY./Gerald F. Till
|xx| DEFENSE ATTY./Ralph Malanga, Esq.
|xx| ARIZONA DEPART OF CORRECTIONS
|xx| C.C.S.O. JAIL
|xx| ADULT PROBATION DEPARTMENT
|xx| MAILED _8 24 95
CASE _____

**STATE OF ARIZONA**                vs.        **EARL FELTON CRAGO, JR.**
                                                Date of Birth: **10-16-71**

---

## SENTENCE OF IMPRISONMENT

CASE NO: **CR94000471**

JUDGE **HONORABLE MATTHEW W. BOROWIEC**          DENISE LUNDIN GLASS, CLERK
DIVISION **One**
COURT REPORTER **Merle R. Briefer**             By Stephanie L. Williams 8/__/95, Deputy
ADDRESS & PHONE                                  Docketed by _____

---

**2:13 p.m.**  The State is represented by **Deputy County Attorney, Gerald F. Till**; the Defendant is present with counsel, **Ralph Malanga, Esq.**

Court Reporter, **Merle R. Briefer** is present.

The Defendant is advised of the charge, the determination of guilt and is given the opportunity to speak.

Pursuant to A.R.S. Section 13-607, the Court finds as follows:

|XX| JURY VERDICT  The determination of guilt was based upon a verdict of guilty after a jury trial.

THE RECORD MAY SHOW Stanley Davidson, grandfather of the victim, addressed the court and Lottie Ross, sister of the victim, addressed the court.

Page 1

| One<br>Div | August 21, 1995<br>Date | HONORABLE MATTHEW W. BOROWIEC<br>Judge | Stephanie L. Williams<br>Deputy |
|---|---|---|---|

No. **CR94000471**     STATE vs **EARL FELTON CRAGO, JR.**

Having found no legal cause to delay rendition of judgment and pronouncement of sentence, the Court enters the following judgment and sentence:

IT IS THE JUDGMENT OF THE COURT that the Defendant is guilty of the following crime(s), that upon due consideration of the facts, law and circumstances relevant here, the Court finds that suspension of sentence and a term of probation are not appropriate and that a sentence of imprisonment with the Department of Corrections is appropriate.

THE COURT FURTHER FINDS that there are circumstances sufficiently substantial to call for a **LIFE** term as indicated on the following page. These circumstances are stated by the Court on the record.

AS PUNISHMENT, IT IS ORDERED that the Defendant is sentenced to a term of imprisonment and is committed to the Arizona Department of Corrections as follows:

168

| One Div | August 21, 1995 Date | HONORABLE MATTHEW W. BOROWIEC Judge | Stephanie L. Williams Deputy |
|---------|---------------------|-------------------------------------|------------------------------|

No. CR94000471    STATE vs EARL FELTON CRAGO, JR.

OFFENSE:                            murdered Carl H. Davidson, Jr.

FELONY CLASS:                       class one (1) felony and Count II of the Indictment

IN VIOLATION OF A.R.S. §§:          13-1105, 13-1101, 13-604, 13-703 and 13-701

DATE OF OFFENSE:                    on or about the 28th day of September, 1994

SENTENCE:                           committed to a LIFE term in the Department of Corrections

| |  | NONDANGEROUS   |XX|  DANGEROUS PURSUANT TO A.R.S. §13-604

|XX|  NONREPETITIVE   | |   REPETITIVE PURSUANT TO A.R.S. §13-604

| |  NONDANGEROUS BUT VIOLATIVE OF A.R.S. §13-604.01(B)      | |    DANGEROUS AND VIOLATIVE OF A.R.S.§13-604.01(A)

This sentence is to date from **this date, August 21, 1995.** The Defendant is to be given credit for **337 days** served prior to sentencing.

**IT IS ORDERED:** That the Defendant must serve every day of twenty-five (25) years of the sentence imposed before he is eligible for any type of release.

**IT IS FURTHER ORDERED:** That pursuant to A.R.S. §13-603(1), the Defendant will be required to do mandatory community supervision sentence—one day for every seven days sentenced to, for a total of 3 years, 7 months.

## RESTITUTION

IT IS ORDERED: That the Defendant shall pay restitution to the victim of this crime for their economic loss through the Clerk of the Superior Court, P.O. Drawer CK, Bisbee, AZ 85603, in the total amount of $3,610.00.

Page 3

| One<br>Div | August 21, 1995<br>Date | HONORABLE MATTHEW W. BOROWIEC<br>Judge | Stephanie L. Williams<br>Deputy |
|---|---|---|---|

No. CR94000471      STATE vs EARL FELTON CRAGO, JR.

### ATTORNEY'S FEES

**IT IS ORDERED:  That the Defendant shall reimburse Cochise County for the costs of legal representation through the Clerk of the Superior Court, P.O. Drawer CK, Bisbee, AZ 85603, in the total amount of $7,000.00.**

The Court advised the Defendant of his right to appeal and written notice of those rights is provided to the Defendant.

ORDERED remanding the Defendant to the custody of the Sheriff of Cochise County and authorizing the Sheriff to deliver the Defendant to the custody of the Arizona Department of Corrections and authorizing the Department of Corrections to carry out the term of imprisonment set forth herein.

ORDERED that the Clerk of the Superior Court shall remit to the Department of Corrections a copy of this Order, together with all pre-sentence reports, probation violation reports, medical and psychological reports relating to the Defendant and involving this cause.

Let the record reflect that the Defendant's fingerprint is permanently affixed to this Sentencing Order in Open Court.

FILED: Notice of Rights of Review after Conviction, signed by the Defendant and Defendant's handwritten statement read to the court.

**2:37 p.m.** Hearing Concludes.

JUDGE OF THE SUPERIOR COURT

Page 4

Exhibit 2

**ARIZONA DEPARTMENT OF CORRECTIONS**
**RELEASE DATE CALCULATION**
**FOR OFFENSES COMMITTED ON OR AFTER JANUARY 1, 1994**

NAME: *Crago, Earl*   ADC#: *115357*   BY: *R. J. Smith*

CAUSE#: *94000471*   LOCATION: *Florence   CB-6*

Reason for Time Computation:

Tentative Release Dates are projected upon placement or return to Class I effective _____ *N/A*

[ ] Initial
[ ] Change in time credits to Class ____ eff. _____ for _____ days.
[ ] Change in Sentence
[ ] Forfeiture of _____ days release per Director's letter dated _____
[ ] Extension of Class _____ for _____ days, eff. _____
[✓] Other _____

*N/A* **TEMPORARY RELEASE DATE**

*N/A* **ERCD/COMM.SUPER.DATE**

*9-17-2019* SED/COMM.SUPER.DATE

*4-13-2023* COMMUNITY SUPER.END DATE

The Earned Release Credit Dates are projected and reflect release credits earned and to be earned. In accordance with ARS 41-1604.10, release credits earned do not reduce the term imposed. This change in law was effective 08-13-86. The Sentence Expiration date will not change.

Earned release credits only affect the Earned Release Credit Date. When earned release credits plus the actual time served by the inmate equals the sentence imposed by the court, the inmate has achieved his/her Earned Release Credit Date.

Date Computed: *3-7-96*

TIME COMPUTATION

**"INMATE COPY"**

DISTRIBUTION: WHITE - C.O. FILE  YELLOW - INMATE  PINK - INSTITUTION FILE

Form: 41001029
Rev: 04/19/94

"SED" means "Sentence Expiration Date"

Exhibit 3



| Last Name | First Name | Middle Initial |
|-----------|-----------|----------------|
| CRAGO | EARL | F |

| Gender | Height (inches) | Weight | Hair Color |
|--------|-----------------|--------|------------|
| MALE | 70 | 165 | BROWN |

| Eye Color | Ethnic Origin | Custody Class | Inmate/Detainee |
|-----------|---------------|---------------|-----------------|
| BLUE | CAUCASIAN | 5/5 | INMATE |

| Sentence | Admission | Prison Release Date | Max End Date |
|----------|-----------|---------------------|--------------|
| Sentence Information Below | 08/24/1995 | | DEATH OR LIFE |

| Cur. Absconded | Hist. Absconded | Release Type | Most Recent Loc | Unit |
|----------------|-----------------|--------------|-----------------|------|
| -N- | -- | RECEIVED FROM | EYMAN | |

| Community Supervision Parole | Last Movement | Commitment Status | Status |
|------------------------------|---------------|-------------------|--------|
| N | 05/08/2019 | COMPLETE AND VERIFIED | ACTIVE |

Inmate 115357

This only applies to AZDOC Supervision.

Earned Credit Release Date is provided for guidance. Confirmation can be sought by contacting ADC.

Details of inmate offenses can be accessed by reviewing the case file at the Office of the Clerk of the Court where the case was adjudicated.

## Commitment Information *3 record(s)*

| Commit# | Sentence yy/mm/dd | Sentence County | Court Cause# | Offense Date | Sentence Status | Crime | Crime Info | Felony Class | Ruling | Verified |
|---------|-------------------|-----------------|--------------|--------------|-----------------|-------|-----------|--------------|--------|----------|
| A02 | LIFE | COCHISE | 9400471 | 09/28/1994 | IMPOSED | MURDER 1ST DEGREE | D/NR | CL1 | Y | YES |
| B01 | 1 Y/ 6 M/ 0 D | PINAL | 2002-01308 | 10/23/2000 | IMPOSED | AGGRAVATED ASSAULT | ND/NR | CL5 | N | YES |
| B02 | 1 Y/ 6 M/ 0 D | PINAL | 2002-01308 | 10/23/2000 | IMPOSED | AGGRAVATED ASSAULT | ND/NR | CL5 | Y | YES |

## Sentence Information *3 record(s)*

| Commit# | Sentence yy/mm/dd | Admit Date | Consec/ Concur | Release Date(s) | Supervision End | Sentence Expiration | Flat Maximum |
|---------|-------------------|------------|----------------|-----------------|-----------------|---------------------|--------------|
| A02 | LIFE | 08/21/1995 | | 12/31/9999 | 12/31/9999 | 12/31/9999 | 12/31/9999 |
| B01 | 1 Y/ 6 M/ 0 D | 04/22/2004 | Consecutive: A02 | 12/31/9999 | 12/31/9999 | 12/31/9999 | 12/31/9999 |
| B02 | 1 Y/ 6 M/ 0 D | 04/22/2004 | Concurrent: B01 | 12/31/9999 | 12/31/9999 | 12/31/9999 | 12/31/9999 |

## Disciplinary Infractions *56 record(s)*

| Violation Date | Infraction | Verdict Date | Verdict |
|----------------|-----------|--------------|---------|
| 02/12/2019 | POSS OF COMMUNICATION DEVICE | 04/01/2019 | GUILTY-MAJ.VIOL |
| 02/08/2019 | PROMOT PRISON CONTRABAND | 03/13/2019 | GUILTY-MAJ.VIOL |
| 12/26/2017 | POSS OF COMMUNICATION DEVICE | 01/09/2018 | GUILTY-MAJ.VIOL |
| 09/12/2016 | POSS OF COMMUNICATION DEVICE | 11/03/2016 | GUILTY-MAJ.VIOL |
| 09/12/2016 | CONSPIRACY TO COMMIT CL B FEL | 11/03/2016 | GUILTY-MAJ.VIOL |
| 09/08/2016 | CONSPIRACY TO COMMIT CL B FEL | 11/03/2016 | GUILTY-MAJ.VIOL |
| 03/01/2016 | CONSPIRACY TO COMMIT CL B FEL | 03/04/2016 | GUILTY-MAJ.VIOL |
| 09/27/2014 | FIGHTING | 09/27/2014 | GUILTY-MIN.VIOL |
| 02/18/2014 | DISORDERLY CONDUCT | 03/19/2014 | GUILTY-MAJ.VIOL |
| 01/06/2013 | POSS/MANUF INTOXICTNG SUBSTNC | 01/10/2013 | GUILTY-MAJ.VIOL |
| 08/25/2012 | THREATENING OR INTIMIDATING | 09/13/2012 | GUILTY-MAJ.VIOL |
| 08/25/2012 | DISRUPT COUNT OR OUT OF PLACE | 09/12/2012 | DISMISS-COUNSEL |
| 05/09/2012 | DISORDERLY CONDUCT | 06/15/2012 | GUILTY-MAJ.VIOL |
| 01/20/2012 | DISORDERLY CONDUCT | 02/08/2012 | GUILTY-MAJ.VIOL |
| 10/17/2011 | DISRUPT COUNT OR OUT OF PLACE | 10/27/2011 | GUILTY-MAJ.VIOL |
| 12/02/2009 | DISORDERLY CONDUCT | 01/06/2010 | GUILTY-MAJ.VIOL |
| 08/19/2009 | DISORDERLY CONDUCT | 09/10/2009 | NOT GLT-MAJ.VIO |
| 12/26/2008 | FIGHTING | 01/06/2009 | GUILTY-MAJ.VIOL |
| 10/14/2008 | DISRESPECT | 10/22/2008 | GUILTY-MAJ.VIOL |
| 09/30/2008 | DISOBEYING ORDER | 10/06/2008 | GUILTY-MIN.VIOL |
| 04/02/2008 | DISORDERLY CONDCT | 04/04/2008 | GUILTY-MIN.VIOL |
| 02/03/2008 | LYING TO OFFICIAL | 02/03/2008 | GUILTY-MIN.VIOL |
| 02/27/2007 | THEFT/POSSN PROP | 03/14/2007 | DISMS.-PROC.ERR |
| 07/02/2006 | FIGHTING | 07/14/2006 | GUILTY-MIN.VIOL |
| 06/05/2006 | THREATEN W/HARM | 06/12/2006 | GUILTY-MIN.VIOL |

Exhibit 4

# ARIZONA DEPARTMENT OF CORRECTIONS
# INMATE GRIEVANCE APPEAL RESPONSE



| Log # | Inmate Name | ADC# | Case# | Complex | Unit |
|-------|-------------|------|-------|---------|------|
| 596 | Crago | 115357 | A30-079-005 | Eyman | SMU I |

**Response**

In your grievance filed at SMU I, you claim that you are being denied a full listing of case law reporters needed to research and prepare your Habeas Corpus and Civil Suits.

Associate Deputy Warden Freeland stated in his response that the Department is no longer required to provide a Law Library, but assistance is provided by a Paralegal outlined in Department Order 902. If you do not meet the criteria you may seek outside legal assistance at your own expense.

Your grievance appeal has been reviewed. Department Order 902 does not require that you be provided access to case laws. You may independently obtain a listing of case laws through an outside source at your own expense.

The grievance response provided at the unit level is affirmed and appropriate.

cc: Sam Sublett, Division Director, Offender Operations
    John Ontiveros, Warden, Eyman Complex
    Patrick O'Brien, Deputy Warden, SMU I

cd

_____        08/17/06
**Dora B. Schriro, Director**              **Date**

Distribution: WHITE - Inmate
             CANARY - Unit Grievance File
             PINK - File

802-7D
4/99

EXHIBIT 5

SUPERIOR COURT, STATE OF ARIZONA, In and for the County of Cochise

| | | |
|---|---|---|
| STATE OF ARIZONA,<br><br>                      Plaintiff,<br><br>vs.<br><br>EARL F. CRAGO,<br><br>                    Defendant. | November 14, 2008<br><br>Case No. CR94000471<br><br>ORDER (926) | FILED<br><br>2008 NOV 14  PM 2:47<br><br>DENISE I. LUNDIN<br>CLERK OF SUPERIOR COURT<br><br>BY _____ |
| **HONORABLE WALLACE R. HOGGATT**<br>**DIVISION THREE** | | By: Glendalynn Cobb (11/14/08)<br>Judicial Administrative Assistant |

Defendant has filed a "Petition for Special Action," alleging that although he had been sentenced to life imprisonment with the possibility of parole after serving 25 years, the Department of Corrections is treating his sentence as a natural life sentence without the possibility of parole. On March 18, 2008, Defendant filed a Petition for Writ of *Habeas Corpus*, in which he made substantially the same argument. The Court treated the petition for writ of *habeas corpus* as a Rule 32 Petition, and appointed counsel for Defendant. On June 11, 2008, counsel filed a "Notice of Completion Pursuant to Rule 32 and Motion for Extension of Time for *Pro Se* Petition; Motion to Withdraw," in which counsel stated that he investigated this matter and also spoke with a named individual from the Time Computation Unit of the Arizona Department of Corrections. In his notice, defense counsel stated as follows:

> Mr. Crago is again seeking relief pursuant to Rule 32, Arizona Rule [sic] of Criminal Procedure, alleging that Arizona Department of Corrections records reflect a sentence different from the one imposed by the Court. The only ground for relief pursuant to Rule 32, Arizona Rule [sic] of Criminal Procedure, is Rule 32.1 (d), which provides for relief if the person *is being held in custody after the sentence imposed has expired.*

> Mr. Crago will not be eligible for release until he has served twenty-five calendar years. The twenty-five year period will expire around the year 2019. At this time, in 2008, the issue is not ripe because Mr. Crago's sentence has not expired.

> Additionally, Mr. Bailey [the official in the DOC Time Computation Unit] avows that the calculation of Mr. Crago's sentence is being handled in the same way as other persons sentenced to a term of twenty-five to life in the Arizona Department of Corrections. Therefore, unless it can be proved that Mr. Crago's calculations are being handled differently from others similarly situated, there are no grounds upon which to file a Petition for Special Action either.

> Counsel has found no additional grounds for Rule 32 relief and has no basis upon which to file a petition. ... [Emphasis in original.]

COURT ORDER/RULING          Date: November 14, 2008          Case No. CR94000471

This Court gave Defendant additional time within which to file a *pro se* petition for post-conviction relief, but did not do so.  Therefore, on November 06, 2008, this Court dismissed the post-conviction relief proceedings.

Defendant's current petition alleges the same issue previously raised.  He did not present such matters in the form of a pro se petition for post-conviction relief, and he has not filed a petition for review of this Court's order of November 06, 2008.

Accordingly, IT IS HEREBY ORDERED that the Petition for Special Action filed November 10, 2008, is hereby DISMISSED.

DATED this _____14ᵗʰ____ day of _____Nov._____, 2008.

WALLACE R. HOGGATT
JUDGE OF THE SUPERIOR COURT

mailed/distributed: 11-18-08

xc:   Arizona Attorney General; 1275 W. Washington; Phoenix, AZ  85007
      County Attorney – Doyle Johnstun, Esq.
      Earl F. Crago, Jr.; ADC #115357; ASPC – Tucson/Manzanita; P. O. Box 24401; Tucson, AZ  85734

EXHIBIT 6

COPY

**SUPERIOR COURT OF ARIZONA**
COUNTY OF COCHISE
Date **August 22, 2001**

OFFICE DISTRIBUTION
APPEALS
BONDS: REFUND/FORFEITURE
FINE/SALTY FEES/RESTITUTION
CHANGE OF VENUE
JURY FEES
ATTORNEY APPT & CLAIMS
SUPPORT
DIVISION

MAILED 8/23/01

FILED
01 AUG 23 AM 8: 30

CASE:  **STATE OF ARIZONA,**        VS.    **EARL F. CRAGO, JR.**
       Plaintiff                          Defendant

---

MINUTE ENTRY ACTION: **DECISION - POST CONVICTION RELIEF RULING (119)**        CASE NO.: **CR94000471**

---

JUDGE **HONORABLE CHARLES A. IRWIN**            DENISE I. LUNDIN, CLERK
DIVISION **FOUR**
COURT REPORTER  ———————            By **Heidi Tanner (08/22/01),** Deputy (dp)
ADDRESS & PHONE                    Docketed by _____

PRESENT:    ———————

---

The Court having duly reviewed the Petition (May 29, 2001), the Response (June 20, 2001), and the Reply (July 6, 2001) filed herein, as well as the files and records contained within the record, and determines that no material issue of fact or law exists which would entitle Defendant to relief.

**THEREFORE, IT IS ORDERED: DISMISSING** the Petition.

This Order is based upon the following **FINDINGS**

1. After a jury trial, Defendant was convicted of first-degree murder and the trial Court sentenced him to life imprisonment.

2. A consolidated Appeal and Petition for Review was filed and the trial Court summarily dismissed the Defendant's first Petition for Post-Conviction Relief.

3. The Appellate Court affirmed Defendant's conviction and sentence on appeal but remanded the case for an evidentiary hearing on two issues of ineffective assistance of counsel raised in Defendant's Rule 32 Petition (memorandum decision filed March 18, 1999).

4. After the evidentiary hearing was held, the trial Court again dismissed Defendant's Petition for Post-Conviction Relief, finding that he had been provided effective trial counsel.

5. Defendant filed his Petition for Review of the Court's dismissal with the Appellate Court, which granted review but DENIED relief (memorandum decision filed March 13, 2001). Defendant's Petition for Review to the Supreme Court was DENIED.

6. On May 7, 2001, Defendant filed his 2nd Notice of Post-Conviction Relief, followed by the Petition herein alleging his counsel in the preceding Post-Conviction proceeding was ineffective due to her unwillingness

COPY

to accuse the trial judge of falsifying "the facts of evidence/record in his minute entry decision to support his ruling denying relief."

Based upon the above **FINDINGS**, the Court notes as a matter of law that Defendant's Sixth Amendment right to counsel does not extend to state collateral proceedings. <u>Bonin v. Vasquez</u>, 999 F.2d 425, 430 (9th Cir. 1993); <u>State v. Mata</u>, 185 Ariz 319, 336 (1996).

Defendant having failed to present a material question of fact or law having any appearance of validity, THEREFORE, his 2nd Petition for Post-Conviction Relief is **SUMMARILY DISMISSED**. Rule 32.6(c), Arizona Rules of Civil Procedure.

xc:    Gerald Till, Deputy County Attorney
       Earl F. Crago #115357, ASPC Eyman - SMU-2, P.O Box 3400, Florence, AZ 85232
       Karina Rubio, Appeals Clerk

EHXIBIT 7

IN THE COURT OF APPEALS
STATE OF ARIZONA
DIVISION TWO

FILED BY CLERK

FEB 1 9 2002

COURT OF APPEALS
DIVISION TWO

| | | |
|---|---|---|
| THE STATE OF ARIZONA, | ) | |
| | ) | 2 CA-CR 01-0381-PR |
| Respondent, | ) | DEPARTMENT B |
| | ) | |
| v. | ) | MEMORANDUM DECISION |
| | ) | Not for Publication |
| EARL FELTON CRAGO, JR., | ) | Rule 111, Rules of |
| | ) | the Supreme Court |
| Petitioner. | ) | |
| | ) | |

PETITION FOR REVIEW FROM THE SUPERIOR COURT OF COCHISE COUNTY

Cause No. CR94000471

Honorable Charles Irwin, Judge

REVIEW GRANTED; RELIEF DENIED

Chris M. Roll, Cochise County Attorney
 By Gerald F. Till

Bisbee
Attorneys for Respondent

Earl F. Crago, Jr.

Florence
In Propria Persona

H O W A R D, Presiding Judge.

¶1        After a jury trial, petitioner Earl Felton Crago, Jr., was convicted of first-degree murder and was sentenced to life in prison. He filed a petition for post-conviction relief pursuant to Rule 32, Ariz. R. Crim. P., 17 A.R.S., raising claims of ineffective assistance of trial counsel, which the trial court summarily dismissed. A consolidated appeal and petition for review of the trial court's dismissal followed. We affirmed petitioner's conviction and sentence on appeal but remanded the case for an evidentiary hearing on two claims of ineffective assistance of trial

counsel. *State v. Crago*, Nos. 2 CA-CR 95-0488, 2 CA-CR 98-0230-PR (consolidated) (memorandum decision filed March 18, 1999).

¶2    Following an evidentiary hearing, the trial court found that trial counsel had not been ineffective and again dismissed the petition for post-conviction relief. Petitioner then sought review of that dismissal. We denied relief, finding that the trial court had not abused its discretion in rejecting petitioner's claims. *State v. Crago*, No. 2 CA-CR 00-0259-PR (memorandum decision filed March 13, 2001). Petitioner then filed a second petition for post-conviction relief, claiming that counsel in the first post-conviction proceeding had been ineffective. The trial court summarily dismissed that petition, and petitioner then filed this petition for review, asking that we vacate his conviction and remand the case for a new trial. We will not overturn a trial court's denial of post-conviction relief absent an abuse of discretion. *State v. Schrock*, 149 Ariz. 433, 719 P.2d 1049 (1986).

¶3    In remanding this matter to the trial court for an evidentiary hearing, we found, inter alia, that petitioner had presented a colorable claim that trial counsel had been ineffective in failing to investigate and present evidence about the mechanical condition of petitioner's vehicle at the time of the homicide to support his claim that he had shot the victim in self-defense because he had been unable to leave the scene in his car. In denying relief following the evidentiary hearing, the trial court found that counsel had not been ineffective, stating:

> Whether or not the key was broken in the ignition was of no moment to this court, which accepted that point as fact. It nevertheless does not bring into application the law of self-defense. One cannot avail himself of the law of justifiable homicide by shooting another in the back on the belief, reasonable or otherwise, that the person was going to get a gun to kill the defendant.

¶4    To prove ineffective assistance of counsel, a defendant must show that counsel's performance was deficient and fell below an objective standard of reasonableness and that the

2

deficient performance prejudiced the defendant. *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. Nash*, 143 Ariz. 392, 694 P.2d 222 (1985). Petitioner contends that, in denying his second Rule 32 petition, the trial court "threw out the factual findings of the Appellate Court [and] reversed their ruling," thus committing fundamental error. He also argues that, because he had presented a colorable claim of ineffective assistance of Rule 32 counsel, he was entitled to an evidentiary hearing on that claim.

¶5      To the extent we understand petitioner's argument, he seems to be claiming that, when we found he had presented a colorable claim of ineffective assistance of trial counsel and remanded the case to the trial court for an evidentiary hearing, we made a factual finding that counsel had, in fact, been ineffective. He thus contends that Rule 32 counsel was ineffective for failing to show that the trial court had falsified facts to support its own ruling in defiance of this court's "factual finding." Contrary to petitioner's belief, we merely found that he had raised a colorable claim, that is, one that, if true, "might have changed the outcome." *Schrock*, 149 Ariz. at 441, 719 P.2d at 1057. We thus remanded this matter to the trial court for an evidentiary hearing in that court to determine whether counsel had been ineffective. The trial court's ruling was, of course, subject to our review by a petition for review, which petitioner ultimately filed.

¶6      As we found in our denial of that petition for review:

> Based on this record, we do not find that trial counsel was ineffective in failing to present evidence about the status of petitioner's ignition. Because petitioner himself testified that he did not always remove the master fuse and because no one else could testify that he always removed it or that he had removed the fuse that morning, counsel was entitled to conclude, as he did, that it was not relevant or material whether petitioner would have removed the fuse at 4:00 or 5:00 a.m. in a residential neighborhood where he had simply stopped to pay a debt. In addition, counsel had relied on the facts that petitioner's vehicle was unavailable for examination and that petitioner had not made his self-defense claim to the police. . . . Because petitioner had testified that he had believed [the

3

victim] was trying to run into Cissy's house to retrieve his rifle, the court concluded he would not have been entitled to a self-defense instruction on that theory. We agree.

Because we found that the trial court had not abused its discretion in denying petitioner's claim of ineffective assistance of trial counsel, it follows that Rule 32 counsel was not ineffective either.

¶7        Moreover, petitioner filed an appeal in which he was represented by counsel. As the trial court correctly noted, the right to counsel does not extend to collateral proceedings like this one. *See State v. Mata*, 185 Ariz. 319, 916 P.2d 1035 (1996). In that case, the supreme court rejected the notion that a defendant should be permitted to file endless claims of ineffective assistance of counsel, stating that to do so would entitle the defendant "not to effective representation, but to perpetual representation." *Id.* at 336, 916 P.2d at 1052. We note, in addition, that petitioner is mistaken that we are required to search the record for fundamental error on a petition for review from the denial of post-conviction relief. *See State v. Smith*, 184 Ariz. 456, 910 P.2d 1 (1996).

¶8        The petition for review is granted, but relief is denied.


_____
JOSEPH W. HOWARD, Presiding Judge

CONCURRING:


_____
PHILIP G. ESPINOSA, Chief Judge


_____
WILLIAM E. DRUKE, Judge

4



EXIBIT 8

1           IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2               IN AND FOR THE COUNTY OF COCHISE

3

4    STATE OF ARIZONA,          )
                                )
5          Plaintiff,           )
                                )
6    vs.                        )        CR94000471
                                )
7    EARL FELTON CRAGO JR.,     )
                                )
8          Defendant.           )
                                )
9    _____)

10

11          REPORTER'S TRANSCRIPT OF PROCEEDINGS  (ON APPEAL)
                        August 21, 1995

12

13   APPEARANCES: MR. GERALD TILL
                  Deputy County Attorney
14                For the State

15                MR. RALPH MALANGA
                  Attorney at Law
16                For the Defendant

17

18

19   BEFORE:  THE HONORABLE MATTHEW W. BOROWIEC

20

21

22   _____
                  MERLE RHODES BRIEFER
23      Court Reporter, Cochise County Superior Court
                      Drawer CT
24              Bisbee, Arizona  85603
                    (520) 432-9332
25

Sentence Transcripts                                             1-A

1

2                          I N D E X

3

4     WITNESS                                          PAGE

5   Ms. Virginia Cluen

6         Direct Examination by Mr. Malanga              9

7         Cross-examination by Mr. Till                 12

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

1
2
3
4
5
6      THE COURT:  This is State of Arizona vs. Earl
7  Felton Crago Jr., CR94000471.
8      MR. MALANGA:  Ralph Malanga for Mr. Crago,
9  present in custody.
10      THE COURT:  All right.
11      MR. MALANGA:  Something has come to my attention
12  I would like to address the court about.  It seems
13  under Rule 24, one of the aspects of Rule 24 is newly
14  discovered evidence.
15          Yesterday I spoke to a woman named Amy
16  Slaughter, who -- and the reason I am informing the
17  court at this point -- I don't know whether the court
18  would like me to supplement the Rule 24 or not.  I
19  think it's significant, but here's what occurred.
20          Ms. Slaughter was at the time of this
21  incident in September of 1994, she was this fellow
22  DeWitz's girlfriend.  Mr. DeWitz, if the court remembers
23  the trial, there was one individual -- and I forgot his
24  name offhand, but I can give it to you.  I think his
25  name is Warren Beel.  He testified for the defense

1    that the evening prior to the shooting he was

2    staying at the trailer and Cissy Brown showed up

3    with a Carl Davidson and another individual looking

4    for Mr. Crago.  The other individual was this Mr.

5    DeWitz.

6              What occurred in this conversation was

7    Ms. Slaughter indicated to me that Mr. DeWitz was

8    released on his own recognizance on a felony charge

9    and fled the jurisdiction.  He's somewhere but he was

10   charged with drugs.

11             She indicated to me that Mr. DeWitz

12   told her Cissy Brown had in fact solicited him and

13   Carl Davidson to work for her in the capacity of

14   taking care of individuals; in other words, killing

15   them or whatever goes on in this drug culture.

16        THE COURT:  There was some testimony to that

17   at trial.

18        MR. MALANGA:  There's some -- there was some

19   testimony -- I'm not sure who it came in from --

20   if it was just Mr. Crago that testified to that.

21             This would certainly add to that.

22   But more importantly, he was arrested the afternoon

23   of the homicide.  And prior to his arrest, he told

24   Amy Slaughter again -- and she was going to be here.

25   She called at noon and said her daughter was sick

4

1   at school.  She didn't have anyone to stay with her.

2   I told her to try to get here.

3          He in fact told her the reason Davidson

4   got killed was because he tried to do the thing alone.

5   He didn't know what he was doing.  He was inexperienced

6   and got himself killed.

7          The gist of it is that Cissy Brown got

8   DeWitz and Carl Davidson to either assault or whatever,

9   kill, Mr. Crago -- whatever her preference was.

10       THE COURT:  Even if that is true, under the

11   circumstances of the case, what difference does that

12   make as far as this charge against Mr. Crago is concerned?

13       MR. MALANGA:  Mr. Crago's defense was self-defense,

14   and there was no real evidence involved that Mr. Davidson

15   was in fact an aggressor  in this situation except what

16   came through Mr. Crago and his testimony regarding the

17   incident outside the house.

18          Everyone else -- Ms. Brown denied that

19   any of that sort of behavior was going on -- that she

20   hired anybody or anything else when she was called on

21   rebuttal.  She indicated that didn't occur.

22          This would give credence to Mr. Crago's

23   theory of the defense that in fact Davidson and DeWitz

24   were supposed to kill him for Cissy Brown or whatever

25   she wanted from them and it would give additional

5

1    evidence as to that theory.

2          The only evidence I understand that came

3    in from my reading of the transcript was Mr. Crago --

4    there was nothing to support that -- and certainly,

5    given that additional information, the jury could

6    conclude Mr. Crago was acting in fear of his life

7    when he acted out there on the morning of the 24th.

8       THE COURT:  Perhaps the initial acts, but from

9    the testimony as Mr. Davidson fled and was shot in

10   the back, that doesn't look like self-defense.

11      MR. MALANGA:  That's true, but apparently there

12   was a weapon inside the house that was available to

13   Mr. Davidson.

14      THE COURT:  There was also a weapon available

15   to Mr. Crago; that is, the automobile.

16          He could have turned the key on and

17   gotten out of there.

18      MR. MALANGA:  That's true.  In terms of the

19   testimony at the trial, that may be significant.

20          Since we have litigated the Rule 24,

21   it may be that this would be a better subject for

22   a Rule 32 being filed with an affidavit.  I don't

23   know how the court would like to proceed.

24      THE COURT:  You've gotten some indication as

25   to my feeling based -- or my belief based on the testimony.

6

1        MR. MALANGA:  Right.

2        THE COURT:  You are entitled to file another

3  motion for new trial based on that but the indication

4  from me is that I don't -- based on the evidence I

5  heard as the trial judge in this, it's going to be

6  denied.

7        MR. MALANGA:  Your Honor, I would prefer to

8  file the motion to preserve the record since this is

9  a class 1 felony.  It's a serious offense.  If it was

10  some other situation, I would not.  I would prefer to

11  file that and prefer to have Ms. Slaughter testify

12  about those facts rather than me giving the secondhand

13  rendition of the facts.

14        It may be that I am not stating it as

15  accurately as possible.

16        THE COURT:  It will be given full faith.

17  Submit an affidavit from her.  I won't take testimony.

18  I will consider it as true.  You are entitled to --

19  and I am satisfied that the motion is going to be

20  denied, but you are entitled to file your motion if

21  you want to do that.

22        Do you want to do that?

23        MR. MALANGA:  I think I should do that.

24        THE COURT:  After sentencing or before?

25        MR. MALANGA:  I should file it before sentencing.

1    THE COURT:  You have 15 days before sentencing
2  to file motions for a new trial.
3    MR. MALANGA:  Is that what the rule says?
4    THE COURT:  I will check it.
5    MR. MALANGA:  If it's 15 after sentencing, I
6  guess we could proceed.
7    THE COURT:  It used to be.
8        Counsel, I don't get too many of these.
9    MR. MALANGA:  I'm not doing this in any way in
10  bad faith.  This is just what I learned.
11    THE COURT:  It's not Rule 24.
12    MR. MALANGA:  It's not?
13    THE COURT:  No.
14    MR. MALANGA:  I don't have the books here.
15    THE COURT:  Is there one on the shelf there?
16        24.1.  It is 24.1
17    MR. MALANGA:  It is Rule 24, is it not?
18    THE COURT:  Well, 24.1.  You have 10 days after
19  the verdict is rendered for a motion for new trial.
20  Sorry.
21    MR. MALANGA:  Motion to vacate judgment --
22    THE COURT:  That's 24.2, and that's 60 days
23  after the entry of judgment.
24    MR. MALANGA:  That's no problem then.
25        I thought if I had to file it prior

1  to sentencing -- I've got 60 days to file it.

2  I can get an affidavit in the file.

3       THE COURT:  Any objection to proceeding?

4       MR. MALANGA:  With sentencing?  No, Judge.

5       THE COURT:  All right.  Will you and your client

6  step up, please.

7       MR. MALANGA:  Before we proceed, I would like to

8  call Mr. Crago's grandmother to testify in mitigation.

9       THE COURT:  Did we set this for a mitigation

10  hearing?

11       MR. MALANGA:  That's why we set it this afternoon.

12  I informed the court I would probably have a witness.

13       THE COURT:  All right.

14

15                    VIRGINIA CLUEN,

16  called as a witness by the defendant, having been

17  first duly sworn, testified, on her oath, as follows:

18

19                  DIRECT EXAMINATION

20

21  BY MR. MALANGA:

22

23       THE COURT:  She already testified?

24       MR. MALANGA:  That was on another motion.

25  That wasn't in mitigation.

1        THE COURT:  How many witnesses do you have?

2              Does the state have any witnesses?

3        MR. TILL:  Not as such.  We may have a victim

4   or two who would like to be heard.

5        THE COURT:  All right.

6        Q      (By Mr. Malanga):  Please state your

7   full name.

8        A      Virginia Cluen.

9        Q      And your occupation?

10       A      I am a caregiver for elderly.

11       Q      Is that your own business?

12       A      Yes, it is.

13       Q      What is your relationship to Mr. Crago?

14       A      I am his grandmother.

15       Q      What I would like to ask you about today

16  is a little bit of Earl's background growing up.

17             Can you tell the court whether or not

18  Mr. Crago had a, quote, normal family life, when he

19  was growing up?

20       A      I think that would depend on your

21  term "normal."

22       Q      I don't want to banter with you.

23       A      I don't either.

24       Q      I will ask a direct question.

25             Is it true that both Mr. Crago's

1   parents were charged with felonies and were out

2   of his life on the lam, so to speak?

3        A      As a child?  No.

4        Q      How old was he when that occurred?

5        A      I think Earl was pretty close to his

6   18th birthday when that occurred.

7        Q      Prior to that, what kind of family

8   life did he have?  His parents apparently were involved

9   in some criminal conduct prior to his 18th birthday.

10  I would say that was not normal.

11              Why don't we go from that position.

12       A      Okay.  I would say his family life was

13  on a par with migrant workers.  His father always

14  saw the grass on the other side of the fence as greener.

15  They moved a lot.  Sometimes they lived high on the hog;

16  sometimes they had nothing. It fluctuated.  You can't

17  say what's normal.  What's normal for what?

18       Q      They had a nomadic lifestyle?

19       A      True.

20       Q      How many children were involved in

21  this situation?

22       A      They have four children -- three boys

23  and one girl.

24       Q      They were all moved around a lot?

25       A      This is true.

1      Q       Are you Earl's father's mother or

2   mother's mother?

3      A       His mother's.

4      Q       Can you describe what kind of person

5   Earl's father was?  Was he abusive to the children?

6      A       His father was physical with the

7   children.  His manner of disciplining Earl and

8   his brothers was to have a free-for-all with them.

9   Once they were big enough, he invited them out.

10      Q       And did whatever?

11      A       That's what they did.

12      Q       Was there alcohol involved?

13      A       His father is an alcoholic.  He's

14   always under the influence of alcohol and I know

15   his father smokes pot.  With the two combined, he

16   becomes --

17      Q       In short, this family could be

18   described as dysfunctional?

19      A       Absolutely.

20      Q       When did Earl come to -- was he

21   living with you at some point?

22      A       All of those children have lived with

23   me at some point.

24      Q       He was living in Phoenix with you?

25      A       Right.

1    Q        And do you know how long it's been

2  since Earl has seen his mother and father at all,

3  had any contact with them?

4    A        I think Earl saw his mother and

5  father last year.

6    Q        Is this on an infrequent basis that

7  they see each other?

8    A        Yes.

9    Q        Would you say that this family life

10  that he participated in as a child contributed to

11  the problems he has had as an adult?

12    A        I think all children's family life

13  contributes to what they do as an adult.  So yeah.

14    MR. MALANGA:  That's all I have.

15    THE COURT:  Mr. Till, any questions?

16    MR. TILL:  Just a couple.

17

18                    CROSS-EXAMINATION

19

20  BY MR. TILL:

21

22    Q        Did you say you had the defendant

23  living with you in Phoenix for some time?

24    A        Yes.

25    Q        For a short period of time or for some time?

1      A      He stayed with me for a year one time

2 and then he would be there for four, five months or

3 three months.

4      Q      How old was he the first time you had

5 him?

6      A      When he first came to my home, he was

7 just between 17 and 18.

8      Q      That's when he lived with you for a year?

9      A      Yes.

10      Q      Did you provide him a good home when

11 he was there?

12      A      I thought so.

13      Q      Were you married at the time yourself?

14      A      Yes.

15      Q      So you had his grandfather with you

16 helping to care for him?

17      A      Yes.

18      Q      And did you have children of your own

19 that you had in the home as well?

20      A      No, my children are all grown.  My

21 youngest daughter is one year older than Earl.  She

22 was married.

23      Q      What type of work do you do?

24      A      I have an adult foster care home.

25      Q      Were you doing that at the time?

1.

```
 1        A       Yes.

 2        Q       At that time was his mother or father

 3   in prison, do you know?

 4        A       No, they were not.

 5        Q       He has a brother in prison?

 6        A       Yes, he does.

 7        Q       In Colorado?

 8        A       Yes.

 9        MR. TILL:  That's all I have.

10        THE COURT:  Anything further?

11        MR. MALANGA:  Nothing further.  No further

12   questions.

13        THE COURT:  You may step down.

14             Is there anything further, counsel?

15   Any other witnesses?

16        MR. MALANGA:  Not for the defendant.

17        THE COURT:  Then we can proceed to sentencing.

18             Will you have your client approach the

19   lectern, please.

20             You are Earl Felton Crago Jr.?

21        DEFENDANT CRAGO:  Yes.

22        THE COURT:  You are 22 years of age; is that right?

23        DEFENDANT CRAGO:  Yes, sir.

24        THE COURT:  By reason of the verdict of the

25   jury on the 7th day of April, 1995, wherein you were
```

1  found guilty of murder in the first degree, a class

2  1 felony, in violation of Arizona Revised Statutes

3  section 13-1105, committed on or about the 28th day of

4  September, 1994, it is the judgment of this court that

5  you are guilty of this crime of murder in the first degree.

6         Does the state have a recommendation to

7  the court?

8     MR. TILL:  Yes, Your Honor, we do.

9         Before I speak, I would like to ask if

10  there are any victims who want to address the court.

11         Mr. Stanley Davidson?

12     THE COURT:  He can use the microphone at your

13  table, Mr. Till.

14     MR. MALANGA:  Would you like us to be seated?

15     THE COURT:  Yes, why don't you be seated for now.

16     MR. TILL:  Would you tell the court your name.

17     MR. DAVIDSON:  My name is Stanley Davidson.

18  I am Carl Davidson's grandfather.  No outbursts today,

19  Your Honor.

20         While I was in church yesterday, it came

21  to me that I committed a sin Friday letting my emotions

22  overcome my brain and my tongue.  I asked the Lord's

23  forgiveness and at this time I would like to ask the

24  forgiveness of the defense counsel.

25         This last almost 11 months has been a

1   very traumatic time for my family.  This grandson of

2   ours, which we -- well, the first ten years of his

3   life, we had him approximately half the time.  From the

4   time he was ten years old until he reached his majority,

5   we were his legal guardians.  He was very close to us.

6   And even in the last few years -- well, for a while, when

7   he was in California, we didn't see him often, but when

8   he was here invariably we would see him two or three

9   times a week.

10           One of his sisters would see him practically

11   every day.  He was living with her.

12           The funeral there had to be a closed

13   casket.  We had services at the cemetery.  I took my

14   wife down there.  She couldn't attend the services.

15   She collapsed and had to be taken home.  She still can't

16   build up whatever it takes to go to the cemetery.  It's

17   been very traumatic.  We loved that child as if he was

18   our very own.  We raised him as if he was our very own.

19   And it's been very hard.  It's still hard and it will

20   continue to be hard and I ask the court to take that into

21   consideration.

22           Thank you, Your Honor.

23       THE COURT:  Thank you, Mr. Davidson.

24           Any questions?

25       MR. MALANGA:  No.

1      MR. TILL:  I'm not sure if there are any others.

2   I believe the victim's two sisters are present.   I

3   don't know if they wish to address the court or not.

4            Tell the court your name.

5      MS. ROSS:  My name is Lottie Ross.

6            I don't think that's a very good excuse

7   for what he did, saying that he had a dysfunctional

8   family.

9            Charlie didn't have that good of a life

10   neither, and he's only what, 23, 24 years old, and he

11   can go out and kill somebody?  There ain't no reason

12   for that.

13            Charlie wasn't an angel.  I mean, yeah,

14   he did drugs.  They found it in his system.  But he

15   wasn't out there selling drugs to your kids or my

16   kids like he was.

17            It's very easy to sit there and make

18   somebody out to be a bad person like the plaintiffs

19   (sic) did when Charlie is not here to defend himself.

20            He wasn't an angel.  Yeah, he went to

21   jail for domestic violence and DWI's, but he never

22   did anything bad enough, you know, like killing somebody.

23            Nobody here knows his ex-girlfriend, the

24   one that he went to jail several times for domestic

25   violence with.  I don't see how people can sit here and

1    say he was a bodyguard for that woman.  When you see

2    the size of her, she don't need no bodyguard.

3            And if he was a bodyguard or a drug dealer,

4    he would have had a lot more money than he had in his

5    pocket.  And if he had a chance to grab a weapon, he

6    probably would have taken a weapon out there the first

7    time, as he said, when he had to strangle him through

8    his car.

9            We are talking about somebody that was

10   afraid to get a tattoo.  He wasn't into pain.  He never

11   did anything to hurt anybody, and I think he is

12   mistaken in his reasons for shooting him.  I don't think

13   he shot the right person, and I don't know how many

14   years you are going to give him.

15           But he obviously, in my eyes, doesn't

16   have any remorse for what he did.  Prison doesn't

17   help people anyways.  They have no form of, I guess,

18   reforming them, letting them get back into society,

19   it just makes them even worse.

20           And I think after 25 years, I think

21   he's going to be too institutionalized to get back on

22   the street.  He's going to be a threat not only to

23   himself but to everybody else.

24           He is only 23 or 24 years old right

25   now.  What is he going to be like then?

1          I think you should give him as many

2     years as you possibly can.

3          THE COURT:  Any questions?

4          MR. MALANGA:  No, Judge.

5          THE COURT:  Anybody else?  Any other relatives.

6     All right.

7               Mr. Till, do you have a recommendation

8     to the court?

9          MR. TILL:  Yes, Judge.

10               It appears that the court really has

11    in this case really two options.  One is the life in

12    prison as mandated however subject to parole in 25

13    years, and the other is natural life in prison.

14               I believe the last witness addressed the

15    court and summed it up quite well.

16               This was a victim who was unarmed, who

17    was shot in the back.  There was no attempt to save

18    that individual or commit anyone else to save him

19    since he was dumped in the desert.

20               The defendant himself admitted his

21    involvement in the drug trade, which he testified he

22    was aware anybody could get killed at any given time

23    in that line of work.

24               He will be probably 47 years old when

25    he gets out if he is given the opportunity for parole

1    in 25 years.

2            There is enough information we know about

3    him to show that he's a real threat to society.

4            And for that reason and that reason alone,

5    we would ask that the court impose the sentence of

6    natural life; that being really something I believe the

7    court has discretion to do.

8            I believe that fits this particular case.

9    Thank you.

10       THE COURT:  Mr. Malanga?

11       MR. MALANGA:  Thanks, Judge.

12           Judge, this court has been involved

13   in numerous homicide cases.  I know the court has

14   been sitting for a long time.  I have been involved

15   in numerous homicide cases also and I have -- I

16   think the natural life law is written for those cases

17   that are especially egregious in nature, and I am not

18   underplaying in any way this case.

19           I know the victims are sensitive to what

20   I say, but essentially, Judge, Mr. Davidson was involved

21   in whatever manner in drugs and this side of life.

22           He chose to be in that situation.  What

23   exactly occurred on September 24 there in the morning,

24   I don't know.  I don't know if anyone will know the

25   true facts in terms of what we have is what Mr. Crago

1   said and everything else is circumstantial as to what

2   occurred.

3           You know, he disposed of the body.  He

4   did place -- and if we want to get down to the fine

5   points that some of these witnesses testify, Mr. Crago

6   picked up the body gently in one of those kinds of ways

7   and set the body into the car.  He didn't dump the body

8   in the car.

9           The fact that he left Mr. Davidson's body

10  where he left it, once he was dead, it wasn't like he

11  could help him in any way.

12          And the problem I have with the natural

13  life is that because of the circumstances, this isn't --

14  it's difficult for me to believe under the facts, the

15  way they came in, that Mr. Crago simply said, after

16  dropping off Tovah Sitts -- well, I think I will go

17  over to Cissy Brown's and blast the victim.

18          Under the facts, it's difficult to say

19  that was his mindset.

20          What transpired was a set of circumstances

21  that I don't believe the defendant, Mr. Davidson, or

22  anybody else could have predicted were going to transpire.

23  It wasn't some sort of execution style shooting as is

24  set forth in the presentence report.  It was a situational

25  type of incident.

1          Whether or not Mr. Crago acted above and

2     beyond self-defense, which it appears from the facts the

3     way the court heard them and the way the transcript

4     reads that maybe he did do that -- but the fact of the

5     matter is Mr. Davidson also was involved.  He was

6     obviously high on methamphetamines.

7          It was 5:00 in the morning.  There was

8     no testimony brought forth in the trial about what the

9     effects of methamphetamine would have been on Mr.

10    Davidson at that point in time.  And unfortunately,

11    the jury didn't have the advantage of any expert testimony

12    on that.

13         The point is it was 5:00 in the morning.

14    Mr. Crago didn't go up as some executioner:  I'm going

15    to kill Mr. Davidson.

16         This court sentences people for drugs

17    all the time.  It's one of the problems of society,

18    this meth culture that's arising in Sierra Vista and

19    all over.

20         And for whatever reason, you know, Carl

21    Davidson was a young man -- Crago is a young man.  And

22    it's a tragedy for both of them that this occurred.

23         Mr. Davidson lost his life.  Mr. Crago

24    has lost his liberty.  And essentially lost his life.

25    It's one of those things, Judge, and I in no way diminish

1  the victims' pain.

2         Any time there is a loss, and they said

3  he wasn't a great guy, but he didn't deserve to die.

4  Certainly, that's true.

5         In that scenario, given a twist, Mr.

6  Crago could be dead and Mr. Davidson standing here.

7  It's that kind of environment.  I don't think under

8  those facts that Mr. Crago should receive the ultimate

9  penalty of life without possibility of parole.

10         The argument that he will be institutionalized,

11  people are sentenced, as this court well knows, to long

12  terms of prison.  That goes with the territory that they

13  are institutionalized, and also the presentence report

14  listed no mitigation.

15         I am a little concerned when I see that.

16  It's as if there is no effort whatsoever to try to find

17  some aspect of the defendant's character that is worthy

18  of taking a look at.

19         When I see "none" it bothers me.

20  Earl Crago is 23.  He is not a kid but he is still a

21  young man.  He's got no prior felony record whatsoever.

22  And in addition to that, like I have said, primarily

23  the circumstances of this case, the drugs and alcohol

24  involved, the whole thing is a mess, and it could be

25  Carl Davidson standing here before the court.  That's

1    all there is to it under the circumstances.

2            With that in mind, I just -- it seems

3    harsh to sentence Mr. Crago to life without possibility

4    of parole.

5            I know this court has sat in cases that

6    were more egregious, cold-blooded.  We sat in the

7    Mulkey/Mears case.  In that case, he point blank blew

8    somebody's head off and that was in my opinion far more

9    egregious factually than what occurred and the

10   circumstances here.  There was nothing that could

11   mitigate that behavior, that conduct.

12           And this case is different.  It's one

13   of those cases where it was anybody's bet what was going

14   to occur when Earl Crago went over to that house.  And

15   it doesn't appear he went over there with any intent

16   to kill Mr. Davidson.  It seems like it was a circumstance.

17           He's going to pay a price for that.  He

18   is 23 years old.  He is going to spend the best part of

19   his life in prison.

20           When he gets out, he's going to be a shell.

21   I would ask the court to sentence the defendant to life

22   with the possibility of parole in 25 years.

23           I think under the facts of this case

24   it's a just result.

25           THE COURT:  Mr. Crago, do you have anything to say?

1          DEFENDANT CRAGO:  Yes, Your Honor.

2              Your Honor, in refusing my request for

3    new defense counsel approximately three months before

4    trial I was forced to go to trial with an incompetent

5    defense lawyer who I had a very strong conflict of

6    interest with.  I told Jim White on several different

7    occasions I wanted a different defense lawyer but he

8    refused to withdraw.  I wrote the court asking you to

9    appoint different counsel for my defense.  You stated

10   Jim White was very competent and I would have to talk

11   with him concerning the prospect of new counsel.  Jim

12   White told me unless I had funds to obtain private

13   counsel, new counsel would not be appointed.

14        THE COURT:  Mr. Crago, we are not going to argue

15   that motion.  We are talking about sentencing at this

16   point.

17        DEFENDANT CRAGO:  I just have a few things to say.

18   Isn't that my right, Your Honor?

19        THE COURT:  Do you want to talk about your --

20        DEFENDANT CRAGO:  Yes, I do.

21        MR. MALANGA:  He just has a little bit more,

22   Your Honor.

23        THE COURT:  Go ahead.

24        DEFENDANT CRAGO:  Jim White's gross negligence

25   at trial guaranteed my conviction.  Jim White's opening

1    statements biased the jury towards me and had absolutely

2    no relevance in my case.  He did not confer with me

3    prior to making the speech and I was as shocked as I

4    was surprised by the statements he made in opening

5    argument.

6              Second, Jim White refused to impeach

7    Scott Adkins.  He had prior tape-recorded statements

8    by Scott Adkins that would have impeached him on every

9    word of his testimony with the exception of his name

10   and address and relatives.  I told Jim White twice to

11   impeach Scott Adkins on cross-examination.  Jim refused

12   to do it.

13        COURT REPORTER:  A little slower, please.

14        DEFENDANT CRAGO:  He told me he was not going to

15   impeach Scott.  Because we all know the prosecution

16   based its sole argument on Scott Adkins's testimony.

17             Thirdly, Jim White refused to question

18   Detective Bob Pearce on his statements made three weeks

19   prior to trial.  Detective Pearce stated in a tape-

20   recorded interview that from his investigation there

21   was absolutely no proof of premeditation.  In fact,

22   he said he didn't understand how I had been indicted

23   on first-degree murder.  He made these statements after

24   the Sierra Vista Police Department had been investigating

25   the shooting for six months.

1          Considering Detective Pearce interviewed

2    almost all of the state's witnesses and was in charge

3    of collecting evidence for the state's case, we have

4    to assume the statements made by Detective Pearce with

5    the fact there was no new evidence other than a man --

6    that testimony showed he was entering into a conspiracy,

7    lying in court, and still allowed to testify.

8          There was nothing else entered into the

9    state's case between the time statements were made and

10   the trial took place.

11         In short, Your Honor, I feel my constitutional

12   rights to a fair trial by effective assistance of counsel

13   has not been fulfilled.  This man purposely lost my

14   trial.  And you forced me to go to trial with him.

15         I didn't kill that man on first-degree

16   murder.  You know, I did mouth-to-mouth resuscitation

17   on him.  You know, the man spit up a lot of blood.

18   Shit, I couldn't do nothing else.  I did not mean to

19   kill that man.  He attacked me.  He pulled a rifle on me.

20   The man chased me out of the house.  I was trying to leave.

21   He insulted me.  I tried to get him to stop every way

22   I could.  I was trying to leave.  This man told me that

23   I was dead, you know.  He had a gun.  The police testified

24   they found a gun in the house that was loaded, the

25   safety was off.  They didn't even put it into evidence.

28

1          I did not want that man to die.  I didn't

2   even know the man.  I have nothing else to say, Your Honor.

3       THE COURT:  All right.  Any legal cause why

4   sentence should not be imposed at this time?

5       MR. TILL:  No.

6       MR. MALANGA:  No.

7       THE COURT:  I have considered the circumstances

8   presented to the court, and this is one of those --

9   I am satisfied this is one of those critical by-products

10  of the drug culture, there is more than Mr. Crago

11  involved in it.

12          Among the witnesses that testified on

13  the trial, no one of course can know if Mr. Crago

14  fulfills 25 years in prison what he will be like.  And

15  this is a period of time that's much longer or longer

16  than he has already lived.

17          And I am going to impose the sentence of

18  life with the condition that he serve at least 25 years,

19  every day of 25 years.

20          No legal cause appearing, it is the

21  judgment of this court and sentence that you be imprisoned

22  for the term of life and that you not be released on

23  any basis until the completion of the service of 25 years.

24          You are given credit for -- what is the

25  time actually now?  There's been some continuances.

1    MR. TILL:  337 days.

2    PROBATION OFFICER:  That's correct.

3    THE COURT:  337 days spent in incarceration

4    against that term.

5            Further, you are advised you have the

6    right to appeal.  If you cannot afford a lawyer, one

7    will be appointed for you.  That includes the necessary

8    records and transcripts.

9    MR. MALANGA:  We have some of the transcripts

10   and I will file a notice of appeal within the time.

11   THE COURT:  There is restitution of $3610.

12   Ordered that be paid.  Further ordered that you reimburse

13   Cochise County for the cost of legal representation in

14   the sum of $7000.  I am sure it's more than that.

15           Ordered that the defendant is remanded

16   to the custody of the sheriff for transportation to the

17   Department of Corrections.

18           It is further ordered that you will

19   serve three years and seven months community supervision

20   once you are released from prison.

21           For Department of Correction classification

22   purposes, this is a class 1 felony of a dangerous nature,

23   no prior conviction having been alleged.

24           Counsel, will you have your client

25   execute the notice of right of review and have him

30

1    fingerprinted.

2        MR. MALANGA:  I am going to file this.  It was

3    his statement.

4        THE COURT:  Very well.

5        MR. MALANGA:  May I have leave to withdraw

6    when I file the notice of appeal?

7            At this point, if they want to appoint

8    me on the appeal --

9        THE COURT:  Do you want to serve as attorney on

10   the appeal?

11       MR. MALANGA:  I would prefer not to, Your Honor.

12       THE COURT:  Put it in writing and we will

13   consider it.

14

15              (whereupon, the court proceeded

16               to hear other matters)

17

18

19

20

21

22

23

24

25

31

```
 1
 2                    C E R T I F I C A T E
 3
 4    STATE OF ARIZONA    )
                          )     SS.
 5    COUNTY OF COCHISE   )
 6
 7
 8              I, Merle Rhodes Briefer, having been
 9    appointed as official court reporter herein, do hereby
10    certify that the foregoing pages numbered 1 through 30,
11    inclusive, constitute a full, true and correct transcript
12    of all the proceedings of the matter as set forth in
13    the title page hereto, all done to the best of my skill
14    and ability.
15
16              Dated this 27th day of September, 1995.
17
18
19                        _____
20                        MERLE RHODES BRIEFER
21
22
23
24
25
```

# EXHIBIT N

Person Filing: __EARL F. CRAGO # 115357__
Address (if not protected): __EYMAN/SMU 1, PO BOX 4000__
City, State, Zip Code: __FLORENCE, AZ 85132__
Telephone:_____
Email Address:_____
Lawyer's Bar Number:_____

Representing  ☒ Self, without a Lawyer   or   ☐ Attorney for   ☐ Petitioner   OR   ☐ Respondent

_original_

# SUPERIOR COURT OF ARIZONA
## IN COCHISE COUNTY

State of Arizona
_____

Case Number: __CR-94000471__

## PETITION FOR
## POST-CONVICTION RELIEF

__EARL F. CRAGO__
**Defendant's Name** (First, MI, Last)

(Hon. Laura Cardinal, Div. One)

# STATEMENTS MADE TO THE COURT, UNDER OATH:

1. **INFORMATION ABOUT ME, the DEFENDANT / PETITIONER:**

   Name: __EARL F CRAGO__
   Address: __ADC #115357, EYMAN SMU 1, POB4000, FLORENCE AZ, 85132__
   Date of Birth: __10/16/71__
   Prison/Inmate Number (if any): __115357__

2. **CURRENT INFORMATION ABOUT MY SENTENCE:** Defendant / Petitioner is now:

   ☐  On Community Supervision
   ☐  On Parole
   ☐  On Probation
   ☒  Confined in (name of prison/jail): __ASPC-EYMAN/SMU 1__

3. **REASON(S) FOR REQUESTED RELIEF:** Defendant / Petitioner is eligible for relief because of the following reason(s) (Place a check mark next to the reason(s) that apply to your case):

   ☐  The introduction at trial of evidence obtained pursuant to an unlawful arrest.

   ☐  The introduction at trial of evidence obtained by an unconstitutional search and seizure.

   ☐  The introduction at trial of an identification obtained in violation of constitutional rights.

   ☐  The introduction at trial of a coerced confession.



Case Number: _CR-94000471_

☐ The introduction at trial of a statement obtained in the absence of a lawyer at a time when representation is constitutionally required.

☐ Any other infringement of the right against self-incrimination.

☐ The denial of the constitutional right to representation by a competent lawyer at every critical stage of the proceeding.

☐ The unconstitutional suppression of evidence by the state.

☐ The unconstitutional use of perjured testimony by the state.

☐ An unlawfully induced plea of guilty or no contest.

☐ Violation of the right not to be placed twice in jeopardy for the same offense.

☐ The abridgement of any other right guaranteed by the constitution or the laws of this state, or the constitution of the United States, including a right that was not recognized as existing at the time of the trial if retrospective application of that right is required.

☐ The existence of newly discovered material which requires the court to vacate the conviction or sentence. [Specify when the defendant / petitioner learned of these facts for the first time, and show how they would have affected the trial.]

_____

_____

_____

☐ The lack of jurisdiction of the court which entered the conviction or sentence.

☐ The use by the state in determining sentence of a prior conviction obtained in violation of the United States or Arizona constitutions.

☐ Sentence imposed other than in accordance with the sentencing procedures established by rule and statute.

☒ Being held beyond the term of sentence or after parole or probation has been unlawfully revoked.

☐ The failure of the judge at sentencing to advise defendant / petitioner of his/her right to appeal, and the procedures for doing so.

☐ The failure of defendant / petitioner's attorney to file a timely notice of appeal after being instructed to do so.

☐ The obstruction by state officials of the right to appeal.

☒ Any other ground within the scope of Rule 32, Arizona Rules of Criminal Procedure (Please specify the grounds below):

_Significant Change of Law (Martinez v. Ryan, 132 SCt. 1309 (2012),_
_holding that defendant has right to effective assistance of_
_counsel in a initial Rule 32 PCR claiming ineffective assist-_
_ance of counsel at trial and on direct appeal._

© Superior Court of Arizona in Maricopa County
ALL RIGHTS RESERVED

CRPCR11f - 060616



Case Number: _C R - 94000471_

4. **SUPPORTING FACTS:** The facts in support of the alleged error(s) upon which this petition is based are contained below and in the Attachment: [State facts clearly and fully; citations or discussions of authorities need not be included].

_See Attached Memorandum of Facts and Authorities._

5. **SUPPORTING EXHIBITS:**

**A.** The following exhibits are attached in support of this Petition:

- Affidavits (Exhibit(s) # _1 7_
- Records (Exhibit(s) # _1, 2, 6, 7, 8, 9, 10, 11, 12, 14, 15, 16, 18, 19, 21, 22_
- Other Supporting evidence (Exhibit(s) # _3, 4, 5, 13, 20_

**B.** No affidavits, records, or other supporting evidence are attached because (state reason(s) below):

6. **OTHER ACTIONS TO SECURE RELIEF:** The Petitioner / Defendant has taken the following actions to secure relief from his/her convictions or sentences: (Place a check mark in the appropriate box below)

**A.** ☐ Direct Appeal:   YES ☒   or   NO ☐   If YES, list the courts to which the appeals were taken, date of appeals, number, and result:

_Direct Appeal, Court of Appeals - Division Two , 9/8/98_
_2 CA-CR 95-0488_

**B.** ☒ Previous Rule 32 Proceedings: YES ☒   or   NO ☐   If YES, name the court in which such petitions were filed, dates, numbers, and results including all appeals from decisions on such petitions:

_Cochise County Superior Court, CR94000471; 1st PCR 11/17/95 amend_
_ed 12/11/97; 2nd PCR 5/29/01 ; 3rd PCR 10/31/02 ; 4th PCR 3/18/08 ; 5th_
_PCR 4/8/10; 6th PCR 7/16/12 ; 7th PCR 3/21/14 ; 8th PCR 11/30/18._
_1st and 2nd dismissed; 3rd, 6th, 7th and 8th Precluded; 4th and 5th Not ripe._

**C.** ☐ Previous Habeas Corpus or Special Action Proceedings in the Courts of Arizona:

YES ☒   or   NO ☐   If YES, name the court(s) in which such petitions were filed, dates, numbers, and results including all appeals from decisions on such petitions:

_Cochise County Superior Court, Voluntarily withdrawn._

Case Number: *CR-94000471*

D. ☒ Habeas Corpus or Other Petitions in Federal Courts: YES ☒ or NO ☐   If YES, name the districts in which petitions were filed, dates, court numbers – civil action or miscellaneous, and results, including all appeals from decisions on such petitions:

*U.S. District Court - Tucson   (Do not have records)*

7. **NEW ISSUE(s):** The issue(s) which are raised in this petition have not been raised nor finally decided *before this time* because:

*ISSUE 1: Being held in Prison beyond the term of the Sentence imposed.*
*ISSUE 2: Significant change of law requiring effective assistance of counsel in initial Rule 32 PCR alleging ineffective assistance of trial counsel.*

8. **POST-CONVICTION RELIEF REQUESTED:** Because of the reasons stated in the above Petition, the relief which I the Defendant / Petitioner request is: (Place a check mark in the appropriate box):

A.  ☒  Release from custody and discharge.

B.  ☒  A new trial.

C.  ☐  Correction of Sentence.

D.  ☐  The right to file a delayed appeal.

E.  ☐  Other relief (specify):

**DECLARATION:** I declare under penalty of perjury that the information contained in this form and in any attachments is true to the best of my knowledge or belief.

*December 17, 2019*
Date

*Earl F Brager*
Defendant's Signature

RULE 32 PETITION

MEMORANDUM OF FACTS AND AUTHORITIES

I. DEFENDANT IS BEING HELD IN CUSTODY AFTER THE
SENTENCE IMPOSED HAS EXPIRED.

The crime that defendant was sentenced for occurred September 28, 1994. Defendant was sentenced pursuant to the laws and statutes that existed in 1994. (EXHIBIT (EX.) 22, Indictment).

The facts relevant to the sentence are as follows: Defendant was convicted of premeditated murder in the 1st degree as defined by ARS 13-1105. Both the victim and the defendant were over the age of 18 years at the commission of the crime. The state did not file notice of intent to seek the death penalty. The court found mitigating factors existed. ARS 13-1105 held the minimum allowable sentence in 1994 was life without release under any basis until 25 calendar years were completed. ARS 13-1105 in 1994 left it to the judges discretion to determine the type and time of release after 25 years were completed with the one exception that ARS 13-603(I) required community supervision to equal 1 day for every 7 days imprisoned.

The judge ordered the defendant sentenced to "the term of life and that [he] not be released on any basis until the completion of the service of (25) twenty-five years... It is further ordered that [he] will serve three years and seven months community super-vision once [he is] released from prison." (EX. 1, RT, 8/21/95, pp. 28, 29).

Pursuant to ARS 13-607, the judge prepared a certified sentencing document. Pursuant to ARS 13-701(B), the judge sent a certified copy of the sentencing document to the Department of Corrections (DOC). (EX. 2 Sentencing Document).

The certified copy of the sentencing document says the defendant

is "committed to a life term in the Department of corrections. IT IS ORDERED: That the defendant must serve every day of twenty-five years of the sentence imposed before he is eligible for any type of release. IT IS FURTHER ODERED: That pursuant to ARS 13-603(I), the defendant will be required to do mandatory community supervision sentence - one day for every seven days sentenced to for a total of 3 years, 7 months" (Ex. 2, Sentencing Document, p.3).

In accord with the sentencing document, the DOC calculated the Sentence Expiration Date (SED) at 9/17/19; and Calculated the Community Supervision Sentence Expiration Date (CSED) at 4/13/23. (Ex. 3, DOC Release Dates).

Some time after 1994, the laws and statutes governing the sentences for premeditated murder were amended. The amendments removed the judges authority to order the termination of a life sentence after 25 years had been served and inserted the requirement that release from a life sentence after 25 years must be recommended by the board of executive clemency and approved by the governor. The laws were amended again removing authority from the clemency board and the governor to release anyone from a life sentence that was over 18 years old at the commission of the crime; mandating a sentence of natural life or death. See ARS. 13-1105 (D), and ARS. 13-752 (A).

Nothing in the laws as they existed in 1994 prohibited the sentencing judge from terminating the life sentence after 25 years were completed. The law mandated no release until 25 years were served then left it to the judge's discretion to order the time and conditions of release after 25 years.

The Arizona Attorney General has now directed DOC to apply the amendments of laws to the defendant's sentence ex post facto. The sentence now reads "Life or Death" (Ex. 4, DOC AIMS Record, 2019).

The Supreme Court has long held that a defendant's sentence cannot be enhanced on the basis of an amendment of statute or a law that did not exist at the time his crime was committed. *Collins v. Youngblood*, 497 U.S. 37 (1990).

The Attorney General says the defendant's sentence is illegal under the amendments of laws and statutes, and life sentences over ride all other sentences. Based upon this the Attorney General ordered the DOC to disregard the portion of the sentencing order that mandates the defendant be released after 25 years to serve 3 years, 7 months community supervision; and ordered the SED changed to "life or death" and "No Community Supervision Parole". (EX. 4, AIMS record of sentence).

For the sake of argument, if the state was allowed to apply new laws ex post facto, and suddenly the sentence was illegally lenient, the defendant would have a liberty interest in keeping an illegally lenient sentence that is protected under the constitution's 1st and 5th Amendments. This is recognized in Rule 32.3, Ariz. R. Crim. P., which mandates the court may not amend or alter an illegally lenient sentence if more than 60 days has passed beyond the date the sentence was issued.

It should be without question that neither the Attorney General nor the DOC has the authority to alter or amend an illegally lenient sentence issued by the court 25 years ago. They certainly do not have the authority to simply ignore a sentencing order for the termination of sentence on 9/17/19, which has now passed.

The defendant now requests the court to direct the DOC to terminate the life sentence and give the defendant credit towards his community supervision at a rate of 3 days credit for every one day past 9/17/19 that the defendant has been held now.

## II. THERE IS A SIGNIFICANT CHANGE IN THE LAW THAT GOVERNS THE RIGHT TO COUNSEL IN A INITIAL STATE COLLATERAL PROCEEDING. MARTINEZ V. RYAN, 132 S.CT. 1309, 182 L.ED 2d 272 (2012).

The defendant has filed two state Rule 32 petitions since 2012 when Martinez v. Ryan, Ibid, was issued. However, the court denied requests for appointment of counsel and the D.O.C does not provide prisoner's with access to case law or law libraries from which a prisoner could with due diligence learn of the Martinez v. Ryan, Ibid ruling. (EX. 5, Grievance Appeal Response). The court denied appointment of counsel in this instant Rule 32 too.

On 9/12/19, defendant spoke with attorney Harriette Levitt, who told the defendant that she had reviewed his case file. Mrs. Levitt directed defendant's attention to the fact that the state court ruled in 2001 that defendant did not have a right to counsel in a Rule 32 of right proceeding. (EX. 6, Superior Court Decision 8/23/01; EX. 7, Court of Appeal Memorandum Decision, 2/19/02).

Mrs. Levitt then explained that the Supreme court in Martinez had ruled that because ineffective assistance of counsel must be raised in a Rule 32 proceeding, defendants in Arizona have a right to counsel in a Rule 32 of Right to raise an IAC claim. (EX. 17, Affidavit ¶ 2).

Based upon the change of law, defendant resubmits the claim that Rule 32 counsel was ineffective for failing to raise the following claims of Ineffective Assistance of Counsel ("IAC") in the Rule 32 of Right.

## A. IT WAS INEFFECTIVE ASSISTANCE FOR TRIAL COUNSEL TO DIRECT THE DEFENDANT TO ADMIT GUILT IN ORDER TO PRESENT A NONVIABLE JUSTIABLE HOMOCIDE DEFENSE.

Records show the defendant steadfastly denied committing the crime until defense counsel told him to confess to the crime in order to present a non-viable justifiable homocide defense.

Defendant told detectives he did not know the victim. (Ex. 12, Reporter Transcript ("R.T.") 4/4/95, p. 137).

Defendant told investigators he was on the Ft. Huachuka army base at the time the crime occurred. (Ex. 13, Investigator Report, 10/26/84).

Defendant filed a Notice of Defense denying involvement in the crime. (Ex. 14, Notice of Defense, 11/29/94).

Defendant requested new counsel because the lawyer did not want to represent him. (See Minute Entry Actions for 11/14/94 and 11/28/94).

After the request for new counsel was denied counsel changed the defense to justifiable homocide. (Ex. 19, Motion for Production, 2/22/95).

At trial Defendant testified he shot the victim in the back as he ran away because he thought he was going to retrieve a gun and shoot him. (Ex. 10, R.T. 4/5/95, pp. 168, 169, 172).

In closing arguments counsel told the jury the defendant shot the victim in the back to stop him from running into a residence where a gun was at. (Ex. 21, R.T. 4/7/95, pp. 79, 80).

An evidentiary hearing was held on 4/14/00. At the hearing counsel testified that he argued justifiable homocide on the ground that defendant shot the victim in the back to stop him from running away to get a gun to kill the defendant. (See, R.T. 4/21/00, pp. 58, 78, 81).

The judge at the evidentiary hearing was incredolous and stated:

"one cannot avail himself of the law of justifiable homocide

by shooting another in the back on the belief, reasonable or

otherwise that a person was going to get a gun to kill the

defendant. The law is otherwise." (Ex. 8, Minute Entry Action, 4/21/00, p.2)

Therefore, the record before the court clearly shows that trial counsel had the defendant self admit his guilt to present what turned out to be an unlawful/nonviable justifiable homicide defense.

While the rule 32 court went on to say that the justifiable homicide instruction must have been given based on the initial confrontation at the car, Ibid, the trial transcripts clearly show that defendant testified he shot the victim in the back to stop him from going to get a gun, and therefore justifiable homicide was not a lawful defense.

Trial counsel's failure to research and understand that the law of justifiable homicide did not apply to the facts of the defendant's case amounted to IAC in violation of the 6th Amendment. See Strickland v. Washington, 466 U.S. 668 (1984).

Trial Counsel turned the trial process into the functional equivalent of a guilty pleading. By directing the defendant to testify that he shot the victim twice in the back to stop him from running away to get a gun, in order to present a non-viable justifiable homicide defense, the jury had no choice but find defendant guilty of premeditated murder. This violated both the 5th and 6th Amendments of the constitution. See U.S. v. Cronic, 466 U.S. 648.

Rule 32 counsel was ineffective in failing to present this claim in the Rule 32 of Right petition, therefore, under Martinez v. Ryan, Supra, defendant is excused from procedural default of this claim.

## B. TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL BY FAILING TO INVESTIGATE WHETHER THE VICTIM'S BLOOD WAS IDENTIFIED IN THE DEFENDANT'S CAR.

Prior to trial the state told the grand jury blood stains were found in the defendant's car and sent to the crime lab for identification. (EX. 15, R.T. 10/31/94, p. 21).

Defense counsel filed a Rule 15, Ariz. R. Crim. P., Motion for Production to ascertain the results from the testing of the blood stains found in defendant's car. (EX. 16, Motion for Production, 12/21/94).

Several weeks after filing the Motion for Production defense counsel told the defendant that the state had identified the victim's blood in the defendant's car using DNA comparisons. Defense counsel then told defendant to change his defense and admit he killed the victim and defense counsel would argue the killing was excused under the justifiable homocide law. (EX. 17, Affidavit ¶ 3).

It turns out that the victim's blood was never identified in the defendant's car. Regardless of whether the state really told defense counsel the victim's blood was identified in the car, defense counsel convinced the defendant that it was true and directed defendant to admit his guilt and plead justifiable homocide to explain the blood staining being in the car. (Ibid).

There are two possibilities: (1) Counsel purposely lied to defendant to make him admit his guilt and insure his conviction. (2) Counsel did not investigate whether the victim's blood was identified in the car, choosing

1. In 2014 the state told the court that it had identified the victim's blood in the defendant's car using DNA comparison. Years later the DNA records from the crime lab proved the state lied to the court. (EX. 18, Supplement Response, p. 3).

to believe the State's claim of identifying the blood in the car without investigating the veracity of the claim. In either situation counsel rendered ineffective assistance of counsel under _Strickland v. Washington_, supra.

The State prosecutor, Doyle Johnston, recently provided defendant with an e-mail from the analyst who performed the DNA analysis on the blood stains from the defendant's car. The analyst's name is Dave Duplissa. Mr. Duplissa says that defense counsel would have been able to contact him and find out DNA analysis results at any time he chose to. (EX. 20, E-Mail, 2/13/19).

Defense counsel should have investigated whether the blood stains in defendant's car had been identified before telling the defendant the stains were identified as coming from the victim. Had the defendant known this one fact he would have never testified at trial and he would have never signed stipulations admitting guilt. Defendant had already requested different counsel and the court denied the request. (See Minute Entry 11/14/94, and Minute Entry 11/28/94).

## C. TRIAL COUNSEL'S FAILURE TO OBJECT TO THE SHERIFF SHACKLING DEFENDANT WITH A SHOCKBELT AMOUNTED TO INEFFECTIVE ASSISTANCE OF COUNSEL.

The sheriff placed a shockbelt on defendant at trial. The jury told the bailiff they thought the bulge caused by the shockbelt under defendant's clothes was a firearm. The judge asked defense counsel if he wanted the bailiff to tell them it was shockbelt. Counsel said he didn't care. The judge said he would direct the bailiff to inform the jury the defendant doesn't have a gun he's checked all of the time. (EX. 11, R.T. 4/6/95, pp. 157, 158).

There's no record of what, if anything, the bailiff said to the jury. The defendant was clearly prejudiced by the jury thinking he was bringing a firearm to court while on trial for murder.

The shockbelt belt was painful to wear and frightening. Everyday the guards would test activate the belt in front of the defendant causing loud popping and crackling sounds and bright flashes of light as electricity arced back and forth between the electrodes. Then the guards would read a list of injuries the device would cause to the person wearing it. (Ex. 17, Affidavit ¶4).

During trial defendant changed his mind about self admitting guilt and told counsel he wasn't going to testify. A heated argument between counsel and defendant ensued, during which the guard activated the warning alarm on the belt. Defendant was frightened so badly he felt nauseous. The guard told defendant to stop arguing with counsel. After that defendant was afraid to refuse to testify again. Defendant would not have testified if not in fear of the shockbelt being activated. (Ex. 17, Affidavit ¶5).

The court allowing the sheriff to use the shockbelt during trial without a showing of necessity violated *State v. Henry*, 189 Ariz. 542, 550 (1997); *Illinois v. Allen*, 397 U.S. 337 (1970); *Deck v. Missouri*, 544 U.S. 622 (2005).

Counsel's failure to object to the shockbelt amounted to IAC. See *Strickland v. Washington*, supra. As did Rule 32 counsel's failure to raise the claim in the Rule 32 of right.

### D. THE CUMULATIVE IMPACT OF COUNSEL'S ERRORS RENDERED THE TRIAL PROCESS UNRELIABLE AND AMOUNTED TO IAC.

In looking at the record before the court it is hard to ascertain whether defense counsel intentionally onchastrated the defendant's

conviction or was he simply extremely incompetent at his job?

It seems certain that a lawyer deemed qualified for a murder trial would have taken the time to research and understand the law of justifiable homicide and whether it was a lawful defense to the specific facts of defendant's case.

It also seems certain that defense counsel would have called the crime lab analyst and inquired about the results of DNA comparisons for the staining found in the defendant's car. After all the crime lab analyst said counsel could have called anytime he chose to check on the progress of the testing process. (Ex. 20, E-Mail, 2/13/19).

It is also well known law that a court may not shackle a defendant in a murder trial without a showing of necessity being made. A sheriff is never allowed to make the decision on his own. Yet counsel did not object.

So was counsel simply incompetent in failing to research the law, failing to investigate the evidence, and failing to object to shackling before telling the defendant DNA comparison identified the victim's blood in his car and advising him to admit guilt to mitigate the DNA evidence and present a justifiable homicide defense; or did counsel know that justifiable homicide was not a legal defense and the victim's blood was never identified in the defendant's car?

In either scenario counsel's representation turned the trial process into a guilty plea for 1st degree murder. The representation was so defective as to amount to no representation at all in violation of the 5th and 6th Amendments. See U.S. v. Cronic, supra.; See also Strickland v. Washington, supra.

### III CONCLUSION

A. The defendant is being held in custody beyond his sentence expiration date of 9/17/19. The state is prohibited from applying a change of laws to the defendant's sentence ex post facto. The court must order the DOC to terminate the life sentence at the mandatory minimum of 25 years 0 months 0 days as ordered in the certified sentencing document.

B. The record before the court shows that trial counsel failed to provide meaningful representation. At best he provided IAC in violation of the 6th Amendment as defined in Strickland v. Washington, Supra. In reality it appears trial counsel orchestrated the defendant's conviction by lying to the defendant about DNA evidence to manipulate him into testifying he murdered the unarmed victim as he ran away from the defendant. Defense counsel most likely knew that justifiable homicide was not a lawful defense to the facts of defendant's case, but he could not get the defendant to confess to the crime without telling him justifiable homicide was a legitimate defense to the facts of his case. Trial counsel turned the trial process into the functional equivalent of a guilty plea in violation of the 5th and 6th Amendments as defined in U.S. v. Cronic, Supra.

Counsel was ineffective in the Rule 32 of Right for failing to raise these claims. While this court ruled in the successive Rule 32s filed by defendant that he did not have a 6th Amendment right to counsel in the Rule 32 of Right and therefore the above claims of IAC were procedurally defaulted for not raising them in the Rule 32 of Right; the

Supreme court in *Martinez V. Ryan, Supra,* has now held that defendant does have a 6th Amendment right to counsel in the Rule 32 of Right, and counsel's failure to raise the above claims in the Rule 32 of Right was IAC which excuses him from a procedural default in raising the above claims in a Successive Rule 32.

The claims being excused from procedural default under *Martinez V. Ryan* must now be heard on their merits.

The defendant has shown by a preponderance of the evidence that a constitutional violation of his 5th and 6th Amendment rights has occurred. The state must now show beyond a reasonable doubt that those constitutional violations did not prejudice the defendant.

A colorable claim of IAC has now been made and the court must now Schedule an evidentiary hearing. If it cannot be Shown beyond a reasonable ~~dob~~ doubt that the defendant was not prejudiced by the violation of his 5th and 6th Amendment rights then the court must vacate the conviction and sentence.

Date: December 17, 2019.        By *Earl F. Crago* ProSe
                                          Signature of Petitioner

I certify I mailed the original plus
one copy to Amy J Hunley, Clerk of Superior Court,
P.O. Drawer CK, Bisbee, AZ. 85603, on the below date.
Date December 17, 2019        By *Earl F. Crago*