*Earl Felton Crago v. Shinn*, CV 22-00339-TUC-JAS (LAB)

**INDEX OF EXHIBITS**

Exhibit O.    Supplemental (*pro se*) PCR petition, 6/4/20

Exhibit P.    Appointed counsel's memo in support of PCR petition, 8/13/20

Exhibit Q.    Cochise County Superior Court minute entry, 10/20/20

Exhibit R.    Cochise County Superior Court order, 11/4/20

Exhibit S.    State's petition for review

Exhibit T.    Crago's response

Exhibit U.    Arizona Court of Appeals memo decision, 3/25/21

Exhibit V.    Petition for review to the Arizona Supreme Court

Exhibit W.    Arizona Supreme Court order, 7/5/22

Exhibit X.    Transcript, PCR hearing, 10/20/20

# EXHIBIT O

Earl F. Crago  115357
ASPC - SAFFORD - TONTO
896 S. Cook Rd.
Safford Az. 85546

MAF  FILED

2020 JUN -4  PM 1:12

AMY J HUNLEY
CLERK OF SUPERIOR COURT
BY_____
DEPUTY

SUPERIOR COURT OF ARIZONA

COUNTY OF COCHISE

STATE OF ARIZONA,

    Plaintiff,

    v.

EARL FELTON CRAGO,

    Defendant

CASE NO. CR94000471 ✓

SUPPLEMENT TO PETITION FOR POST

CONVICTION RELIEF - ARIZONA

RULES OF CRIMINAL PROCEDURE,

RULE 32, et seq.

    Comes Now the Petitioner, Earl Felton Crago, and hereby files

this Supplement to the Petition for Post Conviction Relief filed pro

per by Petitioner pursuant to Arizona Rules of Criminal Procedure,

Rule 32, et seq.

    Respectfully Submitted this 3rd day of June, 2020.

                                    Earl F. Crago, proper
                                    Signature of Defendant

Copies of the foregoing

mailed this date above to:

Amy J. Hunley, Clerk, PO Drawer CK, Bisbee Az. 85603.

Zucco, County Attorney, PO Drawer CA, Bisbee Az. 85603.

                                    Earl F. Crago

MEMORANDUM OF POINTS AND AUTHORITIES

Defendant hereby supplements Section I of the PCR's Memorandum of Facts And Authorities as follows:

FACTS

In addition to the facts stated at Section I of the PCR's Memorandum defendant adds the following:

As previously shown the Sentencing Court sentenced Crago to life and ordered the life sentence be terminated at the completion of 25 years and Crago then be released "to do mandatory community supervision ("com. sup.") sentence - one day for every seven days sentenced to, for a total of 3 years, 7 months." (Exhibit 2, page 3).

The ADC later notified the defendant the sentence was illegal and changed the sentence by removing the order for com. sup. from the sentence. Defendant filed several documents with the Court to stop ADC from altering the sentence.

On May 4, 2011 the Superior Court issued a Decision and Order holding:

"The Sentencing also added a requirement that defendant serve community supervision, consisting of one day for every seven days of incarceration, amounting to three years and seven months. Evidently that figure was calculated by estimating one-seventh of twenty-five years."

"...the State correctly notes... the imposition of community supervision of three years and seven months was contrary to law."

(Decision and Order May 04, 2011).

On September 09, 2011 the Court of Appeals issued a Memorandum Decision holding:

"¶4...The state asserted 'the community supervision statute does not logically apply' to Crago and the imposition of community supervision thus constituted an illegal sentence."

"¶9... the court correctly concluded 'the imposition of community supervision... was contrary to law.'"

"¶11  Finally, to the extent we understand Crago's argument that ADOC's removal of the erroneous imposition of community service somehow prejudiced him, we reject that argument." (Memorand Decision September 9, 2011).

## LAW

On March 5, 2020 the Arizona Supreme Court held the following:

"¶2...a court lacks jurisdiction to correct an illegally lenient sentence absent timely correction or appeal."

"¶8... courts interpret a criminal sentence with the goal of giving effect to the sentencing court's intent."

"¶19  Illegally lenient sentences are final under Arizona law absent timely appeal or post judgment motion.... Absent an appeal by the state, this court does not have jurisdiction to correct sentencing errors alleged by the state."

_Chaparro V. Shinn_, No. CV-19-0205-CQ, Filed March 5, 2020. (Attached hereto).

## CONCLUSION

Neither ADOC, the Superior court, nor Court of Appeals had jurisdiction to correct Crago's illegally lenient sentence; over a

decade had passed when the state attempted to correct Crago's illegally lenient sentence. The Court did not have jurisdiction, and therefore, the Court's decision correcting the illegally lenient sentence is void.

When the sentencing Court ordered 3 years, 7 months of com. sup. and clarified the sentence by adding "one day for every seven days sentenced to" (Exhibit 2, page 3), the court capped Crago's sentence to the minimum allowed of 25 years.

Crago's illegally lenient sentence is final under Arizona law. Crago's 25 years expired on September 17, 2019 which is now long past. To remedy holding Crago beyond his sentence expiration date, Crago requests the Court give him final discharge from both the sentence of imprisonment and the sentence of community supervision.

IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

---

ABELARDO CHAPARRO
*Plaintiff,*

*v.*

DAVID C. SHINN,
*Defendant.*

---

No. CV-19-0205-CQ
Filed March 5, 2020

---

Certified Question from the
United States District Court for the District of Arizona
No. CV 19-00650-PHX-DWL (MHB)
**QUESTION ANSWERED**

---

COUNSEL:

Mark Brnovich, Arizona Attorney General, Oramel H. Skinner, Solicitor General, Drew C. Ensign (argued), Deputy Solicitor General, Rusty D. Crandell, Deputy Solicitor General, Brunn (Beau) W. Roysden III, Division Chief Appeals & Constitutional Litigation Division, Robert J. Makar, Anthony R. Napolitano, Assistant Attorneys General, Phoenix, Attorneys for Defendant David C. Shinn, Director, Arizona Department of Corrections

Lindsay Herf, Robert J. Dormady, Katherine Puzauskas, Arizona Justice Project, Phoenix; Howard R. Cabot, Randal B. McDonald (argued), Austin C. Yost, Perkins Coie LLP, Phoenix, Attorneys for Abelardo Chaparro

ABELARDO CHAPARRO v. DAVID C. SHINN
Opinion of the Court

JUSTICE BEENE authored the Opinion of the Court, in which CHIEF
JUSTICE BRUTINEL, VICE CHIEF JUSTICE TIMMER, and JUSTICES
BOLICK, GOULD, LOPEZ, and PELANDER (Retired)* joined.

JUSTICE BEENE, Opinion of the Court:

¶1        The United States District Court for the District of Arizona
certified the following question to this Court: Whether, in light of A.R.S.
§ 41-1604.09, a person convicted of first degree murder following a jury trial
for actions that took place on or after January 1, 1994, is parole eligible after
25 years when the sentencing order states that he is sentenced to "life
without possibility of parole for 25 years."

¶2        We hold that a sentence imposing "life without possibility of
parole for 25 years" means the convicted defendant is eligible for parole
after serving 25 years' imprisonment despite § 41-1604.09's prohibition of
parole for persons convicted of offenses occurring on or after January 1,
1994. Additionally, we hold that a court lacks jurisdiction to correct an
illegally lenient sentence absent timely correction or appeal. *State v.
Dawson*, 164 Ariz. 278, 286 (1990).

## BACKGROUND

¶3        In 1993, the Arizona Legislature amended § 41-1604.09 to
eliminate parole for all offenses committed on or after January 1, 1994. On
July 25, 1996, a jury found Abelardo Chaparro guilty of first degree murder
committed on May 21, 1995. At the sentencing hearing and in the ensuing
minute entry, the trial court sentenced Chaparro to prison for "the rest of
[his] natural life without the possibility of parole for 25 years, followed by
a consecutive term of community supervision equal to one day for every
seven days of sentence imposed." On December 6, 1996, however, the trial

---

*        Justice William G. Montgomery has recused himself from this case.
Pursuant to article 6, section 3 of the Arizona Constitution, the Honorable
John Pelander, Justice of the Arizona Supreme Court (Retired), was
designated to sit in this matter.

ABELARDO CHAPARRO v. DAVID C. SHINN
Opinion of the Court

court issued a *nunc pro tunc* order ("December Order") clarifying that Chaparro's sentence was "Life without possibility of parole for 25 years." The December Order did not amend the term of community supervision. The State did not appeal.

¶4        In April 2017, the Arizona Department of Corrections ("ADOC") informed Chaparro he would not be parole eligible and that his only avenue for release would be to apply for commutation of his prison sentence after serving 25 years.   Subsequently, Chaparro repeatedly requested parole eligibility with ADOC officials, who denied those requests.   In February 2018, Chaparro received a letter from ADOC informing him that he "would not be parole certified."

¶5        Chaparro has served 24 years of his sentence.  Accordingly, if Chaparro is parole eligible, ADOC would have been required under § 41-1604.09(D) to initiate parole proceedings in January 2020.  Asserting his entitlement to parole eligibility after serving 25 years, Chaparro sued ADOC in federal district court under 42 U.S.C. § 1983.  The State filed a Motion for Certification or Dismissal in the district court to determine if Chaparro's sentence entitles him to parole eligibility.  The district court granted the State's certification request and issued a Certification Order.

¶6        We have jurisdiction pursuant to article 6, section 5(6) of the Arizona Constitution and A.R.S. § 12-1861.

## DISCUSSION

¶7        The trial court sentenced Chaparro to "[l]ife without possibility of parole for 25 years."  The State contends this sentence does not make Chaparro eligible for parole.  It argues the sentence is ambiguous because it is unclear as to what happens after Chaparro serves 25 years of the sentence and whether "parole" could mean another form of release.  Finally, the State asserts that even if the sentence does provide for parole, a court cannot enforce the illegally lenient sentence.  Chaparro argues his illegally lenient parole eligible sentence is unambiguous and final under Arizona law.

3

ABELARDO CHAPARRO v. DAVID C. SHINN
Opinion of the Court

A.

¶8         We first address whether Chaparro's sentence provides the possibility of parole.  We conclude that although the trial court's use of "parole" and "community supervision" is ambiguous, the December Order and the sentencing transcript demonstrate that the trial court intended for Chaparro to be eligible for parole after 25 years' imprisonment. *See State v. Ovante*, 231 Ariz. 180, 188 ¶¶ 38–39 (2013) (stating courts interpret a criminal sentence with the goal of giving effect to the sentencing court's intent).

¶9         Generally, language is deemed ambiguous "when it is open to multiple reasonable interpretations." *Glazer v. State*, 244 Ariz. 612, 614 ¶ 12 (2018).  If the language is subject to more than one reasonable interpretation, we will resolve the ambiguity by examining other factors, including the surrounding circumstances. *See Ryan v. Napier*, 245 Ariz. 54, 64 ¶ 41 (2018).

¶10       Chaparro's sentence is ambiguous because it refers both to "parole," which was abrogated before the conduct that resulted in his conviction, and to "community supervision," which applied to all qualifying offenses committed on or after January 1, 1994. *See* § 41-1604.09; *compare* A.R.S. § 41-1604.07 (1993), *with* § 41-1604.07 (1994).  Because the trial court's sentencing language is ambiguous, we look to the surrounding circumstances. *See Ryan*, 245 Ariz. at 64 ¶ 41.

¶11       The trial court's December Order illustrates that it intended Chaparro to have the possibility of parole after 25 years.  Chaparro's original sentence stated "natural life," which would contradict the "possibility of parole." *See* A.R.S. § 13-703(A) (1993) ("An order sentencing the defendant to natural life is not subject to commutation or parole, work furlough or work release.").  But the December Order removed "natural," clarifying that Chaparro's sentence was "[l]ife without possibility of parole for 25 years."  If the reference to "parole" was also incorrect or unintended, the trial court could have similarly corrected that aspect of Chaparro's sentence.  Because it did not, the only reasonable inference is that the trial court intended "[l]ife without possibility of parole for 25 years" to indicate that after 25 years Chaparro would be eligible for parole. *See State v. Cruz-*

ABELARDO CHAPARRO v. DAVID C. SHINN
Opinion of the Court

*Mata,* 138 Ariz. 370, 374, 376 (1983) (finding before 1994 that a "life sentence without possibility of parole for 25 years" meant that the "minimum term of imprisonment is 25 years [minus credit for pre-sentence custody] before he is eligible for parole").

¶12        Similarly, the transcript of the sentencing hearing clarifies that the trial court believed parole was an available sentencing option regardless of the reference to community supervision.   During the sentencing hearing the trial court explained the sentencing options:

> Do you understand one of them is death, one of them is life imprisonment for the rest of your natural life, and the other one is life imprisonment without possibility of parole for 25 years? . . . Those are the only three things I can do.

The trial court did not mention release or commutation as an option. Therefore, although community supervision does not apply to a parole eligible inmate, the sentencing hearing and December Order manifest the trial court's intent for Chaparro to be parole eligible.

¶13        We are also unpersuaded by the State's argument that "parole" is shorthand for "release" in the form of commutation.  At the time of sentencing, Arizona laws differentiated the terms "parole" and "commutation."   *See* § 13-703(A) (1993) ("An order sentencing the defendant to natural life is not subject to commutation or parole . . . ."). Section 13-703(A) also specified other types of release.  *Id.* (listing work furlough and work release).  Nothing indicates the trial court intended its repeated references to "parole" to mean "commutation" or any alternate type of "release."

¶14        Dictionary definitions, Arizona law, and federal law all distinguish parole and other forms of release like commutation.  "Absent statutory definitions, courts apply common meanings and may look to dictionaries."  *State v. Pena,* 235 Ariz. 277, 279 ¶ 6 (2014) (internal citations omitted).  "Parole" has a distinct meaning from "commutation" in the dictionary.  *Compare Parole,* Black's Law Dictionary (11th ed. 2019) ("[C]onditional release of a prisoner from imprisonment before the full sentence has been served."), *with Commutation,* Black's Law Dictionary

5

ABELARDO CHAPARRO v. DAVID C. SHINN
Opinion of the Court

(11th ed. 2019) ("[E]xecutive's substitution in a particular case of a less severe punishment for a more severe one that has already been judicially imposed on the defendant.").

¶15        Similarly, Arizona statutory law distinguishes parole and forms of executive clemency like commutation. Pursuant to A.R.S. § 31-412(A), an inmate certified as parole eligible must only show "a substantial probability that the applicant will remain at liberty without violating the law and that the release is in the best interests of the state." But an inmate applying for commutation must show "by clear and convincing evidence that the sentence imposed is clearly excessive . . . and that there is a substantial probability that when released the offender will conform the offender's conduct to the requirements of the law." A.R.S. § 31-402(C)(2). The Board of Executive Clemency may grant parole by a majority or unanimous vote, whereas it may only recommend commutation to the Governor for approval. §§ 31-402(A), -412(C). Individuals not granted parole are automatically re-certified within six months to a year, but an inmate denied commutation typically must wait five to ten years before reapplying. A.R.S. §§ 31-403, 41-1604.09(G). These statutory differences clarify that parole is not a form of executive clemency.

¶16        Finally, the United States Supreme Court has rejected the idea that parole is the same as executive clemency. *See Lynch v. Arizona*, 136 S. Ct. 1818, 1819 (2016) (stating the possibility of clemency does not diminish a capital defendant's right to inform a jury of his parole ineligibility); *Solem v. Helm*, 463 U.S. 277, 300–01 (1983) ("As a matter of law, parole and commutation are different concepts . . . . Parole is a regular part of the rehabilitative process. . . . Commutation, on the other hand, is an *ad hoc* exercise of executive clemency.").

¶17        In sum, although the trial court's use of "parole" and "community supervision" was ambiguous, the sentencing hearing and December Order clarify the trial court's intent to provide the opportunity for parole. And because the meaning of "parole" is not ambiguous or synonymous with other forms of release, Chaparro is eligible for parole after serving 25 years.

ABELARDO CHAPARRO v. DAVID C. SHINN
Opinion of the Court

**B.**

¶18        The parties agree that Chaparro's sentence, as interpreted above to include parole eligibility after he has served 25 years, is illegally lenient because it violates § 41-1604.09, as amended in 1993. However, the State argues that a court cannot enforce an illegally lenient sentence. We find the sentence is final and enforceable.

¶19        Illegally lenient sentences are final under Arizona law absent timely appeal or post-judgment motion. *See Dawson*, 164 Ariz. at 283–84; Ariz. R. Crim. P. 24.3 (providing that the trial court may correct an unlawful sentence upon a timely motion). Here, the State did not appeal Chaparro's sentence pursuant to A.R.S. § 13-4032, which allows the state to appeal "[a] sentence on the grounds that it is illegal." And "[t]he only statutory power we are afforded to *increase* an illegal sentence to conform to the judgment of conviction is predicated '[u]pon an appeal by the *state*.'" *Dawson*, 164 Ariz. at 284 (quoting A.R.S. § 13-4038). Absent an appeal by the state, this Court does not have jurisdiction to correct sentencing errors alleged by the state. *Id.* at 286.

¶20        The State attempts to distinguish the illegally lenient sentence in *Dawson*, which allowed for parole eligibility sooner than statutorily permitted, from Chaparro's illegally lenient sentence. It claims the trial court violated separation of powers by creating parole eligibility for Chaparro—a purely legislative function—and that the "court is utterly without power to make a defendant parole eligible where statutory law prohibits it." *See State v. Miranda*, 200 Ariz. 67, 69 ¶ 5 (2001) ("Defining crimes and fixing punishments are functions of the legislature."). But the State recognizes in its brief that "[m]ere misapplication of the governing law" does not raise separation of powers concerns. That is precisely what occurred both here and in *Dawson*.

¶21        Rather than perform a legislative function, the trial court misapplied the law when it conferred parole eligibility. Therefore, the trial court did not violate separation of powers by including, albeit incorrectly, parole eligibility in its sentencing order, nor does this Court do so by upholding that sentence, which the State failed to appeal. Rather, as in *Dawson*, absent a timely appeal, the illegally lenient sentence must stand.

ABELARDO CHAPARRO v. DAVID C. SHINN
Opinion of the Court

*See* 164 Ariz. at 280 ("Unless an appellate court has the constitutional or statutory power to act to correct such an error, its refusal to act cannot violate the constitutional doctrine of separation of powers.").

¶22      We also reject the State's argument that the sentence is subject to collateral challenge because it is void. *See Walker v. Davies*, 113 Ariz. 233, 235 (1976) (stating a judgment that is "void upon its face" may be collaterally attacked at any time). Here, because the trial court had subject matter jurisdiction, the "order is voidable, rather than void." *See* Ariz. Const. art. 6, § 14; *see also State v. Bryant*, 219 Ariz. 514, 518 ¶ 14 (App. 2008) (citation omitted). When "the trial court has jurisdiction over the subject matter and parties," the judgment, "even if voidable and erroneous, [can] only be modified on appeal or by proper and timely post-judgment motion." *Bryant*, 219 Ariz. at 517–18 ¶¶ 13, 15. Therefore, because the State failed to timely appeal, this Court does not have subject matter jurisdiction to correct the sentence.

## CONCLUSION

¶23      For the foregoing reasons, we answer the district court's certified question as follows: Regardless of § 41-1604.09, Chaparro is eligible for parole after serving 25 years pursuant to his sentence, and his illegally lenient sentence is final under Arizona law.

Indigent Defense
1415 Melody Lane
Bisbee, AZ  85603
(520) 432-9800
idcmeo@cochise.az.gov

F I L E D

2020 JUN 24  PM 3: 50

Rec'd
7-6-20

AMY J HUNLEY
CLERK OF SUPERIOR COURT

DEPUTY

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF COCHISE

| STATE OF ARIZONA, Plaintiff, vs. CRAGO, EARL FELTON, Defendant. | NOTICE RE:  ASSIGNMENT OF COUNSEL | CASE NO. CR94000471 (Division I) |
|---|---|---|

The Court having made a determination of indigence and a referral to the Indigent Defense Office for specific assignment of counsel pursuant to Administrative Order No. 2000-12,

Xochitl Orozco, Cochise County Legal Advocate, is hereby assigned to represent the above-named defendant in all further proceedings in this matter regarding Rule 32 post-conviction relief.

DATED: June 18, 2020

cc:    Cochise County Attorney
       Xochitl Orozco, Cochise County Legal Advocate
       Mayra Munoz, Superior Court Deputy Clerk – Appeals

IDC No. 20-1400

# EXHIBIT P

FILED
Amy Hunley
CLERK, SUPERIOR COURT
08/13/2020  4:08PM
BY: CVICTORIA
DEPUTY

**COCHISE COUNTY OFFICE**
**OF THE LEGAL ADVOCATE**
**P.O. BOX 106**
**BISBEE, AZ   85603**
**Tel.: (520) 432-8470**
**Fax: (520) 432-8477**
**Email: LAMEO@cochise.az.gov**

Xochitl Orozco AZ Bar No. 026075
Legal Advocate
Attorney for Defendant

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF COCHISE

| | |
|---|---|
| STATE OF ARIZONA,                  ) | No. CR94000471 |
| )                                  | |
| Plaintiff,       ) | |
| )                                  | MEMORANDUM IN SUPPORT OF PETITION |
| vs.                                ) | FOR POST-CONVICTION RELIEF AND |
| )                                  | REQUEST FOR INFORMAL CONFERENCE |
| EARL F. CRAGO,                     ) | |
| )                                  | (Hon. Laura Cardinal) |
| Defendant.        ) | |
| )                                  | |
| )                                  | |

The Defendant, Earl F. Crago, by and through counsel undersigned, hereby submits this

Memorandum of Points and Authorities in support of one issue in Mr. Crago's Petition for Post-

Conviction Relief filed December 23, 2019. Mr. Crago further requests that the Court set a

briefing schedule and an informal conference pursuant to Arizona Rule of Criminal Procedure

32.12(a) in order to "expedite a proceeding for post-conviction relief."

RESPECTFULLY SUBMITTED this 13th day of August, 2020.

XOCHITL OROZCO
COCHISE COUNTY LEGAL ADVOCATE

By____/s/Xochitl Orozco_____
      Xochitl Orozco
      Legal Advocate

1

## MEMORANDUM OF POINTS AND AUTHORITIES

I.      **Facts**

Mr. Crago was found guilty of first-degree murder committed in 1994 and sentenced on August 21, 1995. (Appendix "App." 1)  In 1994, the applicable sentencing statute, A.R.S. § 13-703(A) provided: "If the court does not sentence the defendant to natural life, the defendant shall not be released on any basis until the completion of the service of twenty-five calendar years if the victim was fifteen or more years of age and thirty-five years if the victim was under fifteen years of age." At sentencing, the Honorable Matthew Borowiec sentenced Mr. Crago to a life term in the Department of Corrections with the following terms:

> IT IS ORDERED: That the Defendant must serve every day of twenty-five (25) years of the sentence imposed before he is eligible for any type of release.
>
> IT IS FURTHER ORDERED: That pursuant to A.R.S. §13-603(I), the Defendant will be required to do mandatory community supervision sentence- one day for every seven days sentenced to, for a total of 3 years, 7 months.

[App. 1 p. 3]

Judge Boroweic's sentencing provided as follows:

> Among the witnesses that testified on the trial, no one of course can know if Mr. Crago fulfills 25 years in prison what he will be like. And this is a period of time that's much longer or longer than he has already lived.
> And I am going to impose the sentence of life with the condition that he serve at least 25 years, every day of 25 years.
> No legal cause appearing, it is the judgement of this court and sentence that you be imprisoned for the term of life and that you not to be released on any basis until the completion of the service of 25 years…
> It is further ordered that you will serve three years and seven months community supervision once you are released from prison.

[App. 2 p. 28-29]

2

When Mr. Crago arrived at the Department of Corrections, the Department included the community supervision term in the time calculation. [App. 3][1] The beginning of the community supervision term was listed as September 17, 2019, the end date of the community supervision term was listed as April 13, 2023, which is a three year and seven-month term. [*Id.*] The Department has since changed the interpretation of Mr. Crago's sentence, taking out all reference to community supervision. [App. 4]

In 2011, Mr. Crago raised the issue of the community supervision sentence. In the State's response, the State noted: "The Court also ordered, (erroneously), pursuant to A.R.S. section 13-603(I), that Defendant was required to do mandatory community supervision of one day for every seven days sentenced, for a total of 3 years and 7 months." [App 5 p. 2] "Judge Boroweic apparently calculated 3 years and 7 months as the appropriate period of community supervision. However, this calculation is accurate only for 25 years." [App. 5 p. 4] The State further requested that the illegal sentence be corrected: "As the community supervision provision of defendant's sentence is contrary to law, both then and now, it should be stricken, nunc pro tunc, from Defendant's sentence." [App. 5 p. 5] "The State further requests that the community supervision clause in Defendant's sentence be [sic] stricken as contrary to law." [App. 5 p. 5]

The Court of Appeals denied relief noting that the trial court had found that the "community supervision portion of Crago's sentence was illegal." *State v. Crago* 2 CA-CR 2011-0162-PR

---

[1] The copy of the time computation provided by the Clerk's office was cut off. For a complete record, a copy of the entire time computation sheet is provided as well from the Court of Appeals. However, the Court of Appeal's copy is very difficult to read.

mem. dec. filed Sept. 9, 2011. [App. 6][2]

## II.    Analysis

In this case, Mr. Crago received an illegally lenient sentence when he received a sentence of 25 calendar years with a community supervision calculation equal to fifteen percent of 25 years: or 3 years and seven months. [App. 1 p. 3; App. 2 p. 29] This community supervision term is a part of the sentence and cannot just be disregarded. "Community supervision is simply a part of the sentence *that has to be served* in the community *after completion of a period of imprisonment* or served in prison if there is a refusal to sign and abide by the release conditions." *State v. Cowles*, 207 Ariz. 8, 11, ¶ 14, 82 P.3d 369, 372 (App. 2004) (emphasis added); citing Ariz. R. Crim Pro 26.1(c) ("'Sentence' means the court's pronouncement of the penalty imposed on the defendant after a judgment of guilty.");[3] *see also State v. Jenkins*, 193 Ariz. 115, 120, ¶ 14, 970 P.2d 947, 952 (App. 1998) ("[T]he community supervision requirement is simply a part of the punishment imposed upon defendant.").

Arizona Revised Statute 13-603(I) sets out the method of calculation of the community supervision term:

> I. If a person is convicted of a felony offense and the court sentences the person to a term of imprisonment, the court at the time of sentencing shall impose on the convicted person a term of community supervision. The term of community supervision shall be served consecutively to the actual period of imprisonment if the person signs and agrees to abide by conditions of supervision

---

[2] The Ninth Circuit interpreted the Court of Appeals 2011 decision as "effectively amend[ing] the petitioner's judgment of conviction by removing the community supervision provision of the sentence." [App. 7]

[3] Since *Cowles* was decided, Rule 26.1 has been amended but the cited portion remains essentially the same. In 2004, Ariz. R.Crim. P. 26.1 provided: "The term sentence means the pronouncement by the court of the penalty imposed upon the defendant after a judgment of guilty."

> established by the state department of corrections. Except pursuant
> to subsection J[4] of this section, <u>the term of community supervision
> imposed by the court shall be for a period equal to one day for every
> seven days of the sentence or sentences imposed.</u>

(Emphasis added.) Judge Boroweic's calculation was not a mistake or something that can be disregarded, the calculation complied with Ariz. Rev. Stat. 13-603(I) in all ways. This term of community supervision also cannot be viewed as having no effect "A prisoner who has reached the prisoner's earned release date or sentence expiration date shall be released to begin the prisoner's term of community supervision imposed by the court or term of probation if the court waived community supervision pursuant to § 13-603." A.R.S. § 41-1604.07(E).

In 2011, the State made the nature of the illegally lenient sentence clear: "If defendant's sentence is commuted as set forth hereinabove after defendant serves 35 years rather than after 25 years, applying the formula of one-seventh formula for community supervision would be 5 years of community supervision." [App. 4 p. 4-5] However, the State did not timely appeal or cross-appeal this illegally lenient sentence. "In the absence of a timely appeal or cross-appeal by the state seeking to correct an illegally lenient sentence, an appellate court has no subject matter jurisdiction to consider that issue." *State v. Dawson*, 164 Ariz. 278, 286, 792 P.2d 741, 749 (1990); *see also Chaparro v. Shinn*, 248 Ariz. 138, 459 P.3d 50, 52, ¶ 19 (2020) ("Illegally lenient sentences are final under Arizona law absent timely appeal or post-judgment motion."). Moreover, "[a]n appellate court cannot, within the scope of its own review of defendant's appeal, correct a sentencing error that inures to the detriment of a criminal defendant." *Id.*

The Arizona Supreme Court affirmed the holdings in *Dawson. Chaparro v. Shinn*, 248

---

[4] Subsection J refers the calculating terms to the nearest month unless the offense is for a class 5 or 6 felony.

5

Ariz. 138, 459 P.3d 50 (2020). In *Chaparro*, the defendant was convicted of first-degree murder under A.R.S. § 41-1604.09, a statute that does not permit parole. *Id*. at ¶ 3. The trial court sentenced the defendant to parole eligibility after twenty-five years. *Id*. Approximately twenty-one years later, the Arizona Department of Corrections informed the defendant that he would not be eligible for parole because the sentence violated the applicable statute, or in other words, was an illegally lenient sentence. *Id*. ¶ 4.

In the Court's analysis, it looked to the trial court's intent in administering the sentence. *Id*. ¶ 11-12; 17. After finding that the trial court's intent was to impose parole, the Court found that because that was the trial court's order, then the defendant was eligible for parole after serving 25 years, despite that being an illegally lenient sentence under the statute. *Id*. ¶ 17. In this case, the community supervision sentence must stand.

At the conclusion of *Chaparro*, the Court held that "Regardless of § 41-1604.09, Chaparro is eligible for parole after serving 25 years pursuant to his sentence, and his illegally lenient sentence is final under Arizona law." *Id*. p. 3 ¶ 23. This case is on par, Judge Boroweic imposed community supervision as part of Mr. Crago's sentence and that portion of the sentence cannot be excised or ignored. This illegally lenient sentence must now stand. As discussed above, clear caselaw requires this outcome.

**III.    Request for Informal Conference**

Mr. Crago filed his petition on December 23, 2019. If the original time computation had stayed in effect, Mr. Crago would have been released on community supervision on September 17, 2019. Based on the timing of this case, Mr. Crago would request that a briefing schedule be set and an informal conference be scheduled in this matter to expedite any ruling from this Court. Mr. Crago respectfully requests that he participate in the informal conference remotely, and

that he not be transported for the conference.

## IV.    Conclusion

For the reasons set forth above, Mr. Crago requests that his sentence be affirmed and the

Department of Corrections be instructed to follow the 25 calendar year sentence with community

supervision for 3 years seven months.

RESPECTFULLY SUBMITTED this 13th day of August, 2020.

XOCHITL OROZCO
COCHISE COUNTY LEGAL ADVOCATE


By____/s/Xochitl Orozco_____
           Xochitl Orozco
           Legal Advocate

Copy of the foregoing delivered this
13th day of August, 2020 to:

Hon. Laura Cardinal
Judge of the Superior Court
Bisbee, AZ 85603
*via electronic service*

Doyle Johnstun
Deputy County Attorney
Bisbee, AZ   85603
*via electronic service*

Tonto Unit
Earl Crago ADC #115357
896 South Cook Road
Safford, AZ 85546
*Via U.S. mail*

By: Erica Corona

7

# EXHIBIT Q

Filed on 10/20/2020 11:20:09 AM

**IN THE SUPERIOR COURT OF THE STATE OF ARIZONA, In and for the County of Cochise**

**JUDGE: HONORABLE LAURA CARDINAL,**
**DIVISION: ONE**
**COURT REPORTER:** Revolutionary Text, LLC
**INTERPRETER:** ------------------

**AMY J. HUNLEY, Clerk of the Superior Court**
by: JENNIFER CARRANZA (10/20/2020 9:23:27 AM), Deputy Clerk

**HEARING DATE: 10/20/2020**

| | |
|---|---|
| **STATE OF ARIZONA,** <br><br> Plaintiff, <br><br> **VS** <br><br> **EARL FELTON CRAGO, JR.** <br> **DOB: 10/16/1971,** <br><br> Defendant. | **CASE NO: S0200CR94000471** <br><br> **MINUTE ENTRY: RULE 32 POST CONVICTION RELIEF PETITION** <br><br> **HEARING START TIME:  8:57 a.m.** <br> **HEARING END TIME:     10:39 a.m.** |

**State Represented by:** Doyle Johnstun, Deputy County Attorney
**Defendant present by video and by** Xochitl Orozco, County Legal Advocate
**Defendant in Custody: Yes, DOC**

Prior to the commencement of the hearing, Defendant's Exhibit A was marked for identification.

*************************

This matter came before the Court this date for Defendant's Petition for Post-Conviction Relief.

Ms. Orozco presented argument on behalf of Defendant's Petition for Post-Conviction Relief.

Mr. Johnstun presented objection to Defendant's Petition.

Ms. Orozco presented further argument in reply to State's response.

Ms. Orozco called as a witness, BRITTANY CASSIANO, who appeared telephonically, was duly sworn, direct examined, inquired of by the Court, cross examined, and excused from the stand. During the witness testimony, Defendant's Exhibit A was admitted into evidence and Defendant's Exhibit B was marked for identification and admitted into evidence.

Ms. Orozco called as a witness, EARL FELTON CRAGO, who was duly sworn, direct examined, cross examined, and excused from the stand.

Ms. Orozco presented closing argument.

Mr. Johnstun presented closing argument.

Discussion was held to the matter.

**IT IS ORDERED** TAKING this matter **UNDER ADVISEMENT.**

xc: e-mailed (e) by: JC  date: 10/20/2020
☒ County Attorney (e)        ☒ Legal Advocate (e)        ☒ DIV THREE JAA (e)

*To help protect against the spread of COVID-19, effective June 1, 2020, the Courts will require that all visitors use face coverings. Additionally, the Courts and its offices may require wellness screenings to include using touchless thermometers. Please do not visit the courthouse if you are ill. Contact your attorney or the Courts to reschedule your court appearance or to request a telephonic appearance.*

# EXHIBIT R

1 | P a g e

**SUPERIOR COURT, STATE OF ARIZONA, In and for the County of Cochise** FILED

| | | Clerk's Office use only |
|---|---|---|
| STATE OF ARIZONA, <br><br> PLAINTIFF, <br><br> -vs- <br><br> EARL FELTON CRAGO, <br><br> DEFENDANT. | Case No.  CR9400471 <br><br> DECISION AND ORDER RE: PETITION FOR POST-CONVICTION RELIEF | 2020 NOV -4  PM 4: 09 <br><br> AMY J HUNLEY <br> CLERK OF SUPERIOR COURT <br> BY <br> DEPUTY |

| HONORABLE LAURA CARDINAL <br> DIVISION ONE | Date:  10/29/2020 |
|---|---|

The matter came before the court for evidentiary hearing on Defendant's ninth Petition for Post-Conviction relief, filed December 23, 2019. The matter was stayed during the pendency of appeal on Defendant's eighth Petition for Post-Conviction Relief at the Court of Appeals (Memorandum Decision in State v. Crago, 2 CA-CR 2019-0234-PR, issued on March 26, 2020; mandate issued September 9, 2020). Defendant, acting in pro per, supplemented his Petition on April 27, 2020 and again on June 4, 2020; in both supplements he raised as grounds a change in the law affecting the length and definition of the Defendant's sentence, based on the recently decided Arizona Supreme Court case, Chaparro v. Shinn, 248 Ariz. 138, 459 P.3d 50 (March 5, 2020). The case was referred to the Office of Indigent Defense for appointment of counsel on June 11, 2020. Defense counsel filed her Memorandum in Support of Petition on August 13, 2020; the State filed its Response on September 10, 2020; and the Defense filed a Reply on October 8, 2020. Defendant makes two claims for post-conviction relief in his ninth petition:

1.   That the Defendant continues to be, or will continue to be, in custody after his sentence expires, and that there has been a significant change in the law affecting his sentence, to wit, Chaparro v. Shinn, 248 Ariz. 138, 459 P.3d 50 (March 5, 2020), and

2.   Ineffective assistance of counsel by his initial attorney on post-conviction relief, in failing to raise a claim for ineffective assistance of trial counsel and appellate counsel.

At the hearing on October 20, 2020, Defendant appeared via video-conference from the Arizona Department of Corrections and was represented by his appointed attorney, Xochitl Orozco, the Cochise County Legal Advocate; Cochise County Deputy Attorney Doyle Johnstun appeared on behalf of the State of Arizona.

The court has considered the pleadings filed in this matter, the exhibits admitted during the hearing, and the testimony of the witnesses presented at the hearing, and the court's file, including the transcript of the 1995 sentencing hearing, previous orders of the trial court and the court of appeals in this case, and **FINDS** as follows:

2 | P a g e

**1.   That the Defendant continues to be, or will continue to be, in custody after his sentence expires, and that there has been a significant change in the law affecting his sentence, to wit, Chaparro v. Shinn, 248 Ariz. 138, 459 P.3d 50 (March 5, 2020).**

The Defendant asserts that he has served the sentence imposed--that although the sentence imposed was "an illegally lenient" sentence, that he is now eligible for release-- but that he continues in custody due to error committed by the Arizona Department of Corrections.

The record reflects that the Defendant was convicted by a jury of a class one felony, a murder committed on September 28th, 1994. He was sentenced on August 21, 1995 to "... a life term in the Arizona Department of Corrections," that he "must serve every day of twenty-five (25) years of the sentence imposed before he is eligible for any type of release," and was given credit for 337 days of presentence incarceration credit. See Sentencing of Imprisonment, dated August 21,1995, page 3. The sentencing judge, the Hon. Matthew Borowiec[1], further ordered that upon release from prison, the Defendant is to serve community supervision, ordered pursuant to A.R.S.§13-603(1), for a term equal to one-seventh of the sentence imposed, "...three years, 7 months," which is equal to one-seventh (15%) of 25 years. See Sentence of Imprisonment, dated August 21, 1995, page 3.

The defense concedes that the sentence imposed was inconsistent with the sentencing statutes in effect in 1995 for offenses committed after January 1, 1994, and that it is an illegally lenient sentence. The state concedes that the sentence was not appealed by the state, nor corrected or amended by the sentencing court.

It is further understood that the Arizona Department of Corrections (hereinafter ADOC) time computation department told the Defendant, in reliance on the sentencing order, that he was, indeed, eligible for release on September 17, 2019 ("Sentence Expiration Date", hereinafter "SED"). This status of release was maintained by the ADOC from the beginning of his incarceration in 1995 until mid-2006, when, apparently on advice from the Arizona attorney general, Defendant's release eligibility and status within the corrections system was modified to reflect that he was serving a "life" sentence without possibility of release, and that the community supervision portion of the sentencing document had been "revoked" and extended to "life." See Exhibits A and B, to the hearing.

The State of Arizona contends that this issue is precluded, relying on a Court of Appeals' memorandum decision on Defendant's fifth petition for post-conviction relief, 2 CA-CR**2011**-0162PR. In that 2011 memorandum decision, the Court of Appeals reviewed a previous decision in Defendant's case, State v. Crago, 2 CA-CR **2008**-0396-PR, in which Defendant attempted to raise the sentencing issue first through a *pro se* petition for writ of habeas corpus. That habeas petition was deemed a Rule 32 petition by the trial court, but was then dismissed by the trial court for Defendant's failure to file a *pro se* petition for post-conviction relief. A special action claim was raised in the trial court and also dismissed. The 2008 petition for review of the

---

1 Matthew Borowiec served as Cochise County Superior Court judge from 1979 to 2000.

habeas/Rule 32 was reviewed by relief denied by the Court of Appeals. The Court of Appeals in 2011, therefore deemed the issue of modification of the sentence from "life with possibility of release in 25 years" to "life" as precluded as having been raised before. The state relies on that decision in asking the court to find preclusion now.

This court can, therefore, find the issue of sentencing terms imposed in 1995, raised here in Defendant's ninth Petition for Post Conviction Relief, precluded pursuant to Rule 32.2, Ariz. R. Crim. Proc., unless Defendant has raised grounds for relief on the issue which are not precluded. See Rule 32.2(b), Ariz. R. Crim. Proc.

In his ninth petition for post-conviction relief, the Defendant has raised in supplemental pleadings filed *pro se*, and through appointed counsel, the argument that there has been "a significant change in the law" which would affect the sentence imposed in his case. See Rule 32.1(g), Ariz. R. Crim Proc. "Claims for relief based on Rule 32.1(b) through (h) are not subject to preclusion under Rule 32.2(a)(3)." Defendant has timely raised the issue. See Rule 32.2(b), Ariz. R. Crim. Proc.

The threshold question is whether the *Chaparro* decision by the Arizona Supreme Court qualifies as "a significant change in the law." "Rule 32 does not define 'a significant change in the law.' But plainly a change in the law requires some transformative event, a clear break from the past." *State v. Shrum*, 220 Ariz. 115, 203 P.3d 1175, 1178 (2009), *quoting State v. Slemmer*, 170 Ariz. 174, 182, 823 P.2d 41, 49 (1991); *State v. Poblete*, 227 Ariz. 537, 540, 260 P.3d 1102, 1105 (Ct. App. 2011). "It is admittedly often difficult to determine when a case announces a new rule, and we do not attempt to define the spectrum of what may or may not constitute a new rule for retroactivity purposes. In general, however, a case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government." *Teague v. Lane*, 489 U.S. 288, 301, 109 S. Ct. 1060, 1070, 103 L. Ed. 2d 334 (1989).

The *Chaparro* case involves a set of circumstances on all fours with this case. Mr. Chaparro committed a first-degree murder in May 1995, for which he was convicted and sentenced in September 1996, in Maricopa County Superior Court. He was ordered to serve a life sentence without possibility of parole until he had served 25 years. Upon his release, he was sentenced to serve a term of community supervision. As in *Crago*, the state did not appeal the sentence. Chaparro filed numerous petitions for post-conviction relief through the years. In 2017, when Chaparro learned that his sentence had been reconsidered by ADOC and that he would not be deemed eligible for parole after serving 25 years, he initiated a complaint in federal district court under 42 U.S.C. § 1983 alleging equal protection violation (based on the provisions of A.R.S. §13-718, which affords parole eligibility to those serving life sentences for first degree murder who pled to the charge); a due process violation due to the failure of the state to enforce the legal, un-appealed sentence; and a due process violation

for the state's refusal to certify Plaintiff eligible for parole. The matter was referred to the U.S. District Court. See *Chaparro v. Ryan*, 2019 WL 3290328, (D. Ariz. July 22, 2019).

The State filed a motion for certification or dismissal in the federal court, arguing that the key issue in the matter--"whether Chaparro's sentence of 'life without the possibility of parole for 25 years' means he becomes parole-eligible after 25 years or whether the sentence should be construed as never resulting in parole eligibility"-- was an "unresolved question of state law" and more suited to resolution by the state's supreme court. *Chaparro v. Ryan*, id. The district court judge agreed, writing,

> Through certification of novel or unsettled questions of state law for authoritative answers by a State's highest court, a federal court may save time, energy, and resources and hel[p] build a cooperative judicial federalism." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 77 (1997) (citations and internal quotation marks omitted). The Supreme Court has explained that certification is particularly appropriate "when a federal court is asked to invalidate a State's law, for the federal tribunal risks friction-generating error when it endeavors to construe a novel state Act not yet reviewed by the State's highest court." *Id.* at 79. Nevertheless, "[n]ovel, unsettled questions of state law . . . are necessary before federal courts may avail themselves of state certification procedures." *Id.* See also *Harris v. Arizona Indep. Redistricting Comm'n*, 993 F. Supp. 2d 1042, 1068 (D. Ariz. 2014) ("A basic prerequisite for a court to certify a question to the Arizona Supreme Court is the existence of a pending issue of Arizona law not addressed by relevant Arizona authorities."). Furthermore, the Arizona Supreme Court may accept a request for certification only if the question to be resolved "may be determinative of the cause then pending in the certifying court and as to which it appears to the certifying court there is no controlling precedent in the decisions of the supreme court and the intermediate appellate courts of this state." A.R.S. § 12-1861.
>
> All of these requirements are satisfied here. First, this case presents a **"novel or unsettled question[ ] of state law" as to which "there is no controlling precedent"** from the Arizona **appellate courts.** *Arizonans for Official English*, 520 U.S. at 77; A.R.S. § 12-1861. Neither party has cited a case by the Arizona Supreme Court or Arizona Court of Appeals addressing how to interpret a sentence of "life without the possibility of parole for 25 years" that was imposed for a crime committed after Arizona's eradication of parole in 1993. Although Chaparro argues that such a sentence should be construed to provide parole eligibility after 25 years—why else mention the unavailability of parole for the first 25 years?—the State has some counter-arguments in its arsenal. Because this is a pure question of state law, it should be an Arizona state court, not a federal court in a § 1983 action, that resolves it in the first instance.

*Chaparro v. Ryan*, No. CV1900650PHXDWLMHB, 2019 WL 3290328, at *4–5 (D. Ariz. July 22, 2019).

The court **FINDS** that the decision reached by the Arizona Supreme Court in *Chaparro v. Shinn*, 248 Ariz. 138, 459 P.3d 50 (S2020), is a "significant change in the law" that is a transformative event and a clear break from the past, which if applied to Defendant Crago's case, would have an effect on his sentence.

**IT IS THEREFORE THE FINDING OF THE COURT**, that the issue of the definition and terms of the sentence imposed, raised in Defendant's Ninth Petition (supplemented) **IS NOT PRECLUDED.**

The court **FINDS** that the sentence imposed by Judge Borowiec in 1995 is the same in all essential ways with the sentence imposed by the trial court in _Chaparro_ in 1996. The only distinction is Borowiec's use of the word "release" rather than "parole," as used in the Chaparro sentencing. The Arizona Supreme Court in _Chaparro v. Shinn_ made much of the distinction between "parole" and "commutation," and found that the two words were not synonymous forms of release. The Chaparro court wrote, "'Parole' has a distinct meaning from 'commutation' in the dictionary." Chaparro, id, 248 Ariz. at 141. The Court wrote,

> In sum, although the trial court's use of 'parole' and 'community supervision' was ambiguous, the sentencing hearing and December Order clarify the trial court's intent to provide the opportunity for parole. And because the meaning of 'parole' is not ambiguous or synonymous with other forms of release, Chaparro is eligible for parole after serving 25 years."

Chaparro, id, 248 Ariz. at 142.

This court has reviewed the Crago sentencing transcript, sentencing minute entry and clerk's notes in the Crago matter. The court concludes from the sentencing transcript that consensus among the criminal justice community in 1995 was that there were two options for sentencing in non-capital, first degree murder cases: natural life, or, life with the possibility of parole after 25 years. (That conclusion is borne out in the sentence imposed in Chaparro's case.) Both the state's attorney (Gerald Till) and the defense attorney (Rafael Malanga), as well as the victim (Lottie Ross) who spoke at sentencing, all believed that there were those two sentencing options before the judge:

• See Mr. Till's comments, page 19, lines 9-13: "It appears that the court really has in this case really two options. One is the life in prison as mandated however subject to parole in 25 years, and the other is natural life in prison"; page 19-20, lines 24-25, 1: "He will probably [sic] 47 years old when he gets out if he is given the opportunity for parole in 25 years."

• See Mr. Malanga's comments, page 23, lines 7-9: "I don't think under those facts that Mr. Crago should receive the ultimate penalty of life without possibility of parole." Page 24, lines 2-4: "With that in mind, I just—it seems harsh to sentence Mr. Crago to life without possibility of parole." Page 24, lines 21-22: "I would ask the court to sentence the defendant to life with the possibility of parole in 25 years."

• See Lottie Ross's comments, the sister of the victim, page 18, lines 20-22: "And I think after 25 years, I think he's going to be too institutionalized to get back on the street."

There is nothing to suggest that Judge Borowiec intended in imposing a sentence of "life" without the possibility of release "... on any basis until the completion of the service of 25 years," that "release" meant anything other than "parole." Judge Borowiec stated, "...no one of course can know if Mr. Crago fulfills 25 years in prison what he will be like."

It is the further conclusion of this court that the imposition of "community supervision" was Judge Borowiec's acknowledgment of the recent change in the law – a change which made no clear provision for these types of cases.

The Court, therefore, **FINDS** that the use of the term "release" rather than "parole" does not affect the intent of the sentencing court, which was to impose a life sentence with the possibility of parole or other release (work furlough or work release, but distinct from "commutation") after the Defendant had served 25 years in prison, with credit for presentence incarceration.

The Court **FURTHER FINDS**, that application of the ruling in *Chaparro v. Shinn*, supra, is appropriate, fair and just in Defendant Crago's case. "Retroactivity is properly treated as a threshold question, for, once a new rule is applied to the defendant in the case announcing the rule, evenhanded justice requires that it be applied retroactively to all who are similarly situated." *Teague v. Lane*, 489 U.S. 288, 300, 109 S. Ct. 1060, 1070, 103 L. Ed. 2d 334 (1989). Crago is similarly situated to Chaparro.

**IT IS THEREFORE THE ORDER OF THE COURT**, that regardless of A.R.S. 41-1604.09, Defendant Crago is eligible for parole after serving 25 years pursuant to his sentence, and his illegally lenient sentence is final under Arizona law. See *Chaparro v. Shin*, 248 Ariz. 138, 143, 459 P.3d 50, 55 (2020).

**IT IS THE FURTHER ORDER OF THE COURT**, that Defendant Crago shall be placed on community supervision for the term imposed by the sentencing judge, subject to the terms and conditions of the community supervision program.

2. **Ineffective assistance of counsel by his initial attorney on post-conviction relief, in failing to raise a claim for ineffective assistance of trial counsel and appellate counsel.**

The Defendant's very first petition for post-conviction relief was filed by the same attorney who filed his appeal, Paul Newman, Esq. In that first PCR, Newman raised the issue of ineffective assistance of trial counsel. Subsequent petitions filed by Defendant continued to raise the issue of ineffective assistance of counsel, and the issue has been extensively reviewed, through appeal, post-conviction relief review, and petitions for review to the appellate courts.

In neither of Defendant's pro per supplements to his Petition, nor in his appointed attorney's Memorandum in Support of Petition and Reply to the State's Response to Petition, was the issue of ineffective assistance of prior counsel addressed. The State does not address this claim.

Having reviewed the Defendant's extensive file, and being familiar with the claims made in post conviction proceedings,

**IT IS THE FINDING OF THE COURT**, that the Defendant has exhaustively briefed the issue of ineffective assistance of trial counsel, and that the issue is precluded, pursuant to Rule 32.2(a)(2), Ariz. R. Crim. Proc., having been previously addressed in postconviction proceedings.

**IT IS THE FURTHER FINDING OF THE COURT**, that the Defendant has waived the issue of ineffective assistance of appellate counsel, and that the issue is precluded, pursuant to Rule 32.2(a)(3), Ariz. R. Crim. Proc. having failed to timely pursue this claim in any of his subsequent petitions for post-conviction relief (numbers 2-8).

This is a final order, pursuant to Rule 33.13, Ariz. R. Crim. Proc.

DATED THIS ___4___ DAY OF NOVEMBER, 2020.

LAURA CARDINAL
JUDGE OF THE SUPERIOR COU

mailed/distributed: (date)(initials) 11/04/2020

cc: Doyle Johnstun, Esq., Cochise County Attorney's Office, Bisbee, AZ
Xochitl Orozco, Esq., Cochise County Legal Advocate, Bisbee, AZ

# EXHIBIT S

OFFICE OF THE COCHISE COUNTY
ATTORNEY
P.O. Drawer CA
Bisbee, Arizona 85603
(520) 432-8700
Doyle B. Johnston, #010647
Deputy County Attorney

*Attorney for the State*

## ARIZONA COURT OF APPEALS

## DIVISION TWO

| | |
|---|---|
| STATE OF ARIZONA, | No. 2CA-CR2021-011-PR |
| Plaintiff/Appellant, | Cochise County Superior Court No. CR94000471 |
| v. | |
| EARL CRAGO, | **PETITION FOR REVIEW** |
| Defendant/Appellee, | |

Pursuant to Arizona Rule of Criminal Procedure 32.16, the State petitions this Court to review the superior court's orders granting Defendant's ninth Rule 32 Petition for Post-Conviction Relief and ordering his immediate release from prison. *See* Ariz. R. Crim. P. 32.16.

Defendant was sentenced to a term of life imprisonment without the possibility of "release"—i.e., executive commutation—for at least 25 years. Defendant argued in his ninth Rule 32 petition that his sentence expired after serving 25 years, a claim already raised and rejected by this Court in conjunction with Defendant's fifth Rule 32 proceeding, and sought his release. Relying on the Arizona Supreme Court's recent decision in *Chaparro v. Shinn*, 248 Ariz. 138

(2020), the superior court interpreted Defendant's sentence as making him eligible for "parole" after serving 25 years, even though parole was statutorily abolished at the time of his sentencing (in 1995), the sentencing judge never referenced parole at the sentencing hearing or in the sentencing order, and Defendant did not argue in his Rule 32 petition that he was eligible for parole under *Chaparro*. The superior court relied on *Chaparro* as a pretext to avoid preclusion, dubbing it a significant change in the law, and *sua sponte* applied it (incorrectly) to convert Defendant's legal sentence into an illegal sentence.

Compounding that error, the superior court then ordered Defendant's immediate release on community supervision. The basis for that order is unclear, as *Chaparro* involved only parole eligibility, and this Court previously held that Defendant's term of community supervision is incompatible with his indeterminate life sentence. The superior court either converted Defendant's life sentence to a definite term of 25 years (in defiance of this Court's prior holding) or it bypassed the Arizona Board of Executive Clemency and the Governor and determined (without any evidence) that Defendant satisfied the criteria for parole or commutation.

This Court should grant review and reverse the superior court's manifestly erroneous release orders. Defendant was precluded from raising this issue under Rule 32.2(a)(2) and *Chaparro* did not provide a preclusion exception; Defendant's

sentence was an indeterminate life sentence (not a determinate 25-year sentence) and authorized only the possibility for executive commutation (not eligibility for, nor the automatic grant of, parole); and the superior court did not have the authority to order Defendant's parole or other release.  Such authority lies exclusively with the Board of Executive Clemency and/or Governor.

## STATEMENT OF THE ISSUES

1.      Whether Defendant's Rule 32 Petition for Post-Conviction Relief was precluded under Rule 32.2(a).

2.      Whether the superior court's determination that the sentencing judge intended for Defendant to be eligible for parole after serving 25 years is supported by the record.

3.      Whether the superior court erred in ordering Defendant's release on community supervision.

## MATERIAL FACTS

**I.      Defendant's Conviction and Sentence.**

After a jury convicted him of first-degree murder in 1995, Defendant faced two sentencing options: (1) natural life; or (2) life with the possibility of release after 25 years.  The Arizona Legislature had eliminated parole for all offenses committed on or after January 1, 1994.  *Chaparro*, 248 Ariz. at 140, ¶ 3.

On August 21, 1995, the sentencing judge, the Honorable Matthew Borowiec,

chose the latter.  At Defendant's sentencing hearing, Judge Borowiec pronounced:

> I am going to impose the sentence of life with the
> condition that he serve <u>at least</u> 25 years, every day of 25
> years. No legal cause appearing, it is the judgment of this
> court and sentence that you be imprisoned for the term of
> life and that you not be released on any basis until the
> completion of the service of 25 years. ... It is further
> ordered that you will serve three years and seven months
> community supervision once you are released from prison.

(Ex. A at 28–29, emphasis added.)[1]  Similarly, Defendant's sentencing order states:

> Sentence: committed to a LIFE term in the Department of
> Corrections[.] ... the Defendant must serve every day of
> twenty-five (25) years of the sentence imposed before he
> is <u>eligible</u> for any type of release. ... That pursuant to
> A.R.S. § 13-603(I), the Defendant will be required to do
> mandatory community supervision sentence—one day for
> every seven days sentenced to, for a total of 3 years, 7
> months.

(Ex. B, emphasis added.)  Thus, neither the sentencing transcript nor the sentencing

order reflect an intent by Judge Borowiec to defy Arizona's sentencing statutes and

impose an illegal sentence that authorized parole eligibility.  *See State v. Medrano*,

185 Ariz. 192, 196 (1996) (sentencing "[j]udges are presumed to know and follow

the law").  Because of his crime (first-degree murder), the only "release" Defendant

was eligible for was executive commutation.

---

[1] All Exhibits can be found in the accompanying Appendix.

4

## II.   Defendant's Fourth Rule 32 Petition for Post-Conviction.

Following his conviction, Defendant filed several Rule 32 petitions challenging his conviction and/or sentence. *See State v. Crago*, No. 2 CA-CR 2008-0396-PR, 2009 WL 1337148, at *1, ¶ 1 (Ariz. App. May 12, 2009) ("*Crago I*") (discussing Defendant's Rule 32 history).  On March 18, 2008, Defendant filed a petition for writ of habeas corpus in superior court, alleging that the Arizona Department of Corrections ("DOC") had changed his sentence on its public website and institutional file from a determinate 25-year sentence (followed by community supervision) to a sentence of natural life. (Ex. C.) The superior court converted the habeas corpus petition to a Rule 32 petition for post-conviction relief and appointed counsel. (Ex. D.)

On June 11, 2008, counsel for Defendant filed a Rule 32 notice. (Ex. E.)  In that Notice, Defendant's counsel stated it was his "opinion that there were no grounds to file a Rule 32 petition" and requested to be relieved as counsel. (*Id.*) The superior court, the Honorable Wallace R. Hoggatt, granted counsel's request to be relieved and ordered Defendant to file a pro per petition. (Ex. F.)  Defendant never did, and Judge Hoggatt dismissed the proceeding on November 6, 2008. (Ex. G.)

On November 11, 2008, Defendant filed a petition for special action, again alleging that DOC informed him he was not eligible for community supervision and "altered and enhanced" his determinate 25-year sentence to a term of natural life

with no release eligibility. (Ex. H.)   On November 14, 2008, Judge Hoggatt dismissed the special action because Defendant abandoned the issue in his post-conviction proceeding. (Ex. I.)  Defendant then filed a petition for review. (Ex. J.) This Court affirmed Judge Hoggatt's decision dismissing Defendant's Rule 32 proceeding, but vacated his ruling denying special-action relief. *Crago I*, 2009 WL 1337148, at *2, ¶¶ 5–6. It did not do so on the merits, however. Rather, it ruled that Defendant's special-action petition was a distinct request entitled to consideration independent from the Rule 32 proceeding. *See id*. ("[O]ur ruling is not intended to suggest Crago's special action claim has merit, only that he is entitled to have the court consider it.").

On remand, Judge Hoggatt ordered the clerk to assign a civil case number to Defendant's petition for special action. (Ex. K.)  But on August 5, 2009, Defendant filed a motion to voluntarily withdraw his petition for special action.  (Ex. L.) Accordingly, Judge Hoggatt dismissed the action. (Ex. M.)

### III.   Defendant's Fifth Rule 32 Petition for Post-Conviction Relief.

On April 8, 2010, Defendant filed another Rule 32 notice and petition for post-conviction relief, again claiming that DOC changed his determinate 25-year sentence "to natural life not eligible for release." (Ex. N.)  Judge Hoggatt assigned Defendant counsel (Ex. O), who filed an amended Rule 32 petition (Ex. P).  In that amended petition, Defendant's counsel admitted that Defendant was not eligible for

parole because at the time of his sentence, the sentencing laws did not authorize parole.  (*Id*.)  But, he argued, Defendant's sentence required he be released on community supervision after serving 25 years.  (*Id*.)  After the State filed its response, Defendant's counsel moved to withdraw from representation, and Defendant filed a pro per reply.  (Ex. Q; Ex. R.)  Judge Hoggatt granted counsel's withdrawal request.  (Ex. Q.)

On May 4, 2011, Judge Hoggatt denied the petition, ruling that Defendant was not sentenced to a determinate 25-year sentence, but rather a life sentence with the *possibility* of release—via executive commutation—after serving 25 years:

> As the State correctly notes in its response, defendant was not sentenced to serve twenty-five years in prison. Such a sentence would have been illegal. Rather, defendant was sentenced to serve life in prison, with the possibility that after serving twenty-five years, he could achieve his release if recommended by the Board of Executive Clemency and the sentence commuted by the Governor. Release after the service of twenty-five years is a possibility but isn't guaranteed.

> Defendant contends that the Department of Corrections, through its Time Computation Unit, has converted his sentence of life imprisonment to one of natural life. Not so. Nothing that the Department of Corrections did has precluded Mr. Crago from exercising his right, after he serves the required twenty-five calendar years, to apply to the Board of Executive Clemency and the Governor for release.

> By law, the sentencing court could not have imposed a sentence any less than life imprisonment without possibility of release for twenty-five calendar years. That is precisely what the court did. Although the

sentencing court added a provision for community
supervision, addressed below, in terms of the life sentence
itself, the court followed the applicable law.

Because the court followed the law by imposing a
life sentence without possibility of release for twenty-five
calendar years, and also because the defendant has not yet
served twenty-five calendar years, it cannot be said that
defendant is being held in custody after the sentence has
expired. Indeed, even after he has served twenty-five
calendar years, he could not be held in custody after the
expiration of the sentence because the sentence is one of
life imprisonment.

Further, the sentence imposed was not clearly
excessive nor contrary to law. In the imposition of the life
sentence without a possibility of release for twenty-five
years; however, as the State correctly notes in its response,
the imposition of community supervision of three years
and seven months was contrary to law. The imposition of
community supervision in any amount would be.

(Ex. S.)

Defendant filed a petition for review (Ex. T), but this Court affirmed. *See*

*State v. Crago*, No. 2 CA-CR 2011-0162-PR, 2011 WL 4014450 (Ariz. App. Sept.

9, 2011) ("*Crago II*"). This Court first held that Defendant previously raised this

issue in his 2008 petition for writ of habeas corpus/Rule 32 petition; that Judge

Hoggatt denied it; and that this Court affirmed that ruling. *Id*. at *2–3, ¶¶ 6–7. Thus,

it held, "the claim now before us, which Crago has raised to some extent in two prior

pleadings, is precluded." *Id*. The Court alternatively addressed the merits and, like

Judge Hoggatt, held that Defendant was not entitled to release after 25 years, but

that he was sentenced to an *indeterminate* term of life imprisonment and merely

eligible for executive commutation after serving 25 years:

> We note at the outset that Crago's argument is based on the unsupported notion that his original sentence was converted from a determinate term of twenty-five years to one of natural life, thereby "eliminat[ing]" his release eligibility. First, his original sentence expires at the end of his life, an indeterminate period, not in twenty-five years, as he asserts. The court committed Crago "to a Life term in the Department of Corrections," and ordered him to "serve every day of twenty-five ... years of the sentence imposed before he is eligible for any type of release." Second, ADOC's 2006 time computation memorandum did not change Crago's sentence to one of natural life, as he asserts. Rather, it removed the community supervision requirement, but did not, as Crago claims, make him ineligible for release.

> \*\*\*

> Conversely, we do not find any evidence in the record to support Crago's position that he somehow is ineligible to be considered for release after serving twenty-five years. *See* A.R.S. § 31–402(C)(2), (4) (allowing board of executive clemency to recommend commutation); *see also McDonald v. Thomas*, 202 Ariz. 35, ¶ 12, 40 P.3d 819, 824 (2002) (governor's ultimate decision to approve or reject commutation). By the very terms of his original sentence, Crago is required to serve twenty-five years "before he is eligible for any type of release." ADOC's 2008 time computation memorandum did not change this fact. ... However, because Crago began serving his sentence in 1994, he may not be considered for release until 2019.

> Finally, to the extent we understand Crago's argument that ADOC's removal of the erroneous imposition of community service somehow prejudiced him, we reject that argument. The imposition of

community supervision had no bearing on Crago's life sentence or his eligibility to have that sentence commuted.

*Id.* at *3, ¶¶ 8, 10–11. The Court also rejected Defendant's argument that he was entitled to community supervision:

> Moreover, we are unaware of any authority, statutory or otherwise, that supports the imposition of community supervision following a life sentence. The trial court imposed community supervision under A.R.S. § 13–603(I), which provides that it "shall be served consecutively to the actual period of imprisonment." However, Crago never had, nor does he now have a sentence that assures he will be released after twenty-five years, or for that matter, during his lifetime. His sentence was and always has been one of life, and his sentence expiration date was and always has been the end of his life. Accordingly, the court correctly concluded "the imposition of community supervision ... was contrary to law."

*Id.*, ¶ 9. Defendant filed a petition for review to the Arizona Supreme Court, which was denied. (Ex. U.)

## IV. *Chaparro v. Shinn.*

Abelardo Chaparro was sentenced in 1996 to a term of "[l]ife without possibility of parole for 25 years," followed by a consecutive term of community supervision. *Chaparro*, 248 Ariz. at 140 at ¶ 3. After serving 24 years in prison, Chaparro initiated a civil suit in federal court, seeking to compel DOC to certify him as parole eligible once he served his 25th year, even though it was an illegally lenient sentence and statutorily prohibited. *See Chaparro v. Ryan*, No. 2019 WL 3361244,

10

at *1 (D. Ariz. July 25, 2019).  The district court certified the following question to

the Arizona Supreme Court:

> Whether, in light of A.R.S. § 41-1604.09
> [eliminating parole], a person convicted of first-degree
> murder following a jury trial for actions that took place on
> or after January 1, 1994, is parole eligible after 25 years
> when his sentence states that he is sentenced to "life
> without possibility of parole for 25 years."

*Id.* at 4.  The Arizona Supreme Court accepted the certification and, on March 5,

2020, it upheld Chaparro's illegally lenient sentence, holding that the State waived

any challenge by failing to timely appeal it.

The court first addressed whether Chaparro's sentence provided the

possibility of parole.  *Chaparro*, 248 Ariz. at 140, ¶ 8.  The court concluded that it

did because: (1) the sentence expressly authorized "parole" eligibility; and (2) at the

sentencing hearing, the sentencing judge stated that he believed that "parole"

eligibility was a sentencing option.[2]  *Id.* at 140–41, ¶¶ 11–12.  Significantly, "[t]he

trial court did not mention release or commutation as an option," and the words

"parole" and "release" are not synonymous.  *Id.* at 141–42, ¶¶ 12–17.  The court also

noted that "community supervision does not apply to a parole eligible inmate."  *Id.*

Finally, the court held that, because the State failed to timely appeal the sentence, it

waived any challenge.  *Id.* at 142–43, ¶ 22.

---

[2] The court only looked at the sentencing transcript to derive the sentencing
judge's intent because the consecutive term of "community supervision" rendered
the term "parole" ambiguous.  *Chaparro*, 248 Ariz. at 140–142, ¶¶ 9–10, 17.

## V.    Defendant's Ninth Rule 32 Petition for Post-Conviction Relief.

On December 23, 2019, Defendant filed a ninth Rule 32 petition, again arguing that he was being illegally detained beyond his determinate 25-year sentence. (Ex. V.)  After the Supreme Court's decision in *Chaparro*, Defendant supplemented his petition with a citation to *Chaparro* for its holding that the State cannot challenge an illegally lenient sentence if untimely, and argued that DOC, Judge Hoggatt, and this Court did not have jurisdiction to change his determinate 25-year sentence to a life sentence (Ex. W), a claim already rejected by this Court in 2011. *Crago II*, 2011 WL 4014450 at *3, ¶¶ 8–11.

Due to Judge Hoggatt's retirement, the petition was considered by the Honorable Laura Cardinal.   Judge Cardinal first ruled that the issue was not precluded by Defendant's fifth Rule 32 petition because *Chaparro* constituted a significant change in the law and was factually "on all fours with this case." *See* Ariz. R. Crim. P. 32.2(b).  (Ex. X at 3–4.) Judge Cardinal concluded that *Chaparro* was a "transformative event and a clear break from the past" because, in certifying the issue to the Arizona Supreme Court, the federal district court in that case determined that it presented a "'novel or unsettled question of state law' as to which 'there is no controlling precedent' from the Arizona appellate courts." (*Id.*)

Judge Cardinal next ruled that Defendant's sentence was "the same in all essential ways with the sentence imposed by the trial court in *Chaparro*," and, after

reviewing the sentencing record, divined that Judge Borowiec intended for Defendant to be parole eligible, notwithstanding the fact that he never sentenced Defendant to life with the possibility of "parole" and parole was statutorily unavailable at the time. (*Id.* at 5.) Judge Cardinal instead relied on statements made by *other* people at the sentencing hearing: the prosecutor believed that the two sentencing options were natural life and life with the possibility of "parole," Defendant's criminal attorney urged Judge Borowiec to impose a sentence of life with the possibility of "parole," and the victim's mother stated that she believed Defendant would be "too institutionalized to get back on the street" "after 25 years." (*Id.*) Judge Cardinal ruled that Judge Borowiec's use of the word "release" did "not affect" the intent she ascribed to him, adding "[t]here is nothing to suggest that [he] intended in imposing a sentence of 'life' without the possibility of release 'on any basis until the completion of the service of 25 years' that 'release' meant anything other than 'parole.'" (*Id.* at 5–6.)

Based on these findings, Judge Cardinal issued two rulings:

> IT IS THEREFORE THE ORDER OF THE COURT, that regardless of A.R.S. § 41-1604.09, Defendant Crago is eligible for parole after serving 25 years pursuant to his sentence, and his illegally lenient sentence is final under Arizona law. See *Chaparro v. Shin*[n], 248 Ariz. 138, 143, 459 P.3d 50, 55 (2020).

> IT IS THE FURTHER ORDER OF THE COURT, that Defendant Crago shall be placed on community supervision for the term imposed by the sentencing judge,

> subject to the terms and conditions of the community
> supervision program.

(*Id.* at 6.)   On December 18, 2020, Judge Cardinal issued a clarifying order,

amending the first paragraph to reflect that Defendant "is eligible for <u>release</u> after

serving 25 years." (Ex. Y, emphasis added.)   Nothing in the second paragraph

changed.   (*Id.*)   Judge Cardinal extended the time to file a petition for review until

January 29, 2020.  The State timely filed this Petition.

## THE COURT SHOULD GRANT REVIEW

**I.     The Superior Court Erred in Concluding That This Issue Was Not Precluded.**

A claim for post-conviction relief that a defendant "continues to be or will

continue to be in custody after his or her sentence expired" is precluded if it was

finally adjudicated on the merits in a previous post-conviction proceeding.  Ariz. R.

Crim. P. 32.1(d), 32.2(a)(2), 32.2(b).  Defendant's ninth Rule 32 Petition alleged

that he was sentenced to a determinate 25-year term of imprisonment and that he

was still imprisoned after 25 years.  But Defendant raised that same issue in his

fourth and fifth Rule 32 petitions (Ex. C, E, H, N, P), and both Judge Hoggatt (Ex.

S) and this Court *adjudicated* that issue on the merits in conjunction with

Defendant's fifth Rule 32 proceeding. *See Crago II*, 2011 WL 4014450 at *3, ¶¶ 8–

11; *Crago I*, 2009 WL 1337148, at *2, ¶¶ 5–6.  Both concluded that Defendant was

not sentenced to a determinate 25-year sentence, but rather an indeterminate life

sentence with the possibility of release after serving 25 years imprisonment, and that

the consecutive term of community supervision did not alter that sentence. *Id.* Rule 32.2(a)(2) precluded Defendant from raising the issue a third time. *See also* Ariz. R. Crim. P. 32.2(b).

Judge Cardinal's ruling that the issue was not precluded because *Chaparro* constituted a "significant change in the law" was also error. Although claims for relief based on Rule 32.1(g) "are not subject to preclusion under Rule 32.2(a)(3)," "they are subject to preclusion under Rule 32.2(a)(2)." *See* Ariz. R. Crim. P. 32.2(b) (emphasis added). As discussed above, Defendant's claim was precluded under Rule 32.2(a)(2) because it had already been adjudicated.

In addition, *Chaparro* does not qualify as a significant change in the law. *See State v. Shrum*, 220 Ariz. 115, 118 (2009) ("[A] change in the law requires some transformative event, a clear break from the past."). This is because *Chaparro* is distinguishable and did not *change* the law. The issue there was whether "a sentence imposing 'life without possibility of parole for 25 years' means the convicted defendant is eligible for parole after serving 25 years' imprisonment" despite the statutory prohibition on parole. *Chaparro*, 248 Ariz. at 139, ¶ 2. Here, Defendant was sentenced to life without the possibility of *release* for 25 years. Furthermore, the construction principles the Supreme Court applied to interpret Chaparro's sentence were nothing new. *See id.* at 140, ¶¶ 8–12. Nor were the principles relied on to find the State waived its challenge to the illegally lenient sentence. *See id.* at

142–43, ¶¶ 18–22 (relying on *State v. Dawson*, 164 Ariz. 278 (1990)).  Nothing in the court's decision *changed* the law.  It strictly applied the existing law to the facts before it.[3]  The Court should hold that Defendant's claim was precluded.

## II.   The Superior Court Erred in Concluding That Defendant Was Parole Eligible.

Judge Cardinal relied on *Chaparro* to conclude *sua sponte* that Defendant's sentence made him eligible for parole after serving 25 years.  As a threshold matter, Defendant did not argue in his ninth Rule 32 petition that his sentence made him parole eligible.  He argued only that his sentence was a determinative 25-year sentence and that he should be released.  (Ex. V, W.)  Had Defendant raised the parole-eligibility issue, it would have been precluded under Rule 32.2(a)(3) because he could have raised it in a prior post-conviction proceeding and never explained why he failed to raise it.  *See* Ariz. R. Crim. P. 32.2(b).

Nonetheless, *Chaparro* does not support Judge Cardinal's conclusion that Defendant's sentence authorized parole.   The sentencing order in that case authorized the "possibility of <u>parole</u>" after serving 25 years.  *Chaparro*, 248 Ariz. at 140 at ¶ 3 (emphasis added).  Because the use of the word "parole" was ambiguous—

---

[3] Judge Cardinal's reliance on the *Chaparro* parties' representations to the district court—that the issue was "unresolved"—and the district court's certification pursuant to A.R.S. § 12-1861 is similarly misplaced.  Seeking guidance from the Arizona Supreme Court on *how* to interpret a criminal sentence that imposes an illegally lenient sentence is only transformative for purposes of Rule 32.1(g) if the resolution *changed* existing law and effectively overturned Defendant's sentence.  Neither condition transpired.

in light of the sentencing court's accompanying term of "community supervision," which "does not apply to a parole eligible inmate, *id*. at 141, ¶ 12—the court looked to the sentencing transcript to determine the sentencing judge's intent. *Id*. at 140–41, ¶ 10. The transcript revealed that the sentencing judge in fact intended to make Chaparro parole eligible: "Do you understand one of them is death, one of them is life imprisonment for the rest of your natural life, and the other one is life imprisonment without possibility of parole for 25 years? ... Those are the only three things I can do." *Id*. at 141, ¶ 12 (emphasis added). "The trial court did not mention release or commutation as an option." *Id*. Thus, the sentencing judge intended "to provide the opportunity for parole." *Id*. at 142, ¶ 17.

Conversely, here, the sentencing order did not mention "parole," but rather, in accordance with the sentencing statute, ordered only the possibility of "release." Thus, there was no reason to go beyond the face of the sentencing order; it was unambiguous. *See id*. at 140, ¶ 9 ("If the language is subject to more than one reasonable interpretation, we will resolve the ambiguity by examining other factors, including the surrounding circumstances."). That should have been the end of the inquiry. Nonetheless, the sentencing-hearing transcript confirms that Judge Borowiec did not intend to make Defendant parole eligible. He does not mention parole, only release.

Judge Cardinal's reliance on the prosecutor's and defense counsel's statements was incorrect. Obviously, they are not indicative of what Judge Borowiec intended. The signed sentencing order and sentencing transcript—reflecting Judge Borowiec's own words—are controlling. He said "release" and sentencing judges are "presumed to know and follow the law." *Medrano*, 185 Ariz. at 196. Attributing the beliefs of other people to Judge Borowiec and then concluding that Judge Borowiec's use of the term "release" is ineffectual or insufficient to overcome the intent attributed to him (Ex. X at 5–6) is circular and flawed logic.[4]

Judge Cardinal's ruling also ignores (and violates) this Court's holding in 2011: that Defendant's sentence only made him eligible for release—i.e., executive commutation. *Crago II*, 2011 WL 4014450 at *3, ¶¶ 10–11. Judge Cardinal was bound to follow that holding. *See Dancing Sunshines Lounge v. Indus. Comm'n*, 149 Ariz. 480, 482 (1986) ("[T]he decision of a court in a case is the law of that case on the issues decided throughout all subsequent proceedings in both the trial and appellate courts, provided the facts, issues and evidence are substantially the same as those upon which the first decision rested."); *State v. Waldrip*, 111 Ariz. 516, 518 (1975) ("Ordinarily, a decision of an appeals court in a prior appeal of the same case settles the law for an appellate court in a subsequent appeal."). As discussed above,

---

[4] Judge Cardinal also pointed to Judge Borowiec's statement during the sentencing hearing that "no one of course can know if Mr. Crago fulfills 25 years in prison what he will be like." (Ex. A at 28.) But that observation is consistent with the possibility of *release* after 25 years.

nothing in *Chaparro* altered the Court's analysis. The Court should reaffirm that Defendant is not parole eligible.

## III.   The Superior Court Erred in Ordering Defendant's Release on Community Supervision.

After concluding that Defendant was parole eligible, the superior court made another unsupported leap: ordering Defendant's release on community supervision. This presents several glaring errors.

Even assuming that Defendant was parole eligible, it merely made Defendant *eligible* for parole. Defendant cannot be *released* on parole unless DOC certifies him as parole eligible and the Board of Executive Clemency grants him parole. *See* A.R.S. §§ 31-411, 31-412, 41-1604.09. Furthermore, "community supervision does not apply to a parole eligible inmate." *Chaparro*, 248 Ariz. at 141, ¶ 12. Perhaps this explains why Judge Cardinal amended the order to revert back to what Defendant's original sentencing order already said: that Defendant was "eligible for release." (Ex. Y, emphasis added.) But ordering Defendant's release on community supervision violates this Court's 2011 holdings that: (1) "The imposition of community supervision had no bearing on Crago's life sentence[.]"; (2) "[W]e are unaware of any authority, statutory or otherwise, that supports the imposition of community supervision following a life sentence."; and (3) "[T]he imposition of community supervision was contrary to law." *Crago II*, 2011 WL 4014450 at *3, ¶¶ 9, 11; *see also State v. Cowles*, 207 Ariz. 8, 11, ¶ 14 (App. 2004) ("Community

supervision is simply a part of the sentence that has to be served in the community after completion of a period of imprisonment or served in prison if there is a refusal to sign and abide by the release conditions.").

There are only two other theories possibly supporting the superior court's order to release Defendant on community supervision.  Despite its discussion regarding *Chaparro* and its conclusion that Defendant was parole eligible, the superior court may have simply decided that Defendant was sentenced to a determinate 25-year term of imprisonment. But such a conclusion directly contravenes this Court's 2011 holding that he was not. *See Crago II*, 2011 WL 4014450 at *3, ¶ 9 ("We note at the outset that Crago's argument is based on the unsupported notion that his original sentence was converted from a determinate term of twenty-five years to one of natural life .... First, his original sentence expires at the end of his life, an indeterminate period, not in twenty-five years, as he asserts."). Or the superior court could have effectively commuted Defendant's sentence.  But the power to commute a sentence lies exclusively with the Governor, following a recommendation by the Board of Executive Clemency.  *See* A.R.S. §§ 31-411(H), 31-443. This Court should hold that the superior court lacked the authority to release Defendant on community supervision.

## CONCLUSION

For the foregoing reasons, the State respectfully requests that this Court vacate the superior court's orders and direct that Defendant's ninth Petition for Post-Conviction Relief be denied.

Respectfully Submitted this 27th day of January, 2021.

Doyle B. Johnstun
Cochise County Attorney's Office

Copy of the foregoing
Mailed/e-mailed/delivered this
28th day of January, 2021 to:

Honorable Laura Cardinal
Judge of the Superior Court

Xochitl Orozco, Esq.
Cochise County Legal Advocate
Attorney for Defendant

21

# EXHIBIT T

Xochitl Orozco, AZ Bar #026075
Cochise County Legal Advocate
4 Ledge Avenue 4th Floor
P.O. Box 106
Bisbee, Arizona 85603
(520) 432-8470
sorozco@cochise.az.gov
Attorney for Appellant

### IN THE COURT OF APPEALS
### STATE OF ARIZONA
### DIVISION TWO

| | |
|---|---|
| STATE OF ARIZONA,<br>                    Petitioner,<br><br>vs.<br><br>EARL FELTON CRAGO,<br><br>                    Respondent. | 2CA-CR2021-0011-PR<br><br>COCHISE COUNTY<br>SUPERIOR COURT<br>NO. CR94000471<br><br>**RESPONSE TO PETITION FOR REVIEW** |

Respondent Earl Crago, through undersigned counsel, pursuant to Arizona Rule of Criminal Procedure 32.16(f) responds to the State's Petition for Review of the trial court's orders granting Mr. Crago relief pursuant to his petition for post-conviction relief. The trial court granted relief and thereafter issued a clarification of the order. [ROA 365; ROA 371]

Mr. Crago respectfully requests this Court deny review, or in the alternative, grant review but deny relief.

1

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    Statement of the Case

In 1995, Mr. Crago was sentenced to an illegally lenient sentence for first-degree murder. [ROA 365] At sentencing, the Honorable Matthew Borowiec sentenced Mr. Crago to a life term in the Department of Corrections with the following terms:

> IT IS ORDERED: That the Defendant must serve every day of twenty-five (25) years of the sentence imposed before he is eligible for any type of release.

> IT IS FURTHER ORDERED: That pursuant to A.R.S. §13-603(I), the Defendant will be required to do mandatory community supervision sentence- one day for every seven days sentenced to, for a total of 3 years, 7 months.

[ROA 48 p. 3] Under the 1994 statute, community supervision was not available for a first-degree murder sentence and therefore the community supervision portion of the sentence is illegally lenient. A.R.S. § 13-703(A) (1994). The State did not appeal this sentence.

Pursuant to this sentence, the Arizona Department of Corrections "DOC" provided Mr. Crago with a sentence calculation that included a community supervision release date of September 17, 2019 and a community supervision end

2

date of April 13, 2023. [ROA 352 p. 40; App. 1 Tr. 10/20/20 p. 27] Mr. Crago had

the same sentence computation, that included community supervision, from 1995

until 2006 when DOC took away the community supervision element of his

sentence. [ROA 352 p. 43; App. 1 Tr. 10/20/20 p. 31]

In 2011, Mr. Crago raised the issue of DOC's removal of community

supervision from his time calculation. [ROA 214] In the State's response to Mr.

Crago's motion, the State noted three times that the trial court's order was illegal:

1. "The Court also ordered, (erroneously), pursuant to A.R.S. section 13-603(I),

   that Defendant was required to do mandatory community supervision of one

   day for every seven days sentenced, for a total of 3 years and 7 months." [ROA

   224 p. 2]

2. "As the community supervision provision of defendant's sentence is contrary

   to law, both then and now, it should be stricken, nunc pro tunc, from

   Defendant's sentence." [Id. p. 5]

3. "The State further requests that the community supervision clause in

   Defendant's sentence be [sic] stricken as contrary to law." [Id.]

The State's response also noted the trial court's intent: "Judge Boroweic apparently

calculated 3 years and 7 months as the appropriate period of community supervision.

3

However, this calculation is accurate only for 25 years." [*Id.* p. 4]

The trial court, represented by Judge Hoggatt, denied relief finding that "the imposition of community supervision of three years and seven months *was* contrary to law. The imposition of community supervision in any amount would be." [ROA 235 p. 2 (emphasis in original)] Furthermore, the trial court denied the State's request to strike the community supervision portion of the sentence "although the court agrees with the State that the challenged provision was (and is) illegal." [*Id.* p. 3]

On review of Judge Hoggatt's decision, the Court of Appeals denied Mr. Crago relief noting that the trial court had found that the "community supervision portion of Crago's sentence was illegal." *State v. Crago* 2 CA-CR 2011-0162-PR p. 4 ¶ 5, mem. dec. filed Sept. 9, 2011. In affirming the decision, this Court found "the [trial] court correctly concluded 'the imposition of community supervision . . . *was* contrary to law.'" *Id.* p. 7 ¶ 9.

In December of 2019, Mr. Crago filed a petition for post-conviction relief alleging, in part, that he was being held past the expiration of his sentence. [ROA 326] The State's response to the petition acknowledged that the imposition of community supervision was illegal and that the State did not timely appeal the conviction. [ROA 356 p. 6] The trial court, now under Judge Cardinal, held an

4

evidentiary hearing in this matter. [ROA 364]

At the evidentiary hearing, Mr. Crago presented testimony from Brittany Cassiano, an employee with the time computation unit of the Arizona Department of Corrections, "DOC." [Appendix "App." 1 p. 17] Mr. Crago also testified. [*Id*. p. 43] During closing argument, the State conceded that this Court's decision in 2011 is contrary to the decision in *Chaparro v. Shinn*, 248 Ariz. 138, 139 (2020). [App. 1 p. 57]

The trial court granted relief. [ROA 365; ROA 371] In the initial order, the trial court found that *Chaparro* was a significant change in the law which would affect Mr. Crago's sentence. [ROA 365 p. 4] In so finding, the trial court cited the District Court's decision in *Chaparro v. Ryan*, CV1900650PHXDWLMHB, 2019 WL 3290328, at *5 (D. Ariz. July 22, 2019) which found that the defendant's claim was a novel and unsettled question of law in Arizona. [ROA 365 p. 4] The order also included a detailed analysis of the original sentencing. [*Id*. p. 5] In granting relief, the trial court found that Mr. Crago was "eligible for parole after serving 25 years pursuant to his sentence, and his illegally lenient sentence is final." [*Id*. p. 6] The court further ordered Mr. Crago "shall be placed on community supervision for the term imposed by the sentencing judge." [*Id*.] Thereafter, the trial court issued a

5

clarifying order changing the word "parole" to "release." [ROA 371]

The State filed a petition for review. [PFR] This response follows.

## II.   **Argument**

*i.*     *Review of this matter is discretionary and should be denied in this case.*

Under Rule 32, this Court's review of the State's petition is discretionary. Ariz. R. Crim. P. 32.16(k) ("The appellate court may grant review."); *State v. Smith,* 184 Ariz. 456, 459 (1996) ("The court of appeals, however, retains discretion over whether to grant review."). Based on the thorough order of the trial court, review should not be granted.

*ii.*    *The trial court's ruling was not a clear abuse of discretion.*

If this Court determines that review is appropriate, relief should be denied. A trial court's ruling on post-conviction relief is reviewed for a clear abuse of discretion. *State v. Swoopes,* 216 Ariz. 390, 393 ¶ 4 (App. 2007). Nowhere in the petition for review, does the State argue this standard. *State v. Carver,* 160 Ariz. 167, 175 (1989) ("In Arizona, opening briefs must present significant arguments, supported by authority, setting forth an appellant's position on the issues raised. Failure to argue a claim usually constitutes abandonment and waiver of that

6

claim.") Because the State does not argue the correct standard, the petition should be denied.

"An abuse of discretion occurs if the PCR court makes an error of law or fails to adequately investigate the facts necessary to support its decision." *State v. Pandeli*, 242 Ariz. 175, 180, ¶ 4 (2017). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *State v. Burr*, 126 Ariz. 338, 339 (1980) (citation omitted).

The trial court issued detailed orders on Mr. Crago's petition for post-conviction relief that were based on her consideration of "the pleadings filed in this matter, the exhibits admitted during the hearing, and the testimony of the witnesses presented at the hearing, and the court's file." [ROA 365 p. 1] "The trial court is the sole arbitrator of the credibility of witnesses." *State v. Fritz*, 157 Ariz. 139, 141 (App. 1988). In this matter, the trial court considered the testimony of Ms. Cassiano, Mr. Crago, the arguments of counsel, together with the record. This cannot be viewed as an abuse of discretion.

The trial court's order was clear – Judge Boroweic intended for Mr. Crago to receive release after serving 25 years in the form of community supervision. [ROA

7

365 p. 6] Throughout the litigation, the State, the trial courts, and this Court have acknowledged that the community supervision portion of the sentence was illegal which means that under *Chaparro v. Shinn*, 248 Ariz. 138, 139 (2020), the sentence must stand. This finding is not an abuse of discretion.

Moreover the assertion that community supervision is extraneous in some way or can be ignored is incorrect. "Community supervision is simply a part of the sentence *that has to be served* in the community *after completion of a period of imprisonment* or served in prison if there is a refusal to sign and abide by the release conditions." *State v. Cowles*, 207 Ariz. 8, 11, ¶ 14, 82 P.3d 369, 372 (App. 2004) (emphasis added); citing Ariz. R. Crim Pro 26.1(c) ("'Sentence' means the court's pronouncement of the penalty imposed on the defendant after a judgment of guilty.");[1] *see also State v. Jenkins*, 193 Ariz. 115, 120, ¶ 14, 970 P.2d 947, 952 (App. 1998) ("[T]he community supervision requirement is simply a part of the punishment imposed upon defendant.").

Judge Boroweic's intent that Mr. Crago receive a 25 year sentence and then

---

[1] Since *Cowles* was decided, Rule 26.1 has been amended but the cited portion remains essentially the same. In 2004, Ariz. R.Crim. P. 26.1 provided: "The term sentence means the pronouncement by the court of the penalty imposed upon the defendant after a judgment of guilty."

be released to community supervision is clear from the record. He calculated the community supervision term based on a sentence of 25 years. A.R.S. § 13-603(I) ("[T]he term of community supervision imposed by the court shall be for a period equal to one day for every seven days of the sentence or sentences imposed."). If the Judge had meant to simply allow for community supervision, there would not have been a precisely calculated term of community supervision based on a 25 year sentence. This term of community supervision also cannot be viewed as having no effect: "A prisoner who has reached the prisoner's earned release date or sentence expiration date shall be released to begin the prisoner's term of community supervision imposed by the court or term of probation if the court waived community supervision pursuant to § 13-603." A.R.S. § 41-1604.07(E) (emphasis added).

At the evidentiary hearing, even Ms. Cassiano from time computation unit testified that Mr. Crago "should have three years seven months of community supervision." [App. 1 Tr. 10/20/20 p. 38] Based on the record, the evidentiary hearing and the trial court's extensive decision, there can be no clear abuse of discretion that Mr. Crago shall be eligible for release after 25 years and that type of release shall be community supervision.

9

### iii.   *Mr. Crago is not precluded from raising this claim as it was not ripe until 2019.*

The State asserts Mr. Crago is precluded from raising a claim pursuant to Ariz. R. Crim. Pro. 31.1(d), that he "continues to be or will continue to be in custody after his or her sentence expired," because his claim has already been adjudicated on the merits. [Petition for Review "PFR" p. 14 citing Ariz. R. Crim. Pro. 32.2]  However, when Mr. Crago raised this issue in 2011, both the trial court and the appellate court found his argument pursuant to Rule 31.1(d) was not ripe. The trial court found: "Because the court followed the law by imposing a life sentence without possibility of release for twenty-five calendar years, and also because the defendant has not yet served twenty-five calendar years, it cannot be said that defendant is being held in custody after the sentence has expired." [ROA 235 p. 2] The Court of Appeals then held: "Conversely, we do not find any evidence in the record to support Crago's position that he somehow is ineligible to be considered for release after serving twenty -five years… However, because Crago began serving his sentence in 1994, he may not be considered for release until 2019." *State v. Crago*, 2-CA-CR 2011-0162-PR mem. dec. p. 7, ¶ 10 (filed Sep. 9, 2011).

As both the trial court and appellate court found in 2011 that Mr. Crago's claims were not yet ripe, Mr. Crago cannot then be precluded once he has served

twenty-five calendar years. *See* _Brush & Nib Studio, LC v. City of Phoenix_, 247 Ariz. 269, 280, ¶ 36 (2019) ("Ripeness is a prudential doctrine that prevents a court from rendering a premature decision on an issue that may never arise.").

     iv.     *Mr. Crago's argument should also not be found to be issue precluded as under* Chaparro *there is an intervening change in the applicable legal context.*

The State asserts Mr. Crago is precluded from arguing this issue at this time because this argument has been adjudicated on the merits, or in other words, is subject to issue preclusion. [PFR p. 14] Issue preclusion prevents a defendant from continuously raising issues where the "issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment." _Herrera v. Wyoming_, 139 S. Ct. 1686, 1697 (2019) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 748-749 (2001)). The key to this issue is a "valid court determination." In 2011, the State, the trial court, and this Court found the community supervision portion of the sentence illegal or contrary to law. Under *Chaparro*, this argument is no longer valid and cannot stand.

"Even when the elements of issue preclusion are met, however, an exception may be warranted if there has been an intervening 'change in the applicable legal context.'" _Herrera_, 139 S.Ct. at 1697 (quoting *Bobby v. Bies*, 556 U.S. 825, 834

11

(2009)). _Chaparro v. Shinn_, 248 Ariz. 138, 459 P.3d 50, 52, ¶ 19 (2020), is clearly a significant change in the law, or "change in the applicable legal context" as described by the United States Supreme Court. In _Chaparro_, the State argued ambiguity of the sentence and that the court could not enforce an illegally lenient sentence. _Id._ p. 140, ¶ 7. In that case, the State attempted to distinguish _State v. Dawson_, 164 Ariz. 278, 286, 792 P.2d 741 (1990), because in _Dawson_, the trial court granted parole eligibility before the statute permitted eligibility whereas in _Chaparro_, parole was not permitted because of a change in the law. _Chaparro_, 248 Ariz. p. 142, ¶ 20. The Arizona Supreme Court found that even though parole was not permitted for Mr. Chaparro, he must receive that illegally lenient sentence because that was an order by the trial court that was not timely appealed by the State. _Id._ ¶ 22.

Mr. Crago's case applies directly to _Chaparro_ and not _Dawson_. In _Dawson_, the sentence was based on a valid law—that the defendant could legally receive parole—but the illegality of the sentence was premised upon when he could receive parole. 164 Ariz. at 279. In _Chaparro_, parole was not legally available as a sentence but the Arizona Supreme Court ordered parole eligibility because the sentence was not timely cross-appealed by the State. 248 Ariz. p. 142, ¶ 22. This is a valid change

in the way illegally lenient sentences are addressed in Arizona. Therefore, the trial court did not clearly abuse its discretion when it determined that Mr. Crago's arguments were not precluded.

In 2014, when Mr. Crago filed a habeas corpus petition in Federal Court, the Ninth Circuit found that in 2011, the Court of Appeals "effectively amended the petitioner's judgment of conviction by removing the community supervision from his sentence." [ROA 352 p. 62] As the State had not timely appealed, removal of a portion of a sentence that was illegal was directly contrary to *Chaparro*. The State had requested that remedy in 2011: "The State further requests that the community supervision clause in Defendant's sentence be stricken as contrary to law." [ROA 224 p. 5] This is all invalid and illegal in light of *Chaparro*. It is also unfair for the State to argue that Mr. Crago has adjudicated his issue when the State argued an illegal resolution in 2011.

This distinction is also clear in Mr. Crago's 2011 memorandum decision by this Court. In the decision, the Court finds that community supervision "was contrary to law" and that DOC time computation removal of the community supervision requirement was valid. This is in direct contravention to *Chaparro.*

As described below, *Chaparro* changed the applicable legal context for

13

determining how to proceed with an illegally lenient sentence that has not been timely appealed by the State. The trial court did not err in finding that *Chaparro* was a significant change in the law and therefore was not issue precluded.

    v.    *The trial court did not err in finding* Chaparro v. Shinn *as a significant change in the law.*

The trial court found <u>*Chaparro v. Shinn*, 248 Ariz. 138, 139 (2020)</u> was a significant change in the law "that is a transformative event and a clear break from the past, which if applied to Defendant Crago's case, would have an effect on his sentence." [<u>ROA 365 p. 4</u>] The State asserts this was error and Mr. Crago is precluded from arguing this matter. [<u>PFR p. 15</u>]

In *Chaparro*, the defendant was convicted of first-degree murder under A.R.S. § 41-1604.09, a statute that does not permit parole. *Id.* at ¶ 3. The trial court sentenced the defendant to parole eligibility after twenty-five years. *Id.* Approximately twenty-one years later, the Arizona Department of Corrections informed the defendant that he would not be eligible for parole because the sentence violated the applicable statute, or in other words, was an illegally lenient sentence. *Id.* ¶ 4.

In the Court's analysis, it looked to the trial court's intent in administering the sentence. *Id.* ¶ 11-12; 17. After finding that the trial court's intent was to impose

14

parole, the Court found that because that was the trial court's order, then the defendant was eligible for parole after serving 25 years, despite that being an illegally lenient sentence under the statute. *Id.* ¶ 17. At the conclusion of *Chaparro*, the Court held that "Regardless of § 41-1604.09, Chaparro is eligible for parole after serving 25 years pursuant to his sentence, and his illegally lenient sentence is final under Arizona law." *Id.* p. 3 ¶ 23.

In this case, the trial court found *Chaparro* "on all fours with this case." [ROA 365 p. 3] Moreover, the trial court noted the District Court's decision in *Chaparro* that these issues were novel or unsettled together with there being no controlling precedent. [*Id.* p. 4] The trial court's ruling was based on legal analysis, together with the testimony at the evidentiary hearing, consideration of the pleadings and the record. This ruling cannot be a clear abuse of discretion. [*Id.* p. 1]

15

**CONCLUSION**

For the reasons set forth above, Mr. Crago requests this Court deny review of the State's Petition for Review. In the alternative, Mr. Crago respectfully requests this Court grant review and deny relief.

RESPECTFULLY SUBMITTED (electronically filed) 26th day of February, 2021

       XOCHITL OROZCO
       OFFICE OF THE LEGAL ADVOCATE

       By   /s/_____
        XOCHITL OROZCO
        Legal Advocate
        Attorney for Earl Crago

16

## CERTIFICATE OF COMPLIANCE

Undersigned counsel hereby certifies that this Response to Petition for Review complies with Rule 32.16(b) and 32.16(c)(1), Arizona Rules of Criminal Procedure, as follows: the brief is double-spaced, uses 14 point Times New Roman typeface, and is 3,357 words.

RESPECTFULLY SUBMITTED (electronically filed) 26th day of February, 2021

XOCHITL OROZCO
OFFICE OF THE LEGAL ADVOCATE

By  /s/
XOCHITL OROZCO
Legal Advocate
Attorney for Earl Crago

17

## CERTIFICATE OF SERVICE

I hereby certify that one copy of this Response to Petition for Review, filed

with the Court this date, will be delivered on February 26, 2021 to:

Doyle Johnstun
Deputy County Attorney
Post Office Drawer CA
Bisbee, Arizona 85603

And

ASPC Safford, Tonto Unit
EARL CRAGO 115357
896 South Cook Road
Safford, AZ 85546

RESPECTFULLY SUBMITTED (electronically filed) 26th day of February, 2021

XOCHITL OROZCO
OFFICE OF THE LEGAL ADVOCATE

By  /s/ _____
     XOCHITL OROZCO
     Legal Advocate
     Attorney for Earl Crago

18

# EXHIBIT U

IN THE
# ARIZONA COURT OF APPEALS
DIVISION TWO

_____

THE STATE OF ARIZONA,
*Petitioner,*

*v.*

EARL FELTON CRAGO JR.,
*Respondent.*

No. 2 CA-CR 2021-0011-PR
Filed March 25, 2021

_____

THIS DECISION DOES NOT CREATE LEGAL PRECEDENT AND
MAY NOT BE CITED EXCEPT AS AUTHORIZED BY APPLICABLE RULES.
NOT FOR PUBLICATION
*See* Ariz. R. Sup. Ct. 111(c)(1); Ariz. R. Crim. P. 31.19(e).

_____

Petition for Review from the Superior Court in Cochise County
No. S0200CR94000471
The Honorable Laura Cardinal, Judge

**REVIEW GRANTED; RELIEF GRANTED**

_____

COUNSEL

Brian McIntyre, Cochise County Attorney
By Doyle B. Johnstun, Deputy County Attorney, Bisbee
*Counsel for Petitioner*

Cochise County Office of the Legal Advocate, Bisbee
By Xochitl Orozco, Legal Advocate
*Counsel for Respondent*

STATE v. CRAGO
Decision of the Court

―――――――――――――――――

**MEMORANDUM DECISION**

Judge Eckerstrom authored the decision of the Court, in which Presiding Judge Espinosa and Vice Chief Judge Staring concurred.

―――――――――――――――――

E C K E R S T R O M, Judge:

**¶1**        The state seeks review of the trial court's ruling granting Earl Crago Jr.'s successive petition for post-conviction relief filed pursuant to Rule 32, Ariz. R. Crim. P.  In its ruling, the court ordered that Crago is eligible for release from prison and placed him on community supervision. We will not disturb the ruling unless the court abused its discretion.  *See State v. Roseberry*, 237 Ariz. 507, ¶ 7 (2015).  Because the state has established such abuse here, we grant review and relief.

**Factual and Procedural Background**

**¶2**        In 1994, a defendant convicted of first-degree murder could be sentenced to prison for natural life or for life without the possibility of release "on any basis until the completion of the service of twenty-five calendar years." 1993 Ariz. Sess. Laws, ch. 153, § 1.  The statutes at the time did not provide for community supervision after a term of life imprisonment.  *See* 1994 Ariz. Sess. Laws, ch. 358, § 5 (prisoners shall earn release credits "except for those prisoners who are sentenced to serve the full term of imprisonment imposed by the court"); 1993 Ariz. Sess. Laws, ch. 255, § 87 (same).

**¶3**        After a jury trial, Crago was convicted of first-degree murder committed in September 1994.  The sentencing court imposed a term of "life" in prison, ordering that Crago "must serve every day of twenty-five (25) years of the sentence imposed before he is eligible for any type of release." The court also ordered that Crago was "required to do mandatory community supervision sentence—one day for every seven days sentenced to, for a total of 3 years, 7 months."

**¶4**        This court affirmed Crago's conviction and sentence on appeal, denied relief in part on a consolidated petition for review of the denial of his first petition for post-conviction relief, and remanded for an

STATE v. CRAGO
Decision of the Court

evidentiary hearing on two claims of ineffective assistance of counsel. *State v. Crago*, Nos. 2 CA-CR 95-0488, 2 CA-CR 98-0230-PR (consol.) (Ariz. App. Mar. 18, 1999) (mem. decision).  We subsequently denied relief on Crago's petition for review of the denial of post-conviction relief after the evidentiary hearing.  *State v. Crago*, No. 2 CA-CR 00-0259-PR (Ariz. App. Mar. 13, 2001) (mem. decision).  In the years that followed, we also denied relief on seven additional petitions for review from the denials of post-conviction relief. *State v. Crago*, No. 2 CA-CR 2019-0234-PR (Ariz. App. Mar. 26, 2020) (mem. decision); *State v. Crago*, No. 2 CA-CR 2014-0379-PR (Ariz. App. Feb. 25, 2015) (mem. decision); *State v. Crago*, No. 2 CA-CR 2013-0402-PR (Ariz. App. Mar. 11, 2014) (mem. decision); *State v. Crago*, No. 2 CA-CR 2011-0162-PR (Ariz. App. Sept. 9, 2011) (mem. decision); *State v. Crago*, No. 2 CA-CR 2008-0396-PR (Ariz. App. May 12, 2009) (mem. decision); *State v. Crago*, No. 2 CA-CR 2004-0224-PR (Ariz. App. Mar. 29, 2005) (decision order); *State v. Crago*, No. 2 CA-CR 01-0381-PR (Ariz. App. Feb. 19, 2002) (mem. decision).

¶5        In December 2019, Crago filed the current petition for post-conviction relief.  Relying on Rule 32.1(d), Crago argued that he was being held beyond the term of his sentence.[1]  He reasoned that, by imposing community supervision of three years and seven months, the sentencing court effectively "capped [his] sentence to the minimum allowed of 25 years," which he had completed.  Thereafter, Crago filed a notice of supplemental authority, citing *Chaparro v. Shinn*, 248 Ariz. 138 (2020), for the proposition that "if the state fails to timely correct or appeal an illegally lenient sentence then the illegally lenient sentence is final under Arizona law."  The trial court sua sponte appointed counsel for Crago.  Counsel subsequently filed a memorandum in support of Crago's pro se petition, arguing that, like in *Chaparro*, Crago's "illegally lenient sentence" of twenty-five calendar years "must now stand" because the state had failed to timely challenge it.

────────────────

[1] In his petition, Crago also raised several claims of ineffective assistance of counsel under Rule 32.1(a).  The trial court, however, concluded that those claims were precluded as previously adjudicated or waived. *See* Ariz. R. Crim. P. 32.2(a)(2), (3).  Because Crago does not seek review of the court's denial of relief on those claims, we do not address them further. *See* Ariz. R. Crim. P. 32.16(c)(4) ("A party's failure to raise any issue that could be raised in the petition for review or cross-petition for review constitutes a waiver of appellate review of that issue.").

STATE v. CRAGO
Decision of the Court

¶6          In response, the state maintained that the issue raised in Crago's latest petition was precluded because he had raised it previously and courts had addressed it on the merits.  The state further asserted that *Chaparro* was not a significant change in the law warranting relief because it was previously settled in *Arizona v. Dawson*, 164 Ariz. 278 (1990), that an appellate court cannot correct an illegally lenient sentence that was not timely appealed.  The state argued that the sentencing court had ordered Crago to serve a term of life in prison without the possibility of release for twenty-five years, not twenty-five calendar years, and that the imposition of community supervision was "not illegally lenient" but was "illegally harsh" because "there is no legal requirement for any community supervision, let alone three years and seven months" thereof.

¶7          After an evidentiary hearing, the trial court ruled Crago was "eligible for release after serving 25 years pursuant to his sentence" and ordered he "be placed on community supervision for the term imposed by the sentencing judge."[2]  The court explained that it could "find the issue of sentencing terms imposed in 1995 . . . precluded pursuant to Rule 32.2," because it had been previously raised in post-conviction proceedings, unless Crago had "raised grounds for relief on the issue which are not precluded."  The court then determined that Crago's timely argument that *Chaparro* was a significant change in the law that would affect his sentence under Rule 32.1(g) was not subject to preclusion.  In so finding, the court relied on the district court's decision certifying the issue in *Chaparro* to the Arizona Supreme Court—the district court's decision described the issue as "novel or unsettled."  The court then found that application of *Chaparro* was "appropriate, fair and just" in this case, noting that Crago was "similarly situated to Chaparro."  Based on the sentencing minute entry, transcript, and clerk's notes, the court concluded that the sentencing court had intended "to impose a life sentence with the possibility of parole or other release (work furlough or work release, but distinct from 'commutation') after [Crago] had served 25 years in prison."  This petition for review followed.

**Discussion**

¶8          The state argues the trial court erred in concluding that Crago's sentencing claim was not precluded under Rule 32.2.  As it did

---

          [2]The ruling originally specified that Crago was "eligible for parole after serving 25 years," but the trial court later clarified that he was "eligible for release after serving 25 years."

STATE v. CRAGO
Decision of the Court

below, the state maintains that Crago's current petition for post-conviction relief "alleged that he was sentenced to a determinate 25-year term of imprisonment and that he was still imprisoned after 25 years" but Crago had "raised that same issue in his fourth and fifth Rule 32 petitions." And the state points out that both the trial court and this court "adjudicated that issue on the merits in conjunction with [Crago's] fifth Rule 32 proceeding." The state therefore reasons that Crago is precluded "from raising the issue a third time."

¶9        Rule 32.1(d) provides post-conviction relief when "the defendant continues to be or will continue to be in custody after his or her sentence expired." However, such claims are subject to preclusion if they were "finally adjudicated on the merits in an appeal or in any previous post-conviction proceeding." Ariz. R. Crim. P. 32.2(a)(2), (b).

¶10        As part of his fifth post-conviction proceeding, Crago argued that he was "being required to serve a sentence beyond the sentence which was imposed" because the Arizona Department of Corrections (ADOC) had "essentially converted his sentence from one of life imprisonment without the possibility of release for twenty-five years to one of natural life." *Crago*, No. 2 CA-CR 2011-0162-PR, ¶ 3.  He pointed out that, while ADOC's release-date form originally reflected that his community-supervision term began on September 17, 2019, it had been amended in 2006 to show "a life sentence without community supervision." *Id.* In its response, the state argued that, "because Crago was not sentenced to a determinate twenty-five year term, but can only 'be considered for a recommendation for release' in twenty-five years, the original sentence erroneously provided that he serve community supervision upon his release in 2019." *Id.* ¶ 4.  The state thus asked the trial court to strike the community-supervision order from Crago's sentence.  *Id.*

¶11        The trial court denied Crago's fifth petition, reasoning that the community-supervision order was illegal but it was unable to correct the order in the absence of a timely request by the state. *Id.* ¶ 5.  The court further determined that, because Crago had been "sentenced to serve life in prison, with the possibility that after serving twenty-five years, he could achieve his release if recommended by the Board of Executive Clemency and the sentence [is] commuted by the Governor." *Id.* The court observed: "[E]ven after he has served twenty-five calendar years, he could not be held in custody after the expiration of the sentence because the sentence is one of life imprisonment." *Id.*

STATE v. CRAGO
Decision of the Court

¶12      On review, this court determined that Crago's claim was precluded because he had raised it "to some extent in two prior pleadings." *Id.* ¶ 7. We nonetheless addressed the merits of his argument, explaining that Crago's "sentence expires at the end of his life, an indeterminate period, not in twenty-five years," and that "ADOC's 2006 time computation memorandum did not change Crago's sentence to one of natural life" or "make him ineligible for release." *Id.* ¶ 8. We agreed with the trial court that the imposition of community supervision was contrary to the law. *Id.* ¶ 9. But we noted, "[t]he imposition of community supervision had no bearing on Crago's life sentence or his eligibility to have that sentence commuted." *Id.* ¶ 11.

¶13      In his current petition for post-conviction relief, Crago again argues that the sentencing court had imposed a determinate twenty-five-year prison term and that ADOC, at the direction of the Arizona Attorney General, had improperly disregarded the community-supervision clause of his sentence. Although the language may be slightly different, this amounts to the same issue we addressed in Crago's fifth proceeding for post-conviction relief. *See id.* ¶¶ 7-11.

¶14      Crago nevertheless contends that he is not precluded from raising this claim because "it was not ripe until 2019" after he had served his twenty-five-year term. But the question is not one of ripeness. The relevant inquiry under Rule 32.2(a)(2) is whether the issue was previously raised and addressed on the merits. *Compare State v. Martinez*, 226 Ariz. 464, ¶ 7 (App. 2011) (claim for post-conviction relief precluded under Rule 32.2(a)(2) where allegation encompassed by previous claim and adjudicated on merits), *with In re Estate of Stewart*, 230 Ariz. 480, ¶ 12 (App. 2012) (ripeness "prevents a court from rendering a premature judgment or opinion on a situation that may never occur"). As discussed above, that happened here.

¶15      That said, Rule 32.1(g) provides post-conviction relief when "there has been a significant change in the law that, if applicable to the defendant's case, would probably overturn the defendant's judgment or sentence."[3] And such a claim may be raised in an untimely or successive

---

[3]Crago did not characterize *Chaparro* as a significant change in the law under Rule 32.1(g) until he filed his reply to the state's response below. *See State v. Lopez*, 223 Ariz. 238, ¶¶ 6-7 (App. 2009) (no abuse of discretion where trial court declined to address issues first raised in reply to state's response and defendant failed to seek leave to amend petition). However,

STATE v. CRAGO
Decision of the Court

petition for post-conviction relief.   Ariz. R. Crim. P. 32.2(b), 32.4(b)(3)(B).
Thus, as the trial court pointed out, Crago's claim may proceed if *Chaparro*
is a significant change in the law that would probably affect his sentence.

¶16        Our post-conviction relief rules do not define what constitutes
"a significant change in the law."   Ariz. R. Crim. P. 32.1(g); *see also State v.*
*Shrum*, 220 Ariz. 115, ¶ 15 (2009).   "But plainly a 'change in the law' requires
some transformative event, a 'clear break from the past.'"   *Shrum*, 220 Ariz.
115, ¶ 15 (quoting *State v. Slemmer*, 170 Ariz. 174, 182 (1991)).   "Such change
occurs, for example, 'when an appellate court overrules previously binding
case law' or when there has been a 'statutory or constitutional amendment
representing a definite break from prior law.'"   *State v. Werderman*, 237 Ariz.
342, ¶ 5 (App. 2015) (quoting *Shrum*, 220 Ariz. 115, ¶¶ 16-17).

¶17        Our supreme court announced two holdings in *Chaparro*:  (1)
"a sentence imposing 'life without possibility of parole for 25 years' means
the convicted defendant is eligible for parole after serving 25 years'
imprisonment despite [A.R.S.] § 41-1604.09's prohibition of parole for
persons convicted of offenses occurring on or after January 1, 1994," and (2)
"a court lacks jurisdiction to correct an illegally lenient sentence absent
timely correction or appeal."   248 Ariz. 138, ¶ 2.   As to the former, the issue
centered on the defendant's sentence of "life without possibility of parole
for 25 years."   *Id.* ¶ 1.   The supreme court conducted a fact-specific review
of the record to ascertain the sentencing court's intent with regard to parole.
*Id.* ¶¶ 11-12, 23.   It was not overruling previously binding case law or
interpreting a statutory or constitutional amendment.   *See Werderman*, 237
Ariz. 342, ¶ 5; *cf. State v. Poblete*, 227 Ariz. 537, ¶ 10 (App. 2011) (United
States Supreme Court's rejection of approach to ineffective assistance of
counsel claim constituted significant change in law).

¶18        As to the supreme court's latter holding—that courts cannot
correct illegally lenient sentences without a timely challenge—that rule was
well established at least twenty years earlier.   Indeed, in *Chaparro*, the court
cited *Dawson*, 164 Ariz. at 283-84, and Rule 24.3, Ariz. R. Crim. P., for the
proposition that "[i]llegally lenient sentences are final under Arizona law
absent timely appeal or post-judgment motion."   248 Ariz. 138, ¶ 19.   It
therefore cannot be seen as "a clear break from the past."   *Shrum*, 220 Ariz.
115, ¶ 15 (quoting *Slemmer*, 170 Ariz. at 182).

─────────────

because *Chaparro* was decided after Crago had filed his current petition and
because the trial court addressed the issue on the merits, we do as well.

STATE v. CRAGO
Decision of the Court

¶19            Here, the sentencing court imposed a term of "life" in prison, explaining that Crago "must serve every day of twenty-five (25) years of the sentence imposed before he is eligible for any type of release."  Unlike in *Chaparro*, the court did not mention parole.  We thus fail to see how the fact-specific inquiry in *Chaparro* constitutes a significant change in the law that would probably affect Crago's sentence.  *See State v. Pandeli*, 242 Ariz. 175, ¶ 4 (2017) (court abuses discretion if it makes error of law).

¶20            The district court's decision certifying the issue in *Chaparro* to the Arizona Supreme Court does not convince us otherwise.  While the district court may have viewed the issue presented as "novel" and "unsettled," the supreme court did not overrule previously binding caselaw or otherwise break new ground in its opinion.  *Chaparro v. Ryan*, No. CV 19-00650-PHX-DWL, 2019 WL 3361244 (D. Ariz. July 25, 2019).  In determining whether a case represents a significant change in the law under Rule 32.1(g), the focus is on the language and holdings of that decision, not how it was initially assessed by another court.

¶21            As we have previously stated, Crago's sentence "expires at the end of his life, an indeterminate period, not in twenty-five years." *Crago*, No. 2 CA-CR 2011-0162-PR, ¶ 8.  Given that he has now served twenty-five years, he is eligible to be considered for release.  *See id.* ¶ 10 (discussing board of clemency's decision to recommend commutation and governor's decision to grant commutation).  "The imposition of community supervision had no bearing on Crago's life sentence or his eligibility to have that sentence commuted."  *Id.* ¶ 11.  Because we previously addressed on the merits the issue raised in Crago's current petition for post-conviction relief, it is now precluded.[4]  *See* Ariz. R. Crim. P. 32.2(a)(2); *see also State v. Whelan*, 208 Ariz. 168, ¶ 8 (App. 2004) ("law of the case" is "practice of refusing to reopen questions previously decided in the same case by the same court or a higher appellate court") (emphasis omitted) (quoting *Davis v. Davis*, 195 Ariz. 158, ¶ 13 (App. 1999)).

**Disposition**

¶22            For the reasons stated above, we grant review and relief.

---

            [4]Because we agree with the state that the issue is precluded, we need not address the state's additional arguments that the trial court erred in concluding Crago was eligible for parole and erred in ordering his release on community supervision.

8

# EXHIBIT V

Xochitl Orozco, AZ Bar #026075
Cochise County Legal Advocate
4 Ledge Avenue 4th Floor
P.O. Box 106
Bisbee, Arizona 85603
(520) 432-8470
sorozco@cochise.az.gov
Attorney for Petitioner

## IN THE ARIZONA SUPREME COURT

| | |
|---|---|
| STATE OF ARIZONA, | S. Ct. Case No. |
| | 2 CA–CR2021-0011 |
| PETITIONER, | |
| | COCHISE COUNTY |
| vs. | SUPERIOR COURT |
| | NO. CR94000471 |
| EARL FELTON CRAGO JR., | |
| | **PETITION FOR REVIEW TO** |
| RESPONDENT. | **ARIZONA SUPREME COURT** |

The Respondent, Earl Crago, requests review of the Court of Appeals'
("COA") decision in *State v. Crago*, 2 CA-CR 2021-0011-PR, filed March 25, 2021.
In this case, Mr. Crago received an illegally lenient sentence that included
community supervision. The trial court ordered the sentence be followed pursuant
to *Chaparro v. Shinn*, 248 Ariz. 138, 139 (2020), but the COA overturned that
decision. This issue is of statewide importance, first impression, requires
clarification from this Court, and is being applied differently in different

1

jurisdictions in Arizona. For these reasons, Mr. Crago requests this Court grant review and reverse the decision of the COA and affirm the trial court's order.

**ISSUE PRESENTED**

    i.    **Whether the trial court abused its discretion in finding that Mr. Crago received an illegally lenient sentence that must be followed.**

    *a. Standard of Review*

"An abuse of discretion occurs if the PCR court makes an error of law or fails to adequately investigate the facts necessary to support its decision." *State v. Pandeli*, 242 Ariz. 175, 180, ¶ 4 (2017). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *State v. Burr*, 126 Ariz. 338, 339 (1980) (citation omitted). "The trial court is the sole arbitrator of the credibility of witnesses." *State v. Fritz*, 157 Ariz. 139, 141 (App. 1988).

This case merits review because the trial court did not abuse its discretion. Moreover, there appears to be no case law on preclusion under Arizona Rule of Criminal Procedure "ARCP" 32.1(d) or whether *Chaparro* constitutes a significant change in the law under ARCP 31.(g). This is an issue of statewide importance, and lastly, the COA decision in this matter acknowledged that the current rules of

2

criminal procedure lack a definition of "what constitutes 'a significant change in the law'" under ARCP 32.1(g). *State v. Crago*, 2 CA-CR 2021-0011-PR, ¶ 16, p. 17 filed March 25, 2021.

### b. Facts and Procedure Applicable to Argument

In 1995, Mr. Crago was sentenced to an illegally lenient sentence for first-degree murder. [ROA 365] At sentencing, the Honorable Matthew Borowiec sentenced Mr. Crago to a life term in the Department of Corrections with the following terms:

> IT IS ORDERED: That the Defendant must serve every day of twenty-five (25) years of the sentence imposed before he is eligible for any type of release.

> IT IS FURTHER ORDERED: That pursuant to A.R.S. §13-603(I), the Defendant will be required to do mandatory community supervision sentence- one day for every seven days sentenced to, for a total of 3 years, 7 months.

[ROA 48 p. 3] Under the 1994 statute, community supervision was not available for a first-degree murder sentence and therefore the community supervision portion of the sentence was illegally lenient. A.R.S. § 13-703(A) (1994). The State did not appeal this sentence.

From 1995 to 2006, Mr. Crago had a community supervision release date of

3

September 17, 2019. This was calculated by the Arizona Department of Corrections "DOC" and was acknowledged by the time computation unit at DOC at the evidentiary hearing in this matter. [ROA 352 p. 40; Tr. 10/20/20 p. 27] In 2006, DOC took away the community supervision element of his sentence leaving Mr. Crago with no release date. [ROA 352 p. 43; Tr. 10/20/20 p. 31]

In 2011, Mr. Crago raised the issue of DOC's removal of community supervision from his time calculation. [ROA 214] In the State's response to Mr. Crago's motion, the State noted three times that the trial court's order was illegal:

1. "The Court also ordered, (erroneously), pursuant to A.R.S. section 13-603(I), that Defendant was required to do mandatory community supervision of one day for every seven days sentenced, for a total of 3 years and 7 months." [ROA 224 p. 2]

2. "As the community supervision provision of defendant's sentence is contrary to law, both then and now, it should be stricken, nunc pro tunc, from Defendant's sentence." [Id. p. 5]

3. "The State further requests that the community supervision clause in Defendant's sentence be [sic] stricken as contrary to law." [Id.]

The State's response also noted the trial court's intent: "Judge Boroweic apparently

4

calculated 3 years and 7 months as the appropriate period of community supervision. However, this calculation is accurate only for 25 years." [*Id.* p. 4]

The trial court's decision by Judge Hoggatt denied relief finding that "the imposition of community supervision of three years and seven months *was* contrary to law. The imposition of community supervision in any amount would be." [ROA 235 p. 2 (emphasis in original)] Furthermore, the trial court denied the State's request to strike the community supervision portion of the sentence "although the court agrees with the State that the challenged provision was (and is) illegal." [*Id.* p. 3]

On review of Judge Hoggatt's decision, the COA denied Mr. Crago relief noting that the trial court had found that the "community supervision portion of Crago's sentence was illegal." *Crago* 2011 mem. dec. p. 4 ¶ 5. In affirming the decision, the COA found "the [trial] court correctly concluded 'the imposition of community supervision . . . *was* contrary to law.'" *Id.* p. 7 ¶ 9. It is significant to note that the COA's 2011 decision did not include any citation to *State v. Dawson*, 164 Ariz. 278, 286 (1990).

In 2014, Mr. Crago filed a habeas corpus petition in Federal Court and the Ninth Circuit found that the COA's 2011 decision "effectively amended the petitioner's judgment of conviction by removing the community supervision from

his sentence." [ROA 352 p. 62]

In December of 2019, Mr. Crago filed the petition for post-conviction relief at issue alleging, in part, that he was being held past the expiration of his sentence. [ROA 326] The State's response to the petition acknowledged that the imposition of community supervision was illegal and that the State did not timely appeal the conviction. [ROA 356 p. 6] The trial court, now under Judge Cardinal, held an evidentiary hearing in this matter. [ROA 364]

At the evidentiary hearing, Mr. Crago presented testimony from Brittany Cassiano, an employee with the time computation unit of the DOC. [Tr. 10/20/20 p. 17] Mr. Crago also testified. [*Id*. p. 43] During closing argument, the State conceded that this Court's decision in 2011 is contrary to the decision in *Chaparro v. Shinn*, 248 Ariz. 138, 139 (2020). [*Id.* p. 57]

The trial court granted relief. [ROA 365; ROA 371] In the initial order, the trial court found that *Chaparro* was a significant change in the law which would affect Mr. Crago's sentence. [ROA 365 p. 4] In so finding, the trial court cited the District Court's decision in *Chaparro v. Ryan*, CV1900650PHXDWLMHB, 2019 WL 3290328, at *5 (D. Ariz. July 22, 2019), which found that the defendant's claim was a novel and unsettled question of law in Arizona. [ROA 365 p. 4] The order also

6

included a detailed analysis of the original sentencing. [*Id.* p. 5] In granting relief, the trial court found that Mr. Crago was "eligible for parole after serving 25 years pursuant to his sentence, and his illegally lenient sentence is final." [*Id.* p. 6] The court further ordered Mr. Crago "shall be placed on community supervision for the term imposed by the sentencing judge." [*Id.*] Thereafter, the trial court issued a clarifying order changing the word "parole" to "release." [ROA 371]

The State filed a petition for review to the COA. [PFR] The COA granted review and relief. *Crago* 2021 mem. dec. p. 8 ¶ 22. This timely petition for review follows.

 c. *Argument*

The trial court, Mr. Crago, the State, and DOC all followed the sentencing order for community supervision until 2006.  Since that time, Mr. Crago has been making a simple request: reinstate the community supervision he relied on when he was sentenced and for eleven years after. This Court's decision in *Chaparro v. Shinn* clearly refutes the COA's 2011 Crago decision by holding that the community supervision was contrary to law and the court should have followed that provision of the sentence (rather than removing it as the 2011 decision did). The PCR trial court simply followed the original intent of the trial court and this Court's case law

7

in coming to the correct decision: community supervision is an illegally lenient sentence that must be followed.

### i.     The trial court's decision was not a clear abuse of discretion.

The COA found the trial court abused her discretion when she found that *Chaparro* constituted a significant change in the law. *Crago* 2021 mem. dec. p. 8 ¶ 19. The trial court's decision was based on her consideration of the pleadings, the evidentiary hearing and the witnesses and exhibits therein, the court's file, transcripts and previous orders. [ROA 365 p. 1] The decision was seven pages long and included citations to the record and pertinent case law. The trial court found *Chaparro* to be "on all fours with this case" and found the case a significant change in the law. [*Id.* p. 3-4]   As support, the trial court cited the District Court's certification of the issue which found that the case "presents a 'novel or unsettled question[] of state law' as to which 'there is no controlling precedent' from the Arizona appellate courts."[1]   [*Id* p. 4 citing *Chaparro v. Ryan*, No.

---

[1] During litigation in the *Chaparro* matter, "the State argue[d] the key threshold issue in this case is an unresolved question of state law." *Chaparro v. Ryan*, 2019 WL 3290328, at *1 In Mr. Crago's case, the State argued that *Chaparro* was not a change in the law and that "the construction principles the Supreme Court applied to interpret Chaparro's sentence were nothing new." [PFR p. 15] These arguments, both made by the State against an inmate, are directly contrary to one another and should not be rewarded.

CV1900650PHXDWLMHB, 2019 WL 3290328, at *4-5 (D. Ariz. July 22, 2019)]

In denying relief, the COA did not address the fact that had Mr. Crago's case been decided after *Chaparro*, the outcome would be different: the illegally lenient sentence would stand. Throughout the litigation, the State, the trial courts, and the COA have acknowledged that the community supervision portion of the sentence was illegal which means that under *Chaparro*, the sentence must stand. This finding was not an abuse of discretion. The COA also did not address that a representative from DOC testified that the original sentencing included community supervision: "I do see right there in a court document that it's he should have three years seven months of community supervision." [Tr. 10/20/20 p. 38]

Instead, the COA disregarded the District Court's assessment of the issue in *Chaparro* and instead looked to "the language and holdings of that decision." *Crago* 2021 mem. dec. p. 8 ¶ 20.  As will be discussed infra, *Chaparro* is a significant change in the law and so holding was not an abuse of discretion.

### ii. *The trial court did not err in finding* Chaparro v. Shinn *as a significant change in the law.*

The trial court found *Chaparro v. Shinn* was a significant change in the law

---

9

"that is a transformative event and a clear break from the past, which if applied to Defendant Crago's case, would have an effect on his sentence." [ROA 365 p. 4] The COA found *Chaparro* was not a significant change in the law as it was a fact-specific inquiry and an affirmation of existing caselaw. *Crago* 2021 mem. dec. p. 7 ¶¶ 17-20.

In *Chaparro*, the defendant was convicted of first-degree murder under A.R.S. § 41-1604.09, a statute that did not permit parole. *Id.* at ¶ 3. The trial court sentenced the defendant to parole eligibility after twenty-five years. *Id.* Approximately twenty-one years later, the Arizona Department of Corrections informed the defendant that he would not be eligible for parole because the sentence violated the applicable statute; in other words, it was an illegally lenient sentence. *Id.* ¶ 4.

There, this Court's analysis looked to the trial court's intent in administering the sentence. *Id.* ¶ 11-12; 17. After finding that the trial court's intent was to impose parole and that it had ordered parole, this Court held that the defendant was eligible for parole after serving 25 years, despite that being an illegally lenient sentence under the statute. *Id.* ¶ 17.

Here, the trial court found *Chaparro* "on all fours with this case." [ROA 365 p. 3] Moreover, the trial court noted the District Court's decision in *Chaparro*

10

holding that these issues were novel or unsettled together with there being no controlling precedent. [*Id.* p. 4] The trial court's ruling was based on legal analysis, together with the testimony at the evidentiary hearing, consideration of the pleadings and the record. This ruling cannot be a clear abuse of discretion. [*Id.* p. 1]

The COA also erroneously found that the citation to *State v. Dawson*, 164 Ariz. 278, 286, 792 P.2d 741 (1990), in *Chaparro* showed that the proposition that illegally lenient sentences that are not timely appealed must stand is not a "clear break from the past" to make it a significant change in the law. *Crago* 2021 mem. dec. p. 7 ¶ 18 (quoting *State v. Shrum*, 220 Ariz. 115, ¶ 15 (2009)). In *Chaparro*, the State argued ambiguity of the sentence and that the court could not enforce an illegally lenient sentence. *Id.* p. 140, ¶ 7. There, the State attempted to distinguish *State v. Dawson*, 164 Ariz. 278, 286 (1990), because in *Dawson*, the trial court granted parole eligibility before the statute permitted eligibility whereas in *Chaparro*, parole was not permitted because of a change in the law. 248 Ariz. p. 142, ¶ 20. This Court found that even though parole was not permitted for Mr. Chaparro, he must receive that illegally lenient sentence because it was an order by the trial court that was not timely appealed by the State. *Id.* ¶ 22.

This case is on all fours with *Chaparro* and not *Dawson*. In *Dawson*, the

11

sentence was based on a valid law—that the defendant could legally receive parole—but the illegality of the sentence was premised upon *when* he could receive parole. 164 Ariz. at 279. In *Chaparro*, parole was not legally available as a sentence but this Court ordered parole eligibility because the sentence was not timely cross-appealed by the State. 248 Ariz. p. 142, ¶ 22. This is a change in the way illegally lenient sentences are addressed in Arizona and therefore the trial court's decision that *Chaparro* was a significant change in the law was not an abuse of discretion.

Moreover, if the state of the law prior to *Chaparro* was that an illegally lenient sentence must stand, then the 2011 COA decision was incorrectly decided. The COA should have held that although the community supervision was contrary to law, it must remain as the State had not appealed. That is not what happened here—instead the COA removed the community supervision term. There is no conceivable way to reconcile Mr. Crago not receiving relief in 2011 while holding that *Chaparro* is not a significant change in the law.

### iii. Mr. Crago cannot be precluded from an argument deemed to be unripe in previous proceedings.

In the response to the State's petition for review before the COA, Mr. Crago posited that he could not be precluded from an argument that the reviewing courts found to be unripe. [Response p. 10] The COA found the argument unavailing as the

12

issue was raised and addressed on the merits. *Crago* 2021 mem. dec. p. 6 ¶ 14. The ripeness issue should have prevented the courts in 2011 from rendering a decision. *See Brush & Nib Studio, LC v. City of Phoenix,* 247 Ariz. 269, 280, ¶ 36 (2019) ("Ripeness is a prudential doctrine that prevents a court from rendering a premature decision on an issue that may never arise."). The COA's citation to *State v. Martinez,* 226 Ariz. 464, 466, ¶ 7 (App. 2011), should be distinguished as in that case, the defendant raised an issue that was not ripe yet and the Court granted relief. The COA approved of the grant of relief.

In this case, the COA incorrectly decided Mr. Crago's issue while asserting the case was not ripe. *See* [ROA 235 p. 2 ("Because the court followed the law by imposing a life sentence without possibility of release for twenty-five calendar years, and also because the defendant has not yet served twenty-five calendar years, it cannot be said that defendant is being held in custody after the sentence has expired."); *Crago* 2011 mem. dec. p. 7, ¶ 10 ("[B]ecause Crago began serving his sentence in 1994, he may not be considered for release until 2019."). It is a distortion of preclusion caselaw and a blatant Catch-22 to tell a defendant that his argument is not ripe, deny relief in a way that would not have happened after *Chaparro*, and then find the issue precluded when the issue is ripe and the defendant raises it.

13

### iv.    Mr. Crago's community supervision term was improperly removed in 2011.

In its 2021 decision, the COA conceded that in 2011, they found "that the imposition of community supervision was contrary to the law." _Crago_ 2011 mem. dec. p. 6 ¶ 12. However, it found that "'the imposition of community supervision had no bearing on Crago's life sentence.'" _Id._ As a preliminary matter, community supervision is an integral part of a sentence and cannot be ignored: "[c]ommunity supervision is simply a part of the sentence _that has to be served_ in the community _after completion of a period of imprisonment_ or served in prison if there is a refusal to sign and abide by the release conditions." _State v. Cowles_, 207 Ariz. 8, 11, ¶ 14, 82 P.3d 369, 372 (App. 2004) (emphasis added); _see also State v. Jenkins_, 193 Ariz. 115, 120, ¶ 14, 970 P.2d 947, 952 (App. 1998) ("[T]he community supervision requirement is simply a part of the punishment imposed upon defendant."). If the community supervision term had no bearing on Mr. Crago, he should not have been receiving time computation reports until 2006 that included a community supervision release date. [ROA 352 p. 40; Tr. 10/20/20 p. 27] Even the representative from DOC stated that Mr. Crago should have community supervision: "I do see right there in a court document that it's he should have three years seven months of community supervision." [Tr. 10/20/20 p. 38] This interpretation also ignores the

14

fact that the trial court calculated a term of community supervision for 25 years and incorporated such into the oral pronouncement of sentence and sentencing minute entry.

Moreover, if the community supervision had no bearing on the sentence, then there was no reason to remove the community supervision term in 2011. The Ninth Circuit found that "the 2011 state court decisions effectively amended [Mr. Crago's] judgment of conviction by removing the community supervision provision from his sentence." [ROA 352 p. 62] Removal of part of defendant's sentence to his detriment, without a timely appeal from the State, is contrary to law as the courts lack jurisdiction to do so. *Chaparro*, 248 Ariz. at 142, ¶ 18. To be clear, the removal of community supervision changed Mr. Crago's sentence from a sentence with a release date to life with the only possibility of release as executive clemency, an exceedingly rare form of release. This could not have been the original trial court's intent, as he discussed release liberally and calculated a specific term of release in the form of community supervision.

The COA's 2011 decision was incorrect and the verbiage within the 2011 decision bears that out: "the [trial] court correctly concluded 'the imposition of community supervision . . . *was* contrary to law.'" *Crago* 2011 mem. dec. p. 7 ¶ 9.

15

It is fundamentally unfair to find an argument precluded that now, in light of *Chaparro*, would be decided differently, and was not even ripe when addressed before. Preclusion serves a valid purpose in preventing endless litigation. Preclusion should not apply when the prior Court's review was incorrect and there has been a subsequent change in the law.

## CONCLUSION

Mr. Crago's illegally lenient sentence was not timely appealed by the State and must now stand. For the reasons set forth above, Mr. Crago respectfully requests the COA decision be vacated and the trial court's decision be affirmed.

RESPECTFULLY SUBMITTED (electronically filed) 26th day of May, 2021

XOCHITL OROZCO
OFFICE OF THE LEGAL ADVOCATE

By  /s/ Xochitl Orozco
    XOCHITL OROZCO
    Cochise County Legal Advocate
    Attorney for RESPONDENT

16

# EXHIBIT W



FILED

JUL - 5 2022

COURT OF APPEALS
DIVISION TWO

## Supreme Court
### STATE OF ARIZONA

**ROBERT BRUTINEL**
Chief Justice

**ARIZONA STATE COURTS BUILDING**
1501 WEST WASHINGTON STREET, SUITE 402
PHOENIX, ARIZONA 85007
TELEPHONE: (602) 452-3396

**TRACIE K. LINDEMAN**
Clerk of the Court

July 5, 2022

**RE:  STATE OF ARIZONA v EARL FELTON CRAGO JR**
Arizona Supreme Court No. CR-21-0150-PR
Court of Appeals, Division Two No. 2 CA-CR 21-0011 PRPC
Cochise County Superior Court No. S0200CR-1994000471

GREETINGS:

The following action was taken by the Supreme Court of the State
of Arizona on July 1, 2022, in regard to the above-referenced
cause:

**ORDERED: Petition for Review to Arizona Supreme Court = DENIED.**

Tracie K. Lindeman, Clerk

TO:
Linley Wilson
Doyle B Johnstun
Sara Xochitl Orozco
Randal Boyd McDonald
Lindsay Herf
Beth C. Beckmann

jd

# EXHIBIT X

FILED BY CLERK

FEB 2 5 2021

COURT OF APPEALS
DIVISION TWO

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
IN AND FOR THE COUNTY OF COCHISE

STATE OF ARIZONA,

      Plaintiff,

      vs.

EARL FELTON CRAGO, JR.,

      Defendant.

2CA-CR 21 0011

Cochise County
No. CR94000471

Division 1

---

COURT REPORTER'S COMPLETE TRANSCRIPT OF PROCEEDINGS

HEARING ON PETITION FOR POST-CONVICTION RELIEF

Before:  The Honorable Laura Cardinal

October 20, 2020
Bisbee, Arizona
8:57 A.M.

REVOLUTIONARYTEXT
ARIZONA FIRM NO. R1110
LEE ANN EATON
CERTIFIED COURT REPORTER
CERTIFICATE NO. 50963

2

```
 1                    A P P E A R A N C E S

 2

 3    Mr. Doyle Johnstun, Esq.
      Attorney for Plaintiff
 4    150 Quality Hill Road
      Bisbee, AZ 85603
 5

 6    Ms. Xochitl Orozo, Esq.
      Attorney for Defendant
 7    P.O. Box 106
      Bisbee, AZ 85603
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

I N D E X

Witnesses for the Defendant:

BRITTANY CASSIANO

Direct Examination by Ms. Orozco........ 16
Cross-Examination by Mr. Johnstun....... 36
Redirect Examination by Ms. Orozco...... 41


EARL FELTON CRAGO, JR.

Direct Examination by Ms. Orozco........ 43
Cross-Examination by Mr. Johnstun....... 51

EXHIBITS                    Offered/Received

Defendant's A                    23

Defendant's B                    28

4

P R O C E E D I N G S

(On the record at 8:57 A.M.)

THE COURT:   This is State of Arizona versus Earl F. Crago, CR94000471.   This is the time set for a hearing on the -- on a Petition for Post-Conviction Relief.

The record should reflect the defendant, Earl F. Crago, is present by video conference from the Arizona Department of Corrections.   His attorney, Xochitl Orozco, is present in the courtroom.   The state's attorney, Doyle Johnstun, is present as well.

Ms. Orozco, if you would give us an overview of what we're going to do today.

MS. OROZCO:   Yes, Your Honor, Mr. Crago has filed a Petition for Post-Conviction Relief alleging that he is being held past his date of sentence. There has been, admittedly, a very confusing time computation history in his case, and Mr. Crago asserts that he was given 25 calendar years with release, which was community supervision after the 25 years.

That is the only way to read the sentencing minute entry and give it any weight.   You have to look at each element of the sentencing minute entry.   That includes the 25-year without -- and then eligible for any type of release, and then the next sentence is the

1    release type, and that is community supervision for

2    three years and seven months, which is the calculation

3    of 85 percent of 25 years.

4           So the intent is clear.  The State has

5    asserted issue preclusion.  We claim that there is not

6    issue preclusion for two reasons:  First, the courts

7    noted that this wasn't ripe because he had not been

8    held past his 25-year sentence until now, and Chaparro

9    is in direct contradiction to the 2011 memorandum

10   decision regarding Mr. Crago.  The language in the

11   2011 memorandum decision states things like the

12   community supervision is an illegal portion of the

13   sentence that is not enforceable.

14           Well, that's exactly what happened in

15   Chaparro with parole.  Parole was not a legal sentence

16   for Mr. Chapparo, and they said it's an illegally

17   lenient sentence that you have to abide by because the

18   State did not appeal.  The State has not appealed.

19   The State has alleged that this is an illegal

20   sentence, and we are asking that every element of the

21   sentencing minute entry be abided by and that the

22   intent of Judge Borowiec's sentence be clear and

23   followed, which would mean that Mr. Crago has now

24   served his 25 years and that he is now serving his

25   one-and-a-half-year consecutive sentence; and that he

1   be -- he receive community supervision after both of

2   those sentences.  Thank you.

3          THE COURT:  Thank you.  And let me ask you

4   this, Ms. Orozco --

5          MR. JOHNSTUN:  Your Honor, was that an

6   overview of what we're going to be doing?

7          THE COURT:  I'm going to give you an

8   opportunity in a moment as well, but you did not

9   address the portion of the sentence that Judge

10  Borowiec imposed on Page 3 of the sentencing

11  memorandum that he's committed to a life, all caps,

12  term in the department of corrections.  How do you

13  harmonize that with the remainder of the sentence

14  imposed there?

15         MS. OROZCO:  In 1994 the statute

16  distinguished between natural life and life, and life

17  was 25 years with -- before he is eligible for any

18  type of release.  That was the definition of a life

19  sentence at that time, because it had to be

20  distinguished between a natural life sentence and a

21  life sentence.  In the sentencing transcript, I

22  believe it's Mr. Malanga, maybe the State, addresses

23  the fact that Judge Borowiec has that choice, and

24  Judge Borowiec clearly chose life as opposed to

25  natural life.

1    In 1994 this statute got changed, and so

2 judges were dealing with uncertainty as to what these

3 sentences actually meant, which is why there is --

4 there are so many cases coming up right now because

5 there is all of this confusion.

6    What we assert is that Judge Borowiec had

7 two choices:  Natural life or life.  He chose life.

8 Then he said 25 years of the sentence imposed before

9 he is eligible for any type of release, and then the

10 next sentence says what type of release he believes is

11 appropriate, which is 13-603(I), which is still the

12 community supervision statute, and he calculated three

13 years and seven months.

14    This intent can also be derived from the

15 sentencing transcript, where Judge Borowiec says

16 nobody knows what Mr. Crago is going to be like after

17 25 years, so although we cannot question Judge

18 Borowiec as to his intent, we cannot ignore an entire

19 portion of his sentencing minute entry or the

20 statements he makes in court, and Mr. Crago was

21 operating on the assumption that he had a 25-year

22 sentence with the community supervision.

23    That is a life term as compared to a natural

24 life term, so the statute to look at was that.

25    THE COURT:  Okay.  Great.  Mr. Johnstun,

 1   what do you think we're talking about here today?

 2          MR. JOHNSTUN:  Your Honor, the applicable

 3   law regarding illegally lenient sentences was already

 4   the law in 2011 when the Court of Appeals said the

 5   defendant has a life sentence, and it's always been a

 6   life sentence, and it remains a life sentence; and he

 7   is eligible after 25 years to have the sentence

 8   commuted.

 9          You can go in front of the Board of

10   Executive Clemency, and there is a procedure for that,

11   and that was already the law under Dawson.

12          THE COURT:  Isn't commutation a different

13   animal from parole or community supervision?

14          MR. JOHNSTUN:  No.  It's the same because

15   both eligibility for parole in Chaparro and

16   eligibility for community supervision in this

17   sentencing document were both illegally lenient.

18          THE COURT:  But you said, "Commutation."

19          MR. JOHNSTUN:  Okay.  But that's what the

20   Court of Appeals said in 2011, that after 25 years,

21   the defendant -- and the defense is correct, the

22   defendant did not receive a natural life sentence,

23   which means you leave prison when you're dead.  He

24   received a life sentence with eligibility for release

25   after 25 years.

```
 1          THE COURT:  Isn't that a different sentence,

 2    though, than what Judge Borowiec imposed?

 3          MR. JOHNSTUN:  Well, it kind of is and it

 4    kind of isn't.  And the problem with Judge Borowiec's

 5    intent is on the one hand, we have the

 6    three-year-and-seven-month community supervision,

 7    okay, which indicates Judge Borowiec intended the

 8    defendant to be released after 25 years.  But then we

 9    have three different things, either from the

10    sentencing document or from Judge Borowiec's oral

11    statements during sentencing, that cut in the opposite

12    direction.

13          First of all, it's before he's eligible for

14    release, must do at least 25 years.  Not before he's

15    released, before he's eligible for release.  Okay?

16    And the other thing Judge Borowiec said, he has to

17    serve at least 25 years.  Okay?  And, finally, Judge

18    Borowiec's statement that "Nobody knows what the

19    defendant will be like in 25 years," indicates that

20    Judge Borowiec did not pretend to have a crystal ball

21    and be able to say that the defendant should be

22    released after 25 years, but that nobody knows if he's

23    going to be rehabilitated or if he's going to be some

24    terrible thing, and since nobody knows, the fairest

25    reading of that statement by Judge Borowiec goes back
```

1  to he's eligible for release after 25 years, not that

2  he should be released after 25 years.

3              Your Honor, since there are three -- three

4  instances between the sentencing document and Judge

5  Borowiec's oral pronouncement that indicate the

6  defendant doesn't automatically get released versus

7  one -- the community supervision that indicates that

8  he does, you can't say that it was clearly his intent

9  that he does get released.  It's three to one against

10 the defendant.  And so, if anything, Judge Borowiec's

11 intention was that he not be released after 25 years,

12 and, Your Honor, and, again, all of this was already

13 the law in 2011 under Dawson, when the Court of

14 Appeals said the defendant -- the community

15 supervision portion of the defendant's sentence has no

16 effect.

17             The same law in Chaparro was already the

18 law, and the Court of Appeals said this has no effect.

19 The defendant's claim regarding community supervision

20 is precluded, Your Honor, under Rule 32 petitions.

21 The more that get filed on the same issue, they get

22 more precluded after you have raised those issues.

23 They don't get less precluded.  And so I -- if the

24 Court of Appeals was ignorant of Dawson and

25 erroneously ruled against the defendant in 2011, I

1   think the Court of Appeals or the Supreme Court in

2   Phoenix has to say so.  I'm not sure that this Court

3   can say that the Court of Appeals didn't know the law.

4            THE COURT:  And so I'm not sure what

5   argument you're making here exactly.  Are you saying

6   that the Court of Appeals in 2011 abrogated that part

7   of the sentencing from Judge Borowiec that ordered

8   community supervision?

9            MR. JOHNSTUN:  Yes.  That's exactly what

10  they did.  That's in the opinion.

11           THE COURT:  Do you think that the language

12  of the sentence, "Life without possibility of release

13  until 25 years has been" -- at least has been served

14  before there's any eligibility for any type of release

15  is a similar sentence to what might have been imposed

16  prior to January of 1994?

17           MR. JOHNSTUN:  No.

18           THE COURT:  Which was life without

19  possibility of parole, possibility of parole until you

20  have served 25 years?

21           MR. JOHNSTUN:  No.  Prior to January 1994, I

22  believe the law was parole, which is why the judge in

23  Chaparro made Mr. Chaparro erroneously eligible for

24  parole, and as to -- community supervision got

25  substituted for parole in 1994, and that was part of

1  the Truth in Sentencing amendments that required

2  85 percent, and that's where the 1/7th comes from,

3  because that's what's left over after 85 percent.

4          THE COURT:  Uh-huh.  And so what is this

5  community supervision order then?

6          MR. JOHNSTUN:  What is it?

7          THE COURT:  Judge Borowiec's order, what is

8  it?  Is it consistent with the post-January 1, 1994,

9  law?

10          MR. JOHNSTUN:  No.  We know that it's not.

11          THE COURT:  Why would he do that?

12          MR. JOHNSTUN:  He made a mistake because it

13  was a new law, and everybody was trying to figure it

14  out.  Just like counsel has pointed out, a lot of

15  these cases are coming up now on erroneous or illegal

16  sentences because under the new law and no --

17          THE COURT:  Under the Truth in Sentencing

18  Law?

19          MR. JOHNSTUN:  Yes.

20          THE COURT:  How ironic is this?  All right.

21  Let's hear from -- what kind of evidence have we got?

22          MS. OROZCO:  We have Brittany Cassiano

23  calling from DOC.  May I respond just briefly before I

24  forget my --

25          THE COURT:  Sure.

```
 1          MS. OROZCO:  The Court of Appeals affirmed
 2   Judge Hoggatt's order, and Judge Hoggatt did not
 3   remove the community supervision.  He said the State
 4   didn't appeal, and the State just said it was a
 5   mistake.  Well, it was a mistake in favor of
 6   Mr. Crago, and it was not timely appealed.  That is on
 7   all fours with Chaparro.  There is a portion of the
 8   sentence that was not being abided by, and if you look
 9   at the 2011 decision, the State's argument was,
10   Paragraph 4, the community supervision clause in
11   Mr. Crago's sentence be stricken as contrary to law.
12   That's exactly what Chaparro says you cannot do, and
13   so it's -- that's where we are.
14          There is a portion of the sentence that
15   Judge Borowiec took the time to insert, and if you
16   refer to Page 28 of the sentencing transcript -- I'm
17   pulling it up right now.  It says, "And I am going to
18   impose the sentence of life, with the condition that
19   he serve at least 25 years, every day of 25 years."
20   Then he imposes community supervision thereafter on --
21   after providing the presentence incarceration credit
22   on Page 29, it is further ordered that you will serve
23   three years and seven months community supervision
24   once you are released from prison.  He uses the word
25   "Release."  He says, "Serve 25 years," and then he
```

1   puts in community supervision as release.

2           Even if that was a mistake, it was an

3   intentional act to put in an entirely separate

4   paragraph in the sentencing minute entry that cannot

5   just be ignored.  So I wanted to make sure that I

6   addressed that argument before we moved on.

7           I can e-mail Ms. Cassiano and ask her to

8   call in now.  I didn't tell her to call in until 9:30.

9   I thought the openings were going to take a little

10  longer.

11          MR. JOHNSTUN:  Your Honor.

12          THE COURT:  Yes.

13          MR. JOHNSTUN:  A final point.  Pages 7 and 8

14  of the Court of Appeals opinion, it says that the

15  community service requirement has no bearing on

16  defendant's life sentence or his eligibility to have

17  his sentence commuted, so the Court of Appeals said

18  that the community supervision portion of the sentence

19  was meaningless.  I mean, that's what the Court of

20  Appeals said at Pages 7 and 8.

21          MS. OROZCO:  Which makes the argument that

22  Chaparro says, you cannot ignore parts of the sentence

23  just because they don't fit with the issues.  Which I

24  think that that makes our argument stronger.

25          THE COURT:  And the witness that you have

```
 1   got coming in is who?

 2              MS. OROZCO:  Brittany Cassiano from DOC.

 3              THE COURT:  And she is with time

 4   computation?

 5              MS. OROZCO:  Correct.

 6              THE COURT:  She is going to call in on the

 7   Meet Me line?

 8              MS. OROZCO:  At 8549?  Is that the Meet Me

 9   line?

10              THE COURT:  8549.  It is open, and has that

11   been set up up here?  We're connected.  If she is

12   available, see if she can call in.

13              MS. OROZCO:  I also plan on questioning

14   Mr. Crago, but it makes more sense to do that after

15   speaking with time comp.

16              THE COURT:  Is the State going to call any

17   witnesses at all?

18              MR. JOHNSTUN:  No, Your Honor.

19              THE COURT:  Are you emailing her?

20              MS. OROZCO:  I just did.  Thank you. I have

21   marked an exhibit for this witness, Defense A.

22              THE COURT:  So legible.

23              MR. JOHNSTUN:  The next page.

24              THE COURT:  The next page is better?

25              MS. OROZCO:  Mr. Crago, have you been able
```

1   to hear us thus far?

2              THE DEFENDANT:  Yes, ma'am.  Thank you.

3              THE COURT:  We'll take a brief recess.

4              (Brief recess.)

5              THE COURT:  Good morning, Ms. Cassiano.

6   This is Judge Cardinal in the Superior Court.  You're

7   here to testify in the Crago matter?

8              THE WITNESS:  Yes.

9              THE COURT:  Would you please raise your

10  right hand and be sworn by the clerk of court.

11             (Witness sworn.)

12             THE COURT:  Very good.  We have Ms. Orozco

13  here on behalf of Mr. Crago.  I believe that you are

14  her witness, so I'm going to ask her to proceed.

15                   BRITTANY CASSIANO,

16  having been duly sworn, testified as follows:

17                   DIRECT EXAMINATION

18  BY MS. OROZCO:

19      Q.   Good morning, Ms. Cassiano.

20      A.   Good morning.

21      Q.   Could you please state and spell your name

22  for the record.

23      A.   My name is Brittany Cassiano,

24  B-R-I-T-T-A-N-Y, Cassiano, C-A-S-S-I-A-N-O.

25      Q.   And where are you employed?

1          A.    With the Arizona Department of Corrections

2    Time Computation Unit.

3          Q.    And how long have you been there?

4          A.    For 11 and a half years.

5          Q.    And what do you do at time comp?

6          A.    I calculate release dates.  I interpret

7    statutes and how they relate to the inmate's sentence

8    at the time of their offense, and I correlate with

9    courts and the institutions on getting the inmates

10   released.

11         Q.    Do you have any educational background

12   associated with this profession?

13         A.    I do not.

14         Q.    But you have been there for 11 and a half

15   years?

16         A.    Yes.

17         Q.    Have you come across issues with sentences

18   for first-degree murder imposed on or around 1994?

19         A.    Yes.  There have been a few.  We just came

20   out of a -- oh, my gosh, a Supreme Court hearing

21   because of it.

22         Q.    In another case?

23         A.    Yes.

24         Q.    And that was recently, as in how long ago?

25         A.    Oh, gosh.  It was Chaparro versus Shinn, and

1   it was earlier this year; and the issue was how to

2   release an inmate at 25 -- when they have a 25- or

3   35-year-to-life sentence, so the issue is -- go ahead.

4        Q.   In Chaparro the issue was parole being part

5   of the sentence, correct?

6        A.   Correct.

7        Q.   And what was the outcome in that case?

8        A.   The outcome was that if the sentencing order

9   states specifically that the inmate is sentenced to 25

10  or 35 years until parole, then they can have a parole

11  hearing; however, if it says, "25 or 35 years until

12  release," then they are not eligible for parole and

13  would have to apply for commutation.

14       Q.   And has the -- I'm sorry.

15       THE COURT:  Ms. Cassiano, could you repeat

16  what you just said?

17       THE WITNESS:  Sure.

18       THE COURT:  Skip the 35 years.  Just tell me

19  about the 25 -- tell me about 25-year sentences.

20       THE WITNESS:  Okay.  So the outcome of

21  Chaparro versus Shinn was the sentencing order

22  documents must state "Parole" somewhere in the

23  document in order for the inmate to be eligible for a

24  parole hearing after 25 years.  If the sentencing

25  order documents do not state "Parole," then they would

1    have to apply for commutation at the 25-year mark.

2            THE COURT:  What if it says, "Community

3    Supervision"?

4            THE WITNESS:  Community supervision, I don't

5    believe that was covered, so -- let's see here.

6            THE COURT:  Actually, I believe Chaparro

7    does talk about community supervision.

8            THE WITNESS:  Let me pull up the order.

9    Sorry about that.

10            THE COURT:  Are you looking at Chaparro v.

11    Shinn?

12            THE WITNESS:  Yes.

13            THE COURT:  Are you an attorney?

14            THE WITNESS:  No, I am not.

15            THE COURT:  Who advises you legally with

16    respect to interpreting a Supreme Court decision such

17    as this, or are you kind of left to read it and make

18    your own determinations?

19            THE WITNESS:  No.  We get help from Jon

20    Schwartz, Jonathan Schwartz.

21            THE COURT:  Who is Mr. Schwartz?

22            THE WITNESS:  Jonathan Schwartz is a -- hold

23    on one second.  Let me see his exact title.

24            THE COURT:  Okay.

25            THE WITNESS:  It is -- I'm sorry.  I just

1  had it.  He's the Assistant Attorney General.

2          THE COURT:  For the department of

3  corrections or for time computation?

4          THE WITNESS:  For Maricopa County, and yes,

5  he helps the department of corrections time

6  computation.

7          THE COURT:  He works for the Attorney

8  General?

9          THE WITNESS:  Yes.

10         THE COURT:  You said he's in Maricopa

11  County?  Is that what you're --

12         THE WITNESS:  Yeah, he works for the

13  Attorney General.  He works in Maricopa County, mostly

14  deals with Maricopa court cases.

15         THE COURT:  Oh, I see, but if the department

16  of corrections time computation has issues, he's the

17  guy you call?

18         THE WITNESS:  Yes.  Him and then also

19  sometimes -- what's his name?  I'm having a blank.

20  Paul Carter.

21         THE COURT:  Paul Carter?

22         THE WITNESS:  Yes, and he's the Assistant

23  Attorney General for Pima County.

24         THE COURT:  I see.  Okay.  And did you

25  consult with either of those two gentlemen prior to

1  your testimony here today?

2       THE WITNESS:  No.  Actually I have not

3  spoken to them.

4       THE COURT:  Are they present with you during

5  your testimony here today?

6       THE WITNESS:  They are not.

7       THE COURT:  Okay.  All right.  Ms. Orozco,

8  you can continue.

9  BY MS. OROZCO:

10     Q.  In 1994 how were life sentences, not natural

11  life, but life sentences being treated by time

12  computation?

13     A.  Right when we switched over to Truth in

14  Sentencing in 1994, we calculated them as life, and

15  then we gave them what we call a mandatory minimum

16  date because there were no statutes outlining how to

17  calculate the 25-to-life Truth in Sentencing.

18     Q.  And so with the mandatory minimum, did that

19  include a community supervision term?

20     A.  Yes.  Yeah, the 25 years would -- I mean,

21  upon release the inmate would have to go to some sort

22  of supervision; however, we were not 100 percent

23  positive, because, like I said, there were no statutes

24  or clarification on how to calculate the parole

25  25-to-life sentences at that time.

1      Q.   And these calculations were -- the

2  calculations provided to these inmates has changed

3  over the years, correct?

4      A.   Yes.

5      Q.   Why?

6      A.   Because of different legal opinions from the

7  Attorney General's Office and our own legal

8  department, so when we first went into Truth in

9  Sentencing, we would calculate 25 years to life, but

10  we would still reflect life in our system, in our

11  Arizona Inmate Management System, and then sometime in

12  the late '90s we got a different AG opinion to

13  calculate an actual release date for 25 to life; and

14  then sometime after that, I'm not sure exactly when,

15  it went back to it needs to be 25 years to life, still

16  unknown exactly what that 25-year release date would

17  be.

18      Q.   So at the second time, time computation sent

19  out a release date calculation that included a

20  community supervision date, correct?

21      A.   We did, yes.

22      Q.   And when we first started talking, I sent

23  you an appendix that included a calculation for

24  Mr. Crago.  Do you recall seeing that?

25      A.   I do, yes.

1      Q.    Okay.  And that included a release to

2   community service date of September 17th, 2019; is

3   that correct?

4      A.    Yes.

5      Q.    Okay.  And you also sent me some annotations

6   of ADOCRR audits; is that correct?

7      A.    Yes, I did.

8      Q.    Do you have that in front of you?

9      A.    I'm pulling it up right now.  Yes, I have

10  it.

11     Q.    Is it a three-page document?

12     A.    One, two, three.  Yes, it is.

13           MS. OROZCO:  Your Honor, I move for

14  admission of this document.

15           THE COURT:  Any objection, Mr. Johnstun?

16           MR. JOHNSTUN:  No objection.

17           THE COURT:  Defendant's Exhibit A will be

18  admitted into evidence.

19  BY MS. OROZCO:

20     Q.    If you can turn to Page 3 and tell us what

21  ADOCRR is to start.

22     A.    Is Arizona Department of Corrections

23  Rehabilitation and -- oh, what is it?  I'm sorry.  We

24  just changed the names on --

25     Q.    Some other "R" word, right?

1      A.     Yeah, Reentry and Rehabilitation.

2      Q.     And how do you read this document?

3      A.     So the O-5 time computate means that those

4   are annotations from time computation employees

5   through the years.  So it started in 1995.  That was

6   when our first audit was complete, and so back then,

7   though, we didn't put the actual release date in our

8   annotation, which is why I included the screenshot

9   above.

10     Q.     So for this document, Mr. Crago's sentence

11  has been evaluated by time computation 29 times; is

12  that correct?

13     A.     No.  You have to look at each date.  So

14  9-9-1995 was the first comment, and then you go to

15  3-7-1996 and then that comment lasts until Line 5, and

16  then the next comment was started at Line 6, on

17  June 9th, 1999; and that comment ended on Line 14.

18  You can tell because we end our annotations with what

19  we call our SID, which was basically like our names,

20  so if you see BMS1, that is an employee -- on Line 14,

21  that is one of our supervisors at the time; and

22  then -- let's see here.  How many comments in total?

23          So he was audited one, two, three.  The one

24  on Line 13 is not an audit.  That's just us saying

25  that we received the minute entry.  And then Line 15,

1  we audited again.  So one, two, three -- that's four

2  audits.  And then Line 19 is a fifth audit, and then

3  Line 23 is a sixth audit.

4           Then Line 26 is not an audit; however, he

5  received discipline, so that's just us saying that we

6  approved the discipline ticket.

7           And then Line 28 is also not an audit.  It's

8  just simply stating that we manually logged the dates

9  in the system to reflect the above audit.  So in all,

10  he has had six audits over the years.

11      Q.   And in those six audits, are they all

12  consistent?

13      A.   No, because he has -- let's see here.  He

14  has received additional sentences, so that was an

15  audit.  So the first audit was the initial one where

16  we gave him a life, a release date of 25 years to

17  life.  The second audit --

18      Q.   Let me stop you there, and we'll go through

19  each one.

20      A.   Okay.

21      Q.   So the first one it says sentence is a

22  25-year life sentence?

23           THE COURT:  Community audit beginning at

24  Line 3?

25           MS. OROZCO:  Yes.

1        THE COURT:  Okay.  Go ahead.

2        Q.    "Community supervision time reflected

3    subject to GHNG based on AG opinion."  Can you tell me

4    what that means?

5        A.    That's a typo.  Excuse me.  That's a typo.

6    That's actually a CHNG, so that says sentence is a

7    25-year life sentence, community supervision time

8    reflected.  Subject due to change based on AG opinion.

9        Q.    So he did -- Mr. Crago did have a community

10   supervision time calculation in that initial audit,

11   correct?

12       A.    Yeah.  That would be the second audit, and

13   that was because AG opinion changed, yes.

14       Q.    Okay.  I'm sorry.  Maybe I missed -- so the

15   first -- the first audit, what was that one?

16       A.    It was the first line, 9-5-1995, it says

17   audit CR9400471; however, back then in 1995, we did

18   not annotate the exact release dates.  That's why I

19   copied -- and I'm sorry.  They are very poor pictures

20   because it was done on carbon paper in 1995, so it has

21   faded through the years, but above is actually a

22   picture of what his sentence looked like in 1995 when

23   we did that first audit, and it shows "Life"; and then

24   it shows a mandatory minimum date of August 27th --

25   what is that?  I can't read that.

1     THE COURT:  It says August 27th, 7-3-7-8?

2     A.    Yeah, so it was miscalculating back then.

3  But like I said, we didn't know what that minimum date

4  was going to be, like what kind of a release type that

5  was going to be, so the only thing we worried about in

6  1995 was that it was a life sentence; and then we were

7  waiting for some kind of opinion on how to calculate

8  the 25 years.

9     Q.    And so the audit, the second audit that we

10 just discussed, had an AG opinion saying, "Put in

11 community supervision"; is that correct?

12    A.    Yes.

13    Q.    And you did that for Mr. Crago, correct?

14    A.    Yes.

15    Q.    And that was a community supervision release

16 date of September 17th, 2019, correct?

17    A.    Yes.

18    Q.    And a community supervision end date of

19 April 13th, 2023; is that correct?

20    A.    Yes.

21    THE COURT:  Is that reflected in one of

22 these documents, Ms. Orozco?

23    MS. OROZCO:  Your Honor, that is Appendix 3

24 to memorandum in support.

25    THE COURT:  I'm sorry, the memorandum --

1          MS. OROZCO:  That I filed, the original PCR.

2          THE COURT:  And Appendix 3?

3          MS. OROZCO:  Yes.  It is another one that's

4    not great at legibility.

5          THE COURT:  Are you going to have this

6    marked as an exhibit to this hearing?

7          MS. OROZCO:  Your Honor, I had not thought

8    of that because the appendix was submitted as part of

9    the PCR.  I can.  It's up to the Court.

10          THE COURT:  Do you have any objection to us

11    marking the Appendix 3 to the filed memorandum in

12    support of the Petition for Post-Conviction Relief to

13    consider it as evidence?

14          MR. JOHNSTUN:  No, Your Honor.

15          THE COURT:  All right.  Exhibit 3 -- Exhibit

16    3 to the defense Memorandum in Support of Petition for

17    Post-Conviction Relief and Request for Informal

18    Conference filed August 13, 2020, will be admitted.

19    I'm going to disassemble my copy and admit the

20    Department of Corrections Release Date Calculation

21    dated, I believe, March 7th of 1996, as Defense

22    Exhibit B.  It's got two pages.

23          MS. OROZCO:  Yes, because one is cut off,

24    and one is illegible, so I thought two together was

25    better than one.

```
 1            THE COURT:  Both pages of Appendix 3 will be
 2   marked as Defense Exhibit B for this hearing.  Go
 3   ahead.
 4   BY MS. OROZCO:
 5        Q.   Now, Ms. Cassiano, the third audit says
 6   offense and conviction are affirmed.  So did that keep
 7   the second audit's determination?
 8        A.   No.  All that is saying is that the -- his
 9   sentence by the Court is confirmed, so it was
10   confirming that he was sentenced to 25 years to life.
11        Q.   And what was the calculation on that third
12   audit?
13        A.   Let me see here.  Sorry.  Yeah, it stayed
14   consistent, and that didn't change anything.
15        Q.   So there was still a community supervision
16   release date for the third audit?
17        A.   At that time, yes.
18        Q.   Now, we go down to Line 15 for the next
19   audit; is that correct?
20            THE COURT:  If I can interrupt you,
21   Ms. Orozco, Ms. Cassiano, the time computation listed
22   now in what's been marked as Defendant's Exhibit B,
23   which has been moved into evidence, this is a time
24   comp calculation from 1996 indicating a release date
25   to community supervision in 2019, end date of
```

30

1  community supervision in 2023.   The calculation that
2  was performed then in 1996 was based on the Attorney
3  General opinion issued in -- sometime in 19- -- well,
4  I guess, 1996.
5              THE WITNESS:  Yes.
6              THE COURT:  Okay.  But that continued to be
7  in effect through 1998?
8              THE WITNESS:  Yeah.  You know, actually I'm
9  not sure when it stopped going into effect, but it was
10  definitely before we caught it, so we just -- we just
11  didn't change it until it was brought to our
12  attention.
13              THE COURT:  By whom?
14              THE WITNESS:  It doesn't say exactly who
15  brought it to our attention.
16              THE COURT:  All right.  It looks like,
17  though, in the '90s the Attorney General's opinion
18  then was that a court's imposition of a community
19  supervision term on a 25-to-life sentence was not
20  inappropriate?
21              THE WITNESS:  Correct.
22              THE COURT:  Okay.  Go ahead.  Ms. Orozco.
23  BY MS. OROZCO:
24       Q.   Do you know what year the community
25  supervision was taken off of Mr. Crago's sentence in

1  time computation?

2     A.   So it was in 2005; however, he received an

3  additional sentence in 2005, so you're still going to

4  see that we calculated his release dates off of the

5  25-year and gave him the community -- oh, no, wait.

6  Let me see here.

7          No, it was 2006.  I read that wrong.  2005

8  he got that additional sentence, and we still

9  calculated it with an actual release date to

10  consecutive sentence; and on July 26, 2006, on

11  Line 19, it says, "Disregard lines 15 through 18."

12  Inmate dates are S-E-D life to start a

13  one-and-a-half-year sentence consecutive to that life

14  sentence.

15     Q.   So from 1994, when Mr. Crago was sentenced,

16  to 2006, from time computation Mr. Crago had a

17  community supervision release date; is that correct?

18     A.   Yes.

19     Q.   And then he received an additional sentence.

20  Let's switch to that just so that we have got that on

21  the record.  If he were to receive a 25-year calendar

22  sentence on this case and then serve his 1.5 year

23  consecutive sentence in the other county's case, when

24  would he be released to community supervision from

25  DOC?

1        A.    That would be on December 21st, 2020, if he

2    were eligible for his 90-day early release.  Let me

3    see here.  Sorry, I want to bring him up in the system

4    to make sure he meets all that criteria really quick.

5    I don't remember off the top of my head.  Sorry about

6    that.

7        Q.    Let's just go with both and put them both on

8    the record.  So if he got the TR, it would be

9    12-21-20?

10            THE COURT:  Abbreviations -- If he got TR,

11   if he got what?

12            THE WITNESS:  That would be a temporary

13   release.

14            THE COURT:  Thank you.

15       Q.   And that's 90 days; is that correct?

16       A.   90 days early, yes.

17            THE COURT:  What does temporary release

18   mean?

19            THE WITNESS:  That means that they get

20   released 90 days earlier than their mandated

21   85 percent date, and they have to serve that under

22   community supervision, so -- go ahead.

23            THE COURT:  And that would be as to the year

24   and a half, correct?

25            THE WITNESS:  Yes.

1       A.   So, yeah, it looks like right now he would

2  be eligible for the early temporary release, but if

3  for any reason he were to go into a higher custody

4  class or have a detainer somewhere, that pops up on

5  a -- if we run an ACJIS, then he wouldn't be released

6  until -- let me get back to that.  Sorry -- until

7  January 10th, 2021.  That's because it's a violent

8  offense, so he would have to do 85 percent, and then

9  the mandated date is actually 85.7 percent, so that's

10 the difference between those two.  As long as he stays

11 eligible for the early temporary release, it will be

12 December 21st.  If he becomes ineligible to that per

13 our department order 1002, it would be January 10th,

14 2021.

15      Q.   What would the community supervision end

16 date be?

17      A.   So if he were to be released at the early

18 temporary release, it would be November 27th, 2024.

19      Q.   And if it was the non-early?

20      A.   It would be November 4th, 2024.  Keep in

21 mind that these are projected.  It can change at any

22 time if he were to receive any discipline tickets,

23 like that.

24      Q.   Okay.  Now, when the Attorney General issues

25 an opinion regarding these time computations, does

1   somebody go back and look at the original sentencing

2   minute entry in a case to see what the intent of the

3   judge was?

4        A.   Yes.  So when we get an AG opinion changing

5   something like that -- so like earlier this year when

6   Chaparro happened, we had to pull a report of all the

7   inmates we could find that were serving 25 to life and

8   check those court documents and make sure that those

9   inmates are eligible for parole or if they are going

10  to have to apply for commutation.

11       The only reason he was probably missed back

12  then is because we were using a different system.  We

13  changed to a different system which is more accurate.

14  Back then, The Arizona Management System, the ADOA

15  mainframe system was not exactly perfect all the time,

16  so it didn't always bring up all of the inmates on the

17  list.

18       Q.   We may just be pronouncing it differently,

19  but I want to make sure, are you talking about Shapiro

20  like the OJ Simpson former lawyer, or Chaparro, like

21  chaps, with an R-O at the end?

22       A.   I think it's Chaparro.  It's spelled

23  C-H-A-P-A-R-R-O.

24       Q.   Okay.  I just wanted to make sure we were

25  talking about the same case.  So in Chaparro, time

1  computation was not providing parole eligibility to

2  Mr. Chaparro; is that correct?

3       A.   I believe so.

4            MR. JOHNSTUN:  Your Honor, I'm going to

5  object to that question.  That calls for a legal

6  conclusion, and I think the Chaparro decision speaks

7  for itself probably better than this witness.

8            THE COURT:  I'm going to overrule it because

9  I don't know exactly what -- repeat the question

10  again.

11           MS. OROZCO:  And I can move on.

12      Q.   All I'm saying is that the DOC time

13  computation calculations vary depending on the AG

14  decisions, correct?

15      A.   Yeah, until the legislature approves the

16  statute or we get like a court case like Chaparro.

17      Q.   So the AG opinion was overruled by the

18  Arizona Supreme Court in Chaparro for Mr. Chaparro; is

19  that correct?

20      A.   Yes, and also Arizona Revised Statute

21  13-718, that also outlines how to release 25-to-life

22  inmates, and that wasn't passed until, I believe,

23  2019.

24      Q.   And Arizona Revised Statute 13-718 has to do

25  with parole eligibility; is that correct?

1    A.   Yes, and what that does is say that the

2  inmate had to have pled guilty to a 25-to-life

3  sentence, and the plea must state that the inmate

4  would be eligible for parole at 25; and then Chaparro

5  came about because he said it's not fair because he

6  was a trial, but his court document actually said that

7  he would be eligible for parole, specifically at 25

8  years.  So 718 catches if they pled guilty to 25 to

9  life, and then if it's not specific to parole, that's

10  where Chaparro clears it up completely.

11    Q.   And I just want to make sure, since 1994,

12  there have been varying Attorney General opinions

13  about how to treat sentences to life imposed after

14  1994; is that correct?

15    A.   Yes.

16    Q.   That includes treating the sentence as

17  though it were a 25-year sentence with community

18  supervision thereafter, correct?

19    A.   Yes.

20         MS. OROZCO:  I have no further questions.

21  Thank you.

22         THE COURT:  Mr. Johnstun.

23         MR. JOHNSTUN:  Thank you, Your Honor.

24                    CROSS-EXAMINATION

25

BY MR. JOHNSTUN:

    Q.   Mr. Chaparro, he wasn't granted parole.  He was granted eligibility for parole consideration; is that correct?

    A.   Correct.

    Q.   Okay.  Let me ask you this:  Did I understand you to say that this defendant's 25-to-year -- 25-to-life sentence should have been reevaluated following Chaparro, but for some reason it fell through the cracks?

    A.   No.  Chaparro, we did catch it.  I said it fell through the cracks in the early 2000s when the AG opinion changed from giving the inmate a release date with community supervision time to showing it back to 25 years to life.

    Q.   Well, let me ask you, in light of Chaparro, would there be a mechanism in place to have the Attorney General, who advises time computation, to take another look at the defendant's sentence?

    A.   I'm sorry.  Can you repeat the first part of that question?

    Q.   Yeah.  You testified that after Chaparro, you pulled up all of the 25-to-life sentences, and they were -- they were looked at again?

    A.   Yes.

1     Q.   And, now, this defendant's sentence says --

2   instead of parole, it says community supervision.   Is

3   there an administrative procedure for the Attorney

4   General to -- or an audit coming up to get an opinion

5   from the Attorney General regarding this defendant's

6   sentence in light of Chaparro?

7     A.   No.   Actually, we -- since it says it is

8   ordered that the defendant must serve every day of 25

9   years of the sentence imposed before he is eligible

10  for any type of release, it doesn't specify parole,

11  so --

12    Q.   Okay.

13    A.   Yeah, right now, as of right now he would

14  have to apply for commutation, but I do see right

15  there in a court document that it's he should have

16  three years seven months of community supervision, so

17  I believe that is probably something that we should

18  get with the AG's office on.

19    Q.   And but for this morning's hearing, are you

20  saying that probably would not have happened?

21    A.   That has not happened, and it's currently

22  not planned to happen, no.

23    Q.   But you're saying that maybe that should

24  happen now that that's brought to your attention?

25            THE COURT:   What should happen?

1        MR. JOHNSTUN:  That the defendant's sentence

2   should be submitted to the Attorney General's Office

3   for an opinion regarding how time computation should

4   treat the community supervision language in the

5   defendant's --

6        THE COURT:  I think that's why we're here in

7   a court of law.  The Attorney General is not a court

8   of law.

9        MR. JOHNSTUN:  I agree, and I did not -- I

10  was not trying to be offensive.

11        THE COURT:  Are you saying, Ms. Cassiano,

12  that you have never encountered a 25-to-life

13  sentencing document in which there was an order for

14  mandatory community supervision?

15        THE WITNESS:  Well, we haven't encountered

16  one that specifically says what the community

17  supervision time should be.  Most of the time the

18  courts just use a template and leave that 13-603

19  statute in there, so we usually just don't pay

20  attention to it; but since it's so specific to three

21  years seven months, that is strange.

22        THE COURT:  Okay.  So even though Chaparro

23  absolutely recites that the defendant Chaparro would

24  be in prison for the rest of his natural life without

25  possibility of parole for 25 years followed by a

1  consecutive term of community supervision, Chaparro

2  does not guide you on this case?

3        THE WITNESS:   Correct.   Yeah, he does not

4  fall under the Chaparro ruling.

5        THE COURT:   And how is that?

6        THE WITNESS:   Because his court document

7  does not say, "Parole," anywhere, it only says,

8  "Release."

9        THE COURT:   Okay.   So the word "Release" is

10  to be distinguished from -- so any type of release

11  would not include parole?

12        THE WITNESS:   No.

13        THE COURT:   What does "any type of release"

14  suggest?

15        THE WITNESS:   That just suggests that he

16  needs to apply for commutation or pardon at 25 years.

17        THE COURT:   The phrase "any type of release"

18  is limited in the department of corrections's parlance

19  to commutation or what?

20        THE WITNESS:   Or pardon.

21        THE COURT:   Or pardon.   Any type of release

22  does not include parole?

23        THE WITNESS:   According to Chaparro, no.

24        THE COURT:   So that's a very close reading

25  of Chaparro that you have received from the department

1   of -- the Attorney General's Office; is that correct?

2           THE WITNESS:  Yes.

3           THE COURT:  Okay.  Go ahead.

4           MR. JOHNSTUN:  Thank you, Your Honor.

5   BY MR. JOHNSTUN:

6       Q.   Ms. Cassiano, let me ask you this:  Are you

7   familiar with a case before Chaparro called Dawson

8   that -- applicable to inmates getting released earlier

9   than they should if their sentence provided for that?

10      A.   No, I am not familiar with that.

11          MR. JOHNSTUN:  No further questions.

12          THE COURT:  Ms. Orozco, anything further?

13          MS. OROZCO:  Yes, Your Honor.

14                  REDIRECT EXAMINATION

15  BY MS. OROZCO:

16      Q.   Community supervision, can you just tell me

17  what that is?

18      A.   Community supervision is -- it's when the

19  inmate is sentenced to, say, seven years, they

20  serve -- they have to be under supervision upon

21  release, and that supervision is determined by one day

22  for every six days that they serve; so it would be --

23  it comes out to 14.3 percent of the sentence would

24  have to be served under community supervision.  So

25  it's a separate sentence upon release from custody at

 1   department of corrections, and they will be supervised

 2   by community corrections for 14.3 percent of what they

 3   were sentenced to.

 4        Q.   And you're using a word called "Release,"

 5   correct?

 6        A.   Yes.

 7        Q.   So is community supervision a type of

 8   release, in general?

 9        A.   I don't know how to answer that question.

10   So --

11             MS. OROZCO:  That's fine, Ms. Cassiano.  I

12   have no further questions.  Thank you so much for your

13   time.

14             THE WITNESS:  No problem.  Thank you.

15             THE COURT:  Anything further, Mr. Johnstun?

16             MR. JOHNSTUN:  No, Your Honor.

17             THE COURT:  All right.  Ms. Cassiano, thank

18   you so much for calling in this morning.  It has been

19   very enlightening testimony, and I hope you have a

20   good day.

21             THE WITNESS:  Thanks.  You too.

22             THE COURT:  All righty.  Do you have any

23   other witnesses, Ms. Orozco?

24             MS. OROZCO:  Mr. Crago, Your Honor.

25             THE COURT:  All right.  Mr. Crago, I'm going

43

1   to ask you to raise your right hand and be sworn by

2   the clerk of court.

3             (Witness sworn.)

4             THE COURT:  Go ahead.

5                     EARL FELTON CRAGO,

6   having been duly sworn, testified as follows:

7                     DIRECT EXAMINATION

8   BY MS. OROZCO:

9       Q.   Mr. Crago, can you please say and spell your

10  name.

11      A.   Earl Felton Crago, E-A-R-L  F-E-L-T-O-N

12  C-R-A-G-O.

13      Q.   And how old are you?

14      A.   I'm 49.

15      Q.   And how old were you when you went into

16  custody on this case?

17      A.   I was 23.

18      Q.   And have you been in custody since you were

19  23 years old?

20      A.   Yes, ma'am.

21      Q.   And when you arrived in prison on this case,

22  had you been to prison before?

23      A.   No, ma'am.

24      Q.   Did you know what community supervision was?

25      A.   Just from talking to the lawyer, it was

44

1    specified that it was release.  I would go out and do

2    community service of a type, which I was unsure of

3    what that meant that I would be released.

4        Q.   When you were sentenced by Judge Borowiec,

5    do you remember that day?

6        A.   Yes, ma'am.

7        Q.   And what do you think he told you when you

8    were sentenced?

9        A.   He told me I would be released at 25 years

10   to do the three years and seven months community

11   supervision.  They had did a mitigation aggravation

12   hearing.  They found -- I think they had found four to

13   five mitigation factors, and one aggravating factor,

14   being the death of the victim.

15       Q.   Okay.  And when you arrived at DOC, you

16   received a time calculation, correct?

17       A.   Yes, ma'am.

18       Q.   And was that time calculation the same as

19   what you thought your sentence would be?

20       A.   Yes, ma'am, and I received one of those

21   approximately every 11 months like clockwork for many

22   years.  I just -- I never saved them because there

23   were so many.  I just happened to have that one still

24   in one of my legal boxes.

25       Q.   And you're talking about Appendix 3 that we

1  have submitted as Defense Exhibit B, correct?

2      A.   Yes, ma'am, and the reason I thought the

3  sentence would never change, if you look at that time

4  computation, it says that the sentence expiration date

5  will never change, so the community supervision

6  sentence date is the expiration date.

7      Q.   You were able to hear Ms. Cassiano testify,

8  correct?

9      A.   Yes, ma'am.

10     Q.   Does 2006 sound about right when you

11 received notice that they were changing your sentence?

12     A.   I got it in -- I got it in late 2008.  The

13 last thing I received from the DOC stating that the

14 sentence was the same was February 19th, 2008, and it

15 was from Correctional Officer 3, D. Straub, and it

16 still shows my sentence expiration date from the

17 25-year sentence as 9-12-2019, and then it went into

18 the 1.5 years for the other issue that I got into when

19 I was in prison; and it reads exactly the same as she

20 was saying it would read under 25 years.

21     Q.   Now, when you went into custody, did you

22 have familial and friend relationships?

23     A.   Yes, ma'am.

24     Q.   And was one of those people named Lori

25 Williams?

```
 1        A.    Yes, ma'am.

 2        Q.    And what was she to you?

 3              MR. JOHNSTUN:  Objection.  Relevance.

 4              THE COURT:  Overruled.

 5        A.    She was my girlfriend.  We had been friends

 6   since we were 12 years old.  Our birthdays are about

 7   three months apart.  We grew up together.

 8        Q.    And what does she have to do with your time

 9   calculation?

10        A.    She was the one that notified me in 2008,

11   late 2008, that they had changed the sentence on the

12   AIMS.

13        Q.    And what is the AIMS?

14        A.    That is the Automated Inmate Management

15   System that they have on the public website for the

16   department of corrections.

17        Q.    So you had friends and family checking that

18   date in anticipation of your release?

19        A.    Yes, ma'am.  You know, they were always

20   checking for disciplinary and things like that too, so

21   they were on there every week.  They told me right

22   away when it changed.

23        Q.    And did that impact you in 2008?

24        A.    Yeah.  Yeah, it impacted everything.

25        Q.    How?
```

```
1              MR. JOHNSTUN:  Your Honor, if the record
2    could show a continuing objection to this line of
3    questioning.
4              THE COURT:  The record may so reflect.
5         A.   It just caused a lot of anxiety and worry.
6    It changed my reclassification, which later took me
7    out of the ability to attend the programming that they
8    offer in here for inmates to prepare for release, such
9    as --
10        Q.   I'll ask you about that later, but let's
11   focus on --
12        A.   Okay.
13        Q.   -- your friends and family and how that
14   impacted you.
15        A.   Well, Lori became so depressed that she --
16   she couldn't take it much longer after that and we
17   stopped talking, because she couldn't understand how
18   it changed to life, and then my daughters both became
19   so depressed that their mothers suggested that we stop
20   talking for a while, because the change from having a
21   release to having no release, it just -- it really
22   overwhelmed everybody.
23        Q.   Now, you --
24        A.   My youngest daughter -- I'm sorry.  Go
25   ahead.  I was going to say my youngest daughter later
```

1    attempted suicide, and it's just -- that change is

2    just overwhelming to everything, and no matter how

3    much I told them that that was not the sentence, with

4    the DOC telling them it was the sentence and showing

5    them that on the public website, it was just affected

6    everything down to the most basic level.

7         Q.   Now let's talk about how it affected you as

8    an inmate.  You were classified -- were you classified

9    as a life inmate prior to 2008?

10        A.   No, ma'am.  I had a sentence expiration

11   date.

12        Q.   And what does that mean in DOC?

13        A.   Well, that means that I can attend the

14   college programming that they offer.  I can obtain

15   what's called a Class C work clearance so that I could

16   work jobs at the administration building.  I could

17   work the jobs.  I was the CO-3 clerk at the time,

18   which is a trustee position, which you can't have as a

19   life -- with a life sentence.  So once they changed

20   the sentence, they later began not allowing me to

21   attend college courses anymore and not allowing me to

22   have certain jobs, like, for instance, right now had

23   my sentence remained 25 years flat, I would have been

24   eligible to go down to minimum custody approximately

25   five years ago, and I would have been able to work the

1    ACI jobs and build up savings to help prepare for

2    release.

3           And I would have been able to obtain an

4    associate's degree through the Rio Salado College or

5    the Central Arizona College, depending on which yard

6    they would have had me housed on.

7       Q.   Now, when -- excuse me, before 2008, did you

8    obtain any certificates?

9       A.   I took everything that they offered back

10   then.  I took anger management courses.  I took

11   parenting courses.  I took the work-based education

12   courses through Rio Salado.  I'm federally certified

13   as a HVAC technician.  I have my HVAC refrigerant

14   certifications.  I also was certified through the

15   National Center for Construction, Education and

16   Research as an electrician, as a carpenter and as a

17   plumber.

18      Q.   Now, did you pursue all of that because you

19   anticipated staying the rest of your life in DOC?

20      A.    No, ma'am.  I was doing everything I could

21   to prepare for release because I'll be coming out of

22   prison with a felony conviction, which makes it, you

23   know, already harder than it is for even the normal

24   person, so I was taking everything I could to prepare

25   for work so that I could successfully reenter to

1   society.

2        Q.   Now, now that you have been in DOC for 25

3   years, have you been around people with different

4   types of sentences?

5        A.   Yes, ma'am.

6        Q.   And have you been around people that are

7   considered lifers?

8        A.   Yes, ma'am.

9        Q.   In your opinion, do those lifers behave

10  differently than people with a release date?

11       A.   Yes, ma'am, they do.  Their only hope is to

12  get down to the lowest custody facilities they can so

13  they will -- they will allow people to assault them

14  and, you know, worse to stay out of trouble.  They

15  won't fight back.  They -- and because they are going

16  to be old in here and this is all they have, so they

17  try to get down to the lowest custody units that allow

18  the most freedom for lifers, medium custody, I'm

19  sorry.

20       Q.   In your opinion, did you act as a lifer

21  since 1994?

22       A.   No, ma'am.  I have never conducted myself as

23  if I was doing a life sentence.

24            MS. OROZCO:  I have no further questions.

25  Thank you.  Oh, actually, I'm sorry, I do have one

1    follow-up question.

2        Q.   When you were proceeding to trial, were you

3    offered a plea agreement?

4        A.   Yes, ma'am, to second-degree murder.

5        Q.   For how much time?

6        A.   It carried 22 years.

7        Q.   And in your evaluation of the case, were you

8    balancing the plea agreement of 22 years against a

9    natural life sentence?

10       A.   No, ma'am.  I was -- We were speaking with

11   Judge Borowiec at the time, and it was explained to me

12   that if I turned down the plea and went to trial, I

13   would receive a 25-year sentence, and that was the

14   only reason I declined the 22-year sentence, because

15   there was only a three-year difference; and there was

16   the possibility of acquittal or less, a lesser charge.

17            MS. OROZCO:  I have no further questions.

18   Thank you.

19            THE COURT:  All right.  Thank you.

20   Mr. Johnstun, do you have any questions?

21            MR. JOHNSTUN:  Thank you, Your Honor.

22                    CROSS-EXAMINATION

23   BY MR. JOHNSTUN:

24       Q.   Mr. Crago, have you received a transcript of

25   your sentencing hearing?

1 A. Yes, sir, I have.

2 Q. Have you read it?

3 A. Yes, sir.

4 Q. Okay.  Is it correct, to the best of your

5 knowledge and recollection?

6 A. I have no reason to doubt it, so yes, sir,

7 it is.

8 Q. Okay.  And you previously filed a number of

9 Rule 32 petitions in this case?

10 A. Eight, yes, sir.

11 Q. Okay.  And you're familiar with the 2011

12 ruling by the Court of Appeals regarding your

13 community supervision claim?

14 A. Yes, sir.

15 Q. And the Court of Appeals ruled against you?

16 A. All I was -- you have to remember what I was

17 requesting.  All I was requesting was that the DOC be

18 ordered to correct the entry on the AIMS, and then

19 over time that progressed into other things.  The

20 Court would shift the motions to a Rule 32, and there

21 just weren't any grounds under Rule 32 to raise it.

22 I did attempt to raise the argument about

23 the plea at one point, but the Court notified me that

24 they didn't keep records back then of pleas that were

25 declined.  They started doing something called a

1  Donaldson hearing or something now where they keep the

2  records.  I just wanted AIMS to correct the sentence

3  on the AIMS because it was affecting my family so

4  badly, and it was affecting my position inside of the

5  prison for education and work; but, you know, my

6  youngest daughter, she became so depressed that she

7  attempted to take her life, and I was just -- all I

8  was really trying to do was to get AIMS to correct it.

9  I tried doing a special action.  I didn't have the

10 money to pay for it.

11       Q.   But the Court of Appeals said that it was

12 within DOC's authority to remove the community

13 supervision portion from your AIMS, correct?

14       A.   I didn't take that away from it.

15       Q.   Okay.

16       A.   Because DOC is an administrative agency.

17 How can they possibly be allowed to change a judicial

18 sentence?

19       Q.   And the Court of Appeals always said that

20 your -- also said that your sentence was a life

21 sentence, correct?

22       A.   Well, and, you know, the definition of life

23 has changed since I was sentenced because now the

24 definition of life is until you die, where back then

25 the definition of life was 25 years.

54

```
 1            MR. JOHNSTUN:  No further questions.

 2            THE COURT:  Anything further, Ms. Orozco?

 3            MS. OROZCO:  No, Your Honor.  Thank you.

 4            THE COURT:  All right.  Any further

 5   witnesses?

 6            MS. OROZCO:  No, Your Honor.

 7            THE COURT:  All right.  Anything the State

 8   wants to put on in terms of evidence?

 9            MR. JOHNSTUN:  No, no evidence, Your Honor.

10            THE COURT:  All right.  Let's hear some

11   argument.

12            MS. OROZCO:  Do I begin, Your Honor?

13            THE COURT:  You bet.

14            MS. OROZCO:  Okay.  The -- 1994 was a

15   confusing year for first-degree murder.  In 1994 the

16   statute changed, and it changed to one in which an

17   individual could either receive natural life -- and

18   I'm reading from 13-703.  In 1994 it said an order

19   sentencing the defendant to natural life is not

20   subject to commutation or parole, work furlough or

21   work release.  If the Court does not sentence the

22   defendant to natural life, the defendant shall not be

23   released on any basis until the completion of the

24   service of 25 calendar years, if the victim was 15

25   years of age or older.
```

1        Judges across the State interpreted that

2   statute differently and at times interpreted that

3   statute incorrectly.  In this case Judge Borowiec

4   interpreted the statute incorrectly by looking at this

5   language and saying, "Okay.  25 calendar years,

6   released on any basis.  Community supervision is a

7   type of release.  I am calculating that to reflect 25

8   years.  Here is community supervision for a 25-year

9   sentence."

10       That has to be read in context of his

11  sentence, because he said no one is going to know what

12  Mr. Crago will be like after 25 years, because he had

13  calculated community supervision at 25 years.  The

14  unfairness of this is clear from DOC itself.  DOC told

15  Mr. Crago from 1994 to 2006 or 2008, depending on

16  whether it's Mr. Crago or DOC, that he had a community

17  supervision release date of September 2019.  He was

18  told that for at least 12 years, 12 years of

19  operating, telling his friends and family, "I'm

20  getting out on this date.  Wait for me until this

21  date.  Give me this opportunity, because I'm getting

22  out on this date," and then that's arbitrarily taken

23  away by an AG opinion.

24       Chaparro is clear that the AG's opinion and

25  DOC's adherence with Chaparro was incorrect, because

1    it was the intent of the judge at the time to impose

2    parole.  That is not the argument here.  It was the

3    intent of the judge at the time to impose community

4    supervision.  Now, what Ms. Cassiano said was usually

5    what happened in these sentences when they got messed

6    up, was they just imposed community supervision

7    arbitrarily.  They did not provide a calculation.

8    They did not provide a calculation because it was at

9    least 25 years.

10            That's not the case here.  He calculated 25

11   years.  He sentenced life.  DOC testified that they

12   treated life as 25 years for at least 12 years.  How

13   is it fair that an Attorney General working in Phoenix

14   can change the life of all of these people and ignore

15   what the judge put into a sentence just arbitrarily?

16   And I submit that it is arbitrary to ignore an entire

17   part of a sentence.

18            Mr. Crago, in light of Chaparro, should have

19   the section of his community supervision abided by.

20   Community supervision is a part of a sentence.  It

21   cannot be ignored, and in interpreting the community

22   supervision to be extraneous or illegal or

23   unenforceable is directly contrary to Chaparro.

24            We ask that all of the provisions of Judge

25   Borowiec's sentence be abided by, that he receive the

1  community supervision release date he was told he had

2  until at least 2006, that he has submitted in writing

3  that he had a community supervision release date.

4  We're asking that that be followed so that he can have

5  begun serving his 1.5-year consecutive sentence and

6  that the calculations that were taken from the

7  original sentencing document be abided by and followed

8  and that the community supervision not be taken out.

9  It's just an essential part of the sentence.  It was

10  part of the intent from Judge Borowiec.  And I thank

11  you for your time.

12          THE COURT:  Mr. Johnstun.

13          MR. JOHNSTUN:  Your Honor, I think defense

14  counsel's arguments are rational, and they make a lot

15  of sense in light of Chaparro except there's a couple

16  of things in the defendant's case.  This is not an

17  issue of first impression.  This has already been

18  litigated and decided by the Court of Appeals, and the

19  applicable law was the same in 2011 as it is now when

20  the Court of Appeals ruled against the defendant.

21          THE COURT:  Isn't the Court of Appeals 2011

22  decision, however, contrary to the provisions in

23  Chaparro?

24          MR. JOHNSTUN:  It seems to me that it is,

25  and -- but the legal principle of a defendant being

1    entitled to the benefit of an illegally lenient

2    sentence was not part of the ruling in the 2011

3    opinion, and so we are left to wonder whether the

4    Court of Appeals was just ignorant of that legal

5    principle in Arizona or if they were aware of it, but

6    there's some overriding principle as concerns the

7    defendant's case or as concerns community supervision.

8            Because Dawson was not raised in the prior

9    Rule 32, we don't know what the Court of Appeals would

10   have done with that legal principle applied to the

11   defendant.  We know that they ruled against the

12   defendant very emphatically, both procedurally saying

13   it was precluded and substantively saying Court of

14   Appeals was well within its province to disregard the

15   community supervision and that the defendant is

16   serving a natural life sentence unless it's commuted.

17   And -- is serving a life sentence unless it's

18   commuted.

19           The defendant's sentence is and always has

20   been a life sentence.  His sentence will end at the

21   end of his life.  That's what the Court of Appeals

22   said and so we, like I say, if this was an issue of

23   first impression, then I think the -- but we don't

24   know where the Court of Appeals was coming from when

25   they ruled against the defendant in 2011, because the

1   current law under Chaparro was already the law in

2   Arizona.

3           THE COURT:   Anything further?

4           MR. JOHNSTUN:   No, Your Honor.

5           THE COURT:   Final argument, Ms. Orozco.

6           MS. OROZCO:   The law under Chaparro clearly

7   was not the law until 2020 because Chaparro came out,

8   and they were not applying the law correctly.   And

9   Justice Ginsburg addressed issue preclusion and said

10  that even when the elements of issue preclusion are

11  met, however, an exception may be warranted if there

12  has been an intervening change in the applicable legal

13  context.   That is from Herrera versus Wyoming, 139 S.

14  Ct. 1686.   It doesn't say it has to be a change in the

15  law.   It doesn't say it has to be a new legislative

16  decision or a new court decision.   It's just the

17  applicable legal context.   Chaparro is absolutely a

18  change in the applicable legal context.

19          The State has conceded that the 2011

20  decision is contrary to Chaparro, so it can't be the

21  law that is followed.   And the argument that life is

22  the end of his life makes the word "Natural" redundant

23  in a sentence of 13-703.   Because if life means the

24  end of his life, then why have a distinction between

25  natural life and life?

1          That was a choice that Judge Borowiec had,

2    and he chose life, which was 25 years before any type

3    of release, and in this case Judge Borowiec imposed

4    release in the form of community supervision of three

5    years and seven months.

6          The intent is clear.  Chaparro clearly is a

7    change in the applicable legal context in this case.

8    The issue should not be precluded.  Even if the issue

9    is precluded because of Dawson, it should not be

10   precluded because this argument was not ripe until he

11   was being held past his sentence.

12         For all of those reasons, we ask that the

13   sentencing minute entry be abided by and that his

14   community supervision -- or that he be released to

15   community supervision of three years and seven months

16   after serving his 1.5-year consecutive sentence.

17   Thank you.

18         MR. JOHNSTUN:  Your Honor.

19         THE COURT:  Yes, Mr. Johnstun.

20         MR. JOHNSTUN:  Could I be heard on the

21   applicable legal context?

22         THE COURT:  Sure.

23         MR. JOHNSTUN:  Subject to counsel's right to

24   final say.

25         THE COURT:  Sure.

61

1           MR. JOHNSTUN:  Thank you, Your Honor.  Your

2   Honor, that's not the law in Arizona.

3           THE COURT:  Which is not the law in Arizona?

4           MR. JOHNSTUN:  That issue preclusion doesn't

5   apply if there's a change in the applicable legal

6   context.  Your Honor, the federal cases cited by the

7   defense, one was a case where their statehood required

8   Native Americans to get hunting licenses after Wyoming

9   became a state, and the change in the applicable

10   context was a comparison with federal treaties with

11   other Indian tribes, and the other case, <u>Bobby v. Bies</u>

12   cited by the defense, that was a situation where a

13   mildly retarded defendant had been sentenced to death;

14   and then there was a U.S. Supreme Court opinion

15   stating that people who are retarded cannot be -- are

16   not subject to the death penalty and the -- because

17   that had not been the law, the severity of the

18   defendant's retardation had never been litigated; and

19   because of that change in the law and because the

20   defendant was asking for a reduction in his sentence

21   from death, then the Supreme Court held that it was

22   not double jeopardy for the State to fully litigate

23   how severely that defendant was retarded.

24           But in Arizona there's no -- there's no

25   legal authority that I'm aware of or that has been

 1   cited by the defense that a change in the legal

 2   context is how you get around preclusion.  In Arizona

 3   it's Rule 32.1(g) of the Rules of Criminal Procedure

 4   that requires a significant change in the law that if

 5   determined to apply to defendant's case -- and so it's

 6   not a change in the legal context.  The rule actually

 7   provides -- requires a significant change in the law.

 8              THE COURT:  Anything further, Ms. Orozco?

 9          MS. OROZCO:  If Chaparro versus Shinn is not

10   a significant change in the law, I don't know what is,

11   and Mr. Crago has been told -- he was told for a very

12   long time his sentence was what he thought it would

13   be, and then it was arbitrarily taken away.  That's in

14   violation of Chaparro.

15              THE COURT:  If I understand your argument,

16   Mr. Johnstun, you're saying decisional law is not law,

17   only statutory law would be law?

18          MR. JOHNSTUN:  No, Your Honor, I'm saying

19   that because of Dawson, the law -- the holding in

20   Chaparro was required by Dawson.  That had the same

21   exact holding, that the defendant is entitled to an

22   illegally lenient sentence that was not appealed by

23   the State.  That was the holding in the 1990 case of

24   Dawson, and so Chaparro was simply following that law,

25   and so --

63

```
 1              THE COURT:  Okay.

 2              MR. JOHNSTUN:  That was already the law in

 3    2011, and for some reason the Court of Appeals didn't

 4    follow it.

 5              THE COURT:  Ms. Orozco.

 6              MS. OROZCO:  I just enjoy quoting RBG.

 7              THE COURT:  All right.  Oh, my God.  This

 8    better not happen very often.  This is like -- these

 9    are hard cases.  All right.  I have been preparing on

10    this case now for a while, but I'm not going to rule

11    from the bench on this.  I'm going to write a decision

12    and get this out as quickly as possible because I do

13    think that it merits a written decision, and it may

14    have to go farther.  Who knows?

15              But we sure do have a lot of -- a lot of law

16    going on here, statutory law, antique law and

17    administrative law all just like colliding to

18    Mr. Crago's detriment and to our mutual confusion.

19              So I appreciate you guys briefing this out

20    for me and getting some testimony in, and I will get a

21    decision out posthaste.  Thank you both very much.

22    Thank you, Mr. Crago, for appearing here live and in

23    person, and stay in touch with Ms. Orozco.

24              THE DEFENDANT:  Your Honor, I just want to

25    say thank you all for having the hearing.
```

64

```
 1            THE COURT:  You bet.

 2       Interesting issues.  Thanks very much.

 3       MS. OROZCO:  Thank you.

 4       (Hearing concluded at 10:39 A.M.)

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

65

CERTIFICATE

I, Lee Ann Eaton, Registered Merit Reporter, Certified Realtime Reporter, do hereby certify that the foregoing 64 pages constitute a full, true and accurate transcript of the proceedings had in the foregoing matter, all done to the best of my skill and ability.

SIGNED and dated this 18th day of January 2021.


/S/ *Lee Ann Eaton*, RMR, CRR, CSR
Certificate No. 50963