*Earl Felton Crago v. Shinn*, CV 22-00339-TUC-JAS (LAB)

**INDEX OF EXHIBITS**

Exhibit Y.     Transcript, Jury Trial, 04/07/95

1

# EXHIBIT Y

1    IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2    IN AND FOR THE COUNTY OF COCHISE

3

4    STATE OF ARIZONA,          )    DIVISION ONE
                                )    BISBEE, ARIZONA
5         Plaintiff,            )
                                )
6         -vs-                  )    NO. CR94000471
                                )
7    EARL FELTON CRAGO, JR.     )
                                )    Volume V of V
8         Defendant.            )
     _____)    Jury Trial
9

10         REPORTER'S TRANSCRIPT OF PROCEEDINGS
               (FOR PURPOSES OF APPEAL)
11
                 April 7, 1995    2 CA-CR 9 5 - 0 4 8 8
12

13   APPEARANCES:

14             MR. GERALD TILL
               for the Plaintiff,
15
               MR. JAMES WHITE
16             for the Defendant.

17                                ORIGINAL

18

19

20         BE IT REMEMBERED that on the 7th day of April,

21   1995, the above-entitled matter came on for hearing before

22   the Hon. Matthew W. Borowiec, Judge of the Superior Court,

23   Division One.

24             HOLLY R. JOHNSON
               Court Reporter
25             P.O. Box 221
               Sierra Vista, Arizona  85636

FILED
ARIZONA COURT OF
APPEALS DIV. TWO
95 SEP 29 AM 9:10
JOYCE A. GOLDBERG
CLERK

2

1

I N D E X

2     SURREBUTTAL:

3     CHRISTOPHER SLAUGHTER

4            Direct Examination by Mr. White        3
             Cross Examination by Mr. Till          8
5            Re-direct Examination by Mr. White    20

6     STATES REBUTTAL (Cont.)

7     CECILIA BROWN
             Cross Examination Mr. White (cont.)   23
8            Re-direct Examination by Mr. Till     35

9     JURY INSTRUCTIONS                            40

10    CLOSING ARGUMENT BY MR. TILL                 50

11    CLOSING ARGUMENT BY MR. WHITE                79

12    REBUTTAL BY MR. TILL                        100

13    FINAL JURY INSTRUCTIONS                     106

14    VERDICT                                     110

15

16

17

18

19

20

21

22

23

24

25

3

```
 1              P R O C E E D I N G S
 2              THE COURT:  All right.  The record may show
 3    the jury is in the box and seated.  Good morning, ladies and
 4    gentlemen.  I appolgize for the delay.  I asked you to be
 5    here at nine o'clock, and we haven't been able to get
 6    started.
 7              Who do we--have the State's rebuttal witness back
 8    yet?
 9              THE COURT:   Do you have additional
10    surrebuttal?
11              MR. WHITE: I do, Your Honor.  Defense would
12    like to call Christopher Slaughter.
13              (The witness is sworn in by the clerk.)
14              SURREBUTTAL
15            CHRISTOPHER SLAUGHTER
16    is called as a witness for the Defense, after having been
17    duly sworn, testifies as follows:
18              DIRECT EXAMINATION
19    BY MR. WHITE:
20    Q.       Would you state your name for the record,
21    please.
22    A.       It's Christopher Robert Slaughter.
23    Q.       And are you're currently being held in custody over
24    at the Cochise County Jail; is that correct, sir?
25    A.       Yes, sir.
```

4

1    Q.        All right.  Mr. Slaughter, you have been recently

2    convicted of a felony; is that right?

3    A.        Yes, sir.

4    Q.        How long have been in the Cochise County Jail?

5    A.        For a period of almost two months, now.

6    Q.        And during that two-month period, have come in

7    contact with a Mr. Godfrey?

8    A.        Yes, I have.

9    Q.        All right.  How did that contact come about, sir?

10   A.        We were pod mates at one time, till they did a

11   segregation at the jail, and they moved him to a different

12   pod at that point.

13   Q.        Do you know when thee moved him?  Do you recall?

14   A.        A couple weeks back.

15   Q.        Couple weeks ago?

16   A.        Yeah.

17   Q.        Pod mate means that you weren't cell mates but in

18   the same pod?

19   A.        Yes, sir.  They released all of--they unlocked all

20   of our doors at six o'clock and we all lived in the same

21   quarters.

22   Q.        And you have the ability to associate with other

23   inmates within that pod; is that right?

24   A.        Yes, sir.

25   Q.        Now, during--and were you in the same pod that

5

1   you're were saying with Mr. Godfrey during this period of
2   time?
3   A.      Yes, sir.
4   Q.      All right.  During that period of time, did you
5   have a conversation with Mr. Godfrey?
6   A.      Pertaining to what?
7   Q.      Have you had several conversations with him?
8   A.      Yes.
9   Q.      Did you have a particular conversation that
10  involved his testimony or information in this trial--
11  related to this trial?
12  A.      Not during while he was pod, no, that happened
13  after he left the pod.
14  Q.      All right.  Did you have a conversation though
15  about his--at some point in time, about some information
16  related to this case?
17  A.      Yes.
18  Q.      What was the nature of that conversation?
19  A.      Well, he told me that him and Ogren was trying to
20  work out a deal with the District Attorney.  That they were
21  going to--to--they wanted me--he wanted me to back his story
22  as far as what I'd heard in the pod, and I told them that
23  that was absurd because Crago never talked about his case.
24  I couldn't back him up in that.
25  Q.      Okay.  What are you talking about "backing up"

6

1   about what information?

2   A.      He wanted me to say that I heard Crago talk about

3   his case to him.

4   Q.      Oh, I see.  Okay.  This Ogren, is that--do you

5   understand that to be Dale Ogren?

6   A.      Yes, sir.

7   Q.      All right.  And those two were going to get

8   together and work out a deal; is that right?

9   A.      They were trying.

10  Q.      They wanted you to got involved in that?

11  A.      Yes, sir.

12  Q.      I guess, Godfrey did particularly to back him up on

13  this store; is that right?

14  A.      Yes, sir.

15  Q.      Part of that story was that Mr.--he wanted you to

16  say--

17                  MR. TILL:  Your Honor, excuse me, I'll object

18  to leading, and ask that the witness be allowed to answer.

19                  THE COURT:  Yes.  Sustained.

20  Q.      (By Mr. White)  What was your understanding of what

21  he wanted you to do?

22  A.      He wanted me to back his story.  He told it was a

23  lot better that if the D.A. heard that we heard it in the

24  pod, instead of him hearing from Ogren.  Because it was

25  better for him if he heard and somebody else was a witness

7

1   to that in the pod.

2   Q.      Have you been around Mr. Crago since you've been

3   the Cochise County Jail?

4   A.      Yes, sir.

5   Q.      And what was the nature of that contact?  Were you

6   in the same pod with him or?

7   A.      We were also in the same pod.

8   Q.      The same pod.  Have you--have you seen occasion

9   when Mr.  Crago discussed his case with anyone?

10  A.      He don't even discuss it with me.

11  Q.      All right.

12  A.      I have to read about it in the paper.

13  Q.      All right.  Why did you come forward with this

14  information, Mr. Slaughter?

15  A.      Because hearing after Godfrey and Ogren, I didn't

16  think it was right for them to go ahead and try to make a

17  deal off something they don't know nothing about, especially

18  for Godfrey to make a deal like that.  He was just trying to

19  get a deal.

20  Q.      Are your trying to gain any benefit for yourself?

21  A.      I have nothing to gain.

22  Q.      For your testimony here?

23  A.      I have nothing to gain.

24  Q.      Now, it's true that I've-- I've been your attorney;

25  isn't that right?

8

1   A.       Yes, sir.

2   Q.       And you understand that I'm also Mr. Crago's

3   attorney?

4   A.       Yes, sir.

5   Q.       Did I ask to do anything in regards to this case or

6   anything at all to assist Mr. Crago?

7   A.       No, sir.

8            MR. WHITE:   No further questions.

9            THE COURT:   You may cross examine, Counsel.

10                       CROSS EXAMINATION

11   BY MR. TILL:

12   Q.       Mr. Slaughter, how hold are you?

13   A.       I'm 24 years old.

14   Q.       And you were convicted of a felony on December 19,

15   1994?

16   A.       Yes, sir.

17   Q.       And that's in Cochise County, Arizona?

18   A.       Yes, sir.

19   Q.       And that felony was for child abuse?

20   A.       Child neglect, yes, sir.

21   Q.       And you say you've in jail now for two months this

22   time?

23   A.       Yeah, for probation violation.

24   Q.       When did you get out of jail?

25   A.       I think it was January--February 14th.

1   Q.       February 14th.   And you've been in since February

2   14th?

3   A.       Yes, sir.

4   Q.       And you have a disposition coming up in the next

5   week?

6   A.       Monday I go to sentencing.

7   Q.       And where were you housed when your first got in?

8   A.       South 8.

9   Q.       Were you ever in S.E.13?

10  A.       Not in 13 no.   Southeast 16 is where I lived up

11  until last night.

12  Q.       Is there an S.E. 13, how is that arranged down?

13  You have different pods?

14  A.       I got A. B. C. D. and E.

15  Q.       And you got S.E.13, and you were in S.E.16?   So how

16  far up does it go?

17  A.       Three rooms.

18  Q.       Three rooms.   And you were never housed in S.E.13?

19  A.       No, sir.

20  Q.       Do you know if Earl Crago was housed in S.E.13?

21  A.       Yeah.

22  Q.       How do you know that?

23  A.       'Cause he lived in the same pod.   I lived in S.E.

24  16, he lived in S.E.13.

25  Q.       Is S.E.--is that a cell designation?

10

| | | |
|---|---|---|
| 1 | A. | South E. pod-cell 16. |
| 2 | Q. | Cell 16? |
| 3 | A. | Yes, sir. |
| 4 | Q. | S.E.13 is South East pod-cell 13? |
| 5 | A. | Yes, sir. |
| 6 | Q. | And you were in the same pod but in a different |
| 7 | cell? | |
| 8 | A. | Yes, sir. |
| 9 | Q. | Were you ever housed in the same cell as a cell |
| 10 | mate with Earl Crago? | |
| 11 | A. | No, sir. |
| 12 | Q. | Were you ever as a cell meat with Thomas Godfrey? |
| 13 | A. | No, sir. |
| 14 | Q. | Were they ever cell mates to your knowledge? |
| 15 | A. | Yes, sir. |
| 16 | Q. | And where would that have been? |
| 17 | A. | South E.13. |
| 18 | Q. | Do you know when that was? |
| 19 | A. | I can't remember exact dates.  It was about a month |
| 20 | back. | |
| 21 | Q. | If I told it was around the 8th of March, does that |
| 22 | sound about right? | |
| 23 | A. | I guess. |
| 24 | Q. | That's about a month ago? |
| 25 | A. | Yeah. |

1    Q.       Can you visit different--each other's cell like

2    college-dorm room?

3    A.       Yeah, you can.

4    Q.       Did you ever visit S.E.13?

5    A.       Not often.  We usually function outside in the pod

6    area near the picnic tables and T.V.

7    Q.       That's out in the commons area?

8    A.       Yes, sir.

9    Q.       Do you have--do prisoners have any reports on their

10   individual case accessible to them.  You know, police

11   reports and witness statements and so forth?

12   A.       If they want them accessible, I guess they can be

13   accessible to everybody else, but if you want then under

14   key, that's your responsibility to keep them under lock and

15   key.

16   Q.       Where can you put them under lock and key if want

17   to keep them secure?

18   A.       In your own living quarters.

19   Q.       You have the ability to lock it up?

20   A.       No.  What I'm saying is under your mattress and

21   watch your room.

22   Q.       So in a sense you give up some right to privacy by

23   being in jail.  You've got to hide this more or less under

24   your mattress, if you want to keep your case files private?

25   A.       Basically.  If you want to keep them private, you

12

1   have to keep them--you have to let people know that you

2   don't want them in your stuff, in order to keep anything

3   private in jail.

4   Q.      Is it common for most inmates to keep their own

5   police reports and witness statements private to their own--

6   to themselves somehow?

7   A.      If they want to.

8   Q.      What is usually done? Is it usually accessible to

9   everybody?

10  A.      It depends on the person.

11  Q.      As part of that, is it pretty common to read about

12  what evidence the police have on your individual case--look

13  and see--

14  A.      It depends on the individual person on whether they

15  want to share that everybody in the pod or not.

16  Q.      Okay.  Some do and some don't?

17  A.      Some do and some don't.

18  Q.      What you are saying is that in your opinion, Earl

19  Crago is one of these who doesn't chose to share the details

20  about his case?

21  A.      In my opinion.

22  Q.      Which he has a right to do, doesn't he?

23  A.      Yes, sir.

24  Q.      Okay.  And during the time when he was with the

25  other individual, Godfrey--are the cells closed at night or

1  what happens?

2  A.      From eight o'clock at night until 6:30 in the

3  morning they are locked.

4  Q.      And you're with your cell mate that time?

5  A.      Yes, sir.

6  Q.      Can your hear the conversations that go on in

7  another cell, let's say from 16 over to 13?

8  A.      Pretty much, yeah.

9  Q.      And even at night time?

10  A.     Yes, sir.

11  Q.     Is everybody-- how many cells in a pod?

12  A.     Well, in that particular pod there are 16 cells.

13  Q.     So all 16 cells with--what two people to a cell?

14  A.     No.  There is one--from one through eight, which is

15  on the top tear, is one bunk;  and then from nine to 16

16  there two bunks, on the bottom floor.

17  Q.     Some of them are doubled up and some are just two

18  in a room?

19  A.     Yes, sir.

20  Q.     But can't really hear what's going on--being said

21  in all 16?

22  A.     Yeah, you can because everybody is usually  laying

23  down in bed by that time.  By eight o'clock everybody locks

24  their doors and they go to bed and wait for the door to

25  unlock at 6:00 because that's period that you don't really

14

1    like.

2    Q.      I asked you what was being said over in S.E. 7 on a

3    given night, could you tell us?

4    A.      Be a little harder for S.E.--well, in my

5    particular--in my particular cell because it was a Number

6    16, S.E. 7 would be right above me one door.  So that would

7    be easy to hear.

8    Q.      What was being said on March 18 in Pod S.E. Cell

9    Seven?

10   A.      I don't recall. I don't record each and every

11   conversation that takes place in the pod.

12   Q.      How about in the day time?  Is there a kind of a

13   opening of the cell doors and daytime people are able to go

14   out in the pod?

15   A.      Yes, sir.  They're free the doors open from 6:30 to

16   eight o'clock at night.  You're welcome to go in your cell

17   or not.

18   Q.      What do you do during that time?

19   A.      Play cards, eat.

20   Q.      At a table?

21   A.      Yeah.

22   Q.      Are you all together at that time or are you

23   visiting friends within the pod?

24   A.      Visiting friends usually.

25   Q.      So if somebody wanted to stay in their cell and

15

1   talk or study their police reports and witness statements,
2   they are free to do so?  They wouldn't have to come out to
3   the pod?
4   A.      Yes, sir.
5   Q.      Does that happen sometimes?
6   A.      That happens.
7   Q.      A lot doesn't it?
8   A.      It happens.
9   Q.      People visit together in the a cell?
10  A.      Yes, sir.
11  Q.      And are you saying that you're aware of what's
12  being spoken at all times in every cell?
13  A.      Not every--during lock down, but no--during lock
14  down, everybody's a lot quieter and it's a lot easier to
15  hear things after lock down.
16  Q.      I see.  So daytime people could be conversing over
17  in this cell, a couple of friends together and you're
18  playing cards, you might miss what was being said?
19  A.      Exactly.
20  Q.      Where was Ogren?  Where was he?
21  A.      Ogren was in South B.
22  Q.      South B.  Is that a different pod?
23  A.      Yes, sir.
24  Q.      Now, is he a--how long has he been in?
25  A.      I'm not quite sure.

1   Q.      Is he under charge at this time?

2   A.      I'm not sure.  I imagine so, he's incarcerated.

3   Q.      And he has his right to--to not talk, I guess,

4   being a prison?

5   A.      I guess.

6   Q.      And you're saying that he and Godfrey were trying

7   to work out a deal with--or they would talk if they could

8   get some sort of a plea agreement?

9   A.      Yes, sir.

10  Q.      And that was being done by both of them, Ogren

11  trying to work a deal where he would testify if he could get

12  a plea agreement; and so was Godfrey according to what he

13  told you trying to work a plea agreement and then he'd

14  testify and tell what he knew?  Is that what you're saying?

15  A.      Well, I think what happened was when they did  this

16  segregation--when they did--when they moved everybody at the

17  jail--

18  Q.      What happened?

19  A.      They moved everybody around.  What happened was,

20  Godfrey and Ogren ended up in the same pod.  What happened

21  was, I think Ogren caught on--

22  Q.      Now, I don't want you to just speculate.

23  A.      I'm not speculating.

24  Q.      Okay.  And I don't want you tell me what somebody

25  else told you that's not hear.  What you're saying is

17

1   Godfrey told you that he was trying to work a deal and  was

2   his statement to you that Ogren was as well.  Is that what

3   you're saying?

4   A.      Yeah.

5   Q.      Okay.  Where was Crago during that time?

6   A.      He was off in one of the other cells or in a pod

7   somewhere.  I wasn't sure.

8   Q.      Is he in the same area as Ogren?

9   A.      No.  We are in different pods. When he came and

10  talked to me, they were out on rec.  We all use the same rec

11  room.  Out windows face the rec yard.  And he knocked on the

12  windows and asked for Slaughter, and I went to the window--

13  Q.      Who asked for Slaughter?

14  A.      Godfrey did.

15  Q.      Okay then you--

16  A.      In that particular room there was too many people,

17  and he asked for me to go down to a more private room and I

18  went to the en of the hall.

19  Q.      Does Crago--do you know if he used to be friends

20  with Ogren?

21  A.      I'm not sure.

22  Q.      Were they ever in jail together at the same time?

23  A.      Incarcerated at the same time.  Whether or not

24  living in the same quarter or not--

25  Q.      Is it your impression right now they are in the

1  outs?  They are not friends?

2  A.      I don't know.

3  Q.      Would you surmise that would be the case if in

4  fact--

5              MR. WHITE:  Your Honor, now he has asked the

6  witness to speculate, when he asked the witness not to

7  speculate before.

8              THE COURT:  Rephrase your question.

9              MR. TILL:  This is cross examination--

10  Q. (By Mr. Till)  Does it--does it appear that maybe Ogren

11  wanted to testify against Crago if he could get a deal, that

12  he is now not a friend of Crago at this particular time?

13  A.      I don't know what Crago's relationship is with

14  Godfrey before or after being incarcerated.

15  Q.      Do you know if Godfrey and Crago are at a falling

16  out of some manner?

17  A.      I'm not sure.

18  Q.      So all you know is that Godfrey said he wanted to

19  testify.  He wanted a deal and that could you state what

20  Crago had told about his to--

21  A.      If I could be a witness as to what he heard.

22  Q.      And you said, wait Crago doesn't talk about his

23  case to nobody.

24  A.      Yes, sir.

25  Q.      So I can't make up anything.  He didn't ask you to

19

1   make up anything, did he?

2   A.        Well, no I asked him exactly he was gonna say.  I

3   told him I didn't want do that because it wasn't right to

4   Crago that they should just let the facts come out as they

5   are.  I  asked him, what are you guys going to stay?  He

6   said he hadn't talked to Ogren in order to find out exactly

7   what they were going to say.

8   Q.        It's not something to do in jail to testify against

9   other prisoner, is it?

10  A.        It's not something you do.

11  Q.        It's not a--something that's looked upon with favor

12  by other inmates to snitch on another prisoner?

13  A.        Not necessarily, no.

14  Q.        It looks upon with disfavor; isn't it? For one

15  inmate to testify about another inmate's case in Court?

16  A.        Yeah, I would imagine.

17  Q.        But yet Godfrey told you that he was going to do

18  that,  and could you--

19  A.        --back him up.

20  Q.        --back him up.  You said I don't have any

21  information from Crago to back you up so to speak?

22  A.        Exactly.

23  Q.        Did--did Thomas Godfrey tell you what he was going

24  to testify to--what the evidence was is going to be?

25  A.        No.

1   Q.      All right.  Do you know if Mr. Ogren knows where

2   the gun is in this case?

3   A.      No, I don't.

4   Q.      Do you know if Mr. Crago knows in this case?

5   A.      No, I don't.

6               MR. TILL:  That's all I have.

7               THE COURT:  Re-direct, Mr. White.

8               MR. WHITE:  Thank you, Judge.

9                       RE-DIRECT EXAMINATION

10  BY MR. WHITE:

11  Q.      Mr. Slaughter, you've said that to try to gain

12  whatever privacy an inmate can gain, many times they'll put

13  their personal papers underneath their mattress?

14  A.      Yes, sir.

15  Q.      All right.  Are there some people that have cells

16  by themselves and some people that have cell mates?

17  A.      Yes, sir.

18  Q.      All right.  Would it be easier to protect your

19  privacy if you don't have a cell mate?

20  A.      Yes, sir.

21  Q.      One could watch--if you didn't have a cell mate,

22  you could watch your cell to make sure that nobody

23  unauthorized went in there?

24  A.      It's easier.

25  Q.      All right.  But with a cell mate that other cell

1    mate has the right to have access of that cell, too, right?

2    That's his or her living quarters?

3    A.        Yes.

4    Q.        Now, you weren't saying that during lock down that

5    you can hear each and every conversation that goes on, are

6    you?

7    A.        No, that's not what I'm saying.

8    Q.        You were saying that, again, that it's easier to

9    hear things?

10   A.        Yes, sir.

11   Q.        All right.  You're not saying that you over head a

12   conversation between Mr. Crago and Mr. Godfrey, did you?

13   A.        No.  I'm not saying that.   I'm just it's a lot

14   easier to hear what goes on in the pod than it is during the

15   day.

16   Q.        All right.  You said that snitches are looked on

17   with disfavor by other inmates; is that right?

18   A.        Yeah.  It's hard to categorize a snitch.

19   Q.        All right.  Everybody has their own personal

20   interest, right?

21   A.        Yes, sir.

22   Q.        And Mr. Godfrey has his own personal interest?

23   A.        Yes, sir.

24   Q.        And Mr. Godfrey approached you to--to lie?

25                MR. TILL:  Objection, a leading question,

1  mischaracterizing, Your Honor.

2  THE COURT:  Yes. Rephrase your question.

3  Q.      (By Mr. White)  Mr. Godfrey appoached you to get

4  you--to get you to say something that wasn't true.

5  MR. TILL:  Leading objection.

6  THE COURT:  Overruled.  You may answer.

7  A.      Yes, sir.

8  MR. WHITE:  No further questions.

9  THE COURT:  You may step down, Mr. Slaughter.

10  You're excused.

11  Are--do we have our other witness here?

12  MR. TILL:  I've been advised that the witness

13  that was on the witness stand has arrived.

14  THE COURT:  All right.  Miss Brown, let's get

15  her back on the stand for rebuttal testimony.  Cross

16  examination on rebuttal I think that's where we are.

17  MR. WHITE:  Yes, sir.

18  THE COURT:  Can you give me how long you

19  anticipate that will take?

20  MR. WHITE:  I think it's going to depend on

21  some things, Judge.

22  THE COURT:  All right.  Okay.  All right,

23  you're still under oath, Miss Brown.  You may continue with

24  your cross examination, Counsel.

25  MR. WHITE:  Thank you, Your Honor.

23

REBUTTAL CONTINUED

CECILIA BROWN

CROSS EXAMINATION CONTINUED

BY MR. WHITE:

Q.      Good morning, Miss Brown.

A.      Hi.

Q.      Miss Brown, when we concluded yesterday, I  was asking you some questions, and I was asking you primarily to tell the truth; isn't that correct?

A.      Yes.

Q.      Now you've had some time to think and reflect between yesterday afternoon and this morning, and have you now decided to tell the truth?

A.      I have been telling the truth.

Q.      Isn't it true, Miss Brown, that for a significant period of time, over a number of months prior to September 28th of '94, you were--you personally were involved in significant drug trafficking out of your home; isn't that true?

A.      Can you repeat that please.  I wasn't listening to the first part of your question.

Q.      I'd appreciate it if you would, please--

A.      I will try to concentrate better.

Q.      Okay.  Isn't it true, Miss Brown, that for several months prior to September 28th of '94, you were involved--

24

1   personally involved in significant drug trafficking from

2   your home?

3   A.        I don't know that it would be significant. I don't

4   know what that term --how you define that term.

5   Q.        Isn't it true, ma'am, that practically daily from

6   those period of months, you had people coming in and out of

7   your house to buy and sell drugs?

8   A.        No, that is not correct.

9   Q.        And so therefore, your neighbors--respectable

10  people in the neighborhood--are lying when they testified in

11  this case that they observed over significant number of

12  months prior to September 28th that they saw people coming

13  and going practically daily at all times of the day and

14  night--they're lying about that?

15  A.        That's not what you said.

16  Q.        Isn't it true -- so if that was the case, if these

17  people did testify to that, you're saying they're lying?

18  A.        No.  I'm not saying they're lying.

19  Q.        All right.

20  A.        That's not what you said, Mr. White.  You said

21  drug--people coming to my house daily to buy drugs.  That's

22  not what's happening.

23  Q.        Right.  Let me ask you this.

24  A.        Okay.

25  Q.        The neighbors--your neighbors have testified that

1   over several months prior to September 28th of '94, they saw

2   almost on a daily basis, people coming in and out of your

3   house at all times of the day and night.

4   A.        I would--almost on a daily basis.  There was not a

5   daily basis.  There was days that there was nobody there.

6   Q.        This occurred very frequently, didn't it?

7   A.        Often.

8   Q.        I think yesterday you testified occasionally?

9   A.        You asked me to be honest.  I'm being honest.

10  Q.        Oh, you're being honest today, but you weren't

11  yesterday?

12  A.        I was being honest yesterday.  I'm being honest

13  today.

14  Q.        Do you recall--

15  A.        Often.

16  Q.        Do you recall yesterday I asked you that same

17  question, that you told the jury only on occasion that this

18  happened, do you recall that?

19  A.        No, sir.  I believe what I said on occasion I was

20  involved in the buying and selling of drugs on occasion.    I

21  believe that's what I said.

22  Q.        Now, I believe I also asked you, ma'am--I'm not

23  going to argue with you, I think the jury can remember what

24  you said.  But--but I--and it's their recollection that

25  counts in this case.

1   A.      Yes, it is.

2   Q.      As I recall, when I asked you that question about

3   people coming in  and out of the home,  you said only

4   occasionally.   And now your testimony here today is often?

5   A.       Daily--

6               MR. TILL:  Argumentative, Your Honor.

7               THE COURT:  Well, it was a question, I think.

8   And there was a response.   Objection overruled.

9   Q.       (By Mr. White)  You do acknowledge the fact that

10  you were involved in drug activity out of your house?

11  A.      Yes.

12  Q.      And you were selling drugs; correct?

13  A.      Sometimes.

14  Q.      And this was methamphetamine?

15  A.      Sometimes.

16  Q.      And marijuana?

17  A.      Yes.

18  Q.      And  this was going on while your two children,

19  Scott and Chad, were living in the same house with you?

20  A.      Yes.

21  Q.      And you had people coming in and out of that house,

22  again, over several months.   Some of these people you knew,

23  some of these people you didn't know; isn't that correct?

24  A.      Yes.

25  Q.      Many of these people were carrying weapons; isn't

27

1  that true?

2  A.      A few of them.

3  Q.      A few of them carried weapons?  And, again, this

4  while your two sons were in the house; isn't that true?

5  A.      Sometimes.

6  Q.      All right.  Isn't it true, Miss Brown, that you got

7  your drugs primarily from Rocky Griffin?

8  A.      No.

9  Q.      And that Rocky Griffin fronted you those drugs.  By

10  that I mean, Rocky Griffin gave you the drugs,  and you were

11  to make payment later; isn't that true?

12  A.      No.

13  Q.      Primarily methamphetamine; isn't that true?

14  A.      No.

15  Q.      And that you maintained a ledger or a record--

16  written record of your drug transactions by name and amount

17  owed to you; isn't that true?

18  A.      No, not always.

19  Q.      You did though?

20  A.      Not--no I didn't.  Really I didn't.

21  Q.      When you say not always, what do you mean by that?

22  That--the connotation of that is that you did it sometimes.

23  A.      No.  What I would do sometimes is I would maybe use

24  some kind of code to remind myself, but it wasn't like a

25  list or ledger or any book or anything like that.  It wasn't

1    that type.

2    Q.      You realize that when the police searched your home

3    that morning of September 28th, they found what these police

4    officers testified to be or appeared to be a drug-type

5    ledger?  Do you understand that?

6    A.      That's-- yes, I do.

7    Q.      Do you know anything about that?

8    A.      No, I don't.

9    Q.      And they found that in your bedroom?

10   A.      That's what--yeah.

11   Q.      But this document or these documents were found in

12   your bedroom, but you don't know anything about them?

13   A.      That particular one, no, I don't.

14   Q.      Okay.  Where did it come from?

15   A.      I don't know.  As many people that were in and out

16   of my house, no telling.

17   Q.      Oh, I see.  So somebody else did it?

18   A.      I didn't say that.  I don't know.

19   Q.      You don't know?

20   A.      You don't know.

21   Q.      You're saying this magically appeared in your

22   bedroom?

23   A.      No.  I don't know.

24   Q.      Miss Brown, I asked and I'll ask you again to be

25   honest.

1   A.      Mr. White, I am being honest.

2   Q.      In your opinion; isn't that true?

3   A.      In my opinion, what?

4   Q.      That you're being honest.

5   A.      I am being honest.

6   Q.      Now you went over to--on your early morning hours

7   of September 28th about 3:30 a.m., you went over Danny

8   Mason's house, didn't you?

9   A.      No, sir, I did not.

10   Q.      You do acknowledge the fact that you were in Danny

11   Mason's house sometime on late 27th of--late on  the 27th of

12   September or early the 28th of September; isn't that

13   correct?

14   A.      Yes.

15   Q.      And you went over there to collect a debt, didn't

16   you?

17   A.      Yes.

18   Q.      All right.  And with you, you had Mr. Davidson and

19   this young man named John; isn't that correct?

20   A.      Yes, it is.

21   Q.      And you went over to collect a debt from Mr.

22   Mason--a drug debt, didn't you?

23   A.      No.

24   Q.      And when you went over there with Mr. Davidson and

25   Mr-- and this John, John was armed with a semi-automatic

1    pistol, wasn't he?

2    A.        No.

3    Q.        And when you went over to Danny Mason's house with

4    Mr. Davidson, that same time, Mr. Davidson was armed with a

5    large knife in a sheath, wasn't he?

6    A.        No.

7    Q.        Isn't it true, Miss Brown, that part of Mr.

8    Davidson's relation with you is that he was your enforcer;

9    isn't that true?

10   A.        No.

11   Q.        He--you hired him or not hired him--but part of

12   your association with him was that he was to collect the

13   debts that you accumulated; isn't that true?

14   A.        No, that's not true.

15   Q.        And that you manipulated him to do that; isn't that

16   true?

17   A.        No, that's not true.

18   Q.        Isn't it true, ma'am, that you were out to get, in

19   whatever manner, Mr. Crago for a debt that he owed you for

20   drugs; isn't that true?

21   A.        No.

22   Q.        And that Mr. Davidson was to carry out that threat;

23   isn't that true?

24   A.        No, that's not true.

25   Q.        On the early morning hours of September 28th of

1   1994, that's exactly what Mr. Davidson did; isn't that true?

2   A.      No.

3   Q.      And he did that through your instructions; isn't

4   that true?

5   A.      No, that is not true.

6   Q.      You will agree with me, you will not, that you are

7   partially responsible for this death of Mr. Davidson?

8   A.      I will not agree with that.

9   Q.      You will agree with me, will you not, that Mr.

10  Davidson's death can be attributed to in large part to your

11  activity; isn't that true?

12  A.      No, I cannot agree with that.

13  Q.      Isn't it true that after this event occurred on

14  September 28th of '94, you asked--you called Mr. Mason's

15  house about five o'clock in the morning; isn't that true?

16  A.      I don't remember.  I--I probably did call him.  I

17  don't remember.

18  Q.      Isn't it true when you called Mr. Mason's house,

19  you talked to Randy Beel; isn't that true?

20  A.      I don't--I don't remember that either.

21  Q.      When--and when Mr. Beel asked you if you had called

22  the police, you said no and hung up on him?

23  A.      Oh, no.  That's not true.

24  Q.      And isn't it also true that you also called this

25  John Wood in the early morning hours of September 28th;

1    isn't that true?

2    A.      No, that's not true. I tried to page him.

3    Q.      And you also called Mr. Rocky Griffin?

4    A.      Yes, I did.

5    Q.      All right.  You didn't call the police, did you?

6    A.      No.  I didn't need to, they were there.

7    Q.      You didn't call try to  call the police, did you?

8    A.      They their were.

9    Q.      They were there?

10   A.      They were coming down the street.  They were right

11   there.

12   Q.      Seems like other people add opportunities to call

13   the police?

14   A.      I can only speak for myself.

15   Q.      The reason you didn't call the police, Miss Brown,

16   is because you didn't want the police involved, did you?

17   A.      No, that's not true.

18   Q.      You didn't want the police over at your house

19   asking questions and looking around, did you?

20   A.      No, that's not true.  I invited them in.

21   Q.      Because you were afraid that if the police did show

22   up and started looking around and asking questions they'd

23   find out the truth; isn't that true?

24   A.      No, that's not true.

25   Q.      Isn't it also true, Miss Brown, that you picked up

33

```
 1    that weapon in the early morning hours of September 28th, it

 2    was laying on your front walk; isn't that true?

 3    A.      No, that's not true.

 4    Q.      And subsequently the day afterward you spent some

 5    time with Mr. Ogren, didn't you, in Tucson?

 6    A.      No, that is not true.

 7    Q.      Mr. Ogren didn't spend anytime with you in Tucson?

 8    A.      No, he did not.

 9    Q.      And isn't it true that you gave that weapon to Mr.

10    Ogren?

11    A.      No, that is not true.

12    Q.      Isn't it true that the reason you did that, again,

13    is to conceal what really happened in this case?

14    A.      No.

15    Q.      And that is, to conceal the fact that you are

16    significantly responsible for the death of Mr. Davidson;

17    isn't that true?

18    A.      No, that is not true.

19    Q.      And you don't care, do you, Miss Brown?

20    A.      I care immensely.

21    Q.      You care mostly for yourself, don't you?

22    A.      No, that's not true.

23    Q.      You're afraid that if the truth comes out, Miss

24    Brown--

25    A.      The truth is out.
```

34

1    Q.      That you may--you may find yourself in legal

2    trouble; isn't that true?

3    A.      No, I'm not afraid of that the truth is out.   I

4    have been honest.

5    Q.      Isn't it true that you--your position in this case

6    is that everybody else is lying but you?

7    A.      No, that's not my position in this case.

8    Q.      Isn't it true that you saw Mr. Davidson and Mr.

9    Crago together on several occasions in your home?

10   A.      No, I can't even say that.   I think they were mild

11   acquaintances.

12   Q.      You never saw them together in your own home?

13   A.      What--please define together.   Were they chums?

14   No, they weren't chums.

15   Q.      Did you see them--

16   A.      Did they nod to each other?   Yes, they nodded to

17   each other.

18   Q.      Did you see them converse or have any contact with

19   each other in your own home?

20   A.      They would speak.   Yes, they would speak to one

21   another.

22   Q.      All right.   In fact you--you--in an interview that

23   I did with you, with Mr. Till and Detective Pearce present,

24   you told us that there were times when Mr. Crago and Mr.

25   Davidson were together in your home; isn't that correct?

1   A.      Yeah, there was.

2   Q.      All right.  And during that you also told us that

3   you not ever saw any friction between Mr. Crago and Mr.

4   Davidson?

5   A.      I did not.

6   Q.      All right.

7   A.      They were very cordial.

8   Q.      Couldn't see any reason why Mr. Crago would want to

9   do anything to Mr. Davidson; is that correct?

10  A.      No.

11          MR. WHITE:  I have nothing further at this

12  time, Your Honor.

13          THE COURT:  Mr. Till, re-direct, Mr. Till.

14          MR. TILL:  Just a couple.

15                  RE-DIRECT EXAMINATION

16  BY MR. TILL:

17  Q.      You said that Crago and Davidson were not together,

18  but they would be at the same place-- that is inside your

19  house at the same time, greet each other, what do you mean

20  by that?

21  A.      If--if Charlie came in when Earl was there they

22  would, you know--hi, that kind of thing.

23  Q. So together you mean they weren't--weren't friends or

24  come in the same car, that type of thing?

25  A.      Exactly.  You know, they weren't chummies, you

1    know, they were cordial--polite.

2    Q.       Do you know if they knew each other?

3    A.       To my knowledge they did not.  They met at my house

4    to my knowledge.

5    Q.       Well, I mean after they met at your house, did they

6    preceding the shooting--did they--did they know each other?

7    I don't mean before they met at your house.

8    A.       Not that I know of.

9    Q.       I mean if--if--if the Defendant, Earl Crago, was at

10   your house and Charlie Davidson came in, would he know--know

11   that person?

12   A.       Yes. He would have recognized him, yes.

13   Q.       Do did you carry a gun yourself?

14   A.       No.

15   Q.       Even though you were selling to people who you

16   didn't know at times?

17   A.       It's not that I didn't know them.  I didn't sell to

18   people I did not know.  There were people that came to my

19   house that I didn't--somebody would bring them.   Not

20   everybody that came to my house did not come to buy drugs.

21   Q.       If you sell to somebody you didn't know, how did

22   you know that person might be undercover officer?

23   A.       You don't know.

24   Q.       That's one of risks of selling to somebody you

25   don't know?

1   A.      Yeah.   I would say that is.

2   Q.      Is there a lot of suspicion involved with people

3   who either using or trading or selling or giving away drugs?

4   A.      Suspicion, I guess that's a good word for it.

5   Q.      Sometimes the police masquerade as a person

6   interested the buying drugs and it maybe an undercover

7   officer?

8   A.      Yes.

9   Q.      Did--was it Earl Crago or was it Ogren that

10  confronted you with that possibility?

11  A.      I believe it was Earl?   Because Dale had been

12  accused of the same thing.

13  Q.      And how do you know that?

14  A.      Because just--it was general consensus.   I mean

15  just people knew that.

16  Q.      Did you ever--did you ever tell Earl that you were

17  a narc?

18  A.      Told him I was an undercover cop once.

19  Q.      When did you tell him that?

20  A.      It was the Saturday before Charlie died.

21  Q.      So if Charlie died on Wednesday the 28th, then it

22  would be just three or four days before that?

23  A.      Right.

24  Q.      Where was that that you mentioned that to him?

25  A.      At my house.

1   Q.      All right.  What part of your house?

2   A.      I was in the bathroom--but my bedroom.

3   Q.      What was going on at that time?

4   A.      It was combing my hair preparing to leave with

5   Charlie--to go out with Charlie, and Earl and his friend

6   came in; and I told him, I said, okay, you got me.  Let me

7   tell you the truth, I'm an undercover cop.  It was just a

8   joke.  It was probably  in poor taste, but it was a joke.

9   Q.      Was it true?

10  A.      No.

11  Q.      Did Earl--do you know if he understood that it

12  wasn't true at the time?

13  A.      I think not initially he didn't, but he did before

14  he left.  I mean because I started laughing.

15  Q.      Okay.  Do you know anything about a quarter pound

16  of methamphetamine that was stolen around the 12th of

17  September?

18  A.      No, I don't.

19  Q.      Did you ever hear that mentioned at all by anybody?

20  A.      Not until--no.

21  Q.      So I take you didn't know if Charlie would have

22  been accused by Earl of taking a quarter pound of meth?

23  A.      No.

24  Q.      Who do you recall calling or trying to reach by

25  phone after the--the killing?

39

1   A.        I called everybody.  Robert Phillips, called Steve

2   Ramie. I called my friend, Pat Allen.  I called-- I don't

3   even really know who I called, to tell the truth.  I really

4   don't remember.

5   Q.        Would--would Danny Mason and Randy Beel-- since you

6   had seen them just before this, would they be possibly

7   people you would have called?

8   A.        Possibly, but I don't think I would have called

9   Randy.  I think I would have Danny.

10  Q.        You didn't know Randy as well as Danny Mason?

11  A.        No.

12  Q.        Did you have your pajamas on when you spoke to

13  police, to the best of your recollection?

14  A.        Seems to me that I had a T-shirt and maybe sweat

15  pants or something like that on.

16  Q.        Did you ever change clothes?

17  A.        I changed while the police were there.

18            MR. TILL:  That's all I have.

19            THE COURT: You may step down.  You're

20  excused.  You're free to go.

21            Now is all the evidence in, Counsel?

22            MR. TILL:  Yes, Your Honor.

23            MR. WHITE:  Yes, sir.

24            THE COURT:  All right.  Are we--anybody want

25  a break at this time?  Is everybody okay?  I've got about 35

1  minutes of instructions to the jury, and at that time we

2  will take a short break before Counsel begin closing

3  arguments.

4         Mr. Silva, will you pass out the instructions to

5  the jury, please.

6              (The instructions are passed out to the

7  jurors.)

8         Each of you will have a copy.  I have to read it

9  into the record, ladies and gentlemen.  You can follow along

10 with me or you can simply read it later yourself or any

11 particular instruction you want, you may wish to examine at

12 a later time.

13        Ladies and gentlemen, I'm going to tell you the

14 rules you should follow to the decide this case.  It is your

15 duty to follow these instructions and your duty to determine

16 the facts.  "Facts" means what actually happened.  You

17 determine the facts only from the evidence produced in open

18 court.  You should not guess about any fact.  You must not

19 be influenced by sympathy or prejudice.  You must not be

20 concerned with any opinion that you feel I have--have about

21 the facts.  You are the sole judges of the what happened.

22        You must consider all of these instructions.  Do

23 not pick out one instruction or part of one and disregard

24 the others.  However, after you have determined the facts,

25 you may find some instructions no longer apply.  You must

1   then consider the instructions that do apply, together with

2   the facts as you have determined them.  Decide this case by

3   applying these instructions to the facts which you find.

4           You must find the facts from the evidence in

5   court.  The evidence which you are to consider consists of

6   exhibits and testimony of witnesses.  If an objection to a

7   lawyer's question was sustained, you should disregard that

8   question and any answer the witness gave.  Anything ordered

9   stricken from the court record is not to be considered.

10          Evidence can be divided into direct and

11  circumstantial evidence.  Direct evidence is the testimony

12  of a witness who saw or heard an event.  Circumstantial

13  evidence is the proof of a fact from which the existence of

14  another fact may be inferred.  You must determine the weight

15  to be given to all of the evidence without regard to whether

16  it is direct or circumstantial.

17          In opening statements and closing arguments, the

18  lawyers talk about the law and the evidence.  Anything the

19  lawyers say is not evidence, but it may help you to

20  understand the law and the evidence.

21          You must decide the believability of witnesses.  In

22  doing so, take into account such things as their ability and

23  opportunity to observe, their memory and their manner while

24  testifying, any motive or prejudice they might have, and any

25  inconsistent statements.  Consider each witness's testimony

1   in light of all of the other evidence in the case.

2   Neither side is required to call as witnesses all

3   persons who may have been present at any of the events

4   disclosed by the evidence or who may appear to have some

5   knowledge of those events, or to produce all objects or

6   documents mentioned or suggested by the evidence.

7   No verdict of guilty may be based on mere

8   suspicion, probability or supposition.

9   In deciding whether the defendant is guilty or not

10  guilty, do not consider the possible punishment.  Punishment

11  is decided by the judge, not the jury.

12  The law does not require a defendant to prove

13  innocence.  Every defendant is presumed by law to be

14  innocent. The State must prove the defendant guilty beyond a

15  reasonable doubt.  This means the State must prove each

16  element of the charge beyond a reasonable doubt.  If you

17  conclude that the State has not met its burden of proof

18  beyond a reasonable doubt, then reasonable doubt exists, and

19  the defendant must be acquitted of that charge.

20  You must not consider any statements made by the

21  defendant to a law enforcement officer unless you determine

22  beyond a reasonable doubt that the defendant made the

23  statements voluntarily.

24  A defendant's statement was not voluntary if it

25  resulted from the defendant's will being overcome by a law

43

1   enforcement officer's use of any sort of violence, coercion,

2   or threats or by any direct or implied promise, however

3   slight.

4        You must give the same weight to the defendant's

5   statement as you feel it deserves under all the

6   circumstances.

7        Neither side is required to call as witnesses all

8   persons who may have been present at any of the events

9   disclosed by the evidence or who may appear to have some

10  knowledge of these events, or to produce all objects or

11  documents mentioned or suggested by the evidence.

12       You are to consider only the evidence in the case.

13  But in your consideration of the evidence, you are not

14  limited solely to what you can see and hear as the witnesses

15  testify.  You are permitted to draw such reasonable

16  inferences as seem justified in the light of your experience

17  from facts which you find have been proved.

18       Inferences are deductions or conclusions which

19  reason and common sense lead you to draw from facts which

20  have been established by the evidence in the case.

21       The fact that a witness has been convicted of a

22  crime, if such be a fact, may be considered by you for

23  purpose of determining the credibility of that witness that

24  is, whether the witness is capable of being believed.

25       The fact of such a conviction does not necessarily

44

1   detroy or impair that witness's credibility.   It is one of

2   the circumstances that you may take into consideration in

3   weighing the testimony of such a witness.

4          Such evidence was not received and may not be

5   considered by you to prove that he is a person of bad

6   character or that he has a disposition to commit crimes.

7          The rules of evidence ordinarily do not permit the

8   opinion of a witness to be received as evidence.   However, a

9   witness may testify as to an opinion on the subject upon

10  which the witness has been become an expert because of

11  education, study, or experience.   You should consider the

12  opinion of an expert and you should weigh the reasons, if

13  any, given for it.   However, you are not bound by any expert

14  opinion.   Give the expert opinion the weight that you

15  believe it deserves.

16         The State has charged the defendant with the crime

17  of and it reads:   In Count One, on or about the 28th day of

18  September, 1994, Earl Felton Crago, Jr. murdered Carl H.

19  Davidson.   This charge is not evidence against the

20  defendant.   You must not think the defendant is guilty just

21  because of this charge.   The defendant has pled "not

22  guilty," and this plea of "not guilty" means the State must

23  prove every part of the charge beyond a reasonable doubt.

24         The crime of first-degree murder requires proof of

25  the following three things:   Number One, the defendant

1   caused the death of another person; and Number Two, the
2   defendant intended or knew that he would cause the death of
3   another person; and Number Three, the defendant acted with
4   premeditation.

5       "Premeditation" means the defendant's intention or
6   knowledge existed before the killing long enough to permit
7   reflection.  However, the reflection differs from the intent
8   or knowledge that certain conduct will cause death.  It may
9   be as instantaneous as successive thoughts in the mind, and
10  it may be proved by circumstantial evidence.  It is this
11  period of reflection, regardless of its length, which
12  distinguishes first-degree murder from intentional or
13  second-degree murder.  An act is not done with premeditation
14  if it is the instant effect of a sudden quarrel or heat of
15  passion.

16      The crime of first-degree murder includes the less
17  serious crime of second-degree murder.  You may find the
18  defendant guilty of the less serious crime only if you find
19  either of the following:  Number One, the State has failed
20  to prove the more serious crime beyond a reasonable doubt;
21  or you cannot agree on the defendant's guilt on the more
22  serious crime; and the State has proved the less serious
23  crime beyond a reasonable doubt.

24      The crime of second-degree murder requires proof of
25  any of the following:  Number One, the defendant

1    intentionally caused the death of another person; or Number
2    Two, the defendant caused the death of another person by
3    conduct which he knew would cause death or serious physical
4    injury.  The difference between first-degree murder and
5    second-degree murder is that second-degree murder does not
6    require premeditation by the defendant.
7         If you determine that the defendant is guilty of
8    either first-degree murder or second-degree murder and you
9    have a reasonable doubt as to which it was, you must find
10   the defendant guilty of second-degree murder.
11        "Intentionally" or "with intent" as used in these
12   instructions means that a defendant's objective is to cause
13   that result or to engage in that conduct.
14        Intent may be inferred by all the facts and
15   circumstances disclosed by the evidence.  It need not be
16   established exclusively direct sensory proof.  The existence
17   of intent is one of the questions of fact for your
18   determination.
19        "Knowingly" means that the defendant acted with
20   awareness of or belief in the existence of conduct or
21   circumstances constituting an offense.  It does not mean
22   that a defendant must have known the conduct is forbidden by
23   law.
24        The State must prove that the defendant did a
25   voluntarily act forbidden by law.  You may determine that

47

1    the defendant intended to do the act if the act was done

2    voluntarily.

3          A defendant is justified in using or threatening

4    physical force in self-defense if the following two

5    conditions existed:  Number One, a reasonable person in the

6    defendant's situation would have believed that physical

7    force was immediately necessary to protect against another's

8    use or attempted use of unlawful physical force; and Number

9    Two, the defendant used or threatened no more physical force

10   than would have appeared necessary to a reasonable person in

11   the defendant's situation.

12         However, a person may not use deadly physical force

13   in self-defense only for protection against another's use or

14   threaten--I'm sorry.  I read that wrong.  Let me read this.

15         However, a person may use deadly physical force in

16   self-defense only to protect against another's use or

17   threatened use of deadly physical force.

18         Self-defense justifies the use or threat of

19   physical force only while the apparent danger continues.

20   The right to use physical force in self-defense ends when

21   the apparent danger ends.

22         The standard for determining whether a defendant is

23   entitled to the defense of self-defense is whether a person,

24   similarly situated, would believe that physical force was

25   immediately necessary to protect against another's use or

1    attempted use of unlawful physical force.  That the

2    defendant's belief was honest is immaterial.  You must

3    measure the defendant's belief against what a reasonable

4    person would believe.

5         If evidence was presented that raises the issue of

6    self-defense, then the State has the burden of proving

7    beyond a reasonable doubt that the defendant did not act in

8    self-defense.  If the State fails to carry this burden, then

9    you must find the defendant not guilty of the charge.

10        The defendant is not required to retreat before he

11   may act unlawful--lawfully in killing in self-defense, even

12   if it appears that safety might more easily have been gained

13   by the defendant by which withdrawing from the scene or by

14   flight.

15        Running away or hiding after a killing has been

16   committed does not in itself prove guilt.  You may consider

17   any evidence of the defendant's running away or hiding

18   together with all of the other evidence.

19        You may come--

20             MR. WHITE:  Your Honor, I think you're

21   missing an instruction.  I don't think anybody has it.

22   May I--may I approach--

23             THE COURT:  All right.  That's not the one

24   which I want.  It is the one--

25             MR. WHITE:  It is the one--

1          THE COURT:  It's not been read, Mr. Till.  I

2    don't know why it's not in here.

3          MR. TILL:  Let me look at that again, Your

4    Honor.  I'm sure that's the one we're looking--no,

5    not--that's not it.

6          THE COURT:  Let me see that again.

7          MR. WHITE:  Sure.

8          THE COURT:  I don't see it.  Will you have

9    Nancy do that immediately-- run off 18 copies.

10         I'll read you this instruction, ladies and

11   gentlemen.  It's been given to you partly in writing.  The

12   fact that it was left out should be of no significance.  No

13   additional significance as to it's separation in part from

14   this packet.  Its omission is on my part.  I apologize for

15   it.  It is to be treated as any other instruction and reads

16   as follows:

17         Concealing evidence after a killing has been

18   committed does not in itself prove guilt.  You may consider

19   any evidence of the defendant's concealment of evidence

20   together with all the other evidence.

21         I believe that's the instruction.  Is that right?

22         MR. WHITE:  That's the one, yes.

23         THE COURT:  All right.  That will be passed

24   out to you, ladies and gentlemen.  All right.  I'm going to

25   read the rest of the instructions--the last three pages--

1  after the lawyers argue.  Ladies and gentlemen we will take

2  a brief recess for about ten minutes at this time.  At which

3  time on your return, I will be giving the additional

4  instructions.

5         Counsel, any objection to it being apart as opposed

6  to it being stapled in the packet?  The jury understands

7  that it was an omission.  It's been given to you in

8  addition.

9               (A short recess was taken )

10        THE COURT:  The record will reflect the jury

11  in the box and Counsel are present.  The defendant is

12  present.  You did get your--Mr. Silva, will you pass out the

13  additional instruction.

14        Mr. Till, are you prepared to make your closing

15  argument?

16            MR. TILL:  Yes, Your Honor.

17            THE COURT:  Then you may do so.

18            MR. TILL:  Your Honor and members of the

19  jury, at this time I have an opportunity to make a closing

20  argument to you.  Before I start, I want to thank you very

21  much for your time, spending a week here, giving up whatever

22  else you had planned that you might have done, that would

23  have been more enjoyable perhaps, that would have been

24  easier and more comfortable.

25        However, having said that, I suspect that there is

1    nothing more important than what you could be doing than

2    what you're doing right now.  I submit to you that after

3    this is over and you leave and you reflect back on this

4    week, you're going to feel that was a tremendous

5    contribution to society, to the criminal justice system and

6    to all that is good and right about our country.  And I

7    thank you for serving.

8           The evidence is all in now.  I feel strange talking

9    to you over this, but I do want to refer to this document;

10   and I think you can all see my face. So I'll just leave it

11   where it is.  The evidence is in, and we have the

12   opportunity at this time to try to help you to make your

13   decision--to try to tie together any loose ends and to

14   perhaps answer some questions in your mind that you have.

15          You know a jury is a--you've got fourteen of you.

16   Now at the end, two of you will be stricken, that is by

17   lot--chosen as the alternates; and we have a chance to

18   deliberate on the evidence.  But it's still a unique system

19   because we have twelve of you who will be joining your

20   collective memories about what the evidence was, your

21   collective experience about what happened, and your

22   collective common sense in terms of how to reach a decision

23   on this case.

24          The idea of course is that the twelve of you

25   combined is going to be much more important in reaching a

1   proper decision than any one given individual.  There maybe

2   some of you who will remember something that another one

3   didn't.  There maybe some of you have a common sense that

4   others don't share on a given point, there maybe some of you

5   have who have experiences with this case--perhaps cars or

6   guns-- that will help you to listen to the evidence--did

7   help you to listen to it; and maybe help the others in terms

8   of the common sense that you'll bring into the case and try

9   to sift through the evidence.

10      The charge in this case, as the Judge has gone over

11   and has read, is a murder charge.  Before I get to that,

12   there's a couple of items of the instructions that I do want

13   to remind you of.  That is several of the Judge has read to

14   you such as this particular one that states:  Neither side

15   is required to call all witnesses, all persons who were

16   mentioned who are involved in the case whose names have come

17   up or to bring in every particular exhibit or item that was

18   been mentioned.

19      We try to, in this case, economize you might say

20   the business of putting on the trial.  We have certain

21   stipulations that have been reached.  Stipulated to as a

22   fact.  And I believe there is an instruct in here that a

23   stipulation is as good as the evidence itself.  It's not in

24   dispute and it is a piece of evidence that in fact is taken

25   as true.  That has enabled us to avoid bringing in--both

1   sides--certain expert witnesses, certain matters that are

2   uncontested and be able to move along in that way without

3   bringing those people in.  You should be aware that's what

4   the law entitles us to do.

5          There is another instruction here that's pretty

6   much what I just told you, and that is that you're

7   entitled--you're permitted to draw such reasonable

8   inferences as seen justified in the light of your experience

9   from the facts that you have found to be proved.  That your

10  common sense--you don't have--you don't have a book with you

11  to help you make a decision.  You have certain items of

12  evidence, pictures that you didn't get a chance to look at

13  very much.  These exhibits that perhaps you didn't get a

14  chance to look at as slowly and deliberately as you would

15  have liked, those will go with you, those that you want to

16  go with you, that are admitted in evidence, take your time

17  to look at those to see what they say.

18          Then you can apply your common sense and your

19  experience to those exhibits, to the testimony under oath

20  that people have given and what they have said; and then you

21  decide--the jury decides what happened.  The Judge decides

22  the law and has read it, then you collectively apply your

23  collective assets, you might say abilities; and you decide

24  who's telling the truth, what happened here.  You make a

25  decision at the end that reflects that.

1       The crime of first-degree murder requires the proof

2   be made beyond a reasonable doubt that the defendant caused

3   the death of another person.   I submit to you that Dr.

4   Flores testified that the death in this case was caused by a

5   .380 caliber bullet through the middle of the back, upward

6   angle, 27 centimeters higher than where it in fact ended up

7   and that penetrated the aorta, and the person very quickly

8   bled--internally bled to death; that was the cause of the

9   death.

10      By now we know that the--that happened in front of

11  the house.   We know that the defendant in this case is the

12  one that fired the bullet--fired the gun.   So we know that

13  the defendant caused the death of another person.

14      Second outlet that must be proven on that, is the

15  defendant intended or knew that he was going to cause the

16  death of another person.   Basically, common sense, again, if

17  you fire three times with a .380 at another human being--

18  twice in the back--common sense would indicate that a

19  reasonable person would have intended or knew that these

20  gunshots were going to cause the death of another person.

21      The third--the third area here is more difficult,

22  that's what's mostly in contention.   I submit to you that

23  the defendant acted with premeditation.   "Premeditation," as

24  the Judge told you, is reflection ahead of time.   A

25  reflection on--on what the defendant is going to do.   We

1   usually think of premeditation in terms of a plan in

2   advance.  I'm premeditating today what I'm going to do

3   tomorrow because I'm planing in advance.

4         The defense may argue that they're certain there

5   was no premeditation in this case an hour before this

6   shooting or a half an hour before the shooting because the

7   defendant was with Tovah Sitts, asked her--perhaps even when

8   she said--begged her to come along with him to his house,

9   unlikely that he had a plan premeditating to kill anybody at

10  that time.  I submit to you that is what the evidence

11  shows, that there is no evidence of a premeditation a half

12  an hour before the death.

13        But you look at the instructions here, and you see

14  that the reflection may be as instantaneous as successive

15  thoughts in the  mind that may be proven by circumstantial

16  evidence.  We have to prove by circumstantial evidence

17  really in most cases what the intent a person has whether

18  there is reflection.

19        But I point out to you that as instantaneous as

20  successive thoughts in the mind-- I just had another

21  thought--that's the point, that's a pretty short; and it's

22  not an hour, and it's not a half and hour; and I submit to

23  you, that a person who has an automatic weapon and who

24  squeezes off a shot--be it front-back--can't tell you where

25  the first shot went in this case.  So nobody saw it except

1   the defendant--and then squeezes off another shot into the
2   back or somewhere else on the body and then finely squeezes
3   off a third shot, those things don't happen automatically.
4   Those are successive thoughts, although very fast, that
5   direct a person to accomplish his goal.

6       So just simply asking you to look at that and
7   realize that there is no set period of time that we have to
8   prove that meditation--this premeditation--the reflection
9   took place.

10      If however, you conclude that you can't say that
11  this premeditation occurred, that you want more time--you
12  don't have to because of the instruction-- then there is an
13  offense of second-degree murder, which is set forth in your
14  instructions as pretty much the same as first degree in most
15  ways, except without the premeditation requirement.  That's
16  set forth in your statutes.

17      Now, well, there's another--the defense of self-
18  defense has been raised in this case.  We'll talk about that
19  some more.  But I want--I wanted to talk about a couple of
20  points on the self-defense instruction.  Obviously in our
21  country--our laws as the Judge has given, we're entitled to
22  use self-defense as a means of protecting ourselves and
23  preventing certain injuries to ourselves.  In this case the
24  defense has raised to that.  So we must address that to
25  you.

1    The Judge has read this, and I want to emphasize it
2  again, than generally speaking a person is entitled to use
3  that amount of force as is necessary to resist or protect
4  himself from the same amount of force coming back at them.
5  And it states hear that you may use physical force, punch,
6  push, a blow to defend against something similar coming at
7  you.  When you start to use a deadly weapon--a gun or a
8  knife--then you're not permitted to do that unless the
9  similar type force is coming at you.

10    In this case the Judge has read, and I want to read
11  it again to remind myself of it, a person may use deadly
12  physical force in self defense only to protect against
13  another's use or threaten the use of deadly physical force.
14  Self-defense justifies the use or threat of physical force
15  only when the apparent danger continues.  And I submit that
16  same applies to deadly physical force.  The right to use
17  physical force in self-defense ends when the apparent danger
18  ends.  And there is--are other aspects of that, but I wanted
19  to point that out to you.

20    This case is, I submit to you, understandably
21  easier if you think of two parts--two parts of the case.
22  The first part I entitled--to help me understand it as, "I
23  did it, but they won't be able to prove it was me."  The
24  second part I've entitled, "I did it; they can prove it, but
25  I did it in self-defense."  With that in mind, I submit to

1   you that this case will be a little bit easier for you to

2   understand.  And we have--I have a chart here to try to help

3   me explain to you--and I hope you can all see that--if I can

4   see it, as I look at it.

5        Basically we have one, two, three, four, five

6   different people in this case who help us to understand what

7   happened out there at the 28th of September '94.  And do you

8   remember I said that all of us--when you're considering this

9   evidence, each of you has your own individual experiences

10   that you bring to the table.  Well, in a sense I think we

11   have a little bit of that in this case.

12        Each witness saw something different and much the

13   same in their prospectives from where they watched and

14   heard, and perhaps added all together is better than having

15   just one person giving his clear view from beginning to end.

16   Just as jurors, I submit to you, as a group you are more

17   wise than any one of you together--any one of you

18   separately.

19        In this case, before I start, I want to just talk a

20   little about waking up from a sleep.  Because there is some

21   discrepancy as to what people observed when they first wake

22   up.  And think of the last time that you were awakened

23   suddenly from your sleep, perhaps even by an alarm clock

24   that you weren't expecting or certainly a sound outside.

25   Especially, I submit, if you've ever been wakened by

1   gunfire, most of us haven't; but there is a certain period

2   of time there when you're going to have to figure out what's

3   going on.  What did I hear?  Did I hear it?  Other case, I

4   think my doorbell rings in the middle of the night; I think

5   somebody does it and runs, but I'm never sure because it

6   might be just in my mind.

7        But anyway it takes a while to figure out what went

8   on there.  Some people, I submit to you, do take a little

9   bit of a different time period to get going.  At any rate,

10  we have five different people.  I would like to just go

11  through those quickly.  The-- and we have different times

12  they get to their window to see what's going on.

13        Chad Adkins testified that he was sleeping in his

14  bedroom.

15        MR. WHITE:  Your Honor, I'm sorry to

16  interrupt; but for the record, I don't believe it was

17  Chad.

18        MR. TILL:  Scott.  Thank you.  It wasn't Chad,

19  it was Scott.  Scott said that he was in bed sleeping, and

20  he was awakened by the sound of gun shots.  I've tried to

21  put--by virtue of these dots--the testimony as I recalled it

22  describing the order of the shots.  He said that he heard

23  three shots boom--boom-boom.  A little space between the

24  first--between the first and the second; and he said that he

25  waited about 30 seconds in bed.  He was a light sleeper,

1  heard all three shots.

2  He then said he looked out the bedroom window which

3  faces the street Canyon View--faces Canyon View Drive--he

4  looked out of his bedroom.  And there was a glimpse and he

5  saw the defendant, who he knew from being around the house

6  as Earl Crago; and he was over by the car--his Datsun 300Z.

7  The car was on the driveway--took him he said 30 seconds--

8  again with a grain of salt.  He estimated 30 seconds--some

9  delay to get where he looked out and saw the defendant by

10 the defendant's car there on the driveway.

11 At the same time--these shots were three shots, I

12 submit to you, going off at the same time.  So we have these

13 shots going off at the same time.  Matthew Taylor said he

14 heard three shots.  I believe he said he didn't know any

15 particular order, just shots.  He was in his bedroom.  His

16 wife had gotten up earlier to go to work, and he was

17 partially asleep or lightly asleep.  He said when those

18 shots went off he went from the bedroom in the back, out

19 down to his living room, where he looked out the living room

20 window.

21 And he said that he saw from the time it took him

22 to get from the bedroom to the living room window, at that

23 time, he sees a man standing between the body that was on

24 the sidewalk area and the car that was parked in the

25 driveway.  Appeared to him at that time that this person was

1    picking up something.  Don't know what.  The car was on the

2    driveway at that time.  It backed down.

3        Gertrude Steinmann, she is sleeping in her

4    bedroom--a big bedroom she said.  The window is right by the

5    bedroom.  Right out by the--her house is a two story house,

6    and she has the window on the side facing east looking

7    across to 2475--diagonal view.  She said she got up.  She

8    heard two shots--two shots.  She got right up, looked out

9    the window; and she saw a man over the body.  Now where was

10   the car at that time did she say?  She said the car was down

11   on the street.  I submit to you that she being close to the

12   window--perhaps didn't hear the first shot but heard the

13   second two--was to that window earlier than anybody else to

14   see this car down in the street.

15       She then saw the man walking to the street.  She

16   saw the driver walk--let me move to the next one, maybe that

17   will help clear it up.

18       Robert Peterson said he was in his bathroom. He was

19   in the bathroom back on the west side of his house, and he

20   heard--he was getting ready to go to work.  He's the major

21   with the military.  And he heard several shots two or

22   three--couldn't specify any given order--and he then walked

23   from the bathroom to the bedroom into the living room; and

24   there he couldn't tell you whether there was a man that he

25   saw or not--couldn't see a man--couldn't see much of

1    anything because he didn't have his glasses on.

2         But he did say he thought--he thought he saw

3    vehicle movement on the street, but he can't see that well.

4    He goes back to his bedroom or bath to get his eye glasses.

5    So he leaves the view for some period of time.

6         Gregory Dootson, who lived back to the south, in

7    this area, one street removed.  He testified that he heard

8    three shots.  Five--he said 5:05 he thought he woke up-- was

9    awake maybe five minutes, laying in bed about 5:10--same as

10   Gertrude Steinmann has it, same as the call that came in,

11   basically, to the police--and he hears what he descirbes as

12   a boom--boom-boom--three shots, can't see much of anything.

13        He goes to his kitchen window, which is one strtte

14   over.  He--soon hears a car start up, and said that he

15   continues to hear the car run for--I don't know if he said

16   two or three minutes--for some period of time.  I believe--

17   I believe it was two or three minutes, but your recollection

18   is certainly better than that of mine.

19        Then we have--get back to Scott, and Scott had

20   gone--he had been in the bedroom then he went out of--a

21   period of time--some delay--back to bed, for again, I don't

22   know if it was a minute or two.  That is my recollection as

23   a minute or two.  Then he waited in bed before coming back

24   into the living room; and in the living room, he looks out

25   the door, and there he sees, now for the first time--

1  probably because of the trellis--the defendant, who he

2  knows, picking up the victim, who he knows.  Earl Crago was

3  picking up Carl Davidson-- Charlie.

4       Now, we also--he knows who he sees.  Matthew Taylor

5  sees a man who he doesn't know carrying a body about that

6  time, puts that body in the passenger side door.  This time

7  Scott Adkins had gone back to his bedroom to hope it would

8  all go away--back in bed, didn't see that happen.  But we

9  know that Matthew Taylor saw it happen because he described

10  it to you.  Described how this man he watched across the

11  street picked up the other man, put him in the passenger

12  side of the vehicle.

13       Gertrude Steinmann basically has the same

14  testimony.  That she saw this man she didn't know carry the

15  victim to the passenger side and then comes back, gets into

16  the car.  Peterson, yet is getting his glasses, he looks out

17  and sees the last part of that transaction.  He sees not the

18  carrying of the body--remember he said the man, who he

19  couldn't identify with long shoulder-length hair, quite a

20  slender individual-- that person is leaving the passenger

21  side of the car, going around to the driver side.  Dootson

22  is not seeing any of this.  He's still trying to listen, see

23  what's going on because he's in the next block.

24       Now, we've got Scott Adkins said, I saw--looked out

25  the bedroom window.  He heard the car; so I looked out, and

1    I saw the car leaving westbound on Canyon View without

2    lights.   Except Matthew Taylor--Matthew Taylor sees the man

3    in the car, backing the car out--to my recollection Matthew

4    Taylor was not asked if he saw the car without lights going

5    on Canyon View--but did say that he saw the lights were on

6    in the driveway, reflecting off the garage.

7         Robert Peterson at this time has got his glasses,

8    and he sees the man in the car backing up and leaving

9    without the head lights on.  And each one of these, by the

10    way, may have some difference as to whether they're

11    interpreting it as fast or slow.  Again, the collective

12    experience hopefully can help.

13         Scott knows these people, testified I believe as

14    leaving quickly--fast.  Taylor I believe said it was leaving

15    at normal pace, even stopped at the stop sign at Cherokee

16    and Canyon View, takes a right.  Gertrude Steinmann said

17    yeah, it was going fast out of there.  Robert Peterson said

18    it seemed to be a normal speed.

19         Gregory Dootson now comes in visually for the first

20    time.  He's looking through these two houses, not knowing

21    really what's going on; and he sees through the 30 feet or

22    so--the  space between the houses--a vehicle going westbound

23    on Canyon View with its lights off.  So we know--we know a

24    lot of things in this case.  There is a lot that we know.  A

25    lot of facts that we know.  I submit to you that the

1  collective testimony here of what they saw, when they saw

2  it, shows you certain things that you know.  There are a few

3  things that we don't know, and I'm going to talk about them

4  a little bit, after I go through some of the things that, I

5  submit, that we know.

6      We know that this was about--this comes in where I

7  talk to you a little bit later about the change in the title

8  to the story--these known facts compared to what we don't

9  know very important.  We know that on September 28th about

10 5:10--a little bit before that--that the defendant, Earl

11 Crago, picked up Tovah Sitts at Sierra Vista Community

12 Hospital--would have to have been sometime before 5:10

13 obviously.  I believe the testimony was four o'clock or even

14 earlier than that--3:15--3:30--time enough to pick up the

15 two girls at the hospital, go to Fort Huachuca, drop one

16 girl off, sit and talk for a while in front of Tovah Sitts's

17 house--the defendant was doing this--try to get her to come

18 along with him, drives off post down to make a stop at 2475

19 Canyon View Drive.  You pretty much know that, I submit to

20 you.

21     We know that about 5:10 there was three shots

22 fired.  We know that Carl Davidson Jr. known as Charlie was

23 shot.  We know it was once in the front thighs, passing

24 through one thigh and passing through the other thigh.  We

25 know that there is two holes in the back.  Dr.  Flores

1   explained those--the front thigh wounds; and the ballistics

2   person testified that the right front--well it's actually

3   the left front--had some lead fragments on it, indicating

4   him as Dr.  Flores agreed, bullet passing front to back and

5   then on the right leg entering from front, again to back.

6          We know there is a bullet wound, that didn't come

7   out any place, in the middle of the back.  We know that

8   there's the higher wound that didn't come out any place, but

9   he took it out at the autopsy, that was angled left to right

10  and top to bottom.  Dr. Flores indicated that would be

11  consistent with somebody either firing from a low angle or

12  having their back bent over running.

13         We know that Charlie Davidson was loaded into a 300

14  Datsun or Nissan Z.  We know that he was loaded in there by

15  the defendant.  We know that the defendant was the one

16  that--that shot.  We know that vehicle backed out and that

17  it left without head lights on.  We know that the defendant

18  was not apprehended at that time, that he took the body to a

19  remote desert area and took the body and put it in the

20  wash.  We know that the--that was Charlie Davidson, and we

21  know that Charlie Davidson died at some point before being

22  found on Sunday October 2nd.  So the body was in the wash

23  from about six o'clock, I submit to you, on Wednesday, all

24  day Wednesday, Wednesday night, Thursday, Thursday night,

25  Friday, Friday night, Saturday, Saturday night, Sunday up to

1   about five o'clock in the afternoon.  We know that in this

2   case.

3         We know that it was discovered with a board over it

4   by Laurie, who was out for a walk that particular

5   afternoon.  We know that this is an area that has dirt roads

6   gridding it.  That it is ultimately sparsely populated--some

7   houses in the area.  We know furthermore that it was a

8   Datsun hatch-back 300ZX vehicle that was involved.  And we

9   know it was the defendant's, and we know that he bought it

10   from H and C Auto.

11         We know there were, eventually in this case, three

12   bullets recovered--two from the body of Charlie and one near

13   the front door over the area of the carpet or what they call

14   a pad, there in front of the--welcome mat.  We know there

15   was one casing recovered in the area of the driveway.  We

16   know that it was a .380 automatic that fired these bullets,

17   don't know what brand it was.  We know we don't have that

18   weapon.  There was no weapon on Carl Davidson.  We know that

19   now, except for a very small folded pocket knife that was

20   found in his pocket.

21         We know that Davidson had some methamphetamine in

22   his blood--that's stipulated to.  We know that the autopsy

23   showed that the death had occurred in the manner that I

24   described.  We now know that there was some drug activity

25   going on at the house at 2475 Canyon View Drive.  People

1   visiting that--some number of people--extensively to buy

2   drugs or to use drugs.  We know that the defendant himself

3   was selling--apparently for a living-- methamphetamine at

4   this time.   That's not in dispute.

5          We know that he called Tovah Sitts at about six

6   o'clock in the morning or sometime after he deposited the

7   body in the desert--perhaps from a station.  We don't know

8   where other than that was mentioned by the defendant, but we

9   know that there was telephone call made.  The defendant said

10  I've got to leave town.  We know that within the next day--

11  day at about ten o'clock in Texas--in Senora, Texas--he was

12  arrested by the Senora, Texas police; and he had his Datsun

13  300ZX with him; and he had among other things an empty

14  holster--and that's stipulated to.

15         We know all these things.  The defendant now knows

16  all those things.  He knows we know all those things.  There

17  are several things, that I submit to you, that we don't

18  know; and I'm going to just--I've listed about six.  I'm

19  going to try to write them down best I can.

20         First one we don't know:  Did the defendant, at the

21  time of this killing, have any drugs in his blood at all?

22  We know the victim did.  Did the defendant?  We don't know

23  that.  He says he didn't.  He was arrested in Texas the 2nd

24  day.

25         We don't know the motive in this case.  Why-- why

1   did Earl Crago kill Charlie Davidson?  We don't really know

2   that.  There's some testimony from a jail inmate that there

3   had been--there's an accusation, an argument, a dispute just

4   preceding killing about the defendant accusing the victim of

5   stealing a quarter pound of methamphetamine.  We don't have

6   to prove motive.  There is nothing in the instructions that

7   requires us to prove motive, but this an area unknown.

8         We don't know whether the defendant ever went

9   inside the house, when he went over the 2475 Canyon View.  He

10  says he did.  Nobody else could say.  We don't know that.

11        Which shot was fired first?  We don't know that.

12  The defendant does.  He said he shot--shot the victim in the

13  leg first and then the other two in the back later on.  We

14  know there were three shots.  We know where they ended up,

15  but we can't say which one was first.

16        Did the defendant--hoping you can see.  Some of you

17  might not be able to see that--did the defendant know--did

18  the defendant know--did he owe money to Miss Brown?  He says

19  he did--said he owed $230.  She says he didn't.  We don't

20  know.

21        Did he pay $30 or $40?  Did he pay $40?  He said he

22  did, and he said that was all he had--that was all he could

23  pay.  I believe he testified that he had $96 with him when

24  he was arrested in Texas.  Did he make a payment or not?  We

25  don't know.

1    Now those are things that--that we do know--a lot

2    we know; and these are things, I submit to you, that we

3    don't know by the evidence and may never know.  Now, up

4    until a certain period of time this case was a--called a

5    who-done-it case.  I submit to you, that the defendant's

6    position would be:  They can't catch me, and they can't

7    catch me because of a number of things.  It was dark, and I

8    was there.  Nobody moving around in the house, nobody came

9    out of the house.  If I was seen from somebody across the

10    street--as he said he saw amidst the excitement of just

11    having killed a man--a blind being opened and somebody

12    looking at him.  They didn't know him.

13    He removes the body, puts it in a wash.  It's going

14    to be a good time before somebody finds that body.  I can

15    get a head start and maybe they won't find the body, but

16    they're probably find a body, but they won't have a gun to

17    match up with anything.  No gun that's going to be found.

18    And nor is there going to be at least two shell casings.

19    The third one is somewhere, maybe they'll miss that, but

20    they won't find the two shell casings.  Bullets--well,

21    without the gun that's not going to do much good, but maybe

22    they've gone through the body.

23    Didn't even tell Tovah Sitts what he had done.

24    Again, nobody can prove that I did this crime at this

25    point.  He leaves.  He's arrest in Texas.  He's charged on

1   the warrant:  assault with a deadly weapon, not even murder

2   yet.  Did you--well, he talks about the officer--Officer

3   Adams said that he talked about a bond reduction; and Adams

4   said, well, they found the body of Carl.  Who is Carl?  Carl

5   Davidson.  Don't know Carl Davidson.  It's still--it's still

6   a who-done-it case. I submit to you at this point.

7          The car, make arrangements to release that back

8   some way.  We have made the search of the car.  By the way,

9   we have taken--done some damage to that front passenger

10  seat, taken that to check that stain to see if it's blood,

11  see if it can be matched up with the victim's blood.  Now,

12  perhaps lights will slowly start to go off, the defendant is

13  brought back to Arizona.

14         We know from the other prisoners that--that the

15  defendant's in jail.  You have access to their case.  It's

16  like a, again, credibility is something you decide whether

17  you're to believe somebody or not, that's what you decide.

18  The defendant says, well, I had those; but I really didn't

19  read those very much.  Do you believe that?  Because it's

20  your case, you're charged now, with first-degree murder.

21  Wouldn't you want to find out why they charged you with this

22  and what the evidence is?  I submit to you, that the

23  defendant became very very very familiar with the facts in

24  this case--what we could prove and we couldn't prove and a

25  lot of time to do that from October to the trial of this

1  case.

2  He knew--evidently at some point when Mr. Shawn

3  Laubinger talked to him in the jail--that a fellow who had

4  been in the jail but is now--a small fellow who is out of

5  uniform is out of custody--recollection is that he said, the

6  defendant told him in jail, well, it must not have been--

7  whoever did it, it must not have been robbery because knives

8  and money were found on this person.  Still who done it?

9  Still a who-done-it case.

10  Now, the reports start to indicate blood was drawn

11  during the autopsy from the victim.  The evidence has been

12  gathered, soil samples, plant samples, police reports,

13  witness statements indicating that two boys inside that

14  house--one of them testified in this case, Scott Adkins--saw

15  somebody out there.  He knows him.  He knows his name as

16  Earl Crago, and he knows the deceased; and now all of a

17  sudden we have a "I did it, they can prove it was me that

18  did it."  I submit to you that at this point the defendant

19  turns to a self-defense motive--self-defense explanation not

20  motive but self-defense explanation.

21  There are those certain problems that he has

22  fitting that in.  You know, we have now some known facts, a

23  whole lot of them; and he has to fit self-defense into these

24  known facts.  And there's a couple of problems.  One of them

25  is--one of them is a big one and that is that car that's

1    down on the street, that car is seen down on the street,

2    already, when the body is up here.  Mrs. Steinmann--this

3    whole series shows you that the car is on the street.  There

4    is a body up here.  Somehow the defendant has to get that

5    car up to where he says he fired the shots.

6         Why is that?  Well, it's not very consistent with

7    self-defense to pick up your shells and try to cover tracks

8    that way.  But if the car is there, the shells are going to

9    fly in the car, one of them accidently landed outside--that

10   explains that.  So very convenient to have somehow get that

11   vehicle up there to argue that's where the shooting occurred

12   from.  But if you have a car there, ought you not to be able

13   to get away from somebody who your fear--you're in fear of?

14   You need to defend yourself from?  You should be able to

15   drive away and avoid the shooting.

16        But not if the car won't start right away, not if

17   you have a fuse out as a way of-- don't lock it up, take the

18   fuse out of that thing.  That way--even though I'm only

19   going to go in here for a couple of minutes at five in the

20   morning to pay a debt--always do it, lock it up, out of

21   habit, key's broken off.  It takes me awhile to get--it does

22   take awhile to get up under the firewall and put the fuse

23   back; but interestingly enough, that didn't happen.

24        Tovah Sitts, who used this vehicle for rides a lot,

25   hundreds of times-- well maybe a hundred or fifty, yes.  Did

74

1   you ever see him lock it up that way?  Take that fuse out?

2   No, just lock the door, sometimes I do.  Sometimes I don't.

3   But there is an explanation going through trying to fit the

4   self-defense into an impossible situation.

5            Now, how do I get that vehicle down after the body

6   is over here, which Mrs. Steinmann see.  I've got to get

7   that vehicl down to the driveway, so I don't call her a

8   liar.  Well, he puts it in gear or rather releases the

9   emergency break and coasts down and then backs it up--it's

10  on a slight hill, but somehow he backed that vehicle up.  At

11  any rate, there's where he then put the fuse in, he said.

12  And, you know, watching to be sure is that this--these

13  people weren't going to kill him.

14           Now, that's a necessary step because now we don't

15  have to call Mrs. Steinmann a liar because she saw the car

16  right there.  She didn't see me running down initially, but

17  she saw me walking down to get that car, which he later says

18  he does.  She just happened to join in a little too late.

19  All of this stuff happened--this is where this time frame is

20  very important.  He has got to squeeze in--he's got to

21  squeeze all this in to a very narrow area here.

22           We know the shots occurred.  We know Mrs. Steinmann

23  sees the car out there on the street and the body up here on

24  the driveway.  He's got to squeeze all this in--coasting

25  down, getting under there, getting that fuse in, then

1  getting back up, running.  He must do first aid on the
2  fellow he just shot, getting back up there.  All of this has
3  to occur.  It can't really.  It can't fit in.  He's got a
4  very difficult job to squeeze that in.  It caused him
5  problems because it didn't happen.  It didn't happen.
6        That car had to be on the street when the shooting
7  occurred.  All time frames are there.  It had to be on the
8  street when the shooting occurred.  That means he didn't
9  shoot from the street.  That means he was picking up shells,
10  shell casings, as one of the witnesses saw--picking up some
11  things.  And the gun wasn't left there.  The gun wasn't left
12  there, he took the gun.  He had to admit that because that's
13  not consistent.
14        Now, in any event that "I did it, but I say it was
15  self-defense."  I didn't take a gun with me.  I mean that's
16  inconsistent.  Well, why I didn't take this body--this
17  person--who I shot--I didn't take them to the hospital?
18  Even though you've just been there a few hours before.  I
19  didn't call the--the emergency people on 911, even though
20  you knew there was a phone inside, and I panicked.  We know
21  now that he dropped the body in the desert.  I panicked.
22  Seems as I made a turn, I looked out as I got on 92 just in
23  time before the sirens, as he said, the red lights could
24  stop me.  It just--just doesn't apply.
25        Self-defense is just a figment of the defendant's

1   imagination.   It's been created by him very very carefully--

2   very calculatingly.   From all the facts that we know, he

3   just ran into some problems squeezing that in to make it. It

4   did not happen.

5           I submit to you that the shooting occurred up front

6   of the house and that the defendant--somehow bullets wound

7   up in the front door, one casing is ejected on to the

8   driveway area where there is a small shell written in

9   there.   That in fact is what happened here.

10          Whatever happened to Carl Davidson coming out of

11  that house, for whatever reason, there was something that

12  went on that Earl Crago has his weapon and fires shots from

13  the area in front of the driveway, in front of the garage;

14  and that is where the incident occurred; and the vehicle was

15  just where Mrs. Steinmann had seen it was down on the street

16  at that time.   So you know there is a--there is a common

17  tactic.   We all did it as kids.   If your parents or you see

18  your kids do it--if somebody accuses you of something--one

19  child accused of not cleaning up his room, it's a very human

20  reaction to point to brother number one, who isn't doing it

21  either.   There is a real tendency to blame other people, to

22  put the focus of the attention on the other guy.

23          And I am referring to the--in days of hunting by

24  understanding that hounds get on the scent of a fox, they

25  would drive after that fox until they catch it--often times

1  couldn't catch it.  Together the dogs hone in, the hunter

2  would take a red herring and drag it across the trail and

3  the dogs see the stronger scent that lores-- the stronger

4  one--the smell would steer them off the trail they were on.

5  So the red-herring scent could be brought back home,

6  otherwise they would run all night.

7        I submit to you that in this case we have a red

8  herring here, and that is Cecilia Brown.  Cecilia Brown is

9  the red herring.  So I submit to you, when I see evidence--

10  talk about Cecilia Brown, that is the red herring getting

11  you away from the task at hand.  He's trying in this case--

12  trying to distract you from what your task really is.  And

13  whether that happens, I ask you to demand of yourself that

14  your attention focus on where we are.

15        We're on a homicide case.   A homicide case where

16  Earl Crago is charged with killing a man--shooting him in

17  the back.  And that's where your focus should be.  These

18  crimes often involve lots of other folks--lots of other

19  people, lots of other wrong doing, lots of other people

20  doing wrong things; but please whether that red herring

21  comes across your trail, your attention must be to get to

22  the case at hand.

23        We've got to judge whether or not this man

24  committed first-degree murder.  And after I have a chance to

25  talk to you again, briefly I hope, in rebuttal, I will be

1   asking you for a conviction of this individual.  Thank you.

2          THE COURT:  Ladies and gentlemen, we are not

3   going to finish this in a short time and would be going to

4   run into lunch.  We're going to take a brief recess.  The

5   jury will be--where is my bailiff?  Convey a message.

6          The jury will be taken into the jury room for about

7   five--ten minutes no longer.  Then you will be taken to

8   lunch, and I believe down the hill here at the used to be

9   Old Timers; now, it's Mexican Express.  They have food other

10  than Mexican food there if you want something else, I

11  believe.

12         While you're at lunch, ladies and gentlemen, you

13  are not permitted to talk about this case, not with each

14  other or with anybody else.  The only time you will be

15  permitted to talk about this case is in the jury room after

16  all argumentts have been made and you're in there to begin

17  your deliberations and you do deliberate.  And after you

18  render a verdict and the case is discharged from further

19  particpation, of course you may talk about the case.

20         Open the jury room, the jury is now excused.  Mr.

21  Silva will let you into the jury room, and we'll back in

22  five minutes or as soon as it takes to make the arrangements

23  with the restaurant.  Let's stand at recess till about 1:30

24  or so.  That out to be enough time for the jury to eat.

25              (The noon recess is taken.)

1          THE COURT:   The record may show the jury in

2    the box and seated.   Counsel are present.

3          Mr. White, are you ready to proceed with your

4    closing argument?

5                MR. WHITE:   I am Your Honor.

6                THE COURT: You may proceed.

7                MR. WHITE:    Thank you very much.   Good

8    afternoon.   I hope you enjoyed your lunch.   Now, let's get

9    back to business.

10          Ladies and gentlemen, I told you in my opening

11   statement that this case would likely show that what I call

12   the seediest side of the drug world; and I told you that we

13   would expect the evidence in this case to show the power

14   that drugs have over people, the power that people have

15   other people that use drugs, and the lengths that some

16   people will go to obtain money to buy drugs.

17          I also told you that some witnesses may be less

18   than candid with you--honest with you about their

19   involvement in drugs, as far as the purchase or sale of

20   drugs, and the people that associated with other people in

21   this situation.

22          Before I get into the events that occurred on

23   September 27th and 28th of 1994, I'd like to go through a

24   little background with you.   The evidence showed that Miss

25   Cecilia Brown and her two sons lived at 2475 Canyon View

1   Drive in Sierra Vista.   This in addition is what we call a

2   new addition, got some nice homes there.   And some of her

3   neighbors, who testified here as you recall--Miss Steinmann,

4   Major Peterson and Mr. Taylor--were neighbors of hers.

5           And they for some months prior to September 28th of

6   '94, all three people testified that they saw a lot of

7   activity at 2475 Canyon View Drive; and described that

8   activity as people coming in and out of the house at all

9   times of the day and night.   There were cars and there were

10  motorcycles and all kinds of different vehicles there, and

11  there were young people and old people going in and out of

12  this house and lots-- a constant flow of people.

13          The evidence has shown that there was drug activity

14  going on in this house--in Cissy Brown's house.   There was

15  the purchase and sale of drugs going on inside that house.

16  And I submit to you no matter what Miss Brown says that is

17  what these people were there for.   She was selling drugs,

18  she was distributing.   Again, there was drug dealings going

19  on in this house almost constantly for several months prior

20  the September 28th of 1994.   Several witnesses confirm this.

21          Her own son, Scott Adkins, said he--he saw people

22  coming in and out of the house at all times of the day and

23  night.   He saw drugs in his own house.   There were other

24  occasions when he would go into his mother's bedroom and

25  find methamphetamine in her bedroom and marijuana in her

1    bedroom.  He didn't go in there all the time.  Sometimes he

2    would find these things when he was looking for something

3    else, and sometimes he would go there just out of curiosity

4    to see what was going on.

5         Because apparently a lot of this activity that Miss

6    Brown was conducting with all of these people was going on

7    primarily in her bedroom--other parts of the house--

8    primarily in the bedroom, that was her office so to speak.

9    Again, nice neighborhood, nice neighbors; and they have this

10   activity going on for months and months and months and

11   months.

12        Let's go to the events of September 27th and

13   September 28th.  And also let's-- before we do that, let's

14   talk about some of the people that are involved here.  Let's

15   talk about Cissy Brown.  Okay.  Again, evidence that Cissy

16   Brown was a major distributor of drugs, that she got her

17   drugs from a gentleman by the name of Rocky Griffin, and

18   that on many--on all occasions Mr. Griffin would front her

19   the drugs.  In other words,  he gave her the drugs, she'd

20   sell the drugs, and then try to collect from these people.

21   All right.  Cissy Brown has been described as a conniver, as

22   a power monger, a person that wants to be in control of

23   other people, and a dangerous person.

24        Let's talk about another person, that's Carl

25   Davidson.  Carl Davidson was living with Miss Brown for some

1   time prior to or at least staying at her house some time

2   prior to September 28th of 1994.  He used drugs himself.  He

3   was not only a friend, a boyfriend of Miss Brown, but he

4   also was basically her enforcer--her collector--he was her

5   strong arm.  And there has been evidence of that.  We'll go

6   through that a little more later.  He is a man that had a

7   violent reputation, and we showed you some instances of this

8   violence.

9          We had several police officers as well as Mr.

10  Laubinger, if you remember, come in and testify about

11  several assault charges that were filed against Mr.

12  Davidson--disorderly conduct which involved fighting or

13  seriously disruptive behavior, and previous to this--that he

14  choked, he struck, there was one victim here Jody Brokaw.

15  But I submit to you that third type of evidence indicates,

16  again, he wasn't a stranger to violence, that he was a man

17  that had a quick temper, that he had a short temper.  Little

18  things like throwing a cassette around or knocking the--

19  throwing pots over would set him off, and he would assault--

20  physically assault Miss Brokaw.  He had a demeanor about him

21  that indicated that he was a violent person.

22          Let's talk about the, again, the events of

23  September 27th and 28th.  The evidence is that--we'll start

24  with Tovah Sitts.  Tovah Sitts is at the hospital with a

25  friend of hers, who has been injured at a party in Sierra

1   Vista; and she paged Mr. Crago to come--purpose was to ask

2   him to come pick her up and take her home.  She didn't want

3   to call her mother.  It was--it was late--very early in the

4   morning.

5            Mr. Crago arrived at the hospital, picked Tovah up

6   as well as her friend, Belinda Carter; and took them on to

7   Fort Huachuca, had stopped at the main gate, went through

8   any procedures that he had to go through to get on to the

9   fort.  And then Mr. Crago dropped off Belinda Carter at her

10  home, then Tovah Sitts and Mr. Crago spent some time

11  together; and before Mr. Crago left her house, which was

12  about 4:30 or so in the morning, Mr. Crago asked if Tovah

13  could go with him to his brother's house to get some sleep.

14  Apparently this wasn't an unusual situation, this has

15  apparently happened in the past.  And he mentioned to her

16  that on the way to his brother's house, he wanted to stop by

17  Miss Brown's.

18           Now, the evidence shows this wasn't an exclusive

19  deal.  It wasn't that, well, Tovah, if you don't go with me,

20  I'm not going to stop by Cissy Brown's.  It was all one

21  package, that was part of the deal.  Tovah Sitts, she didn't

22  want to go, that she had to go to school the next morning;

23  so Mr.Crago left.

24           Mr. Crago went to Cissy Brown's house.  Mr. Crago

25  pulled up into the driveway, got out of the car, went up to

1   the front door, was meeted by Mr. Davidson.  Mr. Crago

2   entered the house, and he went there for the reason to pay

3   Cissy Brown some money that he owed for drugs.  The evidence

4   was that Mr. Crago went in.  Mr. Davidson insisted that he

5   give-- that Mr. Crago give him the money.  He gave him the

6   money.  Mr. Davidson went to Miss Brown's bedroom, that a

7   light was on, he couldn't see her.  He could see that there

8   was a light on inside.

9        Shortly thereafter, Mr. Crago heard, "I'm tired of

10  playing with the son of a bitch.  Kill him." Mr. Crago ran

11  out of the house, got into his car, which was parked in the

12  driveway.  He was reaching down to put the fuse into the

13  car, so he could start it and get out of there.  Next thing

14  he knows Mr. Davidson has him around the neck and is choking

15  him.  Mr. Crago reaches down underneath the seat to get his

16  pistol, brings it up outside the window, tells Mr. Davidson

17  to lie down.

18       Then Mr. Crago testified that he just wanted Mr.

19  Davidson to leave him alone, so he could get out of there.

20  And that Mr. Davidson was standing within about two feet of

21  him.  And Mr. Crago went--during the process of Mr. Crago

22  putting the gun out the window and told Mr. Davidson to lie

23  down; Mr. Davidson reached for the gun, Mr. Crago fired, no

24  reaction from Mr. Davidson.  Mr. Davidson then steps back a

25  couple steps and says, "Your fucking dead."  And starts to

1  run into the house--toward the house.

2         Mr. Crago testified that he shot twice at Mr.

3  Davidson, not intending to kill him, but intending to stop

4  him from going inside because Mr. Crago was aware of the

5  fact that--there were a lot of facts.  One thing he knew is

6  that Mr.Crago--Mr. Davidson had a violent reputation.  In

7  fact Mr. Davidson has previously bragged about his violent

8  behavior towards Miss Brokaw in the presence of Mr. Crago.

9         Mr. Crago was also concerned because he saw a .22

10  rifle that you heard about in this case.  In fact he saw it

11  in the hands of Mr. Davidson.  Mr. Crago also testified that

12  when Mr. Davidson was standing next to the car, before the

13  first shot was fired, he could see Mr. Davidson's--let's say

14  Mr. Crago was over here and Mr. Davidson was standing like

15  this--he could see Mr. Davidson's left hand, but couldn't

16  see what was in his right hand.

17         We must understand that all these events apparently

18  happened very quickly.  Mr. Crago testified that Mr.

19  Davidson after the second or the third shot Mr. Davidson

20  went down approximately in the area right here, that's on

21  the sidewalk that leads to the front door.  Mr. Crago then

22  testified that he released the brake on the car, and he let

23  the car roll out onto the street and parked it there.

24         Why did he do that?  He testified that he was

25  trying to put some distance between himself and the front

1   door of that residence and or Mr. Davidson.  He wasn't sure

2   what the situation--situation was with Mr. Davidson.  All he

3   knew is that he had gone into the house to pay some money.

4   The next thing he knows Mr. Davidson is assaulting him.  Mr.

5   Crago then testified-- he testifies that he had gone back up

6   to Mr. Davidson to check on him because nobody came out of

7   the house.

8          And Mr. Crago testified that he stood over Mr.

9   Davidson talking to Mr. Davidson.  He saw--he said he saw

10  Mr. Davidson.  His eyes were open, but no movement from Mr.

11  Davidson.  That Mr. Crago told Mr. Davidson, please don't

12  die.  Please don't die.  And then tried to revive Mr.

13  Davidson--tried to give him mouth-to-mouth resuscitation,

14  but blood came out of Mr. Davidson's nose and mouth; and at

15  that time Mr. Crago knew that Mr. Davidson was critically

16  injured.  Still nobody came out of the house.

17         Mr. Crago still concerned for his own well being.

18  He knew the reputation of Cissy Brown.  He's been around

19  her, heard her talk.  He'd seen her actions before.  He goes

20  back out to the street.  He gets the car--the fuse in the

21  car, starts the car up, drives up in the driveway, picks Mr.

22  Davidson up, places him in the car, and then leaves.  Now,

23  we'll stop right there for now.

24         Let's go back to the testimony of the three

25  neighbors.  What they saw.  Now we must understand that this

1    happened very early in the morning--around five o'clock or

2    so.  We have some people that were sleeping, some people--I

3    think Mr. Taylor said that he was awake--but they were kind

4    of in a drowsy condition.  All of a sudden--actually four

5    people, Mr. Dootson said he heard the shots.  They're

6    awakened or aroused by what they hear.  Some people here say

7    there were two gunshots.  Some people say they hear three.

8    And I believe the gunshots were described as pop or

9    boom--pop--pop-pop.  Okay that seems to be the sequence of

10    the people that heard the three.  Miss Steinmann heard two.

11    Okay.

12        Now, I also mentioned to you in my opening that,

13    it's very interesting, when you have three people basically

14    looking at the same thing, you've got different versions.

15    Now, I'm not going to stand here and tell you that any of

16    these people were lying because they're not lying.  All--

17    when they testified on this stand telling you what they

18    believe they saw.  Again, it's very interesting that even

19    though these three people were watching this from one time

20    or another, they seemed to see different things.

21        Major Peterson, let's take him first and then go to

22    the other two.  Major Peterson said he was in his bathroom

23    shaving when he heard what he thought were gunshots.  He

24    came out to the front window, and he said he thought he saw

25    a car pulling in the driveway.  He wasn't sure because he

1  didn't have his glasses on.  He went back to get his

2  glasses, and he said he saw a man walk around the car, get

3  in, back out of the driveway and drive off toward Cherokee.

4  That's basically what Major Peterson saw.

5  Okay.  Miss Steinmann, she said she heard gunshots.

6  She got up, and she saw what looked like a person down on

7  the sidewalk here at the corner of the garage.  There is--

8  she saw another man bending over him in some kind of

9  activity.  She said she heard mumbling.  She couldn't tell--

10  couldn't distinguish the words, but she heard a mumbling

11  coming from that direction.  She said she saw the man walk

12  out to the street, get into this car, the car was started

13  up, driven up into the driveway, saw the man get out of the

14  car, pick up the other man, put him in the car, come back

15  out of the driveway, and drove out toward Cherokee.

16  Okay.  Mr. Kane testified that he remembers lying

17  in bed.  His wife had been up.  She got ready for work.

18  Said he was lying in bed and, I think, said he was kind of

19  half drowsy.  He heard the gunshots from his back--which he

20  was back here in his bedroom--came out of the bedroom,

21  looked out his front window, and he saw what he thought was

22  a man appeared to be down on the sidewalk; and he said he

23  saw another man standing appearing to bend down and pick

24  some things up between the car and the man.  The car was

25  parked in the driveway and the man.  He said he couldn't

1    really-- couldn't tell what or if the person was picking

2    something up.  He just a man--a person bending down

3    appearing to pick something up.

4            Now, if you look at one of the photographs that are

5    in evidence--you will when you go into your deliberations--

6    you'll see and you'll recall that we entered into evidence a

7    photograph taken by Mr. Foster standing at Mr. Taylor's

8    window; and the photograph shows from Mr. Taylor's window

9    this area of the house at 2475 Canyon View.  You'll note in

10   that photograph there is a tree between--be in the course of

11   vision of Mr. Taylor, and there is some mailboxes.  You'll

12   see the picture.

13           I submit to you that what Mr. Taylor thought he saw

14   was actually Mr. Crago bending down over Mr. Davidson just

15   as Miss Steinmann saw.  Miss Steinmann just had it from a

16   different angle.  Miss Steinmann from this angle didn't have

17   an unobscured view.  She could see what was going on.

18   Again, Mr. Taylor had a different angle, and his vision was

19   partially obscured.  Again I--I'm not calling--going--about

20   to call Mr. Taylor a liar because he's not.  What he saw is

21   what he saw, but he didn't really see what was going on.

22   Mis Steinmann had a better view, and so when Mr. Taylor said

23   he thinks he saw Mr. Crago picking up things; again, I

24   submit to you, that Mr. Crago was merely doing what Miss

25   Steinmann testified about and standing over the body of Mr.

1   Davidson talking to Mr. Davidson, trying to render aid to

2   Mr. Davidson.

3        Mr. Till says well, now, that's not what happened.

4   From what Mr. Crago says, this couldn't be possible.  That

5   the car was parked out on the street all the time.  And that

6   this thing between Mr. Crago and Mr. Davidson happened in a

7   completely different manner.

8        Well, let's talk about that.  Because if you recall

9   Scott Adkins testified that he-- after he heard the shots

10  and that moments passed, he looked out of his bedroom window

11  and Mr. Davidson--excuse me-- Mr. Crago was by his car in

12  the driveway.  Well, that's what Mr. Crago said.  Mr. Crago

13  says, I pulled up in the driveway, got out of the car, went

14  into the house.  After he got back out of the house, that's

15  when Mr. Davidson attacked him.      All right.  So that

16  follows.

17       That Mr. Peterson or Major Peterson testified that

18  the first time he looked out the window, he thought he saw a

19  car pull up into the driveway.  Well, that's corroborates

20  with what Mr. Crago said.  Because Mr. Crago said that after

21  he--after he had--after Mr. Davidson was shot, he rolled his

22  car out of the driveway and parked it here.

23       Now, Mr. Till says that well, Mr. Crago is

24  manufacturing all this just kind of to fit into a tidy

25  defense.  Well, why couldn't Mr. Crago testify that, you

1  know, when he rolled the car out of the driveway it rolled

2  in the same location as Miss Steinmann.  That would-- Miss

3  Steinmann says the car was over here, Mr. Crago says it was

4  here.  I mean if he was trying to fit his testimony to the

5  statements of the witnesses, wouldn't it make more sense if

6  Mr. Crago says, oh, yeah, I parked my car over here where

7  Miss Steinmann says it was.

8       Different perceptions, you know, Miss Steinmann

9  says she saw the car--where it was here where Mr. Crago says

10  it was or whether it was over here where Miss Steinmann says

11  it was.  It still corroborates the fact that the car was in

12  the street just as Mr. Crago testified.

13       Mr. Crago testified that he then went out to the

14  car--again, being cautious about keeping one eye on what was

15  going on here because he didn't know the condition of Mr.

16  Davidson.  He didn't know what Cissy Brown might do.  He got

17  his car started.  He pulled the car into the driveway.

18  Again, went over, picked Mr. Davidson up, put him in the

19  car.

20       Let's talk about some things here that--questions

21  here that Mr. Till posed to you up here.  Did--first

22  question Mr. Till asked, did Davidson--or excuse me--did the

23  Defendant--I guess "D"--have drugs in his blood?  You know,

24  Mr. Till argues that well, you know Mr. Crago says he

25  didn't; and so, you know, there is no evidence of that to

92

1    substantiate or contest that.

2    Well, if you remember during the trial, it wasn't

3    till January 13th of 1995 that the State asked for a blood

4    sample from Mr. Crago-- some months later.  I mean, Mr.

5    Crago was arrested on September 28th, the day after these

6    events occurred.  Why did it take the State three months

7    plus to ask for a blood sample of Mr. Crago?  Certainly if

8    they'd done that promptly they could have tested Mr. Crago

9    to see whether there was any drugs in it.

10    Mr. Till says, well, what was the motive here by

11    Mr. Crago?  Well, frankly, there was no motive.  The

12    evidence is that there was no friction between Mr. Crago and

13    Mr. Davidson.  There wasn't any hard feelings.  Nothing to

14    support any kind of theory that there was bad blood between

15    Mr. Davidson and Mr. Crago, and that's why Mr. Crago shot

16    Mr. Davidson.  No motive.

17    Did Mr. Crago go inside the house?  Well, if you

18    remember the first time Cissy Brown testified she said well,

19    she wasn't sure whether Mr. Crago went into  the house or

20    not.  Well, I think her--the substance of her testimony was

21    she didn't know what was going on.  How would she know

22    whether he went in the house or not?  If you believe her

23    testimony.  Testimony--the evidence in this case--the only

24    uncontradicted evidence in this case--is that Mr. Crago did

25    go into the house.  Again, we talked about what happened

1    when he was in the house.

2         Mr. Till asked you which shot was first?  Well, Mr.

3    Crago testified that after the first shot, Mr. Davidson

4    didn't seem to flinch or nothing.  Nothing happened.  I

5    submit to you, the first shot was the shot that Dr. Flores

6    testified about, that was the one that went into the left

7    thigh of Mr. Davidson, creased the left thigh, passed to the

8    right thigh, which is consistence with what Mr. Crago said

9    that Mr. Davidson was standing outside the car.  Mr. Crago

10   would be over here.  Mr. Davidson--I submit to you, Mr.

11   Davidson was probably--was standing in a position like this;

12   and then Mr. Crago shot, that was the first shot.  Boom--

13   boom-boom.  The first shot was the thigh shot, that didn't

14   seem to deter Mr. Davidson at all.

15        Did the Defendant owe money to Cissy Brown?  Well,

16   if you believe Cissy Brown, she didn't do anything wrong.

17   She might have on occasion sold some drugs; but, no, things

18   aren't nearly as bad as what the neighbors said or what

19   anybody else said.  And no, Mr. Crago didn't owe her any

20   money.  Well, let's think about that.  Because she testified

21   that sometime--a few hours previously--she'd gone over to

22   collect some money from Mr. Mason, and she had Mr. Davidson

23   and this John fellow with her.

24        We'll talk about that.  She says it wasn't for a

25   drug debt, if you believe her.  I submit to you that it

1   was.  What about the--the slip of paper that the police

2   found inside Miss Brown's house when they did the protective

3   search, that had names on it, amounts of money?  That could

4   establish something here, some evidence that she kept a

5   running record of debts and the people that owed her the

6   debt.  What happened to that record?  Police gave it back to

7   her.  Didn't make a record of it.  Didn't make a note of it,

8   gave it back to her.

9       Did the defendant pay her $40?  Mr. Crago said he

10  owed her $230.  He paid her $40.  Again, consistent with the

11  fact.  I would submit to you, that's why she went over to

12  Danny Mason's house that morning, to collect a drug debt.

13      So I submit to you, ladies and gentlemen, we've

14  answered the questions posed by Mr. Till-- reasonably

15  answered those questions.

16      Mr. Beel if you recall--Mr. Randy Beel testified

17  that about 3:30 in the morning, morning of the September

18  28th, Cecilia Brown, Carl Davidson and this John showed up

19  over at Danny Mason's house, where Mr. Beel lived.  Miss

20  Brown admits she went over there.  She doesn't admit that

21  she was there for what Mr. Beel says she was there for.  It

22  was for another purpose than Mr. Beel said she was there,

23  but she does admit she was there.

24      Mr. Beel testified that basically Mr. Davidson and

25  Miss Brown were looking for Earl Crago; and the reason that

1  is because Earl owed Cissy Brown money and that Mr. Davidson

2  was acting in a threatening manner, saying threatening

3  things that he was out to get Mr. Crago to collect the money

4  by any means necessary, that this John fellow was armed with

5  a semiautomatic pistol that he had in a holster, that Mr.

6  Davidson was--had a knife on him.

7        Ladies and gentlemen, Mr. Crago didn't go over to

8  that house in the morning of the 28th, as the State would

9  submit to you, to kill anybody.  He went over there for the

10 purpose he said.  He went over there for what Mr. Crago told

11 you.  That after this happened, he was scared.  He was

12 frightened.  He was concerned for his own safety.

13        I submit to you that the actions of Mr. Crago at

14 the time would seem a little strange--maybe  a little

15 strange.  Let's just say strange.  Taking the body of Mr.

16 Davidson out in the country, covering him with a piece of

17 plywood, going on to his brother's house, picking up some

18 personal items of his and leaving town.

19        Mr. Crago told you that he was scared for a couple

20 of reasons.  Main reason--one of them--he was afraid that he

21 was going to go to jail.  He was afraid of reprisal from

22 Miss Brown because he knew that she had connections.  He

23 knew that she made threats and tried to carry out those

24 threats on previous occasions.  Interestingly enough as you

25 heard, after Mr. Crago was arrested and brought back to

1   Cochise County, death threats were made against him, and he

2   was placed in protective custody at the county jail for his

3   protection.  Mr. Crago had to sign a release-- a waiver of

4   responsible for the jail to released from protective

5   custody.

6        I submit to you, ladies and gentlemen, that

7   basically confirms Mr. Crago's fears.  He ended up going to

8   jail, that's come true for sure, but also the reprisal by

9   Cissy Brown or her associates also came true.

10       Going through the instructions, ladies and

11  gentlemen, let me if I may just bring up a few important

12  things here.  One is the instructions say you're not to be

13  influenced by sympathy or prejudice.  In other words, don't

14  let emotions get involved in your objective-- consideration

15  of the evidence in the determination of this case.

16       The other one is credibility of witnesses.  All

17  right.  In determining the credibility of witnesses you are

18  to make that determination by a number of factors, some of

19  these being their manner while testifying, any motive or

20  prejudice they may have, any inconsistent statements.  All

21  right.

22       Now, the State may argue that Mr. Crago, being the

23  person accused here, has a significant motive to lie.  I can

24  hear that argument, now.  Therefore you should disbelieve

25  him.  Basically any person charged with a crime has a motive

1    to lie, that's not the only consideration.  And I submit to

2    you that Mr. Crago is not lying.  Because the other thing

3    that you are to consider are any inconsistence statements;

4    and if you recall, Mr. Crago's testimony--no matter how hard

5    Mr. Till tried to get him to change that testimony--Mr.

6    Crago was consistent.  And we all know from our own

7    experience consistency of a story usually means one thing

8    and that is it's the truth.  Because we all know in our

9    experience that lies get twisted around, people forget some

10   details and lies just fall apart.  Again, Mr. Crago was

11   consistent, no matter how much Mr. Till tried to twist

12   things around and get him to say something different--no,

13   this is the way it was.

14          No verdict, ladies and gentlemen, may be based

15   upon suspicion, probability or supposition.  And that duck

16   tails into the fact that Mr. Crago is innocent until proven

17   guilty by the State beyond a reasonable doubt, that's the

18   proof that the State must show.  Again, convictions are

19   not--should be not be based upon probability, suspicion,

20   supposition, innuendo, that's not the standard that we go by

21   here.

22          Let me, if I may show you something here that may

23   help you in applying the law to the facts to this case.  On

24   first-degree murder the elements are that Mr. Crago

25   intended--I'll put intended to kill Mr. Davidson.  In other

1    words, that was his purpose was to kill Mr. Davidson or that

2    Mr. Crago had knowledge that what he did would cause the

3    death of Mr. Davidson.

4          Then we have premeditation; and that means there is

5    a period of reflection before the act, where Mr. Crago

6    formed the intent or the knowledge that he would kill Mr.

7    Davidson.  You all--if you all agree that those three

8    elements of first-degree murder were met by the State beyond

9    a reasonable doubt, then your verdict on first-degree murder

10   is guilty.  All right.  Now if you find that there is no

11   intent, if you find that there was no knowledge by Mr.

12   Crago, and if you find no premeditation, then your verdict

13   would be not guilty.  If you're not certain that the State

14   has met its burden of proof beyond a reasonable doubt, then

15   your verdict should be not guilty.

16          Let's look at second-degree murder.  All right.

17   Second-degree murder is intent to kill or knowledge that

18   what Mr. Crago did when he did it would cause the death or

19   serious physical injury to Mr. Davidson.  If you find that

20   if--you cannot find--if you cannot all agree there was no

21   intent and no knowledge, your verdict would be not guilty.

22   If you find that there was intent or knowledge to kill Mr.

23   Davidson your verdict would be guilty.  If you're not sure,

24   again, no supposition, no probability, you're not sure, the

25   State didn't meet their burden, not guilty.

1        Let's talk about self-defense.  Self-defense,

2  ladies and gentlemen, is a person is justified in using

3  deadly force against another in their own defense if a

4  reasonable person would think that appropriate under the

5  circumstances and in response to either deadly force or the

6  threat of deadly force against them.  Okay.  So if you find

7  self-defense, your verdict would be not guilty.  If you find

8  no self-defense, and you find that the State has met their

9  burden of proof beyond a reasonable doubt as to first-degree

10  murder or second-degree murder, then your verdict would be

11  guilty.  You can all agree to that.  You're not certain that

12  the State has met it burden of proof of self-defense beyond

13  a reasonable doubt, not guilty.

14        Ladies and gentlemen, you have been an excellent

15  jury in this case. I noticed that everybody--just about to

16  the last person--has been very attentive, very conscientious

17  in your duty as the jurors today.  What Mr. Till says--and

18  he gets another shot--and what I say, of course, is not

19  evidence.  The evidence is what you people individually or

20  collectively determine to be the facts in this case.  What

21  Mr. Crago and I ask of you--you is that you deliberate

22  conscientiously, that you look at all the evidence, that you

23  consider all the evidence in this case, and that you reach a

24  fair and just verdict.  Thank you very much.

25        THE COURT: Mr. Till.

1          MR. TILL:  You know what Mr. White says about

2     credibility of witnesses is very important.  Every day when

3     we function whether we go to the store or we buy something

4     from somebody or pay our bills.  We have to make those

5     decisions who is truthful a person, who is telling the truth

6     and who isn't.  Each of us has our own way of doing that,

7     and you're going to have 12 different ways to do it.  He's

8     right, one of the things we look for is inconsistencies.

9     Keep that in mind when you listen in your on mind to the way

10    the defendant described himself going up to the body--going

11    up to Carl Davidson and concern--mouth-to-mouth

12    resuscitation, CPR, picking him up, putting him in the car,

13    keeping the airway open--he's telling this to you

14    now--didn't drag the body.  That mark on the ground was

15    where he fell down carrying the body down to the wash, puts

16    a board over it, yes, protect it from the animals; that's

17    what he's telling you.

18          You heard Pedro Velasquez and Angelica Larimer tell

19    what he described in a laughing, bragging manner about

20    blowing somebody away.  You get a different look--

21    inconsistency.  It reminds me of Eddie Haskell in the old

22    Leave It To Beaver show.  One person over here when he's

23    away from Mr. and Mrs. Cleaver, and when he's front of Mr.

24    and Mrs. Cleaver quite a different manner.  You judge

25    credibility on these things.

1      You know, there was an interesting exchange in the

2 questioning that you recall; and when I mentioned it in

3 terms of motive in this case, evidently the defendant would

4 argue that the $190--that is $230 minus $40, that's a reason

5 why Mrs. Brown would have said to Charlie, kill this fellow.

6 He didn't pay debts.  But I was asking the defendant about

7 the drug business, the drug world, and it's an interesting

8 exchange.  It's an interesting view that we got there.

9      We talked about the quarter pound of meth to try to

10 make some sense out of this.  I couldn't at the time I was

11 asking him.  But one pound is sixteen ounces.  Did I get

12 this correct for you?  If there was a quarter pound missing

13 that would be four ounces of methamphetamine that would be

14 missing.  It's pretty apparent from the testimony as the

15 defendant admitted that he's pretty used to working these

16 grams versus ounces calculations.  He's had no trouble in

17 stating that one ounce equals 28 grams, and this is

18 evidently sold by the quarter gram he said.  He said one

19 quarter gram is $20.

20      If you take 28 grams, you got four quarters

21 multiply by four and you get 112 of those sales available--

22 in every ounce.  You multiply that by $20, you're going to

23 come up with $2240 per ounce.  We've got four ounces, so

24 we--so we multiply the four ounces, and we come up with

25 $8960 that is going to be missing; that gets into some

1   pretty big money.

2          If you're in the business of selling drugs, which

3   the defendant said he was, and you're missing--you're

4   missing a piece of your property that's worth $8960; it's

5   certainly more of a motive there to teach a lesson and to

6   let the word get out, so to speak, that there is--to have

7   somebody in your own home, in your own neighborhood, with

8   your two sons sleeping in the other room, order someone

9   killed for a $190.

10          Just again, common sense--common sense approach.

11   You know, this is a lot better than what I was using this

12   morning; but I submit to you that, we still--we still don't

13   have a logical acceptable explanation of how this scenario

14   could have occurred as--as the defendant would with you

15   believe.

16          And the reason is right here, Mrs. Steinmann. We'll

17   try to explain this again.  In order to accept the version

18   of the defendant, Mrs. Steinmann--the first view--would have

19   had to see the following:  She would have to see the car in

20   the driveway, and then--this is after the shots now, there

21   is a body there--a little time the defendant was looking

22   down noticing his fuse is lost.  She should have then seen

23   that car coasting down--that's what he said he did--and--and

24   why would he put it in the other way?  Well, because he's

25   trying to be consistent.  He's faced the nose eastbound.  If

1    he's turning the other way, he's got to face it westbound.

2    So he has no choice but to make it consistent so backed it

3    down and put it on the other side of the driveway, on the

4    west side but facing the same way.

5         She then should have seen him in the car for some

6    period of time looking for--the car is on the street--until

7    he found the fuse, then underneath the dash near the drywall

8    apparently--I mean the firewall putting the fuse in.  Then

9    she should have seen him running back up to the body.

10   Because that's what he said he did; but instead she didn't

11   see any of that.  She got to the window right away, as the

12   others said they did, but they had to go through their

13   house.  She sees him at that point up there over the body.

14        So I submit to you, that's as consistent to think

15   that mumbling was a cursing of the deceased as it was to

16   believe that it's some type of enthusiastic urging him to

17   get better.  And that just isn't--just didn't happen.

18        But if you don't--if you think that there was time

19   in there somehow for that to have happened, then I still

20   submit to you that we have no self-defense.  The defendant

21   said he was in the vehicle and both of the deceased's hands

22   were on his throat.  He's sitting there.  He said he reached

23   down with his left hand to get under the seat--to get under

24   the seat to get that gun. If this were to have happened, I

25   submit to you, that it's much more reasonable to think that

1   he's fighting off the choke hold, getting down there with
2   his right hand and then pointing the gun at the fellow's
3   head in the door and saying back off; but he didn't do
4   that.  Why would he say--why would he give a story then
5   about the left hand?  He read the report folks.  He's
6   consistent.
7          Remember Miss Steinmann said it looked like
8   something was in his left hand when he was up there over
9   this body.  So this man is trying to--he's trying to do too
10  good of a job.  It doesn't all fit, trying to be consistent
11  with what she said.  Here's what he has to say--not only
12  that, but evidently he says he was shooting with his left
13  hand.  He would have you believe that he was trying to shoot
14  this fellow in the butt, but gee, he hit him in the back,
15  not intending to kill him.  Right hand--hard to explain
16  that, just doesn't make any sense.
17         Now, I'm going to finish up here.  I'm going to
18  finish up quickly.  I'm sure I've forgotten some things.
19  Randy Beel, I think his testimony speaks for itself.  He
20  said one thing when the defense was questioning him--oh,
21  yeah there was threats.  I never saw her go to work.  Well,
22  how many time were you over there?  Three times.  Only two
23  in the house.  You know when you pinned him down he just
24  didn't hold water.  And that's Randy Beel.  So you have to
25  apply your credibility tools, and you're ciphering out

1   dishonesty and analyzing that.

2           I submit to you there is more than one purpose in

3   taking blood.  We don't go into that.

4           Finely, I want to try to rap this up into--

5   encourage you not to fall into a trap.  And that is--that

6   is--that is this:  You know, we had the defendant said this

7   drug business is dangerous.  We all know that.  We hear

8   stories about--as he said-- people getting killed.  And a

9   little bit of his testimony when he described his meeting

10  with Charlie Davidson gives some--some incite.

11          He said oh, yeah he's a good man with a knife but

12  silent, and I heard him threaten this guy with a knife--cut

13  your throat.  Was that over a drug debt?  Well, I don't

14  know, but that's pretty extreme remedy if it was a car

15  debt.  It implies pretty strong stuff to drug debts, but

16  maybe not so strong for regular debts.  It's an--it's a

17  dangerous area.  We all know that.

18          And there is a tendency sometimes for us to say a

19  drug killing--well, these people are--are getting what they

20  asked for.  They're getting what they asked for.  But, you

21  know, the drug business involves lots of people.  It

22  involves a lot of people who get addicted.  These people are

23  involved in this business, they can be cured.  They can have

24  a life.  Life is to be respected.  We cannot let ourselves

25  just simply write off these lives.  It--there is no asterisk

1   in the instructions on murder saying second-- second-degree

2   murder--first-degree murder these do not apply, however, to

3   drug dealers or drug dealers or pushers or their customers.

4   You don't hear that, and you don't see that.

5          Very important--I said I was going to have a--

6   you're going to have a real contribution to society this

7   week which you've spent here.  I envy you that because

8   you're going to sit, sort this out; and you're going to

9   focus in on one person--only one person--fired three shots.

10   One guy shot twice in the back, unarmed.  There is no

11   evidence of any--I couldn't see his right hand--both hands

12   were just on the throat.  There is nothing in his hand.

13   There is nothing out there.  There is one man who knew that.

14   We know who he is.  Just one man that dumped that body in

15   the desert, left it out there--left Carl to die, if he

16   wasn't dead, he was dead to rot in the desert.

17          That's what you have to focus in on.  That's where

18   your contribution is going to come in.  You're going to send

19   a message to this defendant, doesn't make any difference if

20   it's drug related, you killed somebody--you murdered them,

21   you're not justified.  You're guilty.  I ask you to find him

22   guilty of first degree murder.

23          THE COURT:  Ladies and gentlemen, if you will

24   turn to the third-to-the-last page of the instructions,

25   which I have previously given to you.

1    You may come to one of three verdicts.  You may

2  return a verdict of guilty of murder in the first degree,

3  murder in the second degree, or not guilty.

4    All twelve of you must agree on the verdicts, if

5  you can do so--that should be verdict--if you can do so,

6  whether the defendant is "Guilty" or "Not Guilty."

7    When you go to the jury room you will choose a

8  foreman who will be in charge during your deliberations and

9  who will sign any verdict form.

10    You will be given three forms of verdict on which

11  you will indicate your decision.  Omitting the formal parts

12  they read as follows:

13    We the jury duly impaneled and sworn in the above

14  entitled action upon our oaths do find the defendant, Earl

15  Felton Crago, Jr., guilty of murdering Carl H. Davidson, Jr.

16  in the first degree on or about the 28th day of September,

17  1994.

18    The second option:  We the jury duly impaneled and

19  sworn in the above entitled action upon our oaths do find

20  the defendant, Earl Felton Crago, Jr., guilty of murdering

21  Carl H. Davidson, Jr. in the second degree on or about the

22  28th day of September, 1994.

23    And the third option:  We the jury duly impaneled

24  and sworn in the above entitled action upon our oaths do

25  find the defendant, Earl Felton Crago, Jr., not guilty of

1   the crime of murder.

2           Please remember of the three forms only one--at the

3   most--only one can be signed.

4           The attitude and conduct of jurors in deliberations

5   in the jury room are matters of considerable importance.

6   Please remember that you are judges in this matter, not

7   partisans or advocates.  In your work as jurors, there can

8   be no triumph except the ascertainment and declaration of

9   the truth.

10          Both the State and Defendant are entitled to the

11  individual opinion of each juror.  It is your duty to

12  consider the evidence for the purpose of arriving at a

13  verdict if you can do so.  Each of you must decide the case

14  for yourself.  You should freely and willingly discuss the

15  evidence and the instructions with your fellow jurors.

16          You should not hesitate to change an opinion you

17  may hold if reason tells you otherwise and you are convinced

18  it is wrong.  However, you should not be influenced to

19  decide any question in a particular way because the majority

20  of the jurors, or any of them, favor such a decision.

21          If you are able to reach a unanimous verdict, your

22  foreman should sign the verdict form and notify the bailiff

23  that you have reached your verdict.  You will not reveal

24  that verdict to him or to anyone until the time you have

25  returned it to open court.

1          In addition to the forms of verdicts, you will able

2     to take with you to the jury room your notebooks and

3     pencils, these instructions from which I am now reading, and

4     any exhibits that you--that have been admitted into

5     evidence.

6          I will direct that all exhibits may be taken into

7     the jury room.  Mr. Silva, these are the three forms of

8     verdict.

9          We have two alternates here, ladies and gentlemen.

10    The law requires that a panel of twelve be selected to make

11    this decision.  The clerk will draw two names out.  And I

12    will thank you in advance--the two alternates--for being

13    with us.  You won't get a chance to make this decision,

14    unfortunately.  The alternates will be discharged, of

15    course; and they will be free to speak to anyone about it

16    except, of course, the jury panel deliberating.

17         It's about twenty minutes to 3:00, ladies and

18    gentlemen.  I don't know and you don't how long it will take

19    you to make this decision.  May I suggest that about a

20    quarter to 5:00, if you're still in the deliberation process

21    that you simply--your foreman knock on the bailiff's door--

22    and you will find out where it is.  You probably know where

23    it is now--knock on the bailiff's door and tell the bailiff

24    you're going home, leave the forms of verdict on the table

25    in the jury room and just go home.

1    If you do that, you are to return Monday morning at

2    nine o'clock.  When all twelve of you have gathered, the

3    foreman will then notify the bailiff, you will be locked in

4    the jury room and you can again begin your deliberations.

5    As you know the two restrooms in there, there should be

6    coffee, aspirin, Tums or anything else you may need to

7    assist you in your work.

8        The--let me see.  The two alternates are David

9    Connors and Mack Conyer.  Again, remain seated right now.

10   Leave your books and your--you may carry the instructions

11   home because they are of no further value to us, but leave

12   the books on your chair when you go.  The rest of you will

13   take your books into the jury room.

14       I'm going to make an order appointing Mr. Rudy

15   Silva as bailiff to take charge of the jury also Miss Nancy

16   Fusco, and that's probably all we will be needing as far

17   as--as far as bailiffs.

18       Anything further before the jury is discharged to

19   begin its deliberations, Counsel?

20       MR. TILL:  No, Your Honor.

21       THE COURT:  You won't need any envelopes this

22   time because there is only one possible form of verdict.

23   They will just leave all three verdict forms on the table in

24   the jury room.

25       All right.  The jury will now begin its

1  deliberation process.  You may repair to the jury room.

2                    (The jury is dismissed to deliberate.)

3                    (Judge Steven Desens is required to hear the

4  verdict for Judge Matthew Borowiec.)

5                    THE COURT:  The record will reflect we've

6  reconvened in the matter of State of Arizona vs. Earl Felton

7  Crago,  Jr., CR940004721.  The attorneys are present and the

8  defendant is present and the jury is present.

9            A record may show I'm Steven Desens of Cochise

10 County Superior Court for Division Two.  I understand there

11 is a verdict, and I'm advised that you, Mr. Cox, are the

12 foreman, sir?

13                   MR. COX:  Yes, sir, I am.

14                   THE COURT:  Very well.  Will you hand the

15 form of verdict to the bailiff.  Appreciate it, thank you.

16 Very well.  The clerk will read and the court reporter will

17 take it down for the record the verdict.

18                   THE CLERK:  Omit the formal parts.  We the

19 jury dually impaneled and sworn in the above entitled action

20 upon our oaths do find the Defendant, Earl Felton Crago,

21 Jr., guilty of murdering Carl H. Davidson, Jr. in the first

22 degree on or about the 28th day of September, 1994.  Signed

23 by James D. Cox, Foreman.

24            Ladies and gentlemen of the jury, is that your

25 verdict?

1               THE JURY:  Yes, it is.

2               THE COURT:   Counsel, do I wish to poll the

3     jury?

4               MR. WHITE:  Yes, Your Honor.

5               THE COURT:  Very well.   The clerk will ask

6     each of you jurors a question and you simply need to answer

7     yes or no.

8               THE CLERK: James D. Cox, is this your

9     verdict?

10              MR. COX:  Yes, it is.

11              THE CLERK:  Ingrid F. McClern, is this your

12    verdict?

13              MS. MCLEARN:  Yes, it is.

14              THE CLERK:  Joe Angel Coronado, is this your

15    verdict?

16              MR. CORONADO:  Yes, it is.

17              THE CLERK: Guillermo B. Hernandez, is this

18    your verdict?

19              MR. HERNANDEZ:  Yes, it is.

20              THE CLERK:  Roger D. Hossman, is this your

21    verdict?

22              MR. HOSSMAN:  Yes, it is.

23              THE CLERK:  Allen K. Baker, is this your

24    verdict?

25              MR. BAKER:  Yes, it is.

1          THE CLERK:  Francis McDearmid, is this your

2    verdict?

3          MR. MCDEARMID:  Yes, it is.

4          THE CLERK:  Augustin Durazo, is this your

5    verdict?

6          MR. DURAZO:  Yes, it is.

7          THE CLERK:  Edward A. Haynes, is this your

8    verdict?

9          MR. HAYNES:  Yes it is.

10          THE CLERK:  Alvie P. Smith, is this your

11    verdict?

12          MR. SMITH:  Yes, it is.

13          THE CLERK:  Olive Rothman, is this your

14    verdict?

15          MS. ROTHMAN:  Yes, it is.

16          THE CLERK:  Richard A. Pradeau, is this your

17    verdict?

18          MR. PRADEAU:  Yes, it is.

19          THE COURT:  Very well.  Thank you, ladies

20    and gentlemen, on behalf of all the parties in this trial

21    and especially the Honorable Matthew W. Borowiec.  As he

22    stated earlier in this trial all of us within the judicial

23    system know that jury service is an inconvenience.  We thank

24    you for your time and apologize for any inconvenience.

25          And it will be the order of the Court at this time

1    releasing you from the previous admonition that the Court

2    has given to you.  Since the admonition no longer applies,

3    you are free to talk about the case with the attorneys if

4    you so desire or not talk about the case to anyone, that is

5    your personal choice.

6              If you do not wish to talk about the case to

7    someone about it, simply tell them nothing and that you

8    don't wish to discuss it.  If you wish to speak you may.

9    Please leave jurors' badges with the Court and your

10   notebooks.  The bailiff will destroy any notes in the

11   notebooks.

12             Thank you, once again for your service.  It is

13   appreciated and have a good weekend.  You're excused.

14                  (The jury is excused from the courtroom.)

15             THE COURT:  Very well.  Reconvened and the

16   jury having been dismissed.  It will be the order of the

17   Court revoking all release conditions of the certain

18   defendant.  Be the order of the Court remanding the

19   defendant in custody to the Cochise County Sheriff's

20   Department.

21             Mr. White, I just glanced at the calendar.  It

22   would appear time for sentencing should be on or before

23   Monday, May 8, 1995, is that a satisfactory date for you,

24   sir?

25                  MR. WHITE:  Yes, sir.

1          THE COURT: Okay.  Very well.  At this time it

2  will be the order of the Court then setting this matter for

3  sentencing on Monday, May 8, 1995 at 10:30 a.m. in Division

4  One of the Cochise County Superior Court.  Is there anything

5  further at this time?  Mr. Till?

6          MR. TILL:  No, Your Honor.

7          MR. WHITE:  For the record, I advise the

8  Court that I need to talk to my client about this, of

9  course.  We may be asking for mitigating hearing, but I will

10  inform the Court of that after I have had a chance to talk

11  with him.

12          THE COURT:  Certainly.  I know Judge Borowiec

13  would consider after that request.  And just whatever order

14  I entered accordingly.

15          MR. WHITE:  Certainly.

16          THE COURT:  As the Court indicates all

17  release conditions are hereby revoked.

18          (Court is dismissed.)

19

20

21

22

23

24

25

116

1                    C E R T I F I C A T E

2     STATE OF ARIZONA    )
                          )   ss.
3     COUNTY OF COCHISE   )

4            I, Holly R, Johnson, having been appointed as
      official court reporter, do hereby certify that the
5     foregoing pages numbered 1 through 116, inclusive,
      constitutes a full, true and correct transcript of all the
6     proceedings of the matter as set forth in the title page,
      all done to the best of my skill and ability.

7

8                  Dated this 29th day of September, 1995.

9

10

11

12

13                    _____
                      Holly R. Johnson
14                    Court Reporter

15

16

17

18

19

20

21

22

23

24

25